IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA :
          :
v.         :  Criminal Action No.
          :  3:21-CR-0004-TCB-RGV
ROBERT PURBECK   :

## MOTION TO SUPPRESS STATEMENTS, PASSWORD DISCLOSURES, AND MATTERS ARISING THEREFROM

Defendant Robert Purbeck hereby respectfully moves to suppress any and all statements, password disclosures, or other information obtained by the government from Mr. Purbeck on or about August 21, 2019 during the interrogation at his residence, as well as any and all fruits of that interrogation and any other illegal actions by the government.[1]

I. The Interrogation of Mr. Purbeck.

Mr. Purbeck was employed as an Information Technologies technician for Ada County, Idaho. Mr. Purbeck owned multiple personal computers. At about 7:30 a.m. on August 21, 2019, as Mr. Purbeck was leaving for work, FBI Agent Coffin approached him in his driveway, put his hands on Mr. Purbeck, and said he

---

[1] Mr. Purbeck is filing under seal a "Notice of Filing Exhibits In Support of Motions," which contains all exhibits referred to in this motion and in the other motions Mr. Purbeck is filing contemporaneously with this motion.  References to "Exhibit __" are to the exhibits contained in that Notice of Filing.

was there to execute a search warrant.[2] Simultaneously, multiple vehicles pulled up and more than ten law enforcement officers wearing body armor emerged and ran up the driveway with guns drawn. Mr. Purbeck did not know which jurisdiction or jurisdictions the officers were from. They knocked on the front door, waited only a few seconds, and then entered Mr. Purbeck's home, where his physically disabled girlfriend (Sarah Ganger) was inside, still in bed.

Another FBI agent, Agent Pinette, told Mr. Purbeck that they were going to have a discussion and that Mr. Purbeck's boss from Ada County would be arriving soon. Mr. Purbeck asked to see the search warrant, but the agents refused. Agent Pinette, holding onto Mr. Purbeck's bicep, steered him into the backyard, pulled up some plastic chairs, and directed Mr. Purbeck to sit. Agents Pinette and Coffin began questioning Mr. Purbeck about his county job, his computer usage, and his side business. Agent Pinette took notes of the conversation and also recorded it.

The agents did not tell Mr. Purbeck that he was free to leave, and they did not provide a Miranda warning. Mr. Purbeck noticed that his cat had wandered outside and asked if he could put the cat back inside, but Agent Pinette told Mr. Purbeck that he could not leave his chair. Mr. Purbeck also asked if he could go inside for a cup of coffee, but Agent Pinette again ordered him to stay seated.

---

[2] The factual recitation in this motion is based on the sworn declarations of Robert Purbeck and Sarah Ganger, which are Exhibits A and B, respectively.

The agents took Mr. Purbeck's work and personal cell phones. They positioned his chair so that it faced east, directly into the sun, while keeping their own chairs in the shade. As the day wore on, the agents repeatedly relocated Mr. Purbeck's chair so that it was always in the sun. Mr. Purbeck suffers from health problems for which he takes prescription medications. Some of these medications have a diuretic effect, requiring Mr. Purbeck to drink water regularly throughout the day to remain hydrated. For one of the medications, prolonged exposure to direct sunlight is contraindicated.

As the temperature climbed into the upper nineties, Mr. Purbeck developed a headache, began to sweat, and felt dizzy, dehydrated, and sunburned – classic symptoms of heatstroke. The agents took regular breaks from the conversation to refresh themselves, but refused to provide Mr. Purbeck with any water or food. At one point, an agent who was searching the house stepped outside with his hand on his gun and began yelling at Mr. Purbeck. Mr. Purbeck was afraid for his own life, and also worried about his girlfriend, trapped inside with the agents. He asked the agents about her, but was given no information and was not allowed to see her.

The agents told Mr. Purbeck that they knew about his hacking activities, and they demanded the password to a computer they had found in his home. This computer was so heavily encrypted that it would have been virtually impossible for the government to access it without the password. (See Exhibit C: Declaration of

James B. Persinger, ¶ 12.) Mr. Purbeck did not provide the password. The agents told him that the prosecutor would give him special treatment if he gave it. Eventually, Mr. Purbeck asked for a lawyer, but the agents said he did not need one and continued to question him. They said he would not get a deal from the prosecutor if he hired a lawyer. Mr. Purbeck asked for his phone to call a lawyer, but was told he could not have it. He asked to borrow a phone from the agents, but was again told no. He asked if the agents would call a lawyer for him, but – once more – the answer was no.

Mr. Purbeck asked if he was under arrest, but the agents said they didn't know. He asked when his boss would arrive, but the agents didn't know that, either. Mr. Purbeck was afraid he would be fired if he did not answer the agents' questions because his employee handbook prescribed termination for failure to cooperate with a county-initiated investigation, and Mr. Purbeck believed that the agents were there at his employer's request.

Finally, after approximately two hours of questioning, feeling shaky and unable to think and blinded by sunlight, Mr. Purbeck divulged the computer password that the agents wanted. The agents then had Mr. Purbeck sign a form ostensibly granting consent for the government to assume his online identities and take over his email and other accounts.  (See Exhibit D). This form listed the passwords for these accounts.

After obtaining this information from Mr. Purbeck, Agent Coffin then handed him a <u>Miranda</u> form and directed him to sign it.  The agents recorded Mr. Purbeck verbally agreeing to waive his rights, and they continued grilling him. A detective with the Ada County Sheriff's Department arrived at the scene, along with Ada County's Director of Information Technology, and these men joined in the interrogation. The detective formally read Mr. Purbeck his <u>Miranda</u> rights, and Mr. Purbeck again agreed to waive them, figuring that he had already been coerced into revealing his encryption password. Law enforcement personnel continued to interrogate him, seeking additional inculpatory information and more passwords. He was still offered no water or shade.

At one point Mr. Purbeck asked to use the restroom. Agent Pinette had to help him out of his chair, as Mr. Purbeck could not stand on his own. Agent Pinette escorted him inside and held the door open while he used the toilet, in great physical pain. When he returned to his chair outside, Mr. Purbeck again asked if he was under arrest, and one of the agents said that he thought so. Agent Pinette patted Mr. Purbeck down and removed his wallet and searched it. At about 3:30 p.m., however, the law enforcement officials left without arresting Mr. Purbeck. It took days for Mr. Purbeck to recover physically from the ordeal, and he is being treated for PTSD as a result of it.

II.     <u>Ninth Circuit Law Applies Here.</u>

Because the search of Mr. Purbeck's home, his custodial interrogation, and the seizure of his property took place in Idaho, which falls within the boundaries of the United States Court of Appeals for the Ninth Circuit, the law of the Ninth Circuit governs the legality of law enforcement's conduct.

Although there is no controlling precedent on this issue, "[t]he few federal cases that have addressed a similar choice-of-law issue in the criminal context have adopted a lex loci (i.e., the 'law of the place' of the conduct) approach." <u>United States v. Ozuna</u>, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001) (adopting lex loci approach and applying Fourth Circuit law to analyze legality of police-citizen encounter that occurred in Maryland). Thus, the legality of a search or interrogation is evaluated under the law of the forum where the search or interrogation occurred, not the forum where the defendant is prosecuted. <u>See</u> <u>id.</u>; <u>United States v. Restrepo</u>, 890 F. Supp. 180, 191 (E.D.N.Y. 1995); <u>United States v. Gerena</u>, 667 F. Supp. 911, 918 (D. Conn. 1987); <u>see also</u> <u>United States v. Barragan</u>, 589 F. Supp. 2d 1012, 1015 (S.D. Ind. 2008) (applying Ninth Circuit law to evaluate propriety of California wiretap); <u>United States v. Gates</u>, No. 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008) (applying Fourth Circuit law to analyze legality of North Carolina traffic stop).

III.   <u>Mr. Purbeck's Statements Must Be Suppressed Because the
Government Custodially Interrogated Him Without Miranda
Warnings.</u>

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any
criminal case to be a witness against himself." And under <u>Miranda v. Arizona</u>, 384
U.S. 436 (1966), "to reduce the risk of a coerced confession and to implement the
Self-Incrimination Clause . . . the accused must be adequately and effectively
apprised of his rights and the exercise of those rights must be fully honored."
<u>Missouri v. Seibert</u>, 542 U.S. 600, 608 (2004). "[F]ailure to give the prescribed
warnings and obtain a waiver of rights before custodial questioning generally
requires exclusion of any statements obtained." <u>Id.</u>; <u>see also</u> <u>Dickerson v. United
States</u>, 530 U.S. 428, 433-444 (2000) ("unwarned statements may not be used as
evidence in the prosecution's case in chief"). In this case, the FBI agents extracted
Mr. Purbeck's computer password and other incriminating statements during a
custodial interrogation without first advising him of his <u>Miranda</u> rights. Thus, these
statements must be suppressed.

Controlling Ninth Circuit precedent establishes that Mr. Purbeck's
interrogation was custodial. In <u>United States v. Craighead</u>, 539 F.3d 1073 (9th Cir.
2008), eight law enforcement officers representing multiple agencies arrived at
Craighead's residence with a search warrant. All were armed, and some wore flak
jackets. While the warrant was being executed, an FBI agent and a police detective

took Craighead to a small, cluttered storage room at the back of his house and closed the door. The FBI agent told Craighead that he was not under arrest and was free to leave, but she did not Mirandize him. She questioned Craighead for 20 to 30 minutes while the police detective stood in front of the door, and Craighead confessed to criminal activity.

The district court denied Craighead's motion to suppress his confession, ruling that his Miranda rights had not been violated because the interrogation was not custodial. The Ninth Circuit reversed.

Recognizing that a suspect is "in custody" if he has been deprived of his freedom in a significant way, Ninth Circuit noted that in-home interrogations are unique in that "a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free to 'terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." Id. at 1083. The court identified four factors relevant to determining whether an in-home interrogation "effected a police-dominated atmosphere" and was thus custodial: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."

<u>Id.</u> at 1084.

Applying those factors to Craighead's interrogation, the court concluded that it was custodial. First, because armed officers from multiple jurisdictions arrived at Craighead's house, "[a] reasonable person in Craighead's position would feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation." <u>Id.</u> at 1085. Second, although Craighead was not physically restrained, he was taken to a small room where a police detective blocked the exit, showing that his "freedom of action was restrained in a way that increased the likelihood that Craighead would succumb to police pressure to incriminate himself." <u>Id.</u> at 1086. Third, his isolation in the "dark recess" of the storage room demonstrated that "the FBI controlled Craighead's environment" and he was not free to leave or invite others in. <u>Id.</u> at 1087. Fourth, although the FBI agent said Craighead could leave, he reasonably doubted both her authority to make that pronouncement, given the presence of other law enforcement agencies on the scene; and her sincerity, given that she had removed him to a dark room with an armed guard.

In addition to the four <u>Craighead</u> factors, the Ninth Circuit has also identified several other factors that should be considered in determining whether an interrogation was custodial: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the

physical surroundings of the interrogation; (4) the duration of the interrogation; and (5) the degree of pressure applied to detain the individual." United States v. Herran, No. 20-10157, 2021 WL 5027488 (9th Cir. Oct. 24, 2021) at *1 (quoting United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002)).

Considering all of these factors here, Mr. Purbeck's interrogation was plainly custodial. Multiple armed law enforcement agents swarmed his driveway early in the morning, shouting and entering his home. They sat him in a chair outside in direct August sunlight without water or food. They made him stay there, took his phone, and refused to let him in his home. He was isolated from, and unable to communicate with, his disabled girlfriend inside. The agents grilled him for hours without giving Miranda warnings or telling him that he was free to leave or that his statements were optional. They told him they knew about his criminal activity. A local police detective and a supervisor from Mr. Purbeck's workplace joined in the questioning. When Mr. Purbeck asked if he was under arrest, agents first said that they did not know, and later that they thought he was. They ignored his requests for counsel. Mr. Purbeck's home was dominated by police activity, and no reasonable person in his situation would have believed he could end the interrogation and leave.

Under these circumstances, the agents' failure to Mirandize Mr. Purbeck requires suppression of his statements. See Craighead, 539 F. 3d at 1089; see also

Herran, 2021 WL 5027488 at *2 (reversing denial of motion to suppress because non-Mirandized defendant was in custody throughout in-home interrogation given "the length of the interrogation, the number of armed agents, and the way in which the agents directed and escorted Herran around his own property," along with their use of pressure and confrontation of Herran with evidence of his guilt); United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007) (affirming the suppression of Mittel-Carey's confession where eight officers arrived at his house to execute a search warrant, ordered him out of bed, separated him from his girlfriend, told him where to sit in the living room, discouraged him from getting a lawyer, monitored him while he used the bathroom, and interviewed him for nearly two hours without Mirandizing him).

> IV.   Law Enforcement's Belated Miranda Warnings Do Not Save Mr. Purbeck's Post-Warning Statements.

Agent Coffin eventually handed Mr. Purbeck a Miranda form, and the police detective later read him his Miranda rights — but these warnings were given *after* the agents had already extracted incriminatory statements, including the computer password, from Mr. Purbeck. "[T]his midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement[.]" Missouri v. Siebert, 542 U.S. at 604.

Accordingly, any statements that Mr. Purbeck gave after being <u>Mirandized</u> well into the interrogation are not admissible. <u>Id.</u>[3]

In the wake of the Supreme Court's <u>Missouri v. Siebert</u> decision, the Ninth Circuit has held that "a trial court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning — in light of the objective facts and circumstances — did not effectively apprise the suspect of his rights." <u>United States v. Williams</u>, 435 F. 3d 1148, 1157 (9th Cir. 2006). Under Ninth Circuit law, a court first determines whether police deliberately delayed <u>Mirandizing</u> the suspect in hopes of obtaining a confession. Although interrogators rarely admit their intent candidly, "[o]nce a law enforcement officer has detained a suspect and *subjects him to interrogation . . .* there is rarely, if ever, a legitimate reason to delay giving a <u>Miranda</u> warning until after the suspect has confessed." <u>Id.</u> at 1159; see also <u>Reyes v. Lewis</u>, 833 F.3d 1001, 1027 (9th Cir. 2016) ("the purpose of the two-step interrogation technique [is] to render <u>Miranda</u> warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed") (punctuation omitted.) In this case, there was no legitimate reason for the agents to delay <u>Mirandizing</u> Mr.

---

[3] The government has denied that Mr. Purbeck was read his <u>Miranda</u> rights, much less that he signed a <u>Miranda</u> form.  The missing <u>Miranda</u> form is the subject of a motion to compel.

Purbeck until after their hours-long interrogation finally yielded the information they sought.

When police deliberately delay a <u>Miranda</u> warning, as they did here, then the court must determine whether the belated warning "adequately and effectively apprised the suspect that he had a genuine choice whether to follow up on his earlier admission." <u>Williams</u>, 435 F.3d at 1160 (punctuation omitted). This inquiry requires the consideration of multiple factors, including (1) the completeness and detail of the pre-warning interrogation; (2) whether the content of the two rounds of interrogation overlapped; (3) the timing and circumstances of both interrogations; (4) the continuity of police personnel, (5) the degree to which the interrogator's questions treated the second round as continuous with the first; and (6) whether any curative measures were taken. <u>Id.</u> at 615.

Applying these factors here, Mr. Purbeck's pre-warning interrogation lasted for hours and included comprehensive questions about a range of topics, including his computer password. The interrogation was one continuous event, involving the same law enforcement personnel (with the addition of the police detective) pursuing the same lines of questioning, in the same setting, with no temporal break. No curative measures were taken. Because all six <u>Williams</u> factors weigh in favor of suppression, Mr. Purbeck's post-<u>Miranda</u> statements are inadmissible. <u>See</u> <u>Reyes</u>, 833 F.3d at 1031-1034 (where officers skillfully interrogated suspect on

several occasions, <u>Mirandized</u> him, and then continued asking questions, suspect's

post-<u>Miranda</u> statements were inadmissible under <u>Siebert</u>); see also <u>United States</u>

<u>v. Maddox</u>, No. 1:18-CR-169-TRM-CHS, 2020 WL 896769 at *8-10 (E.D. Tenn.

Jan. 29, 2020) (suppressing defendant's incriminating statements where <u>Miranda</u>

warnings were administered in the middle of an unbroken police interrogation).

     V.    <u>The Fruits of the Government's Coercion Are Also Inadmissible.</u>

During their custodial interrogation of Mr. Purbeck, the agents coerced him

into divulging his computer encryption passwords, which they then used to access

information on the computer. They also bullied Mr. Purbeck into signing a consent

form purporting to allow the government to assume his online identities and take

over his accounts. The fruits of these illegal acts — the contents of Mr. Purbeck's

computers and the results of the government's misappropriation of his online

identities — must be suppressed.

    A.  <u>The contents of Mr. Purbeck's computer must be suppressed because his</u>
        <u>disclosure of the password was involuntary.</u>

The production of electronic passwords "constitutes incriminatory testimony

protected by the Fifth Amendment." <u>United States v. Sanchez</u>, 334 F. Supp. 3d

1284, 1295 (N.D. Ga. 2018) (suppressing contents of defendant's iPhone because

his admission concerning the phone password was not voluntary). In <u>United States</u>

<u>v. Patane</u>, 542 U.S. 630 (2004), the Supreme Court held that physical evidence

obtained as a result of a statement elicited during a non-<u>Mirandized</u> custodial

14

interrogation is admissible, but only if the statement was voluntarily made. Id. at 633-634 (plurality), 644-645 (Kennedy, J., and O'Connor, J., concurring). If the statement was not voluntary, however, then the physical evidence must be suppressed. United States v. Mora-Alcaraz, 986 F.3d 1151, 1157 (9th Cir. 2021) (remanding case to district court to consider whether defendant's consent to search truck, which was given during an un-Mirandized custodial interrogation and which led to the discovery of a gun, was involuntary — in which case the gun would need to be suppressed.) In this case, Mr. Purbeck's disclosure of his password was involuntary, so any information obtained through use of the password must be suppressed as fruit of the poisonous tree.

The essence of the right against compulsory self-incrimination "is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." Culombe v. Connecticut, 367 U.S. 568, 581 (1961). In evaluating the voluntariness of a statement, a court considers the totality of the circumstances of the interrogation, including "the duration and conditions of the detention . . ., the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control." United States v. Preston, 751 F.3d 1008, 1016 (9th Cir. 2014) (quoting Culombe, 367 U.S. at 602).

The burden is on the prosecution to show that the statements were voluntary. United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

Here, the totality of the circumstances show that Mr. Purbeck's statements to police were not freely given. He was subjected to inhumane physical conditions by being forced to sit for hours in direct sunlight in the August heat without water or food, even though he took diuretic medications that required him to hydrate frequently. He was worried about his disabled girlfriend, who was trapped incommunicado inside their home with multiple armed agents. He was told his boss would be arriving and participating, causing him to fear for his job. Over the course of hours, the agents hounded him for his computer password, promising him prosecutorial leniency if he gave it and ignoring his requests for counsel. Finally, suffering symptoms of heatstroke, Mr. Purbeck divulged the password. Because this revelation was "not the product of a rational intellect and a free will," Brown v. Horell, 644 F.3d 969, 979 (9th Cir. 2011) (punctuation omitted), but was instead the result of extreme physical and psychological pressure, the fruits of that password must be suppressed. See Sanchez, 334 F. Supp. 3d at 1295.

B. Mr. Purbeck's password revelation also was involuntary because he was forced to choose between disclosure or losing his job.

"If an individual's refusal to answer incriminating questions subjects him to a penalty, then the Fifth Amendment is self-executing and any statements made under threat of such penalty are inadmissible." United States v. Saechao, 418 F.3d

1073, 1077 (9th Cir. 2005). In <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967), the

Supreme Court held that confessions given by police officers who were forced

either to incriminate themselves, or to lose their jobs, were involuntary and

inadmissible.

Mr. Purbeck worked for Ada County and was required, as a condition of his

employment, to cooperate with any county-initiated investigations. As set forth in

the Ada County Employee Manual, which Mr. Purbeck was subject to, he was

required to cooperate with official internal and external investigation conducted by

or at the request of Ada County, and he could be terminated if he did not:

> GROUNDS FOR DISCIPLINE
> Specific examples of potential violations are listed below and include
> but do not limit the items that are deemed cause for disciplinary
> action. This is a list for general reference and should not be
> considered all- inclusive:
>
> Impeding, interfering with, or failing to cooperate in an official
> internal or external
> investigation conducted by or at the request of the County.

(<u>See</u> Exhibit E: Ada County Employee Manual, §2.5.2, pp. 45-46).

From the beginning, Mr. Purbeck was told that his boss would be arriving to

monitor the interrogation, leading him to believe that his employer had initiated, or

at least was part of, the criminal investigation. Mr. Purbeck reasonably feared that

failure to answer the agents' questions would result in the loss of his job. Under

these circumstances, "there is a reasonable basis for concluding that [Ada County]

17

attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." United States v. Goodpaster, 65 F. Supp. 3d 1016, 1029 (D. Or. 2014) (punctuation omitted). Accordingly, Mr. Purbeck's statements must be suppressed because he was placed in "a penalty situation." Id. at 1030 (excluding postal employee's confession because he was subject to workplace requirements that he cooperate with investigations or face disciplinary or other legal action).

C. Mr. Purbeck's signing of the consent form was not voluntary.

Finally, Mr. Purbeck's signing of the form purporting to give the government consent to appropriate his online accounts was not voluntary. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." United States v. Yeary, 740 F.3d 569, 581 (11th Cir. 2014); see also United States v. Chan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997). "Where there is coercion, there cannot be consent." Bumper v. North Carolina, 391 U. S. 543, 550 (1968). Mr. Purbeck signed the form only because of the physical and psychological coercion described above. Accordingly, all evidence or information gained through that "consent form" must also be suppressed.

VI.   Mr. Purbeck's Statements — and the Fruits Thereof — Must Be Suppressed Because Law Enforcement Agents Ignored His Requests for Counsel.

A person who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication . . . with the police." Arizona v. Roberson, 486 U.S. 675, 678 (1988) (citing Edwards v. Arizona, 451 U.S. 477, 484-485 (1981)). Although "[a] request for counsel need not be stated as a model of eloquence and clarity," Alvarez v. Gomez, 185 F.3d 995, 997 (9th Cir. 1999), the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). If police continue the interrogation after the accused has asked for a lawyer, then the accused's statements must be suppressed. Alvarez, 185 F.3d at 998.

Mr. Purbeck said he wanted a lawyer when the agents badgered him about his computer password. He then asked for his phone so he could call a lawyer. When the agents denied that request, Mr. Purbeck asked to use one of their phones to call a lawyer. Finally, when the agents made it clear that Mr. Purbeck was allowed no access to any phone, he asked if they would call a lawyer for him. In the face of Mr. Purbeck's multiple unambiguous requests for counsel, the agents

should have ceased the interrogation until a lawyer could be made available to him. Id. Instead, they tried to talk him out of getting a lawyer, saying the prosecutor would not give him a deal if he had one. This was a clear violation of Mr. Purbeck's rights. See Sessoms v. Grounds, 776 F.3d 615, 629 (9th Cir. 2015) (officers violated clearly established law when they responded to suspect's request for counsel by telling him a lawyer would only hurt him, then continuing their questioning). Mr. Purbeck's uncounseled statements, and the fruits thereof, must be suppressed.

WHEREFORE, Mr. Purbeck respectfully requests that the Court (1) hold an evidentiary hearing on all matters raised in this motion to suppress and any others that may be developed at the hearing, (2) establish a briefing schedule for all parties to address the issues raised in this motion to suppress and developed at the evidentiary hearing, and (3) thereafter grant this motion and suppress and exclude from evidence any and all information, material, items, or evidence gathered from the illegal detentions, searches, seizures and interrogations detailed in this motion.

Respectfully submitted, this 13th day of December, 2021.

/s/ *Andrew C. Hall*_____
Andrew C. Hall
Georgia Bar No. 318025
Hall Hirsh Hughes, LLC
150 E. Ponce de Leon Ave., Suite 450
Decatur, Georgia  30030
404/638-5880 (tel.)
404/638-5879 (fax)
andrew@h3-law.com
*Counsel for Defendant Robert Purbeck*

<u>CERTIFICATE OF COMPLIANCE WITH TYPE AND FONT</u>

<u>AND CERTIFICATE OF SERVICE</u>

I hereby certify that this motion has been prepared in Courier New font (13 pt.) and consistent with the Local Rules of this Court.

I further hereby certify that I have this date caused a true and correct copy of the foregoing MOTION TO SUPPRESS STATEMENTS, PASSWORD DISCLOSURES, AND MATTERS ARISING THEREFROM to be served by filing it with the Clerk of Court using the ECF System that will send notification of such filing to:

Assistant United States Attorney Michael Herskowitz and Nathan Kitchens

This the 13th day of December, 2021.

<u>/s/ Andrew C. Hall</u>
Andrew C. Hall