1                    United States District Court
                     Northern District Of Georgia
2                           Newnan Division

3

4     United States Of America )
                               )
5                 Plaintiff, )
                               )        Criminal Action
6             vs.              )        File No. 3:21-CR-004-TCB
                               )
7                              )        Atlanta, Georgia
      Robert Purbeck,          )        September 1, 2022
8                              )        10:20 a.m.
                  Defendant. )
9     _____)

10

11
                      Day 1 of 2 / Volume 1 of 2
12
                      Transcript Evidentiary Hearing
13             Before The Honorable Russell G. Vineyard
                    United States Magistrate Judge
14

15

16    APPEARANCES:

17        FOR THE GOVERNMENT:          Michael Herskowitz
                                       Alex Sistla
18                                     Brian Mund
                                       Assistant U.S. Attorneys
19
          FOR THE DEFENDANT:           Andrew Hall
20                                     Attorney at Law

21

22

23    Lori Burgess, Official Court Reporter
      (404) 215-1528
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by CAT.

### INDEX OF EXAMINATIONS

**Witness Name**                                           **Page**

**Sp. Agt. Roderick Coffin**
Direct By Mr. Herzkowitz.............................................    6
Cross By Mr. Hall...................................................   43

**Sp. Agt. James Pinette**
Direct By Mr. Mund..................................................  113
Cross By Mr. Hall...................................................  137

**Sp. Agt. Clark Harshbarger**
Direct By Mr. Hall..................................................  183
Cross By Mr. Herskowitz.............................................  221
Redirect By Mr. Hall................................................  222

**Detective Ryan Pacheco**
Direct By Mr. Hall..................................................  226

1          THE COURT:  This is the case of United States

2    versus Robert Purbeck.  Case No. 3:21-CR-4.  We are here for

3    an evidentiary hearing on the motions to suppress

4    statements, password disclosures, and matters arising

5    therefrom, Document Number 25.  We have Mr. Herskowitz

6    Mr. Sistla on behalf of the United States.  Mr. Hall is here

7    on behalf of the defendant.

8          MR. HERSKOWITZ:  Good morning.

9          MR. HALL:  Good morning, Your Honor.

10          MR. HERSKOWITZ:  May I introduce a trial attorney

11    from Washington in our computer crime and intellectual

12    property section, Brian Lund, and Special Agent Roderick

13    Coffin as well.

14          THE COURT:  Good morning.

15          MR. HALL:  On my part, Your Honor, good morning.

16          THE COURT:  Yes, sir.

17          MR. HALL:  If I can introduce, please, Mr. Robert

18    Purbeck is present here, and then also this is my paralegal,

19    Ms. Allison Hornbuckle.  Ms. Hornbuckle will be in and out

20    assisting me throughout the day.  I wanted to let you know

21    who was sitting at counsel table with me.

22          THE COURT:  Thank you, Mr. Hall.  I appreciate

23    that.

24          MR. HALL:  Yes, sir.

25          THE COURT:  And we have other folks in the

1    courtroom as well.  Is the rule going to be invoked?

2                MR. HALL:  Yes.  We invoke the rule.  Both parties

3    will.  We do have, by agreement, however, have agreed to

4    allow a witness, Dr. John Allen, who will be testifying in

5    an expert witness capacity, to remain in the courtroom to

6    listen to the testimony.  And I can certainly answer

7    questions about that, but the gist of it is, because we

8    believe there is going to be some factual disputes going on,

9    he is not going to testify to the facts, but rather, based

10   on the facts, that depending on what Your Honor decides, how

11   that medically may affect things.  So we discussed that

12   among the parties and agreed that he could be present for

13   the duration.

14               MR. HERSKOWITZ:  That is right, Your Honor.

15               THE COURT:  Okay.  All right.  Very good.  Any

16   other preliminary matters?

17               MR. HERSKOWITZ:  No, Your Honor.

18               MR. HALL:  I think I have one that I probably

19   should put on the record.  I will be real quick, and then we

20   will move on.  So Your Honor has already ruled against me, I

21   think it was done where we went by email, it was my choice

22   because I went about it more informally.  But just to

23   formalize it, my understanding Your Honor's ruling today's

24   hearing is for docket entry number 25.  Not quibbling with

25   the Court.  I had asked from our perspective just to state

1    formally, Your Honor, that we believe that an evidentiary

2    hearing was appropriate under *Franks* I infer Your Honor has

3    decided otherwise from that.  I am not going to dwell on

4    that.  But even separate from that, we thought it was

5    important to have an evidentiary hearing about three

6    distinct matters.  Again, I totally recognize Your Honor has

7    already said no to this, and the government does oppose it,

8    and I have already alerted the Court to the opposition, but

9    one is whether the search warrant with attachments was

10   present during the search of Mr. Purbeck home, we think that

11   is a relevant fact that is open to evidentiary development.

12   What was the basis for receiving large numbers of items from

13   Mr. Purbeck's home that were not within the scope of the

14   search warrant, which is relevant to Mr. Purbeck's position

15   that the government treated this warrant as though it was a

16   general warrant.  And three, what instructions or directions

17   were provided to the searching agents and what did the

18   searching agents understand the search warrant authorized

19   them to search for and seize, which is also relevant to

20   Mr. Purbeck's position that the government treated the

21   search warrant as a general warrant.

22            I presented those matters to Your Honor via a

23   letter from counsel back in April-ish, alerted you to the

24   government's opposition.  Your Honor has responded to that a

25   long time ago and said no, we are going to do it with this.

1    I'm not renewing it or reiterating, I just feel like I went

2    the informal route and, as counsel, I should formalize that

3    statement.

4              THE COURT:  Yes, sir.

5              MR. HALL:  Period.

6              THE COURT:  Thank you, Mr. Hall.

7              MR. HALL:  Yes, Judge.

8              THE COURT:  Any response, Mr. Herzkowitz?

9              MR. HERSKOWITZ:  No, Your Honor.

10             THE COURT:  Are you ready to proceed?

11             MR. HERSKOWITZ:  Yes, Your Honor.

12             THE COURT:  Call your first witness.

13             MR. HERSKOWITZ:  We call the first witness,

14   Special Agent Roderick Coffin.

15                    Sp. Agt. Roderick Coffin

16                              Sworn

17             THE CLERK:  Please state and spell your name for

18   the record.

19             THE WITNESS:  Special Agent Roderick Coffin.

20   R-o-d-e-r-i-c-k C-o-f-f-i-n.

21                        Direct Examination

22   BY MR. HERSKOWITZ:

23   Q.  Good morning.  Where are you employed?

24   A.  I am employed with the FBI in Atlanta, Georgia.

25   Q.  How long have you been employed with the FBI?

1     A.   A little over 12 years.

2     Q.   Are you an FBI Special Agent?

3     A.   I am.

4     Q.   What positions have you held within the FBI or where

5     have you been assigned since joining the FBI?

6     A.   I've been primarily assigned to the FBI Atlanta office.

7     I had a six-months temporary duty assignment to Rome, Italy.

8     Q.   What are your current duties and responsibilities as an

9     FBI Special Agent?

10    A.   I am a -- primarily I investigate computer intrusions,

11    both criminal and national security computer intrusions.  I

12    have a few ancillary duties.  I am one or our leaders on the

13    evidence response team, among other things.

14    Q.   Are you the co-case agent in the investigation of Robert

15    Purbeck together with Special Agent James Pinette?

16    A.   I am.

17    Q.   And generally what type of investigation is it?

18    A.   It's an investigation into a hacking group that is

19    committing computer intrusions and extortions.

20    Q.   Where did Mr. Purbeck reside in August of 2019?

21    A.   He resided in Meridian, Idaho.

22    Q.   Do you have the address of that residence?

23    A.   451 West Waterbury Drive.

24    Q.   And was he the owner of that residence?

25    A.   He was.

1    Q.  And what type of neighborhood is this?  Were there

2    numerous houses on the street, or is this kind of a

3    residence that is by itself?  Can you describe that for the

4    Court?

5    A.  It's a suburban neighborhood with many houses all in

6    kind of a gray pattern.

7    Q.  Did you obtain a federal search warrant to search

8    Mr. Purbeck's residence in Meridian, Idaho?

9    A.  Yes, I did.

10   Q.  Where did you obtain that search warrant from?

11   A.  From the United States District Court of Idaho.

12   Q.  When did you obtain it?

13   A.  I believe it was August 19, 2019.

14   Q.  I want to take you to the day of the search, August 21,

15   2019, were you working on that date?

16   A.  I was.

17   Q.  What was your assignment?

18   A.  I was there.  I had traveled to Boise to participate in

19   the search of Mr. Purbeck's residence and to attempt an

20   interview of Mr. Purbeck.

21   Q.  Why did you want to talk to Mr. Purbeck?

22   A.  We were investigating, not just the hacker that we felt

23   he was, but other hackers that we thought he might have

24   information about, and we wanted to try to get his

25   assistance in that investigation.

```
1    Q.  Did you have an arrest warrant for Mr. Purbeck?
2    A.  I did not.
3    Q.  Were there any charges pending against Mr. Purbeck on
4    that date?
5    A.  No, there were not.
6    Q.  Was there a plan to take him into custody on that date?
7    A.  There was not.
8    Q.  Why not?
9    A.  We felt we wanted to execute the search warrant first to
10   attempt the interview, to collect digital evidence, and to
11   analyze that digital evidence and the result of the
12   interview, and to allow that information to inform our
13   charging decisions should we choose to go that route.
14   Q.  Focus on the morning of August 21, 2019.  What time did
15   you arrive in the vicinity of Mr. Purbeck's residence?
16   A.  It was sometime before 8 o'clock, not too much before,
17   maybe between 7:30 and 8 o'clock.
18   Q.  In the morning?
19   A.  In the morning.  Yes, sir.
20   Q.  How did you arrive?
21   A.  In a vehicle with a supervisory agent, Douglas Hart.
22   Q.  How many other agents or staff were there to assist in
23   the execution of the search warrant that morning?
24   A.  I believe there were 14 total FBI agents -- I am sorry,
25   FBI employees, nine of whom were agents.
```

1    Q.   Who were the other five?

2    A.   So we had of course myself, Special Agent Pinette,

3    Supervisory Agent Douglas Hart, we had agent Clark

4    Harshbarger.

5    Q.   Generally the other five?

6    A.   Generally they were mostly agents from the Boise office.

7    There was myself and Agent Pinette were the only two from

8    Atlanta, and we had one agent from the Washington office.

9    Q.   How were you dressed?

10   A.   I mean, it was three years ago.  I honestly don't

11   remember what I was wearing or how I was dressed.

12   Q.   Did you have a firearm with you?

13   A.   I did have a firearm.

14   Q.   Do you recall if the firearm was visible?

15   A.   I don't believe it was visible because when we wrote our

16   report in the days after the search, we documented that no

17   firearms were visible on the approach to Mr. Purbeck.

18   Q.   Do you recall how other agents were dressed?

19   A.   No, not beyond the way I memorialized that in the 302.

20   Q.   Do you recall how many vehicles there were?

21   A.   There were two or more vehicles parked on the street

22   outside his house.

23   Q.   Were there any marked police vehicles?

24   A.   Not that I recall seeing.

25            MR. HERSKOWITZ:  Judge, we've conferred -- counsel

1    has conferred prior to the hearing, and to expedite matters

2    we have agreed that Government's Exhibits 1 through 6 are

3    admissible into evidence.   Exhibits 1 through 4 are

4    photographs.   5 is a certified weather report that was

5    provided by the defense, and Exhibit 6 is a consent to

6    assume online identity authorization form.   And I am going

7    to use these exhibits with the witness and just expedite

8    things, which we have conferred, and likewise I will give

9    the defense the same courtesy on some matters.   And we would

10   ask to introduce at this time Government's Exhibits 1, 2, 3,

11   4, 5, and 6.

12             THE COURT:   Those are admitted without objection

13   by consent?

14             MR. HALL:   No objection.

15             THE COURT:   They are admitted.

16             MR. HERSKOWITZ:   And I ask to publish them as

17   well.

18             THE COURT:   Yes, sir.

19   BY MR. HERSKOWITZ:

20   Q.   I am showing you Government's Exhibit 1, which has been

21   admitted.   What is Government's Exhibit 1?

22   A.   That is a picture of the front of Mr. Purbeck's

23   residence.

24   Q.   What are you observing in Government's Exhibit 1?

25   A.   There are two vehicles parked in the driveway, and a

1   tiny house along the left-hand side of the residence.
2   Q.  Where was the vehicle you were in that morning in
3   relation to the main residence depicted in Government's
4   Exhibit 1?
5   A.  The vehicle I was in was off the left side of this
6   photograph, which would have been the east side of the house
7   on the road.
8   Q.  Did you eventually encounter Mr. Purbeck that morning?
9   A.  Yes, I did.
10  Q.  And where was he encountered?
11  A.  Mr. Purbeck walked out the front of his house, which
12  would be toward, on the right-hand side of this photo kind
13  of by that planter and he walked from his house to his car
14  which would be the gray Mustang parked in the driveway.
15  Q.  And tell us about the encounter with Mr. Purbeck.
16  A.  As Mr. Purbeck approached his car, myself and the other
17  agents approached him.  I was not the first agent to
18  Mr. Purbeck.  There was another agent who arrived there
19  first.  When I approached Mr. Purbeck, I recall one of the
20  other agents doing a brief pat down where he felt around
21  Mr. Purbeck waistband presumably for safety purposes.  And
22  then after that myself and Special Agent Pinette engaged
23  Mr. Purbeck in conversation while the other agents proceeded
24  to clear the house to make sure it was safe for the search.
25  Q.  I want to break that down just a little bit.  How many

1   agents approached Mr. Purbeck?

2   A.  I'm not sure the total number and how many arrived at

3   what time.

4   Q.  What did you observe?  How many agents talked to

5   Mr. Purbeck?

6   A.  I observed one agent focusing on Mr. Purbeck.

7   Q.  What were the other agents doing?

8   A.  I can't recall.  I was myself also focused on

9   Mr. Purbeck.

10  Q.  How long, after the one agent first encountered

11  Mr. Purbeck and did the pat down, did you arrive to speak

12  with Mr. Purbeck?

13  A.  I don't believe it was very long.  I think it was a

14  matter of probably a few seconds.

15  Q.  And what time in the morning was this?

16  A.  It would have been a little bit before 8 o'clock.

17  Q.  8:00 a.m.?

18  A.  8:00 a.m.  Yes.

19  Q.  Describe your initial interaction with Mr. Purbeck.

20  A.  So myself and Agent Pinette informed Mr. Purbeck that we

21  had a search warrant to search his residence that day.  We

22  informed him that he was not under arrest.  And we asked if

23  we could speak with him, you know, later that morning.  We

24  had questions and we thought he could be of assistance in

25  our investigation.

1   Q.  When you first saw Mr. Purbeck, was he restrained in any
2   way?
3   A.  He was not.
4   Q.  Was he restrained at all in the driveway?
5   A.  He was not.
6   Q.  Were there any handcuffs put on him?
7   A.  There were not.
8   Q.  Were there any guns pointed at him?
9   A.  There were not.
10  Q.  Was he standing, sitting, laying on the ground?
11  A.  I believe he was standing beside the vehicle.
12  Q.  Did he have anything in his hands?
13  A.  I don't recall whether it was in his hand or not, but he
14  did have a cup of coffee when he left the house.  I don't
15  recall if he put it on top of the car, where it was at that
16  moment.
17  Q.  Did anyone scream or raise their voice at Mr. Purbeck in
18  the driveway?
19  A.  No one did.
20  Q.  What was Mr. Purbeck's demeanor?
21  A.  I thought Mr. Purbeck was very calm.  In that moment and
22  later in the day he was always respectful to me.  And he
23  seemed calm and, you know, understanding.
24  Q.  What was your demeanor?  We are speaking of the
25  interaction in the driveway.

1    A.   I feel like my demeanor was pretty much as it is now,

2    where I was speaking respectfully and calmly to Mr. Purbeck.

3    There was never a reason to treat him otherwise that day.

4    Q.   How about Agent Pinette?

5    A.   Likewise.

6    Q.   Aside from the pat down, did you see anybody put their

7    hands on Mr. Purbeck?

8    A.   I did not.

9    Q.   Did you put your hands on Mr. Purbeck at all?

10   A.   I did not.

11   Q.   Did you see Agent Pinette put his hands on Mr. Purbeck?

12   A.   I did not.

13   Q.   Did you deliberately try to take a respectful tone with

14   Mr. Purbeck, as you described it?

15   A.   It did, and it was deliberate.  When I attempt

16   interviews, I've found that rapport-based interviews are the

17   most effective.  So I wanted to use those first moments in

18   my encounter with Mr. Purbeck to establish, you know, a

19   positive relationship where we could have a constructive

20   dialogue.

21   Q.   I believe you testified before that you told Mr. Purbeck

22   he was not under arrest; is that correct?

23   A.   That is correct.

24   Q.   Did you advise Mr. Purbeck that he could leave?

25   A.   I don't recall doing so.

1    Q.  Did you advise him that he could not leave?

2    A.  No.

3    Q.  Did Mr. Purbeck ask any questions in the driveway?

4    A.  I remember him asking something along the lines of, in

5    response to me asking to interview him, I believe he kind of

6    wondered or asked about him getting to work on time.

7    Although I don't remember how he asked it, I remember

8    telling him something like Ada County knows to not expect

9    you to be on time today.

10   Q.  Where did Mr. Purbeck work?

11   A.  He worked at Ada County which is the county that

12   includes Boise, Idaho in information technology at the

13   courthouse.

14   Q.  Did Mr. Purbeck ask to leave?

15   A.  He did not.

16   Q.  And what was his response to you wanting to speak with

17   Mr. Purbeck?

18   A.  I don't recall him giving us a verbal response, but I

19   know he, you know, continued to agree to interview with us

20   and that indeed did happen.

21   Q.  Did you conduct the interview on the driveway?

22   A.  No, sir.

23   Q.  Did you decide to conduct the interview somewhere else?

24   A.  Yes.  We decided to conduct the interview in the

25   backyard of the house.

1    Q.   How did you get to the backyard?

2    A.   So we walked up, "we" being myself, Agent Pinette, and

3    Mr. Purbeck, and entered the house through the front door.

4    And then the main space of the house was largely one open

5    area.  We walked through the living room, kind of passed the

6    kitchen-slash-dining room, and out the rear doors and into

7    the backyard.

8    Q.   Where were the other agents at that time?

9    A.   I don't recall exactly where people were.  I don't

10   specifically remember where everything else was at.

11   Q.   Was there anyone else besides you and Agent Pinnette

12   that walked with Mr. Purbeck from the driveway to the

13   backyard?

14   A.   I believe it was just us two who walked with him.  I

15   don't believe there were any other agents.

16   Q.   How long were you in the driveway before you walked

17   through the house to the backyard?

18   A.   I don't believe it was very long.  I mean, it's been a

19   few years since then, but my recollection was that it was

20   fairly brief, probably less than fifteen minutes.  I can't

21   imagine there is any way it was more than thirty.

22   Q.   When walking from the driveway through the house to the

23   backyard, did anyone put hands on Mr. Purbeck?

24   A.   No, they did not.

25   Q.   Did anyone yell at him?

1  A.  They did not.

2  Q.  Did anyone threaten him?

3  A.  They did not.

4  Q.  Did anyone promise him anything?

5  A.  They did not.

6  Q.  Did he seem to object to going to the backyard to speak

7  with you?

8  A.  He did not.

9  Q.  I'm showing you Exhibit 2.  Would this picture be

10  helpful in describing the route you took to the backyard?

11  A.  Yes.  This is the picture of the living room kind of

12  looking past the kitchen to the rear door.  So we would have

13  walked through the room that is in the front of this

14  picture, kind of up along the middle of the picture and out

15  the doors at kind of the middle top portion of the exhibit.

16  Q.  Did he ask for anything, Mr. Purbeck, on the way to the

17  backyard?

18  A.  He asked to refill his coffee cup.

19  Q.  What was the response from --

20  A.  I don't remember exactly how we put it, but yeah, we

21  definitely allowed him to fill his coffee.

22  Q.  Can you describe the condition of Mr. Purbeck's home,

23  walking through it?

24  A.  As is kind of demonstrated in this exhibit, the house

25  was very cluttered.  There weren't a lot of spots that were

1   open or that would have been conducive for conducting an

2   interview.  And the house had a rather foul odor.

3   Q.  What time did you arrive in the backyard?

4   A.  I believe we were at the backyard at approximately 8

5   o'clock in the morning.

6   Q.  What was the weather at that time, Agent Coffin?

7   A.  So the sun was up, the weather was cool certainly at

8   that point in time.  I recall that it was at least a partly

9   sunny day, and that the sun striking at least some of the

10  backyard at that point.

11  Q.  Is there anything else you can describe for the Court

12  about the backyard area?

13  A.  The backyard, it is a fenced-in backyard with a grass

14  lawn.  There was a small storage shed.  The lawn extended

15  around the left-hand side of the house as you were facing

16  the house.  There were kind of two paths around that large

17  wooden structure which we found was a tiny home, and there

18  was a gate facing the street on the left-hand side of the

19  backyard.

20  Q.  Could one get out of the backyard to the front of the

21  house, the front of the residence, without going through the

22  house?

23  A.  Yes.  They could have gone through the gate on the

24  left-hand side of the house.

25  Q.  Were there any chairs in the backyard?

1    A.   There were.

2    Q.   Where were the chairs?

3    A.   I don't recall where they were when we initially entered

4    in the backyard.

5    Q.   And then how did you begin the set up or the

6    conversation with Mr. Purbeck?

7    A.   Well, we did want to -- it would be more comfortable to

8    sit, so we did find several white plastic lawn chairs that,

9    you know, we set out in the backyard so myself, Agent

10   Pinette and Mr. Purbeck could talk.

11   Q.   Was there any thought to where the chairs were placed --

12   A.   No.

13   Q.   -- and who would sit in what chair?

14   A.   No.

15   Q.   Did anyone face Mr. Purbeck facing the sun?

16   A.   No.

17   Q.   How close were you to Mr. Purbeck?

18   A.   I don't think we were, you know, terribly far apart.  I

19   don't feel we were in each other's personal space, and we

20   were close enough to easily hear each other, so it was

21   probably two to five feet apart.

22   Q.   I am showing you Exhibit 3.  Is Government's Exhibit 3

23   helpful in describing where you were, where Agent Pinette

24   was, and where Mr. Purbeck seated in the backyard?

25   A.   Yes, I believe it is.  In kind of the -- I don't know,

1    the left third kind of center of the photo you see what
2    appears to be the glass doors with curtains on either side,
3    and I believe that is probably Special Agent Pinette that
4    you see sitting kind of facing away from the photograph.
5    Q.  Were any of the chairs intentionally positioned so they
6    would be in the sunlight?
7    A.  They were not.
8    Q.  Did Mr. Purbeck, when you started the interview, express
9    any concerns about the sun or the weather?
10   A.  He did not.
11   Q.  Did he ask to speak with you somewhere else?
12   A.  He did not.
13   Q.  Did he ask to leave?
14   A.  He did not.
15   Q.  Did you read Mr. Purbeck his Miranda rights?
16   A.  We did not.
17   Q.  Why not?
18   A.  We did not feel he was in custody.
19   Q.  What if he had asked to leave?
20   A.  He would have been allowed to leave.
21   Q.  And did he agree to speak to you in the backyard?
22   A.  He did.
23   Q.  Describe Mr. Purbeck's demeanor and your demeanor and
24   Agent Pinette's demeanor as the interview commenced?
25   A.  I mean, as I stated earlier, I felt that Mr. Purbeck was

1    calm, he was respectful to myself and Agent Pinette

2    throughout the interview.  He was articulate and smart.

3    Q.  Was the interview audio or video recorded in any way?

4    A.  It was not.

5    Q.  Did you or Agent Pinette have a tape or video recorder

6    with you?

7    A.  We did not.

8    Q.  Why did you choose not to record the interview?

9    A.  Well first of all, it wasn't required by FBI policy.

10   And second of all, we thought we might have a more effective

11   rapport-based interview if we just spoke with him without

12   the recording device between us.

13   Q.  Did you document the interview?

14   A.  We did.

15   Q.  How was it documented?

16   A.  Both myself and Special Agent Pinette took

17   contemporaneous notes with the interview.  And then a few

18   days after the interview was concluded and we returned to

19   Atlanta, we formally documented that in an FD-302 report of

20   investigative activity.

21   Q.  Do you recall how many pages that report was?

22   A.  I believe it was nine.

23   Q.  Would you have written a nine-page report if the

24   interview had been recorded?

25   A.  I would not have.

1  Q.  Why not?

2  A.  The recording would have just spoken for itself.  We

3  would have download it to a disc and stored it in evidence,

4  and our 302 would have include a preamble that stated it was

5  a recorded interview and it would have referred to the

6  recording for the substance, and then we could have

7  optionally summarized some of the pertinent facts in the

8  body of the 302 if we chose to.

9  Q.  Did you give Mr. Purbeck any orders to either sit or

10  stand up, or any orders whatsoever, while you were in the

11  backyard?

12  A.  We did not.

13  Q.  Were there any other agents in the backyard besides you

14  and Agent Pinette?

15  A.  I don't recall any agents, at least throughout the bulk

16  of the interview.  I just remember the two of us.

17  Q.  Did Mr. Purbeck ask for any food or water?

18  A.  Not that I recall.

19  Q.  If he had asked for food or water, would have you

20  provided that to him?

21  A.  Certainly.

22  Q.  And when in the backyard, did you conduct any other

23  search or pat down of Mr. Purbeck?

24  A.  I did not.

25  Q.  Did you or Agent Pinette lay any hands on Mr. Purbeck?

1    A.   We did not.

2    Q.   And did anyone raise their voices with him?

3    A.   No.

4    Q.   Did Mr. Purbeck mention any medical conditions?

5    A.   He did not.

6    Q.   Did he appear sick or ill at any time while in the

7    backyard speaking with him?

8    A.   No.

9    Q.   Did he appear to be in pain at any time?

10   A.   No.

11   Q.   Did he appear to be sunburned at any time?

12   A.   No.

13   Q.   Did he appear to be in any discomfort at all?

14   A.   Not at all.

15   Q.   Did Mr. Purbeck appear to be under the influence of

16   drugs or alcohol?

17   A.   No.

18   Q.   Did he appear nervous at all?

19   A.   No.  No.  He was surprisingly calm.

20   Q.   And did he appear willing to speak with you?

21   A.   Yes.

22   Q.   Tell us how the interview began.

23   A.   So myself and Special Agent Pinette began with

24   background questions.  In the early part of the interview, I

25   believe it was Special Agent Pinette who was asking most of

1    the questions.  So in the early questioning it was

2    Mr. Purbeck responded to us about his educational background

3    that he had a Bachelor's of Science from the University of

4    Phoenix, that he completed the majority of his studies to

5    get a Master's of Science from the American Public

6    University.  Our background questioning covered his

7    employment, and he informed us that he worked for Ada County

8    in information technology and worked in the courthouse, and

9    had previously worked for the State of Idaho.

10   Q.  Did he appear intelligent?

11   A.  He did.

12   Q.  Did he appear educated?

13   A.  He did.

14   Q.  Did Mr. Purbeck ask you any questions at this early part

15   of the interview?

16   A.  I believe early in the interview he asked you how he

17   could be of assistance and mentioned that a security

18   researcher had reached out to him, and the researcher felt

19   that he was a member of a hacking organization that he

20   didn't want to be identified with.  And myself and Special

21   Agent Pinette informed him that we did want to talk about

22   how he could be of assistance, but we wanted to finish some

23   background questions first.

24   Q.  Did anyone yell at Mr. Purbeck?

25   A.  They did not.

1  Q.  Did you ever observe an agent come outside and scream at

2  him?

3  A.  No.

4  Q.  Did you observe an agent come outside and put their hand

5  on their gun?

6  A.  No.

7  Q.  During the entire time that you spoke to Mr. Purbeck,

8  did either you, Agent Pinette or any other agent ever raise

9  their voice or yell at Mr. Purbeck?

10  A.  We did not.

11  Q.  Did anyone ever promise him anything?

12  A.  No.

13  Q.  Did Mr. Purbeck ever ask to go inside?

14  A.  Not that I recall.

15  Q.  If he had asked to go inside, would you permit him to go

16  inside by himself?

17  A.  No.

18  Q.  Explain to the Court why not.

19  A.  So we would have facilitated whatever request was

20  causing him to want to go inside, but for two primary

21  reasons we wouldn't let him walk around the search scene by

22  himself, and the first would be safety.  As we saw on the

23  first exhibit, it was a rather cluttered house, it hadn't

24  been searched yet by agents.  We wouldn't want anybody,

25  including the defendant, to walk around and potentially grab

1   a weapon, startle an agent, and do anything that would

2   create a safety issue for our personnel or for him.  And the

3   other would be evidentiary.  We are searching that same

4   scene for evidence.  We need to be able to attest to the

5   validity of the evidence that we collect, so we need to have

6   control of the scene.  We wouldn't want him to try to grab

7   evidence, move evidence, or otherwise interfere with our

8   evidentiary search.

9   Q.  I am showing you Government's Exhibit 4.  Does that --

10  can you describe that exhibit for the Court?

11  A.  That is a picture from the inside of Mr. Purbeck's

12  residence.

13  Q.  Does that picture inform at all your decision-making

14  about allowing Mr. Purbeck to walk around the house by

15  himself during the search?

16  A.  Yes.  I mean, the house obviously had a significant

17  amount of clutter, it hadn't been searched at that point in

18  time.  We don't know what evidence or weapons or other types

19  of things might be stored in that -- in all of those

20  possessions.

21  Q.  Once the house was searched, would there be a reason

22  again not to let Mr. Purbeck walk around the house by

23  himself?

24  A.  Yes.  I think still the concern about officer safety

25  could still exist.

1   Q.  As the interview progressed, did you and Agent Pinette
2   and Mr. Purbeck in the same spots in your chairs?
3   A.  No.  Myself, Agent Pinette, and Mr. Purbeck to move our
4   chairs as the lighting in the backyard changed.  As the sun
5   rose, different areas were shaded, different areas became
6   sunny, and we moved our chairs to kind of follow the shade
7   as the morning progressed.
8   Q.  Were you all in the shade or the sun?  Do you recall?
9   A.  The shade most of the time.
10  Q.  And did you instruct Mr. Purbeck or Agent Pinette
11  Mr. Purbeck where to put his chair?
12  A.  No.
13  Q.  Did Mr. Purbeck move his own chair?
14  A.  He did.  For awhile.
15  Q.  And then what happened?
16  A.  And then at some point I recall Mr. Purbeck stopped
17  moving his chair to stay in the shade with myself and Agent
18  Pinette.
19  Q.  Did the temperature change throughout the interview?
20  A.  Yes.  As the morning progressed it got increasingly
21  warmer.
22  Q.  Was Mr. Purbeck sweating at all?
23  A.  Not that I recall.
24  Q.  Would you describe him as drenched in sweat at any part
25  of the interview?

1    A.   Absolutely not.

2    Q.   Did you review, Agent Coffin, some certified weather

3    data provided by defense counsel?

4    A.   I did.

5              MR. HERSKOWITZ:  May I approach, Your Honor?

6              THE COURT:  You may.

7    BY MR. HERSKOWITZ:

8    Q.   I just showed you Government's Exhibit 5.  Do you recall

9    that document?

10   A.   I do.

11   Q.   What is that document?

12   A.   This is certified climate data.  I believe it is from

13   the Boise Air Terminal.  I seen it on the top left.

14   Q.   And in that document is there data showing the

15   temperature and dew point on August 21, 2019 at the Boise

16   Air Terminal?  And that is in Idaho?

17   A.   Yes, there is.  And yes, that's in Idaho.

18   Q.   What page are you looking at, Agent Coffin?

19   A.   On the third page.  Local climatological data.  Hourly

20   observations.  Yes, that's the one.

21   Q.   Can you describe for the Court the temperature starting

22   at 7:53 in the morning and going to 11:53 in the morning,

23   just that range?

24   A.   According to this report, at 7:53 in the morning the dry

25   bulb temperature was 75 degrees, the dew point was 42, and

1    the relative humidity was 31.

2    Q.   Okay.

3    A.   And then at 8:53, the dry bulb temperature was 78

4    degrees, the dew point was 44, and the relative humidity was

5    30.   At 9:53 the dry bulb temperature was 80 degrees, the

6    dew point was 44, and the relative humidity was 28.   At

7    10:53 the dry bulb temperature was 84, the dew point was 44,

8    and the relative humidity was 25.   At 11 o'clock the dry

9    bulb temperature was 84, the dew point was 44, the relative

10   humidity was 25.   And at 11:53 the dry bulb temperature was

11   89, the dew point was 44, and the relative humidity was 21.

12   Q.   Are you familiar with the terms dry bulb temperature,

13   dew point, and relative humidity?

14   A.   Dry bulb is a new -- dry bulb is a new term for me, but

15   I am familiar with dew point and relative humidity.

16   Q.   Would you, based upon your experience, tell us what that

17   is?

18   A.   Yeah.   My experience would be -- I mean, obviously I

19   think the temperature is relatively straightforward, and

20   relative humidity would be a measure of how much moisture is

21   in the air.   And I believe dew point, my familiarity with

22   dew point is it tends to be a good indicator of how

23   comfortable it is outside.   When I spend time outside I look

24   often at the relative humidity.   I know if the relatively

25   humidity is over 70 it is extremely uncomfortable, that is

1    what we experience here in Georgia, and if that relative
2    humidity is in the 60's and below it's going to get more and
3    more comfortable.  Again --
4    Q.  And again, what was the relative humidity here?
5    A.  The relative humidity at 7:53 -- I'm sorry, the relative
6    humidity or dew point?
7    Q.  Both.
8    A.  The relative humidity went from 31, and then at 11:53 it
9    dropped to 21.  The dew point went from 44 and rose to --
10   I'm sorry -- 42 and rose to 44.
11   Q.  So what does that tell you about the humidity on that
12   day?
13   A.  That it would be a relatively comfortable day if you can
14   get outside of the sun particularly.  In Georgia it can feel
15   hot even if you are in the shade.  If you can get out of the
16   sun in this dew point, it would have felt comfortable.
17   Q.  What about in the sun?
18   A.  It could be warm.  Yes.
19   Q.  And I believe you testified before that you were in the
20   backyard to start the interview at approximately 8 o'clock
21   a.m.?
22   A.  Yes.  That is correct.
23   Q.  At what point did Mr. Purbeck make inculpatory
24   statements in connection with the hacking activity?  Do you
25   recall the time that he did that?

1  A.   Yes.   At the point that we kind of reached that critical

2  portion of the interview, my recollection was that it wasn't

3  significantly long.   I don't think there is anyway it could

4  have been more than an hour-and-a-half into the interview

5  that we reached that critical phase of the interview.

6  Q.   So would that be before 9:53 or around that time?

7  A.   I believe it was before 9:53.   Yes, sir.

8  Q.   Were you sweating in the backyard?

9  A.   I don't recall sweating.   No.

10  Q.   Were you uncomfortable?

11  A.   No.

12  Q.   Did you any body armor on?

13  A.   I did have body armor, at least at the beginning.   I

14  don't recall if I left it on the whole time.

15  Q.   Do you know if it was inside your shirt or outside your

16  shirt?

17  A.   I don't remember, unfortunately, at this point.

18  Q.   Did Mr. Purbeck ask for an attorney at any point in the

19  interview?

20  A.   He did not.

21  Q.   Did the subject of an attorney ever come up?

22  A.   It did.

23  Q.   How did it come up?

24  A.   At one point in our interview when we were challenging

25  his recollection of nicknames that we believed he controlled

1   and that he had omitted to mention to us, he said that he

2   was nervous and asked if he should have an attorney.

3   Q.  What was your response to that question?

4   A.  Myself and Agent Pinette told him that we could not give

5   him legal advice.  He was entitled to an attorney and he did

6   not have to talk to us.

7   Q.  How did he respond to that?

8   A.  He still wondered -- he asked the question how much time

9   was he looking at.  And we told him that we couldn't make --

10  we couldn't make any determination of whether he would have

11  been charged or if he was charged what potential sentence he

12  would be looking at.

13  Q.  Did he ever ask for an attorney during the interview?

14  A.  He did not.

15  Q.  Did he ask to call an attorney?

16  A.  He did not.

17  Q.  Did he ask to use your phone to call an attorney?

18  A.  He did not.

19  Q.  Did he mention an attorney again that day?

20  A.  No.

21  Q.  After this exchange that you just testified to, did

22  Mr. Purbeck keep talking?

23  A.  He did.

24  Q.  Did he appear, well, to talk?

25  A.  He did.

1   Q.  Did his demeanor change at all?

2   A.  No.

3   Q.  Briefly, what did Mr. Purbeck say after that?

4   A.  He took a breath and said, okay, you know about the

5   hacking.  I am lifelock.  And lifelock is the identity of

6   one of the hackers that we were investigating.

7   Q.  Did you ask Mr. Purbeck for any passwords to any

8   computers?

9   A.  Yes, I did.

10  Q.  How was that request made?

11  A.  So after kind of that critical portion we began to

12  explore other questions.  We asked about victims.  The

13  conversation turned to the computers that were inside of the

14  house.  He identified for us what was the computer he used

15  in these hacks.  He told us about that computer, an external

16  hard drive that was attached to it.  He informed us that

17  those devices were encrypted with a type of technology

18  called VeraCrypt.  And he consented and we documented that

19  in a consent to assume online identity form.  He consented

20  to give us the password to decrypt those devices.

21  Q.  Let me show you Exhibit 6.  What is Exhibit 6?

22  A.  That is an FBI consent to assume online identity form.

23  Q.  And what is the purpose of that form?

24  A.  This form can be used for different purposes.  It is

25  primarily used when somebody agrees to allow us to take over

1    and control their online accounts, but included in this is
2    really both search authority as well as authority to operate
3    those accounts, because once an account is made available to
4    the FBI by definition, we are going to have access to the
5    information stored in it.  So it is both online -- both live
6    access as well as a search.
7    Q.  Who wrote where it says account names, who wrote those
8    accounts?
9    A.  That is my handwriting.
10   Q.  And Mr. Purbeck signed the form?
11   A.  He did.
12   Q.  Where did he sign the form?
13   A.  Can you raise it a little bit in the ELMO?  His
14   signature is on the left side of the form above my name and,
15   you know, in the lines above where I signed.
16   Q.  You said you signed as well?
17   A.  I signed as well.
18   Q.  Did Special Agent Pinette sign?
19   A.  Yes, he did.
20   Q.  And in the form, does it say anything about giving
21   consent at the beginning of the form?
22   A.  It does.  Would you like me to read the relevant
23   portion?
24   Q.  Yes.
25   A.  I give this consent freely and voluntarily without fear,

1    threats, coercion, or promises of any kind.  I have been

2    advised of my rights to refuse to allow the FBI to assume my

3    online identity, and I hereby voluntarily waive this right.

4    Q.  Did anyone threaten Mr. Purbeck in signing this form?

5    A.  They did not.

6    Q.  Did anyone promise him anything to sign the form?

7    A.  No.

8    Q.  Just let me finish -- to sign the form?

9    A.  No.

10   Q.  And did he appear willing to sign it?

11   A.  Yes, he did.

12   Q.  Did he ask any questions about it?

13   A.  No.

14   Q.  What time did you conclude the interview with

15   Mr. Purbeck?

16   A.  Like I said, I felt we reached the critical portion

17   within about an hour and a half.  As we continued the

18   interview and got to the point where we talked about the

19   devices and the passwords, I recall myself splitting my time

20   between being outside and then going inside to look at the

21   evidence, and to verify that the passwords we were given

22   were indeed correct.  So in terms of the ending time, I

23   really don't recall there being a hard end.  There was kind

24   of a -- the interview was front-load with most of the

25   questions where we covered most of the information, and

1  there was a point in time which I started spending more time

2  in the house.  Mr. Purbeck was in the backyard for the

3  duration of the search, but the interview did not take up

4  all that time.

5  Q.  Do you recall what time the consent to assume online

6  identity form was signed, Government's Exhibit 6?

7  A.  I mean, it would probably have been 30 minutes to one

8  hour after kind of we reached the critical phase of the

9  interview, so that would have been 10:00 to 10:30.

10  Q.  In the morning?

11  A.  In the morning.  10:30 to 11:00 maybe.

12  Q.  Who was with Mr. Purbeck when you got up to go in the

13  house?

14  A.  Most of the time I recall Special Agent Pinette was

15  still with him.

16  Q.  Were there any other agents out there with him during

17  that time?

18  A.  Not during that time.

19  Q.  Did Mr. Purbeck stay in the backyard?

20  A.  He did.

21  Q.  Why not leave him alone outside?

22  A.  Once again, I think that would have been an officer

23  safety issue.

24  Q.  How so?

25  A.  The search warrant covered the whole house, including

1   the backyard.  Obviously the storage house probably had

2   tools and other things that could be improvised as a weapon.

3   Q.  Did he ask to get up and walk around in the backyard?

4   A.  He did not.

5   Q.  Would you have allowed him to do so if he wanted to?

6   A.  Yes.

7   Q.  I believe you testified before as to the gate or the

8   exit from the backyard to the front yard.  Were any agents

9   blocking that exit?

10  A.  No.

11  Q.  So did Mr. Purbeck attempt to leave?

12  A.  No.

13  Q.  What if he asked to leave?

14  A.  We would have allowed it.

15  Q.  Did any other authorities arrive to speak to

16  Mr. Purbeck?

17  A.  At some point in the day a detective and an IT

18  supervisor from Ada County arrived.

19  Q.  Do you recall what time they arrived?

20  A.  I don't recall.

21  Q.  Were you part of that interview?

22  A.  I was not.

23  Q.  About what time was the search warrant concluded?

24  A.  Around 2:00 p.m.

25  Q.  And did you have any interaction with Mr. Purbeck around

1    that time?

2    A.  I don't think so.

3    Q.  Did you provide anything to Mr. Purbeck?  A business

4    card, or any documents?

5    A.  I believe at some point I gave him probably my business

6    card, definitely my phone number, because I received a call

7    from him the next day.

8    Q.  Tell us about that interaction where you provided the

9    business card.  How did Mr. Purbeck appear at that time?

10   A.  I don't recall specifically giving him the business

11   card, but I know that I must have given him something with

12   my information on it because I got a call from him the next

13   day.

14   Q.  Did you see Mr. Purbeck when agents were ready to leave?

15   A.  I don't have a recollection of that.

16   Q.  Okay.  Did Mr. Purbeck at any time during the day appear

17   to be suffering from heat stroke?

18   A.  No.

19   Q.  He did he appear drenched in sweat?

20   A.  No.

21   Q.  Did he appear to be in pain?

22   A.  No.

23   Q.  Did he appear to be any discomfort whatsoever?

24   A.  No.

25   Q.  Did he complain about anything?

```
1    A.   No.
2    Q.   Did he ask for any medication?
3    A.   No.
4    Q.   If he had asked for medication would you have given him
5    some?
6    A.   We would have.
7    Q.   At any point during the day were any AUSAs, assistant
8    attorneys, or prosecutors inside or around Mr. Purbeck's
9    residence?
10   A.   No.
11   Q.   Did any AUSAs travel out to Boise with you?
12   A.   Yes.
13   Q.   Who?
14   A.   Only you.
15   Q.   And did I travel out with you to Mr. Purbeck's
16   residence?
17   A.   You did not.
18   Q.   Did AUSA Nathan Kitchens travel out to Boise with us?
19   A.   No.
20   Q.   Was Mr. Purbeck restrained that day?
21   A.   No.
22   Q.   Were handcuffs ever put on him that day at any point?
23   A.   No.
24   Q.   Did he every tell you he wanted to end the interview?
25   A.   No.
```

1    Q.  Did anyone promise Mr. Purbeck anything to get him to

2    talk to you?

3    A.  No.

4    Q.  Did anyone ever lay a hand on Mr. Purbeck or touch him

5    that day to your knowledge besides the pat down that you

6    described?

7    A.  The only encounter I recall is the pat down.

8    Q.  Did anyone threaten him at all that day?

9    A.  No.

10   Q.  Did anyone try to trick Mr. Purbeck?

11   A.  No.

12   Q.  Did he ever appear dehydrated?

13   A.  No.

14   Q.  Did he ever appear sick?

15   A.  No.

16   Q.  Did he ever slur his speech?

17   A.  No.

18   Q.  Did he ever ask for a hat or sunscreen?

19   A.  No.

20   Q.  Were there any moments of levity that day with

21   Mr. Purbeck?

22   A.   There were.  There was a time when we were exploring

23   some of his online nicknames, and we asked him if he used

24   the nickname studmaster and studmaster1 on Alphabay, and he

25   said he did.  He described that as a nickname that his

1    friends had given him because he said he wasn't good with
2    girls.  And I recall that all three of us, myself, Agent
3    Pinette, and Mr. Purbeck had a chuckle about that one.
4    Q.  Did Mr. Purbeck contact you after that day of the
5    search?
6    A.  He did.  I believe he called me and left me a voice mail
7    the next day.
8    Q.  Do you recall what that voice mail said?
9    A.  I don't recall, but I do remember getting a phone call
10   from him the day after that.
11   Q.  Tell us about that phone call.
12   A.  In that phone call I remember I was at the grocery
13   store.  I took the phone call from Mr. Purbeck and he
14   explained to me that he had additional information that he
15   wanted to share.  He said that he was willing to meet with
16   the government to talk about this additional information.
17   You know, I asked if he would be willing to participate in a
18   proffer session.  He said he would.  And I contacted the
19   AUSAs, including yourself, in this case, to arrange a target
20   letter to be issued for Mr. Purbeck so that he could get
21   representation and join us for a proffer session in Atlanta,
22   Georgia.
23   Q.  Did he eventually come to Atlanta for a proffer meeting?
24   A.  He did.
25   Q.  Where was that held?

1    A.   It was held at the FBI office in Atlanta.

2    Q.   When was that?

3    A.   I believe the date was September 9, 2019.

4    Q.   And what was he demeanor during that proffer meeting?

5    A.   His demeanor was the same as it was in the interview.

6    It was calm, respectful, and he was still articulate and

7    smart.

8              MR. HERSKOWITZ:  That's all I have.

9              THE COURT:  Mr. Hall, you may cross-examine.

10                      Cross-Examination

11   BY MR. HALL:

12   Q.   Good morning.  We met briefly, I guess we've talked on

13   the phone before, but we met briefly this morning.  I am

14   Drew Hall, Mr. Purbeck's attorney.

15   A.   Good morning.

16   Q.   Let me ask you, at the very beginning of the August 21,

17   2019 approach to Mr. Purbeck's house out in Boise, Idaho --

18   if I get this wrong -- I understand what you testified to,

19   you said that you and another agent or at least one other

20   agent, approached Mr. Purbeck.  You were not the agent first

21   making contact with Mr. Purbeck, but you were there within

22   seconds.  Did I get that right?

23   A.   That is correct.  Yes.

24   Q.   And if I also heard correctly, you said that -- I wasn't

25   clear which agent, but an agent performed a pat-down of

1    Mr. Purbeck.

2    A.  Yes.

3    Q.  Now, was there anything at that point of day that caused

4    you to believe that Mr. Purbeck was armed?

5    A.  No.

6    Q.  Did you do the pat-down, or someone else?

7    A.  I did not.  I don't recall the identity at the time, but

8    I remember in my capacity as one of the co-case agents.

9    Q.  What is the answer to that question?

10   A.  I believe it was Agent Ryan O'Neil.

11   Q.  And so you and Agent O'Neil approached and Agent O'Neil

12   is the one who patted down Mr. Purbeck to your recollection?

13   A.  My recollection.

14   Q.  Fair enough.  But I understand you are a little fuzzy --

15   not fuzzy, but not 100 percent that it was agent O'Neil but

16   you are 100 percent that Mr. Purbeck was patted down for

17   weapons; correct?

18   A.  Yes.

19   Q.  And you would agree with me, even though I think we all

20   know the language patting down, I will state it for the

21   record, that requires you to put hands on the person's body;

22   correct?

23   A.  Correct.

24   Q.  All right.  And in some form or fashion Agent O'Neil or

25   whomever from the FBI would have grabbed ahold of

1    Mr. Purbeck and put his hands on him to check for weapons;
2    correct?
3    A.   I don't know that I would use the word grab.  But pat
4    down around the waistband.
5    Q.   Is it your testimony that whoever patted down just kind
6    of stood back and reached out, or did they reach up there
7    and put their hands on him and either frisk him or otherwise
8    kind of keep hold of him and see whether he was armed or
9    not?
10   A.   The only interaction I recall, patting down of the waist
11   band.
12   Q.   How long have you been in law enforcement?
13   A.   Twelve years.
14   Q.   How long with FBI?
15   A.   Twelve years.
16   Q.   Is it fair to say you've frisked people before?
17   A.   Yes.
18   Q.   Checked them for weapons for officer safety, or whatever
19   reason?  Correct?
20   A.   Sorry to interrupt you.  Yes.
21   Q.   No, if I misspeak you can correct me.  Is that true?
22   A.   Yes.
23   Q.   And in your experience, when someone gets patted down,
24   it involves law enforcement putting their hands on that
25   individual to control them, as well as to pat them down;

1   correct?  Because if they have a weapon, you don't want

2   something wacky to happen?

3   A.  I don't know that it would be both control and searching

4   for a weapon because I don't think you can use two hands to

5   pat someone down and hold them at the same time.

6   Q.  Were you right there with Mr. Purbeck when Agent O'Neil

7   was patting him down?

8   A.  I believe it was within eyesight.  I don't remember

9   exactly how close I was.

10  Q.  When you first approached Mr. Purbeck, he was leaning

11  into his car, was he not?

12  A.  I don't recall.

13  Q.  All right.  Am I right that he was startled to see the

14  FBI there?

15  A.  I don't know how he felt.

16  Q.  Fair enough.  That is more than fair.  From your

17  observation, did he appear to be surprised to be interacting

18  with law enforcement at 7:30-something in the morning?

19  A.  Honestly, no.  He was surprisingly calm.

20  Q.   Did you ask or hear anyone else ask was it okay to pat

21  Mr. Purbeck down?

22  A.  I don't recall hearing that.

23  Q.  I also thought I heard you say, or maybe I misheard,

24  that days later when you went back and wrote up the FBI 302

25  regarding this search, you documented that no law

1    enforcement were displaying weapons upon approach to the
2    house.  Did I hear that right?  Or did I mishear you?
3    A.  I think what we documented is no weapons were visible on
4    the approach to Purbeck, not specifically addressing the
5    house.
6    Q.  Okay.  When you say no weapons were visible on the
7    approach to Purbeck, are you testifying that that reference
8    is to Mr. Purbeck that no weapons were visible?  Or that no
9    law enforcement had weapons out?
10   A.  That no law enforcement officers had weapons out.
11   Q.  All right.  I will show you what I have marked for
12   identification as Defendant's Exhibit 17.  Can you take a
13   look at that?
14   A.  Yes.  I see this.
15   Q.  And that -- why don't you tell me what you recognize
16   that to be?
17   A.  This is the FD-302 investigative report that myself and
18   James Pinette wrote after the interview of Mr. Purbeck.
19   Q.  If I am right, and I will direct your attention now to
20   about six lines down.  Let me back up.  So if I have this
21   correct, what you documented was, first of all, Mr.
22   Purbeck's name; correct?
23   A.  Correct.
24   Q.  The first sentence.  And that he was interviewed at his
25   residence -- it doesn't say the date of the interview, but

1    he was interviewed at his residence during the execution of
2    a search warrant; correct?
3    A.  Correct.
4    Q.  And then you started and you start talking about prior
5    to the initiation of the interview, Purbeck was approached
6    outside of his residence as he was leaving for work and he
7    was advised the FBI had a search warrant to search his
8    residence including any buildings and vehicles on the
9    property.  That is the next sentence after you've identified
10   your topic sentence of the report; correct?
11   A.  Correct.
12   Q.  Then the sentence that you and I were talking about just
13   a moment ago was, the next sentence says, interviewing
14   agents observed no weapons visible during this approach.
15   Did I get that right?
16   A.  Correct.
17   Q.  And if I understand your testimony, you are saying that
18   that reference is to FBI and law enforcement not having
19   weapons visible, not that no weapons are visible on your
20   approach to Mr. Purbeck, Mr. Purbeck having weapons?
21   A.  That is correct.  That reference was to none of our
22   weapons were visible during the approach.
23   Q.  Why wouldn't you just say that?
24   A.  I don't know why we didn't say it any particular way.  I
25   think it speaks for itself.

1   Q.  I guess here is what I am getting at, you are talking

2   about Mr. Purbeck, you are doing an interview with him.  You

3   are talking about prior to the initiation interview you are

4   approaching him outside his residence; right?  Then your

5   next sentence is no -- interviewing agents observed no

6   weapons visible during this approach.  I mean, that is

7   literally what it says; correct?

8   A.  Correct.

9   Q.  And the part I am trying to make sure I understand is, a

10  reader, me, would think that means you are referring to Mr.

11  Purbeck.  But you are testifying that has something to do

12  with -- it has nothing to do with Mr. Purbeck and whether he

13  should be patted down, or how the approach was when you came

14  up to him, which is what we are talking about, but said that

15  this has to do with whether other agents had their weapons

16  drawn.

17  A.  Yes.  That's -- when we wrote this sentence, and I maybe

18  didn't recall at the time it could have been interpreted

19  ambiguously, but when we wrote this sentence we intended it

20  to document the kind of things such as our visibility of

21  weapons.  And there are other instances in here where we

22  talk about the context that could be useful in evaluating

23  the interview.  So we put that in here because we thought it

24  was helpful to memorialize.

25  Q.  Did you do that based on just your recollection?

1   A.  When we wrote this it was based on my recollection and

2   the recollection of Agent Pinette, and we wrote it within

3   days of conducting the search.

4   Q.  So the investigation, in these events described,

5   happened on August 21; correct?

6   A.  That is correct.

7   Q.  If I am correct, you drafted this report on August 27,

8   six days later; correct?

9   A.  That is correct.  Six calendar days.  It would have been

10  under the five business days that we had per FBI policy to

11  write the investigative report.

12  Q.  I am not quibbling about your policy, I am just making

13  sure I am doing my math right.  So it's six days later when

14  this -- six plus one -- yeah.  Six days later that you sat

15  down and wrote this.

16  A.  Correct.

17  Q.  All right.  Let me show you something different here.

18  Let me show you what is marked for identification as

19  Defendant's Exhibit 18.  Do you recognize this?

20  A.  That is my handwritten notes from the morning of August

21  21.

22  Q.  All right.  Hang on to those.  We'll be back to those in

23  a moment.  I wanted to make sure that I have the right

24  person.  So actually -- let me ask you.  The notes, am I

25  right that those reflect notes you took after you had sat

1    down with Mr. Purbeck in the backyard and don't reflect
2    anything prior to that time?
3    A.   That is correct.
4    Q.   Okay.  And so the initial conversation about approaching
5    the house and your interaction with Mr. Purbeck, that is
6    just done from memory?
7    A.   It is done from my memory at the time I wrote the
8    report.
9    Q.   Along with Agent Pinette's memory?
10   A.   Yes.
11   Q.   Okay.
12            MR. HALL:  Judge, I have a series of photographs.
13   Again, I consulted with the government counsel and we are
14   just going to introduce them all at once to kind of help
15   move the process along.  It's going to be Defendant's
16   Exhibits 1 through 16.  I am going to show them to the
17   agent, and we will kind of move them into evidence.
18   BY MR. HALL:
19   Q.   I am going to show you what I have marked for
20   identification as Defendant's Exhibits 1 through 16 and ask
21   you to just rifle through those real quick.
22   Have you had a chance to look at them?
23   A.   Yes, sir.
24   Q.   So, with respect to Defendant's Exhibits 1 through 16,
25   do you recognize those as FBI photographs taken on August

1    21, the day of the search?

2    A.   Yes.

3    Q.   And I will represent to you, and I already discussed

4    with defense counsel, this is the digital version of those

5    same photographs that I have saved on a thumb drive.

6              MR. HALL:   This is Defendant's Exhibit 19, your

7    Honor.   So I will move into evidence Defendant's Exhibits 1

8    through 16, and Defendant's Exhibit 19 which is the digital

9    version of Defendant's Exhibit 1 through 16.

10             MR. HERSKOWITZ:   No objection, Your Honor.

11             THE COURT:   They are admitted.

12             MR. HALL:   Unfortunately, my laptop won't connect

13   to the Court's system, at least if it does not in the way

14   that I am familiar with, so what I am planning to do is to

15   go the old-school way which is to show the witness the

16   digital versions of the exhibits to talk through.   If we

17   need to display anything on the ELMO, and Your Honor wants

18   to look at it, I am happy to do it as we go along.

19             THE COURT:   Do you want to just put them on the

20   ELMO?

21             MR. HALL:   I want to talk about the date and time.

22   I brought an HDMI cable, but that is not the way to go, so

23   that is an oversight by me.

24             THE COURT:   You may proceed.

25   BY MR. HALL:

1    Q.  So, Agent Coffin, you see, this is Defendant's Exhibit
2    19 I am showing you.  Do you see in there a series of jpeg
3    files label Ex 1 through Ex 16?
4    A.  I do.
5    Q.  And what I am going to do is open these up and make sure
6    they correspond, if you don't mind checking that we have a
7    good record here, so I am going to just flip through them.
8    And if you go along, you let me know.
9    A.  They seem to match, to me, to correlate.
10   Q.  We are going to take Defendant's Exhibit 1 first, and if
11   I come over here and right click on properties --
12           MR. HERSKOWITZ:  Your Honor, may I relocate to be
13   able to see?
14           THE COURT:  Yes.
15           MR. HALL:  Please, Mr. Herskowitz, please.
16   BY MR. HALL:
17   Q.  So you have seen that I opened the properties in exhibit
18   1; correct, Agent Coffin?
19   A.  Correct.
20   Q.  If I go here to details, do you see where it says date
21   taken?
22   A.  I do.
23   Q.  All right.  What does it say there?
24   A.  It says August 21, 2019, 7:53 a.m.
25   Q.  All right.  So let's switch to our ELMO.  So are you

1    familiar with what this photograph is?

2    A.   This is the cover sheet for the search photography.

3    Q.   All right.  And tell the judge, or actually let me ask

4    you, am I right that what happens when the FBI conducts a

5    search warrant, specifically when the FBI conducted a search

6    warrant in this case, at this residence, the FBI had a

7    photographer who, throughout the course of the search, took

8    a series of photographs; correct?

9    A.   That is correct.

10   Q.   And this photograph, the cover sheet, is the first

11   photograph that was taken from that series; correct?

12   A.   Correct.

13   Q.   Hence the cover sheet.

14   A.   Yes.

15   Q.   Right.  So is it safe to say then that as of 7:53 a.m.,

16   the FBI photographer was on scene and beginning to take

17   photographs at Mr. Purbeck's residence?

18   A.   I think that that is safe to say with one caveat, which

19   would be the time sticker that you were showing me that are

20   coming from the file would have been times that the camera

21   was set to.  And since I was not the photographer, I do not

22   know whether the photographer insured that the time was

23   exactly correct when she started taking photos.

24   Q.   So your caveat -- so let me make sure I understand.

25   Your caveat is that the FBI photographer, the camera -- and

1    the photographer is Ms. Nicole Hideman; correct?

2    A.   Correct.

3    Q.   So your concern is that maybe the time stamps on the FBI

4    camera might not be accurate?

5    A.   I just can't testify to that because I never had

6    possession of the camera that day.

7    Q.   Okay.  Absent that caveat, any other problems with

8    thinking that is the first photograph that was taken?

9    A.   No.

10   Q.   In fact, thinking back to your testimony, where you

11   testified that she got there somewhere in the 7:30, 8

12   o'clock range.  This doesn't seem like a crazy time;

13   correct?

14   A.   Correct.  It doesn't seem to be extremely off.

15   Q.   In fact, is it safe to say it doesn't seem to be off at

16   all, given that your testimony was that you showed up

17   between sometime between 7:30 and 8:00 a.m.?

18   A.   I would say it seems to be at least roughly accurate.

19   Q.   Okay.  Now, at the time that the FBI photographer

20   started taking photographs, correct me if I am wrong, but

21   the FBI would have already gone in and searched the

22   situation such as Mr. Purbeck's, and specifically, not

23   generically, but what happened at Mr. Purbeck's house is the

24   FBI goes in there and, quote unquote, clears the house;

25   correct?

1   A.  Yes.

2   Q.  Looking for any kind of problems that would pose a

3   danger to the agents; correct?

4   A.  That is correct.

5   Q.  Before any actual searching starts, you, per se you, but

6   you and your colleagues, the FBI, will go in there and take

7   control of any persons who are in there; correct?

8   A.  The agents would ensure that the house was safe of any

9   threats.

10  Q.  And that includes within it taking control of any

11  persons who are inside the home; right?

12  A.  I am not sure that it would have been -- that I would

13  use the word taking control, but just making sure they

14  didn't present a threat.

15  Q.  In some way making contact with them and insuring that

16  they weren't going to cause any harm to officer safety, as

17  you testified to, or to the evidentiary value of whatever

18  search maybe be taking place?

19  A.  That is correct.

20  Q.  So certainly in that sense, to the extent they are in

21  the house, the FBI at that point has -- they are not able to

22  just wander freely around the house, right?  The FBI has

23  some level of control over him or her; is that correct?

24  A.  That is correct.

25  Q.  The same with Mr. Purbeck, he was outside.  And you

1    testified earlier he couldn't just wander in the house on

2    his own for reasons you gave.  So at some level the FBI has

3    control of his comings and goings; correct?

4    A.   Correct.

5    Q.   Now, let's go to our next photograph.  So this is

6    exhibit 2, the same or similar to one of the ones that you

7    testified to with the government; correct?

8    A.   That is correct.

9    Q.   And if we go to properties, and we go to details, what

10   does the date and time there say?

11   A.   August 21, 2019, 7:55 a.m.

12   Q.   Okay.  To the extent there is any question about whether

13   the cover sheet that was taken was taken at or near the

14   house, we know certainly the FBI photographer was on scene

15   at 7:55 a.m., subject to your caveat about you haven't

16   personally checked the camera; right?

17   A.   Correct.  Roughly that would have probably been when

18   exhibit 2 was taken.

19   Q.   And then let's flip you over here to Defendant's Exhibit

20   5 and Defendant's Exhibit 6.  And I will jump back on you

21   real quick to make sure, this is Defendant's Exhibit 2 that

22   we were just talking about with the 7:55 a.m. time; correct?

23   A.   Correct.

24   Q.   And I am going to put up Defendant's Exhibit 5.  Does

25   that look right?

1    A.   Yes.

2    Q.   All right.  If we were to go over here to Defendant's

3    Exhibit 5, that's Defendant's Exhibit 5; right?

4    A.   Correct.  It is.

5    Q.   If we go to the properties, we go to details, what is

6    the date and time then?

7    A.   August 21, 2019 at 7:59 a.m.

8    Q.   All right.  And for Defendant's Exhibit 6, did I put

9    that up correctly?

10   A.   Yes, sir.

11   Q.   All right.  And again, to confirm for you, opening up

12   Defendant's Exhibit 6 on the Defendant's Exhibit 19; is that

13   right?

14   A.   It is.

15   Q.   All right.  And we go back to properties.  And right

16   there, what is the date and time?

17   A.   August 21, 2019, 8:01 a.m.

18   Q.   So let's pause there for a second.  So if I remember and

19   understood your testimony correctly on direct, you believe

20   that you had started the interview with Mr. Purbeck by 8:00

21   a.m.  Correct?

22   A.   Yes.

23   Q.   And in fact, I understand we have this caveat you have

24   raised about Ms. Hideman's camera, but looking at

25   Defendant's Exhibit 5 at 7:59 a.m., and Defendant's Exhibit

1   6 at 8:01 a.m., and then thinking back to your testimony on

2   direct, you would agree with me, would you not, that

3   certainly by 8:00 a.m. it appears that Agent Pinette was

4   sitting outside of Mr. Purbeck's house in the backyard;

5   correct?

6   A.   Correct.

7   Q.   And that seems to be corroborated by the photographic

8   evidence that the FBI produced to me in this case; correct?

9   A.   Correct.

10  Q.   And although we can't see in Defendant's Exhibit 6

11  because of the way of the curtains, you believe the back of

12  that person's head is Agent Pinette?

13  A.   I think so.  Yeah.

14  Q.   And if I understood your direct testimony, at that time

15  you would have still been with Agent Pinette, you would have

16  been outside interviewing Mr. Purbeck; correct?

17  A.   I think so.

18  Q.   Is that what you testified to on direct?

19  A.   Yes.

20  Q.   I know we can't see you here because there is a curtain,

21  we can't see Mr. Purbeck either, correct?

22  A.   Correct.

23  Q.   But based on your direct testimony and based on looking

24  at these photographs, it looks like around right around 7:51

25  and to 8 o'clock a.m. you had moved already moved the

1    chairs, sat down, and started talking to Mr. Purbeck;
2    correct?
3    A.  I can't tell that we are talking here but, yeah, the
4    first two.  We certainly found chairs and sat down.
5    Q.  But what you are able to testify to at this point is
6    that between 7:59 a.m. on August 21 and 8:01 on August 21,
7    you, Agent Pinette, and Mr. Purbeck had gone from the
8    outside when you first encountered him, through the house,
9    into the back, got the chairs, moved them to where you moved
10   them, sat down, and you are just not clear whether you
11   actually had started physically speaking or not, but you
12   were certainly seated preparing to speak; correct?
13   A.  Yes.
14   Q.  You could have just been sitting there looking at each
15   other I guess; right?
16   A.  Perhaps.
17   Q.  But you told us on direct you had a pretty good rapport
18   talking to Mr. Purbeck throughout the time; correct?
19   A.  I was attempting to establish rapport.  Correct.
20   Q.  All right.  So then as I understand it, and you don't
21   know exactly, but you were outside of Mr. Purbeck -- you can
22   correct me if I misremember what you said on direct --
23   somewhere between 15 to 20 minutes to 30 minutes before you
24   went inside.  Is that true?
25   A.  Yes, if you are referring to the amount of time that we

1  were out on the driveway, I believe it was fairly short, it
2  was whatever time it took to clear the house, which I think
3  was probably under 15, but definitely under 30.
4  Q.  Okay.  Which is why you gave a range of 15 to 30?
5  A.  Yes.
6  Q.  I understand it could be a little shorter, not likely to
7  be longer than 30 minutes?
8  A.  Correct.
9  Q.  And so if we were to take 7:59 -- because you would
10  agree with me you are still seated -- not you, but Agent
11  Pinette -- seated in the same manner in Defendant's Exhibit
12  5 as he is in Defendant's Exhibit 6, and we take 7:59, we
13  back out 15 minutes, then certainly by 7:46 you had
14  encountered Mr. Purbeck in the driveway; correct?
15  A.  I think that makes sense.  Yes.
16  Q.  And you wouldn't quibble with me, or maybe you would,
17  that it could be even earlier than that, but it was
18  certainly sometime 7:30 or later?
19  A.  I think so.  Yes.
20  Q.  Let's next take a look at what is marked and introduced
21  as Defendant's Exhibit 7.  All right.  I am sure that is the
22  right one.
23  A.  They look the same.  Or actually this one, this one has
24  a Coke in it.
25  Q.  All right.  We will go with Defendant's Exhibit 7.  We

1    will put Defendant's Exhibit 7 up on the screen so we can

2    see what we are doing.  Now, Defendant's Exhibit 7, let me

3    make sure that I am opening the right one.  Pop over to

4    properties.  All right, what is the date and time you have

5    there?

6    A.  August 21, 2019, 8:04 a.m.

7    Q.  And do you recognize what Defendant's Exhibit 7 is

8    showing?

9    A.  It's a picture of some of the computers and monitors in

10   Mr. Purbeck's office.

11   Q.  Okay.  And in particular, one of them is turned on;

12   correct?

13   A.  Correct.

14   Q.  I want you to hang on to 7, let's not get rid of that,

15   and get you over to Defendant's Exhibit 11.

16   A.  Yep.  Those are the same.

17   Q.  Looking at Defendant's Exhibit 11, they appear to be the

18   same as Defendant's Exhibit 7, except the right-hand monitor

19   has been turned off?

20   A.  Yes.  That seems to be correct.  And there are other

21   changes as well, but that is one of the changes.

22   Q.  What other changes?

23   A.  For example there is not the coffee cup or the Coke can

24   or the oil.

25   Q.  Right.  All kinds of stuff on the desk that is no longer

1    there.  So something has happened from Defendant's Exhibit 7

2    to Defendant's Exhibit 11; correct?

3    A.  Yes.

4    Q.  Fair enough.  I think that is a fair point you make.  I

5    want to focus on the monitor though.  So among the changes

6    between Defendant's Exhibit 7 and Defendant's Exhibit 11 are

7    that in 7 the right-hand monitor is on and in 11 the

8    right-hand monitor is off; correct?

9    A.  Correct.

10   Q.  Let's go to my thumb drive.  Same photo?

11   A.  Same photo.

12   Q.  All right.  And looking at Defendant's Exhibit 11, when

13   was that taken?

14   A.  August 21, 2019, 1:16 p.m.

15   Q.  Okay.  So we know at that point the -- at that point we

16   know that the right-hand monitor had been turned off;

17   correct?

18   A.  Correct.

19   Q.  So now our window is 8:04 to 1:16 p.m.; correct?

20   A.  Correct.

21   Q.  Okay.  Let's go to Defendant's Exhibit 10 -- 9.  Look at

22   that.  The same one?

23   A.  The same one.

24   Q.  All right.  Properties.  And what time is the date and

25   time for Defendant's Exhibit 9?

1    A.   August 21, 2019, 11:05 a.m.

2    Q.   So, just to work through these -- that is Defendant's

3    Exhibit 9, right?

4    A.   Yes.

5    Q.   So Defendant's Exhibit 9 looks like this and you say

6    that is 11:05 a.m.  Correct?

7    A.   Yes, sir.

8    Q.   And Defendant's Exhibit 11 is this one here, which is at

9    1:16 p.m.  Correct?

10   A.   Yes, sir.

11   Q.   And if I need to pop back over, I am happy to do it,

12   okay?  And Defendant's Exhibit 7 is this one here with the

13   monitor is on at 8:04 a.m.

14   A.   I mean, I don't recall at this point the time stamp, but

15   that sounds roughly correct.

16   Q.   I am not trying to trick you.  I just want to make sure

17   I get my times right.

18   A.   Actually I think 8:04 does sound right.

19   Q.   So 8:04 right here?

20   A.   Yes, sir.

21   Q.   That is Defendant's Exhibit 7.  11:05, right?

22   A.   Right.

23   Q.   That is Defendant's Exhibit 9.

24   A.   Correct.  Yes.

25   Q.   Okay.  And Defendant's Exhibit 11, 1:16 p.m.

1    A.   Correct.

2    Q.   So if we look at Defense 11 and Defense 9, we see we are

3    missing the Coke can or whatever the -- soda can and cup and

4    stuff like that?

5    A.   Yes.

6    Q.   But the real distinguishing factor between Defendant's

7    Exhibit 9 and Defendant's Exhibit 11, other than maybe some

8    small details you will pick up on, is that the right-hand

9    monitor has gone from on to off; correct?

10   A.   Correct.

11   Q.   Now, if I understand things, you had fourteen FBI

12   employees there; correct?

13   A.   Correct.

14   Q.   And nine agents.  And I guess that makes five employees;

15   correct?

16   A.   Yes.  Correct.

17   Q.   But you also had some outside individuals who came to

18   help as well from Intermountain West Regional Forensics

19   Laboratory; correct?

20   A.   That's correct.

21   Q.   Now, do you recall that when you, that morning, so

22   sometime between when you first entered the house to I guess

23   when you left the house, that you were involved with this

24   monitor that was turned on, that you came over there and had

25   a conversation with these Intermountain West Forensic

1   Computer people about that monitor?

2   A.   I mean, we weren't talking about the monitor, but my

3   recollection from looking at the report was, yes, I helped

4   triage the computer to make sure we could shut it down

5   without losing evidence.

6   Q.   Would a different way of saying triage it is that you

7   checked the lock screen settings of the Windows Operating

8   System on that computer --

9           MR. HERSKOWITZ:  Objection.  We object.  We think

10  it is outside the scope of the hearing.  Plus it is -- we

11  were hoping some questions would tie it up, but this is

12  outside the scope of the hearing.

13          MR. HALL:  I think it is well-within the scope of

14  the hearing.  What I am trying to establish is the time that

15  the interview, with respect, ended.  And that is why I am

16  doing each of these different time stamps, so we can do

17  that.  I believe, since we don't have an exact record, we

18  are having to do it by sign posts, and I believe this

19  conversation I am asking him about, and getting ready to ask

20  further about, will establish the time that he was involved

21  with these computers and will further show that the

22  difference between when the computer was on and when it was

23  off ties into when the interview had ended.  So that is why

24  I am using these time stamps, not because I am off on my

25  other motions trying to sneak in evidence about this.  I has

1    to do with the timing of the interview and portions of the

2    interview where certain information was gleaned from

3    Mr. Purbeck, which is exactly what we are doing here today.

4              THE COURT:  If you will stick to the time stamps

5    that you've been doing, I will allow those questions, but

6    don't stray beyond that area.

7              MR. HALL:  Yes, sir.  I am not violate the Court's

8    rule.  But let me -- I do need to -- so I need to be able to

9    ask him -- because I've got the time stamps, I am good

10   there, but I need to ask him about this conversation because

11   it is going to tie into those time stamps.  In other words,

12   I believe he had a conversation with these people that I

13   would hopefully be able to associate at what point that

14   happened.

15             THE COURT:  I will allow that.

16             MR. HALL:  Okay.  I just wanted to make sure that

17   I wasn't running afoul.

18             THE COURT:  Yes, sir.

19   BY MR. HALL:

20   Q.  Back to this conversation.  Did you in fact have a

21   conversation with Intermountain West Regional Computer

22   Forensic Laboratory about that you personally checked the

23   lock screen settings of the Windows operating system on the

24   computer, and determined the computer was set to not lock

25   automatically?

1   A.   Yes, I believe that is correct.

2   Q.   And I guess I can go -- I won't spend a lot of time

3   showing right now, but I can if I need to, but in addition

4   to these photographs, you actually had additional --

5   additional photographs were taken of the various different

6   tabs that were open on this computer; right?

7   A.   That is correct.

8   Q.   I'm not asking you any more about that, I just wanted to

9   establish that conversation took place.  Now then, am I also

10  correct that as part of that conversation, in talking to

11  Intermountain West Regional Computer Forensics folks, that

12  you asked that nothing further be conducted on this machine

13  until after the interview with Mr. Purbeck was completed?

14  A.   I don't recall that, but it is in the report.  So I have

15  no recollection that it is different from that.

16  Q.   So that sounds right to you; correct?

17  A.   I believe it to be correct.

18  Q.   Okay.  And so tying it back in to Defendant's Exhibit 9

19  and 11, then am I safe in saying that in fact -- let me ask

20  you this as well.  And am I also right that ultimately you

21  came back, and the same computer we've been talking about in

22  Defendant's Exhibit 7, 9, and 11, you came back in,

23  confirmed there was no mounted encrypted volumes, and then

24  soft shut down the computer and disconnected it so it could

25  be collected?

1    A.   I think so.  Yes.

2    Q.   That is something you did personally; correct?

3    A.   Yes.

4    Q.   So given that, am I right in saying that looking

5    Defendant's Exhibit 9, Defendant's Exhibit 11, we can have

6    some confidence that you conducted that shutdown, soft

7    shutdown and disconnection at some point after 11:05 a.m.,

8    but before 1:16 p.m.?

9    A.   Yes.  That sounds correct.

10   Q.   We don't know where, but we just know here at 1:16

11   Exhibit 11 is off, and here Exhibit 9, at 11:05 it is on;

12   correct?

13   A.   Correct.

14   Q.   And am I right that we can further, based on your

15   interactions with the Intermountain West Regional Computer

16   folks, ascertain that the interview, that you had asked them

17   don't do anything with the computer until after the

18   interview is completed, had to have been completed at some

19   point after 11:05 a.m.?

20   A.   I mean I think, as I testified on direct, you know, the

21   interview didn't have -- it wasn't like the interviews done

22   now.  It wasn't a, to my recollection, a hard and fast

23   termination to the interview.  I remember that, you know, it

24   was front-loaded with information, we got through the

25   critical phase, there was a part we got hard drive, we got

1    passwords and talked about computers.  It was probably kind

2    of in that phase once I started, as I testified, going into

3    the house, testing the password.  The interview, parts of

4    the interview, may have persisted past that, but it was kind

5    of in that phase where I was coming in to verify the

6    password and look at the computers that that computer was

7    likely shut down.

8    Q.  That is actually a better question than -- your answer

9    is better than the question I asked.  So let me ask it that

10   way so we are clear on the record.  So if I understand your

11   testimony, the critical part of the interview, with respect

12   to getting passwords and stuff, would have occurred at some

13   point, and then you went inside with that information to try

14   it out, and that would have happened sometime -- and that's

15   at or around the time that you turned off this computer that

16   is on in Defendant's Exhibit 9; correct?

17   A.  I'm sorry --

18   Q.  Sure.  Strike that question.  That was a terrible

19   question.  Looking at Defendant's Exhibit 9, and based on

20   what you just testified to, that the critical part of the

21   interview when you got the passwords, that is when you

22   started coming in, and that is when you would have tested

23   the password and shut down the computer in Defendant's

24   Exhibit 9; correct?

25   A.  If I may correct that.

1    Q.   You may.

2    A.   So when I was referring to the critical part of the

3    interview I was talking about once we got to the point where

4    Mr. Purbeck accepted responsibility for being Lifelock and

5    admitted to his hacks.  I believe I testified on direct that

6    that happened within an hour-and-a-half of the interview

7    starting; and that afterwards we had a conversation about

8    the victims and the computers.  So we would have been --

9    when I refer to that critical part I was talking about

10   basically the confession.  And then it was sometime after

11   that that we talked about the computers, that I was given

12   the VeraCrypt password, and when I went into the office to

13   test the password.

14   Q.   Okay.  I am not asking -- I'm sorry, I think I am not

15   asking a clear question, and that is fine.  So to state it

16   again, I understand you are saying the critical part was

17   when he made some kind of admission statement to you;

18   correct?

19   A.   Correct.

20   Q.   Fair enough.  I want to ask you about when you got the

21   passwords.  And so when you got the passwords from him, am I

22   right, that that is when you went inside the house, and that

23   is when you tested them, and that is when you closed down

24   this computer that we've been talking about in Defendant's

25   Exhibit 9?

1    A.   That is probably when it happened, but to clarify, the
2    password was not for that computer.
3    Q.   Fair enough.  But your recollection, as you testify here
4    today, is that's about the time when it occurred, somewhere
5    in that window?
6    A.   Correct.  It would have been within the time -- I
7    believe it was within the time that I was coming in to
8    examine the evidence in the office.
9    Q.   And we would know that would have happened sometime
10   between 11:05 and 1:16 because of Defendant's Exhibit 9 and
11   Defendant's Exhibit 11, correct?
12   A.   I think it is correct to say that some portion of that
13   would have been.  I mean, I might have started coming into
14   the office prior to that time, but I just know that that
15   monitor was shut off between the time that you just
16   reiterated.
17   Q.   Right.  I guess the part I am trying to get at is when
18   you got the passwords.  And if I understood your testimony,
19   and again, if you need to correct me, you do.  But if I
20   understand, what you just testified to was I got the
21   passwords, I went in there, I tested them, I understand that
22   is what it is, but that is when I started shutting down
23   these computers, and this would have been the computer I
24   shut down, so it had to be after 11:05; correct?
25   A.   Let me check my understanding of your question.

1  Q.  Sure.

2  A.  I believe you are trying to use the time between

3  approximately 11 o'clock and 1 o'clock to create bookmarks

4  around when I received the password.

5  Q.  Correct.

6  A.  I don't think that it is necessarily in that time frame

7  because, you know, we had this critical part of the

8  interview, I believe it was sometime before 9:30, and then

9  we had a further interview about -- we continued the

10  interview to explore like the victims and the computers, and

11  then at that point I came in and started testing the

12  password.  That may have been before I triaged this computer

13  and turned it down.  The password that we are referring to

14  is not the password -- it doesn't have anything to do with

15  this computer, but it does have something to do, to your

16  point, when I began to enter the office.  Sometime in that

17  time period we are talking about I was in the office, but I

18  probably had the password before then.

19  Q.  Right.  Or a way of putting it would be that certainly

20  between by 11:05, certainly between 11:05 and 1:16 at some

21  point it, sounds like you don't recollect, you had the

22  password by that point?

23  A.  I believe I had it before 11:00.  Yes.

24  Q.  I want to show you what we have marked for

25  identification Defendant's Exhibit 14.

1    A.  It's the same.

2    Q.  Looking over here at Defendant's Exhibit 14.  Same one?

3    A.  Same one.

4    Q.  And go to properties and go to details.  And what does

5    it say about the time there?

6    A.  August 21, 2019, 1:59 p.m.

7    Q.  And am I right that what this is showing and is an

8    inventory sheet and certainly a page of the search warrant

9    that is on the front stoop of Mr. Purbeck's home?

10   A.  That's correct.

11   Q.  And if we were to turn over here to 15 and 16 -- tell us

12   what 15 and 16 are.

13   A.  15 is a picture of Mr. Purbeck's front door where the

14   door is shut, and 16 is a picture of the front of the house.

15   Q.  And those kind of photographs that were taken by the FBI

16   as they exited and left the premises?

17   A.  That is correct.

18   Q.  All right.  So we go to 15.  Make sure I have the right

19   one.  Yes?

20   A.  It's the same one.

21   Q.  And 16?

22   A.  It's same one.

23   Q.  And I am not going to display those, but I will look at

24   the properties.  So Exhibit 15, what is the date and time

25   there?

1   A.   August 21, 2019, 2 o'clock p.m.

2   Q.   Okay.  And the very last one that was taken, photograph

3   that was taken by the FBI?

4   A.   August 21 --

5   Q.   I've got to go to the details.  Your all right, you're

6   fine.  But what does it say right there?  I'm looking at

7   date taken.  All of these are date taken, right?

8   A.   Yes.  That is how it is documented in the metadata for

9   that file.

10  Q.   And what is that?

11  A.   August 21, 2019, 2 o'clock p.m.

12  Q.   Okay.  All right.  So these are the last photographs

13  that were taken.  That corresponds to your recollection that

14  we were done with the search at 2:00 p.m.; correct?

15  A.   Correct.

16  Q.   And that corresponds with your written report as to when

17  the search was done; correct?

18  A.   It does correspond to the written report for the search.

19  I don't know if I wrote the search 302, I think it was Agent

20  Harshbarger, but that is consistent.

21  Q.   Okay.  But your recollection on all fronts, you guys,

22  meaning you and the FBI, were done and completed by 2:00

23  p.m.; correct?

24  A.   Correct.

25  Q.   So circling back to this caveat you dropped on me a

1    little bit ago, having now gone through it, it looks like

2    that timer or that clock date and time stamp on the FBI

3    camera was pretty close to everything that you recollected

4    and that was recorded as to when the search ended; correct?

5    A.   I would still say that is it is roughly accurate.

6    Q.   Okay.  You testified earlier you ended around 2:00 p.m.

7    Correct?

8    A.   Around 2:00 p.m.

9    Q.   So it looks like that is consistent with what the FBI

10   camera photographs show; correct?

11   A.   Correct.

12   Q.   Let me show you Government's Exhibit 6.  That's the

13   consent to assume online identity form.  Correct?

14   A.   Correct.

15   Q.   Now, there's a date on here, but no time on here;

16   correct?

17   A.   That is correct.

18   Q.   And am I right that there is no -- do you usually put a

19   time?

20   A.   We don't typically put times on these, for whatever

21   reason.

22   Q.   You do put times on Miranda rights forms; correct?

23   A.   I think you are right.  Yes.

24   Q.   I mean, you have used the FBI Miranda rights forms

25   before?

1    A.   I have.

2    Q.   And to your recollection -- I can show you one if you

3    want.   But your recollection is they have a time spot for

4    them, right?

5    A.   I would believe you could say they do, but I don't

6    recall the form offhand completely.

7    Q.   Remind me before we're done and I'll show it to you.

8    Alright, so turning back to this.   I don't need to get all

9    deep in your credentials, but you are in the computer

10   forensics investigation group?   What's the right word?

11   A.   So I am in one of two cyber squads in Atlanta.

12   Q.   Which means what?

13   A.   It means we investigate computer intrusions, you know,

14   in pretty much all shapes and sizes.

15   Q.   And to do that, I don't know how to say this without

16   sounding jerky, but let me just try it anyway.   I mean, you

17   are not just -- you have a particular -- in addition to

18   being an FBI agent, you have a particular expertise to focus

19   on computers.   Correct?

20   A.   I do.

21   Q.   And so in that sense your expertise is different than

22   maybe just a regular field agent insofar as it relates to

23   computers; correct?

24   A.   I mean, I am a regular field agent with background

25   experience in computers and FBI training in computers and

1    forensics.

2    Q.   You mean certifications?

3    A.   Many.  Yes.

4    Q.   As relates to computers?

5    A.   Yes.

6    Q.   Such as what?

7    A.   I mean, I can go back.  I've been programming since I

8    was in elementary school.  Worked professional for about 12

9    years.  I did many Microsoft certifications, completed the

10   MSCS certification series, Java programmer.

11   Q.   I am going to interrupt you, but if you need to keep

12   going, I'm going to let you keep going, but I think it is

13   safe to say you know all about computers; correct?

14   A.   I mean computers is -- there is a lot that goes into

15   computering and computer ecosystem.  I wouldn't say that I

16   know everything about everything.  But I do have -- my whole

17   life has been about computers.

18   Q.   You know about VeraCrypt?

19   A.   I am familiar with VeraCrypt.

20   Q.   And you recognize that VeraCrypt is an encryption

21   mechanism that makes it very difficult to get into without a

22   password; correct?

23   A.   Correct.

24   Q.   And in fact, would you agree with me that but for the

25   passwords that Mr. Purbeck provided you through this

1    interview process, it would be essentially impossible for

2    you -- for the FBI to have accessed the information that was

3    encrypted on those devices?

4    A.   Actually I would like to disagree with you on that.

5    Q.   Why?

6    A.   I understand that VeraCrypt is a very strong type of

7    encryption, and if we look at Mr. Purbeck's password it was

8    leviathan, l-e-v-i-a-t-h-a-n, plus tilde 129.  So 14

9    characters.  That is a very complex password.  Leviathan is

10   a word, it's a dictionary word.  It does not count to the

11   complexity of a password.  So essentially his password was

12   leviathan plus tilde 129, which is a six-character password,

13   which is very week.  I looked at the -- I don't know if I

14   can say this, but the filing your expert did about the

15   complexity of the password, and when I saw used the same

16   program that he did and gave it x criteria that it was a

17   six-character password, it said we can brute force it in

18   under one minute.  Additionally, the papers we found from

19   Mr. Purbeck's house included a handwritten list of

20   passwords.  Many of those passwords started with the word

21   leviathan and had other random letters and numbers behind

22   it.  So it would have been I think trivially simple for us

23   to brute force the password for that computer using the

24   information we found in the search and also the weaknesses

25   in the password he chose itself.

1   Q.  All right.  That's what you -- you never did that

2   though, correct?

3   A.  We did do that for some of the other computers found in

4   the search, and we did successfully decrypt one additional

5   computer.

6   Q.  There are other ones that you did not decrypt; correct?

7   A.  Right, but I don't know the complexity of those

8   passwords.

9   Q.  But the 14 character -- correct me if I am wrong.  The

10  14 character password is incredibly complex; correct?

11  A.  If it is random, a 14-character password would be

12  complex.

13  Q.  Meaning it would take hundreds of years to break, brute

14  force; correct?

15  A.  Sorry to cut you off.  Yes, correct.

16  Q.  You didn't cut me off.  It's no problem.  And your

17  counterpoint to me, from what I understand, is well that is

18  fine, but I don't count it, even if it is 14 characters, I

19  don't count it as a 14-character password either because

20  somehow the first leviathan numbers I am not going to count,

21  or I would have, from some other documents found in

22  Mr. Purbeck's house, identified the leviathan and figured

23  that is a recurring theme, then I am just working with six

24  characters?

25  A.  Correct.  This computer password was vulnerable to a

1    dictionary attack.

2    Q.   What?

3    A.   He chose dictionary words, so in decryption methodology,

4    people will often use dictionary words because they can be

5    remembered, so many forms of trying to crack encryption

6    guess at passwords.  And Mr. Purbeck chose -- I'm sorry --

7    guess at passwords by using dictionary words.  And

8    Mr. Purbeck chose a dictionary word for his password.

9    Q.   So that is what you think you could have done, but you

10   never actually did that with respect to this computer for

11   this password; correct?

12   A.   It wouldn't be a valid test because we knew the

13   password.

14   Q.   So setting aside the validity of the test, you

15   nonetheless didn't go back to see whether you could do that

16   without knowing what you already knew; correct?

17   A.   As I said, we attempted to decrypt other computers that

18   we couldn't decrypt, and we were able to successfully get

19   into at least one additional computer using the dictionary

20   word leviathan and our password-cracking technology.

21   Q.   Okay.  Now I am going to circle back with you and kind

22   of work through some of the events of that day.

23               THE COURT:  Mr. Hall, let me interrupt just a

24   moment, just for planning purposes.  Ms. Burgess was pushed

25   into service today.  She was not planning to be here.  And

1    she's been going at it now for a good hour-and-a-half.

2    Sounds like you've probably got some more time to go with

3    Agent Coffin, it's a little after noon.  How much longer do

4    you anticipate you need on cross?

5              MR. HALL:  I'm going to be here a little bit

6    longer with Agent Coffin.

7              THE COURT:  We are around the lunch hour.  I don't

8    think we're going to take don't we will take a full hour.

9    And I apologize we got a started a little later this

10   morning.  Ms. Zarkowsky made the arrangements that were

11   necessary and they somehow slipped through the cracks.  So I

12   appreciate Ms. Burgess filling in for us on short notice.

13   But there a number of witnesses.  The Government has one

14   other witness, and I think you have a number of witnesses.

15   We've talked about whether we might be able to complete this

16   hearing today.  So I will suggest we take a short break and

17   resume -- it is 12:05 now.  I would like to resume by 12:40.

18   Enough time to get something to eat, check out the downtown

19   choices here in Newnan if you have the opportunity to do so,

20   or if you brought your meal, that is fine.  But then I would

21   like for us to move along as we can.

22             Mr. Purbeck included an affidavit with your motion

23   that made some very specific allegations.  I would just soon

24   get to those and not piddling around with timestamps, okay?

25             MR. HALL:  Yes, sir.

```
 1              THE COURT:  We are in recess.

 2              (break from 12:08 p.m. until 12:41 p.m.)

 3              THE COURT:  You may resumed that question.

 4              MR. HALL:  Agent Coffin, back on that question

 5    about the dictionary password.  Am I not right that even

 6    with a dictionary password that is partially a dictionary

 7    word you would still have to try upper case and lower case

 8    to be able to break it that way?

 9    A.  Right.

10    Q.  It doesn't make it a simple password just based on the

11    fact that it's a real word; correct?

12    A.  I mean, I think it that does dramatically reduce the

13    simplicity of the password.  I have to think about to what

14    degree, but I think it is quite significant.

15    Q.  Changing from hundred of years to break it to still

16    substantial amount of time to break it though; right?

17    A.  No.

18    Q.  I want to turn your attention back to your 302.  Is that

19    in chronological order?

20    A.  I do believe it is, yes, mostly in chronological order.

21    Q.  Okay.  And then turning over to Government's Exhibit 6,

22    the consent to assume online identity, I understand that you

23    didn't write down the time that that was signed.  Did you

24    ever advise Mr. Purbeck, or you or Agent Pinette advise Mr.

25    Purbeck, that he did not have to sign that form?
```

```
1    A.  I don't recall what admonishment we gave him
2    specifically around this form other than what is already
3    written on it.
4    Q.  Do you have your 302 in front of you?  I meant to leave
5    it up there.
6    A.  You handed it to me at one point.  I will see if it is
7    in these papers.  Yes, I found it.
8    Q.  Okay.  Am I right that, with respect to the portion of
9    the 302 -- first, it was a nine-page 302; correct?
10   A.  Correct.
11   Q.  And with respect to the portion of the 302 where it
12   references to Mr. Purbeck voluntarily providing consent,
13   that is words kind of towards the end of it on page 9
14   towards the bottom; correct?
15   A.  Yes.
16   Q.  All right.  And so assuming or understanding that this
17   is a generally chronological order of events, that it sounds
18   like you got this password towards the end of your interview
19   with Mr. Purbeck, the consent form?
20   A.  Yes I believe that is roughly correct.
21   Q.  Let me ask you directly.  And I listened to your whole
22   direct testimony, I understood what you testified.  Let me
23   ask you directly, Agent Coffin, did you place your hand on
24   Mr. Purbeck's shoulder when you and the other agents first
25   approached on the morning of August 21 and say, Robert, or
```

1   something to the effect of Robert?

2   A.  I don't believe so.

3   Q.  Does that mean you didn't, or you don't recollect

4   whether you did?

5   A.  I don't think I did it.

6   Q.  Understanding your gun was not drawn, was Agent

7   Pinette's gun drawn, Agent Harshbarger's gun drawn, or any

8   other agent's gun drawn?

9   A.  I think the way we documented it, which was my best

10  recollection, which is we didn't recall when we wrote the

11  302 any firearms visible as we approached Mr. Purbeck.

12  Q.  Were all the firearms -- you were armed and the other

13  agent were armed?

14  A.  All the agents would have been armed.  Yes.

15  Q.  Would they have been -- if I don't use the right lingo

16  let me know and I will change it.  But side-armed as in

17  pistols, or would some people have had long guns?

18  A.  I don't recall seeing any long guns that day.

19  Q.  Were you wearing tactical body armor?

20  A.  I would have been wearing body armor.  I don't know

21  whether it was over or under.

22  Q.  Were other agents wearing body armor?

23  A.  We were all wearing body armor.

24  Q.  Fourteen employees?

25  A.  Nine.

1    Q.  The non-agent employees don't have body armor?

2    A.  Correct.  The non-agent employees are not required to

3    wear body armor during the searches.

4    Q.  Is the just the entry team and the people who first

5    approached were just the agents with the body armor?

6    A.  Yes.

7    Q.  So once the house is cleared, then the non-agent

8    employees are the ones who enter and conduct additional

9    business?

10   A.  That is correct.

11   Q.  Would Nicole Hideman, for example, be a non-agent FBI

12   employee would not be wearing body armor?

13   A.  Let me check the 302 to determine whether she is an

14   agent.  I need to determine whether she's an agent or not.

15   Q.  Got it. Setting that aside, if she is not an agent, then

16   she would be in the group that would come in after the house

17   is cleared; correct?

18   A.  Correct.

19   Q.  Again, you don't know whether she is an agent or not,

20   that is because she is not out of your office; correct?

21   A.  Correct.

22   Q.  And that means that whatever time she started taking the

23   photographs, it would have been after the house had been

24   cleared; correct?

25   A.  Except for maybe the placard.  The first photo might

1   have been taken before the house was cleared.
2   Q.  But the subsequent ones would have been taken after the
3   house had been cleared.
4   A.  Yes.
5   Q.  Okay.  For instance, Defendant's Exhibit 3 up there with
6   the open door would be an example of that; correct?
7   A.  Correct.
8   Q.  Did you grab Mr. Purbeck by the arm, bicep, or other
9   portion of his body to direct him to walk back inside the
10  house?
11  A.  No.
12  Q.  Did you touch Mr. Purbeck at any time in any way in the
13  time that you first approached him until you arrived in the
14  backyard and sat down with Agent Pinette to talk to him?
15  A.  No.
16  Q.  Am I right that either you or Agent Pinette advised Mr.
17  Purbeck that you are here with the FBI to execute a search
18  warrant and that his employer, Ada County, was going to be
19  coming out as well?
20  A.  No, that is not true.
21  Q.  Did you advise him at all that Ada County was en route
22  or would be coming out to the scene?
23  A.  Not initially.  To answer your question.  If we are
24  talking about on the driveway --
25  Q.  On the driveway did you do that?

```
1    A.   No.
2    Q.   Inside the house did you do that?  Tell him that?
3    A.   No.
4    Q.   Outside in the backyard did you tell him that?
5    A.   No.
6    Q.   Did you tell him at any time that Ada County would be
7    coming out to talk to him?
8    A.   At some point later in the search we found out that Ada
9    County was coming to speak to Mr. Purbeck.  And I don't
10   recall who gave that information to Mr. Purbeck.
11   Q.   Would you recall if it was you?
12   A.   I believe so, but I have no recollection of telling Mr.
13   Purbeck that Ada County was coming.
14   Q.   Do you specifically remember any conversation with
15   Mr. Purbeck about Ada County en route, coming, going to be
16   here, anything, however you want to phrase it?
17   A.   No.
18   Q.   Do you recall Agent Pinette having a conversation about
19   Ada County while you were in the driveway?
20   A.   No.
21   Q.   All right.  While you walked through the house with him?
22   A.   No.
23   Q.   In the backyard?
24   A.   No.
25   Q.   So you think it was either you -- excuse me -- it was
```

1    not you, it was not Agent Pinette, but it was someone else

2    who advised Mr. Purbeck that Ada County was coming out?

3    A.   I don't know.  I mean, it might have been Agent Purbeck

4    (sic.), but I just no recollection of who it was who told

5    Mr. Purbeck that Ada County was coming.

6    Q.   You said Agent Purbeck.  Did you mean Agent Pinette?

7    A.   My apologies.  I don't recall whether Agent Pinette or

8    anybody else was the one to tell Mr. Purbeck that Ada County

9    was coming.

10   Q.   Sounds like you have no recollection that occurring

11   regardless of who or how it happened.

12   A.   I remember learning that it was going to happen, but I

13   have no recollection of who would have informed Mr. Purbeck.

14   Q.   Did you know before you arrived at the search scene that

15   Ada County was going to be coming out?

16   A.   Did not know before the search.

17   Q.   Am I right that in this situation -- I am using "you"

18   collectively -- you, Agent Pinette, other members of the FBI

19   team, would not allow Mr. Purbeck to see Sarah Ganger?

20   A.   We would have allowed him to see her if he requested it.

21   Q.   When I say Sarah Ganger, you know who I am referring to?

22   A.   Yes.

23   Q.   That is his companion that he lives with in his house;

24   correct?

25   A.   Yes, sir.

1  Q.  So are you saying Mr. Purbeck never asked to see
2  Ms. Ganger?
3  A.  Not to my knowledge.
4  Q.  Do you know anything about Ms. Ganger's state or status
5  when the FBI entry team came into the house?
6  A.  No.
7  Q.  That is because you were outside with Mr. Purbeck?
8  A.  I was outside with Mr. Purbeck.
9  Q.  Did you have a conversation with Agent Pinette about
10  whether you should interview Mr. Purbeck inside the home or
11  outside of in the backyard?
12  A.  We did talk about that.  Yes.
13  Q.  And ultimately am I right that -- well, let me ask you.
14  Did you prefer to do it inside the home, or Agent Pinette
15  prefer to do it outside?
16  A.  We both preferred to do it outside.
17  Q.  Did you walk Mr. Purbeck outside while you or Agent
18  Pinette was holding him in any way?
19  A.  I don't recall either one of us touching him.
20  Q.  Am I right that you told Mr. Purbeck where to sit?
21  A.  No.
22  Q.  You did not tell Mr. Purbeck to sit in this chair?
23  A.  No.
24  Q.  With respect to Mr. Purbeck wanting to sit in a
25  particular chair and you directing him to sit in another

1   chair, did that happen with you and Agent Pinette and Mr.
2   Purbeck?
3   A.  I don't -- I have no recollection of that.
4   Q.  Look over at Exhibits 5 and 6 so it is fresh in your
5   mind.
6   A.  Okay.  I have 5 and 6.
7   Q.  All right.  Now, that photo, you would agree with me,
8   shows that the sun is coming in and hitting the agent we
9   believe to be Agent Pinette in the back of the head;
10  correct?
11  A.  Correct.
12  Q.  In what you show as six?
13  A.  Yes.
14  Q.  And so right over here?
15  A.  Actually, I am sorry.
16          THE COURT:  It is not showing up on the screen.
17  BY MR. HALL:
18  Q.  That is five I am showing you?
19  A.  I mean, yes.  That is five.  I see the camera flash.
20  Q.  I am going to switch over to six.  That's the one I want
21  to talk about.  Does that look like six to you?
22  A.  Yes.  It does.
23  Q.  Let's talk about six.  All right.  So we believe this to
24  be Agent Pinette; correct?
25  A.  Correct.

1    Q.  All right.  And to my right, in that orientation, given

2    the direction he is facing, Mr. Purbeck would be facing

3    opposite him outside of the frame of the camera; correct?

4    A.  Likely, yes.

5    Q.  To your recollection, is that the way you were situated?

6    A.  Yes.  My recollection, both myself and Special Agent

7    Pinette were facing Mr. Purbeck.

8    Q.  And so we don't know -- we don't see a photo of you.  We

9    see one of Agent Pinette; correct?

10   A.  Correct.

11   Q.  Do you recall that you are saying sitting in a way

12   facing him, or just guessing that is the way it was?

13   A.  No, I remember being able to see Mr. Purbeck during the

14   interview.  I was certainly looking at him.

15   Q.  So in that photograph at least, if the sun is coming in

16   and hitting Agent Pinette in the back of the head, and

17   Mr. Purbeck is sitting across from Agent Pinette, and

18   perhaps across from you as well, then the sun would be

19   hitting him in the face; correct?

20   A.  Probably.  Yes.

21   Q.  At that time, in that backyard, as you have already

22   testified, there was shade available, but at least we know

23   insofar as this photograph is concerned, the questioning

24   circle was not in the shade; correct?

25   A.  Correct.

1    Q.   Did you order Mr. Purbeck to give his phones over you?

2    A.   No.   I know that by the end of the day I had his phones

3    because I was the one who is listed as the collecting agent.

4    I don't recall at what point during the day that I received

5    the phones.   Unfortunately I don't have a recollection of

6    when that occurred.

7    Q.   You do agree that at some point you took the phones from

8    Mr. Purbeck, his phones from his person, and took them into

9    your possession; right?

10   A.   I did have possession of them.   I don't recall whether

11   he handed them to me or how that occurred.

12   Q.   Were you outside at some point when Mr. Purbeck's cat

13   ran outside the house and he stood up to get his cat and put

14   it back in the house and was told either by you or Agent

15   Pinette to sit back down?

16   A.   I don't have a recollection of that.

17   Q.   When you say you don't have a recollection, does that

18   mean it didn't happen, or you just don't know one way or the

19   other?

20   A.   It means I don't remember it happening.

21   Q.   I believe you testified on direct, but just to be clear,

22   from the time that you and Agent Pinette took Mr. Purbeck

23   outside, he remained outside that entire time until the

24   search was ended with the exception of being brought inside

25   to use the bathroom on one occasion; is that correct?

1  A.  I don't know if it was one occasion, but that is

2  generally correct.  Yes.

3  Q.  Is the point you're making to me that maybe he went to

4  the bathroom more than once, but you don't recollect?

5  A.  The point I was just trying to make is I don't have

6  first-hand knowledge how many times Mr. Purbeck went inside

7  to use the restroom.

8  Q.  But your understanding -- your recollection and general

9  understanding is from the time that you and Agent Pinette

10  decided you were going to interview Mr. Pinette in the

11  backyard, he remained in the backyard but for one, or you

12  say perhaps more than one, occasion where he was brought in

13  to use the bathroom and then taken back outside; correct?

14  A.  Correct.

15  Q.  Am I right that other than that initial cup of coffee

16  that was provided to Mr. Purbeck, he was not given another

17  cup of coffee till he went to the bathroom at some occasion

18  later in the day?

19  A.  I don't know whether he had any other coffee between

20  these two incidents.

21  Q.  You never gave Mr. Purbeck any water.

22  A.  I don't recall doing that personally.

23  Q.  You never saw any FBI agent give Mr. Purbeck any water;

24  correct?

25  A.  I don't remember -- I don't have a recollection of any

1    agent doing that.

2    Q.  Were you drinking water during this time?

3    A.  I know I drank water during the time.  I don't recall

4    whether I had water with me while I was outside with Mr.

5    Purbeck.

6    Q.  Agent Pinette, to your recollection, was also drinking

7    water; correct?

8    A.  Yes.  I believe Agent Pinette drank water throughout the

9    day, but I don't recall at what point, whether it was

10   outside with Mr. Purbeck or not.

11   Q.  Was it bottled water y'all brought, or did you get it

12   there at the house?

13   A.  There was some bottled water that was brought.

14   Q.  So the FBI brought its own water; correct?

15   A.  Yes.  I believe so.

16   Q.  And that is, to your recollection, what you were

17   drinking?

18   A.  Yes.

19   Q.  And to your recollection, what the other agents were

20   drinking?

21   A.  Yes.

22   Q.  You don't know of any agent ever offering any of that

23   bottled water to Mr. Purbeck, do you?

24   A.  I don't have any personal knowledge of that.  No.

25   Q.  Did you have a conversation, you or Agent Pinette in

1    your presence, have a conversation with Mr. Purbeck where he

2    asked to see Sarah or where he said would he be allowed to

3    see Sarah Ganger before you took him to jail, and the

4    response was it all depended on how much he cooperated?

5    A.   I don't recall him making that request.

6    Q.   I guess I asked a bad question because it is compound.

7    Do you remember him at any time asking would he be able to

8    see Sarah before he had to leave with you or anything along

9    those lines?

10   A.   No, I don't remember him making that request.

11   Q.   At one point in the afternoon or -- one point during the

12   day, whether morning or afternoon, did either you or Agent

13   Pinette, in your presence, ask Mr. Purbeck was the sun in

14   his eyes?

15   A.   I don't recall hearing that.

16   Q.   All right.  Do you recall an occasion where he expressed

17   that the sun was in his eyes whether in response to a

18   question asked by you or Agent Pinette or voluntarily, just

19   unilaterally voluntarily he advised you and or your present

20   Agent Pinette of that, and either you or Agent Pinette moved

21   him from where he was to a different spot, but one that was

22   still in the sun?

23   A.   No.

24   Q.   I know on direct testimony you stated that no one ever

25   raised or yelled at Mr. Purbeck.  Something to that effect.

1    Is that correct?

2    A.   Correct.

3    Q.   I want to draw your attention to your 302 again.

4    A.   Okay.

5    Q.   If you will turn over to the fourth page.  And I want to

6    draw your attention to the italics where it says:  Agents

7    then challenged Purbeck's recollection.  Take a moment and

8    refresh your recollection with that passage.

9    A.   Yes, I see that.

10   Q.   That is on page 4.  So I guess just short of halfway

11   through this experience where you challenge Purbeck's

12   recollection of AlphaBay user.  At that time did either you

13   or Agent Pinette raise your voice at Mr. Purbeck?

14   A.   No.

15   Q.   Did you yell at him?

16   A.   No.

17   Q.   Did you speak to him in a stern or testy fashion?

18   A.   No.

19   Q.   You just -- the way you and I are communicating right

20   now, kind of low key, that is how you said, Hey, we don't

21   believe you?

22   A.   Yes.

23   Q.   Later on page 4 you see another italics note where it

24   mentions that Mr. Purbeck asked about whether he needed an

25   attorney.  Correct?

1    A.   Yes.   Correct.

2    Q.   That is in the sequence of events roughly where that

3    exchange took place; correct?

4    A.   Correct.

5    Q.   And in your view, that was before any of the critical

6    features of the interview occurred; correct?

7    A.   Yes.

8    Q.   And certainly before any password was provided; correct?

9    A.   Correct.

10   Q.   And certainly before he signed this consent to assume

11   online identity; correct?

12   A.   Correct.

13   Q.   All right.   Now, in addition to asking did he need an

14   attorney, did he ask you to use his phone to call an

15   attorney?

16   A.   No.

17   Q.   Did he ask you would you give him his phone back so that

18   he could call an attorney?

19   A.   I don't recall him asking that.

20   Q.   Okay.   Did he ask to use your phone or Agent Pinette's

21   phone to call an attorney?

22   A.   I don't remember him asking that.

23   Q.   Did he express in any form or fashion that he wished --

24   he did not have the means right there sitting there with you

25   to make a phone call for an attorney, so could he use your

1    phone, his phone, or the phone inside, or some way to reach

2    out and call an attorney?

3    A.   No, he did not make that request.

4    Q.   Is that because I asked you a compound question, or you

5    are just saying any permutation of that, he never asked for

6    an attorney?

7    A.   He never asked for an attorney.

8    Q.   And just to be clear, he never asked even to call an

9    attorney to consult with an attorney?

10   A.   Correct.  He did not ask to call to consult an attorney.

11   Q.   All right.  Let me draw your attention now to this 302.

12   So page 4, italics at the bottom.  It says:  Agents advised

13   Purbeck that they could not provide legal advice, but that

14   he was under no obligation to speak to agents at this time,

15   and that it was his right to seek legal counsel before

16   answering additional questions.  Did I get that right?

17   A.   That's right.

18   Q.   Is that what happened?

19   A.   Yes.

20   Q.   Let me keep going.  Agents then requested Purbeck to be

21   expeditious in obtaining an attorney as they were

22   interesting in continuing the interview with Purbeck

23   regarding his activities and assistance he may be able to

24   provide in the future.  Did I get that right?

25   A.   Yes.

1    Q.   Is that what happened?

2    A.   Yes.

3    Q.   That is not a verbatim exchange, that is an italics,

4    almost like a side note that you put into the 302 to reflect

5    some event that occurred; right?

6    A.   Correct.

7    Q.   Why would you have in this 302 that you requested him to

8    be speedy about calling an attorney if he had never asked to

9    call an attorney?

10   A.   I believe the way it came about was when we informed him

11   that he had the right to call an attorney, we were then, you

12   know, adding to that.  And if you are going to choose to do

13   so, doing it quickly would be advantageous because he would

14   then be able to more effectively cooperate with us in our

15   investigation.

16   Q.   With the eye on that last part, if he was going to

17   consult an attorney, do it speedily, because it would be

18   more advantageous to him in cooperating, did you or agent

19   Pinette say -- and I don't quote it exactly right, but

20   something to the effect of, we are conducting simultaneous

21   raids around the country, or we are here doing a raid on

22   your house and there are other people being raided too, and

23   whoever cooperates first gets the best deal?

24   A.   I mean we definitely -- I do believe we communicated to

25   him that cooperation could be in his benefit.  I don't

1    recall exactly how it would have been worded.

2    Q.   Okay.  But at a minimum it was worded:  If you choose to

3    call an attorney do it quick because we need you to

4    cooperate quick because it's to your advantage to cooperate

5    quickly.  Did I get that right?

6    A.   Yes.

7    Q.   Did you or Agent Pinette, in your presence, tell

8    Mr. Purbeck something to the effect of if you get an

9    attorney you will not get the best deal from the prosecutor,

10   from the Government, from us?  Don't bog down on the

11   prosecutor part, but something to that effect?

12   A.   No.

13   Q.   Anything that even sounds like that?

14   A.   No.

15   Q.   In this exchange about an attorney, whether to call one

16   or not call one speedily, it was after that that Mr. Purbeck

17   first admitted that he was Lifelock; correct?

18   A.   Correct.

19   Q.   And that, to you, was at least the initial part of the

20   critical phase of the interview; correct?

21   A.   Correct.

22   Q.   And at some point thereafter you had Mr. Purbeck sign

23   this assumption of online identity form that is Government's

24   Exhibit 6.

25   A.   Correct.

1  Q.  Now, after that occurred, did you or agent Pinette in

2  your presence come with a Miranda rights form?  You know

3  what I mean by a Miranda rights form?

4  A.  I do.

5  Q.  Do you want me to show you one?

6  A.  No.

7  Q.  And handed that form to Mr. Purbeck and say something to

8  the effect of if you agree with this, then say yes.

9  A.  Is that your question?

10  Q.  Yes.

11  A.  That never happened.  We did not present Mr.

12  Purbeck with a Miranda form.

13  Q.  Okay.  I am going to ask you the same question, and I

14  will add a part to get the whole concept in there; alright?

15  Did you or Agent Pinette come back with a Miranda form, hand

16  or show -- don't bog down in how it was conveyed -- but

17  conveyed that form to Mr. Purbeck, and say something to the

18  effect if you agree with this then say yes while holding

19  some kind of audio recorder or recorder up to Mr. Purbeck

20  for him to then record or memorialize whatever he said?

21  A.  Absolutely not.

22  Q.  Did you have a recorder on your person on August 21,

23  2019?

24  A.  No.

25  Q.  Did you see Agent Pinette with a recorder on August 21,

1    2019?

2    A.   No.

3    Q.   You own a recorder; correct?  For work purposes?

4    A.   I do not personally.  But our squad owns recorders.

5    Q.   Pardon me?

6    A.   Our squad owns recorders that can be used by agents, but

7    I do not have a personally-assigned recorder.

8    Q.   You have access to recorders that you have used in the

9    past; correct?

10   A.   Correct.

11   Q.   And Agent Pinette has one that he's used in the past;

12   correct?

13   A.   Correct.

14   Q.   Are they all the same brand?

15   A.   No.

16   Q.   Different brands?  Different kinds?

17   A.   Yes.

18   Q.   Different colors?

19   A.   Yes.

20   Q.   Among the group or corral of recorders that you have,

21   you have some that are silver; correct?

22   A.   I don't recall one that is silver.  No.

23   Q.   Are they black?

24   A.   The one that I typically use I think is mostly black.

25   Yes.

1    Q.  All right.  So I understand you said no forms were

2    handed to Mr. Purbeck, it just didn't occur.  So I will ask

3    this question anyway, alright?  So did in fact you and/or

4    Agent Pinette sign a Miranda form that was shown to Mr.

5    Purbeck, sign that form as witnesses?

6    A.  No.

7    Q.  Okay.  Do you recall seeing Agent Pinette looking at

8    this watch, noting the time on this Miranda form that we've

9    been discussing?

10   A.  No.

11          MR. HERSKOWITZ:  Object to the form of that

12   question to the extent it implies there is a Miranda form.

13          MR. HALL:  I understand.

14          THE COURT:  He is acknowledging.

15          MR. HALL:  I agree that he is denying that

16   there -- I will ask a question.

17   BY MR. HALL:

18   Q.  You are not saying this is not true -- this has not

19   happened because there is no form to begin with; correct?

20   A.  Right.  We did not Mirandize him that day.

21   Q.  You didn't even -- when you say Mirandize, you didn't

22   even show him a Miranda form; correct?

23   A.  Correct.

24   Q.  So these questions that I've asked you about, did you or

25   Agent Pinette sign the Miranda form or date or put the time

1    on the Miranda form?  You are saying no you didn't see that

2    now, not only because you didn't see that but also because

3    you are saying that the Miranda form never existed.

4    Correct?

5    A.   I don't know whether we actually had one in our

6    portfolios or not, but we did not have a Miranda form that

7    we began to fill out that day.

8    Q.   That you showed to Mr. Purbeck in any form or fashion?

9    A.   Correct.

10   Q.   Okay.  I understand that.  Did you ever take Mr. Purbeck

11   to the bathroom?

12   A.   No.

13   Q.   Did you witness him being taken to the bathroom?

14   A.   Not that I recall.

15   Q.   Do you recall agents drinking bottled water in front of

16   Mr. Purbeck?

17   A.   No.

18   Q.   Do you recall that Agent Pinette moved Mr. Purbeck

19   throughout the afternoon so that his chair would remain in

20   the sun?

21   A.   No.

22   Q.   You are saying that just didn't happen?

23   A.   Correct.

24   Q.   On your direct, if I recollect, you said something to

25   the effect of at least one time that he had moved -- that he

1   was in the shade or had moved to the shade.  Did I get that
2   right?
3   A.  I believe what I testified to on direct, we were moving
4   our chairs together into the shade out of the sun.
5   Q.  Are you saying Mr. Purbeck was in the shade?
6   A.  Until like I testified on direct, he stopped moving his
7   chair and he remained in the sun.
8   Q.  Oh.  Okay.  I misheard you then.  I thought you said he
9   stopped moving his chair and remained in the shade.  So at
10  what point did he stop moving his chair and remained in the
11  sun?
12  A.  I don't recall when that happened.
13  Q.  Do you have a sense?  Was it early in the day, middle of
14  the day, later in the day?
15  A.  It was while we were actively interviewing, so I would
16  say it was within the first hour or the first three hours of
17  the search that that occurred.
18  Q.  It happened -- was getting online consent form, is that
19  one of the last things that you guys did as part of your
20  interview?
21  A.  I believe it was later.  We started filling out that
22  form as a way to capture his password, so it wasn't like
23  right at the end, but it was in the latter portions of the
24  interview.
25  Q.  And what we've been talking about him choosing not to

1    move his chair but remain in the sun, that happened before

2    that online consent form was signed, or after it?

3    A.   I think it was before.

4    Q.   Prior to that you are saying Mr. Purbeck could pick up

5    his -- did he pick up his chair and move it himself?

6    A.   Yes, he did.

7    Q.   Did you or Agent Pinette move the chair for him?

8    A.   No.

9    Q.   Did he express to you anything about when you -- it

10   sounds like you were in the sun, the sun is moving, you and

11   Agent Pinette are moving your chairs to the shade, and what

12   you are testifying to is that Mr. Purbeck decided to just

13   stay in the sun?

14   A.   At some point.  For the first couple of times we moved,

15   he moved with us.  And there was some point in time that he

16   declined to continue to move out of the sun into the shade.

17   Q.   Did he ever express anything to you as to why he is

18   staying in the sun?

19   A.   He did not explain why.

20   Q.   Did you ever ask him or say anything to him about why

21   are you staying in the sun if we keep moving into the shade?

22   A.   I did not.

23   Q.   Were you present when Ada County showed up and

24   interviewed Mr. Purbeck?

25   A.   I was present when they showed up.  I remember at least

1    seeing the detective in the front yard.  But I was not

2    present for any portion of their interview with Mr. Purbeck.

3    Q.  Did you see how they were situated and where they were

4    sitting?

5    A.  No, I did not.

6    Q.  Were you present when Agent Heap came out and took over

7    kind of sitting outside with Mr. Purbeck?

8    A.  I don't believe so.

9    Q.  And you already testified that to your recollection Mr.

10   Purbeck was not sunburned?

11   A.  Correct.

12   Q.  Never saw him sweating?

13   A.  I never saw him sweat.

14   Q.  Didn't have difficulty speaking?

15   A.  No.

16   Q.  No difficulty standing?

17   A.  No.

18   Q.  All right.  Never mentioned anything about having cramps

19   or -- abdominal crafts or heat cramps or anything along

20   those lines?

21   A.  Not that I recall.

22   Q.  Were you present when Mr. Purbeck was searched and his

23   wallet was removed from his person?

24   A.  I was not.

25   Q.  Are you aware of that occurring?

1    A.   I remember an incident where the hard drive was removed

2    from his person.  I don't recall when the wallet was removed

3    from his person.

4    Q.   Tell me about the hard drive.

5    A.   I only heard this from reading a report.  I wasn't a

6    first-hand witness of this.

7    Q.   That is fine.

8    A.   I recall that --

9    Q.   That's fine.  I misunderstood.  I thought you were

10   recollecting that you had seen this.

11   A.   Okay, no, I was not present for the hard drive, and I

12   don't recall when the wallet was supposedly removed from

13   him, from his person.

14   Q.   You weren't present for the wallet being removed?

15   A.   Not that I recall.

16   Q.   Am I right that you did not participate in the search

17   that was done by the Boise agents and employees?

18   A.   I mean, I was a participant in the search, but mostly in

19   an advisory capacity.

20   Q.   You were not actively engaged in the searching conduct?

21   A.   Correct.

22   Q.   At least -- I understand you went in and out of the

23   house sometimes, but for the most part, at least for the

24   first good portion of the day, you were outside with Agent

25   Pinette interviewing Mr. Purbeck?

1   A.   Correct.

2   Q.   If I can have just a second?

3            THE COURT:   Certainly.

4   BY MR. HALL:

5   Q.   Let me bring you back to this business about yelling.

6   You remember we talked about yelling a little bit ago?

7   A.   Yes, sir.

8   Q.   So your testimony has been that not only did you not

9   yell, Agent Pinette never yelled or raised his voice.

10  Correct?

11  A.   Correct.

12  Q.   I believe your testimony then that no other agent came

13  out and yelled or spoke in excited fashion or loud fashion

14  towards Mr. Purbeck; correct?

15  A.   Not that I recall.

16  Q.   Was there an occasion when you and Agent Pinette were in

17  the backyard speaking to Mr. Purbeck when an agent came

18  outside and asked Mr. Purbeck about the presence of a

19  firearm in the house?

20  A.   I do believe I remember that.

21  Q.   Who was that agent?

22  A.   I don't recall.

23  Q.   All right.  Was it a Boise-based agent?

24  A.   Yes, it would have had to have been a Boise-based agent

25  because the only other two Atlanta agents were agent Pinette

1   and myself.

2   Q.  And -- male or female?

3   A.  I don't recall.

4   Q.  And did that agent coming out to ask -- what did the

5   agent say about a gun?

6   A.  I just remember the question being asked, and Mr.

7   Purbeck explaining that the gun was in a cabin or house in

8   Mountain Home.  Something like that.

9   Q.  When that agent came out, was that agent speaking

10  loudly?

11  A.  I don't recall there being any points in the day that

12  somebody raised their voice to Mr. Purbeck.

13  Q.  How about in an excited fashion or in an urgent fashion?

14  A.  I didn't hearing anything that -- no.

15  Q.  To your recollection, was the agent who was inquiring,

16  or in addition to the firearm, just wanted to know if there

17  was a weapon in the house for officer safety?

18  A.  Yes, that's correct.

19  Q.  So are you saying that the agent who came out to inquire

20  about this dangerous instrumentality just kind of spoke in a

21  low key tone?

22  A.  Yes, I believe so.

23  Q.  I understand you did not see Mr. Purbeck toward the very

24  end of the day before the FBI left; is that correct?

25  A.  Yeah, I don't have a recollection of seeing him towards

1    the end.
2    Q.   Okay.  Do you recollect seeing that one of the plastic
3    chairs that had been -- that you or Agent Pinette or Mr.
4    Purbeck -- you know the plastic chairs I am talking about,
5    right?
6    A.   Yes, I do.
7    Q.   All right.  Do you remember seeing one of those has a
8    broken leg or had a broken leg at some point during the day?
9    A.   Yes.  In fact, I was there when the chair broke.
10   Q.   Tell me about that.
11   A.   As I recall, you know, myself and Agent Pinette were
12   sitting speaking to Mr. Purbeck, and then at some point Mr.
13   Purbeck's chair broke.  And I can't recall if it was because
14   he was leaning back into it or what, but it did break during
15   the interview.
16   Q.   And do you remember at what portion, during the time you
17   were interviewing, when that occurred?
18   A.   No, I'm sorry.  I don't recall when it happened.
19   Q.   And it caused him to fall out of the chair and onto the
20   ground?
21   A.   Yes.
22   Q.   And he was in the sun before he fell out of the chair;
23   correct?
24   A.   I don't know the timing.  I don't know if he was in a
25   sunny position at that time or not.

1          MR. HALL:  Judge, if I may have one more second,

2    please.  (Pause).  That is all my questions.

3          MR. HERSKOWITZ:  Nothing further.

4          THE COURT:  Do you have another witness to call?

5          MR. MUND:  The Government would next like to call

6    Special Agent Pinette.

7          THE COURT:  All right.

8                    Special Agent Pinette,

9                            Sworn

10         THE CLERK:  Please state and spell your name for

11   the record.

12         THE WITNESS:  My name is James Pinette, J-a-m-e-s,

13   last name P-i-n-e-t-t-e.

14         THE COURT:  You may proceed, Mr. Mund.

15         MR. MUND:  Thank you.

16                    Direct Examination

17   BY MR. MUND:

18   Q.  Good afternoon, Agent Pinette.  Can you please explain

19   to the Court, what do you do for a living?

20   A.  I am an FBI agent.  I've been working for the FBI for

21   18 years.  First ten years were working counterterrorism

22   matters, and the last eight have been working cyber crime

23   and national security.

24   Q.  And are you familiar with the case presently before the

25   Court, United States versus Robert Purbeck?

1  A.  Yes.

2  Q.  And in August of 2019, were you -- let me take that

3  back.  Are you currently one of the co-case agents this

4  matter?

5  A.  Yes.

6  Q.  And back in August of 2019, were you one of the co-case

7  agents, FBI co-case agents on the case?

8  A.  Yes.

9  Q.  Where were you on the morning of August 21, 2019?

10  A.  Before 8:00 a.m., we were outside of Mr. Purbeck's

11  residence.

12  Q.  And what you doing there?  Why were you there?

13  A.  We were -- we were looking to conduct a search warrant

14  on his house, and I was sitting in a vehicle, watching the

15  house.

16  Q.  And did you intend to interview Mr. Purbeck that day?

17  A.  Well, we had hoped he would talk to us.

18  Q.  And why did you hope that he would talk to you?

19  A.  Well, we hoped that he would talk to us to fill in some

20  gaps in the investigation, and he might have some -- he

21  might have been in a position to assist us.

22  Q.  And did you have an arrest warrant for Mr. Purbeck?

23  A.  No.

24  Q.  Were there any charges pending against Mr. Purbeck at

25  that time?

```
1    A.   No.

2    Q.   Was there any plan to take him into custody that day?

3    A.   No.

4    Q.   So you mentioned you were located inside of a vehicle?

5    A.   Correct.

6    Q.   What gear were you wearing that day?

7    A.   Well, I don't recall exactly what clothing I had on.  I

8    had a bulletproof vest on and a weapon, which is standard

9    for doing a search warrant.

10   Q.   A weapon, what kind of weapon was it?

11   A.   A Glock.  A pistol.

12   Q.   A firearm?

13   A.   Yes.

14   Q.   Did you draw your firearm at any point during that day?

15   A.   No.

16   Q.   About how many other law enforcement personnel were with

17   you that day?

18   A.   I don't know the exact number there.

19   Q.   Was there anyone else in the car, the vehicle with you,

20   that you recall?

21   A.   Yes.

22   Q.   Do you remember who was in the car with you?

23   A.   I don't.

24   Q.   Do you remember, for the other law enforcement

25   personnel, how were they dressed?
```

1    A.  They had -- they were dressed casually.  They had like

2    khaki pants and polo shirts, I guess.  I don't remember

3    exactly.

4    Q.  Do you recall whether or not other -- if the other law

5    enforcement officials had firearms?

6    A.  Well, we all had firearms.  Yeah.

7    Q.  Do you remember seeing any other firearms drawn?

8    A.  No.

9    Q.  And as you -- okay.  When you were in your car, or in

10   the car, was there a point in time in which you observed

11   Mr. Purbeck?

12   A.  Yes.  He -- Mr. Purbeck, shortly before 8 o'clock, had

13   exited his house and made his way over to one of the

14   vehicles in the driveway.

15   Q.  In the driveway --

16   A.  In the driveway of his residence.

17   Q.  And then what happened at that point in time?

18   A.  There was a call to execute the search warrant.  So I

19   got out of the vehicle and started to approach the

20   residence.

21   Q.  And what happened as -- sorry, to clarify, you

22   approached the residence?

23   A.  Correct.

24   Q.  Okay.  And then what happened?

25   A.  Well, I had reached the vehicle and Mr. Purbeck, and I

1    started to explain to Mr. Purbeck that we were with the FBI
2    and that we had a search warrant for his house.  And that he
3    wasn't under arrest.
4    Q.  Did he provide any additional information about the
5    search warrant at that time?
6    A.  Did I provide any?
7    Q.  Or let me take back the question.  So you said -- you
8    testified that -- let me rephrase the question.  So when you
9    were speaking with Mr. Purbeck, did you provide any other
10   information to him at that time?
11   A.  Well, when I had immediately reached him, it was advised
12   him that I worked for the FBI and that we had a search
13   warrant for his residence, that he was not under arrest, and
14   that we would explain to him further if he was willing to
15   talk to us.
16   Q.  And did Mr. Purbeck express willingness to speak
17   further?
18   A.  Yes.
19   Q.  And how was that expressed?
20   A.  He just said okay.
21   Q.  Was Mr. Purbeck placed under arrest?
22   A.  No.
23   Q.  Was he placed in handcuffs?
24   A.  No.
25   Q.  Was he advised that he could not leave?

1    A.   No.

2    Q.   Did you or -- do you recall anyone else at this time

3    advising him that he could leave?

4    A.   Not -- not at the moment.  Not at that moment but a

5    little later.  I didn't -- I guess what was said was more

6    that he -- initially, it was you're not under arrest, and we

7    would only talk -- the team that was there had collected at

8    the door and wanted to do an initial clear of the house.  At

9    some point after that clearing was done, we made our way

10   into the house, Agent Coffin, myself, and Mr. Purbeck, and

11   at that time I had mentioned to Mr. Purbeck that if he

12   stayed, he wasn't -- you know, we might restrict his

13   movement inside the house.  But that's it.  That's it.

14   Q.   So let me break that up a little bit.  Before you

15   entered the house, do you recall -- or did anybody show him

16   search warrant documentation?

17   A.   I did not.  I did not show him that.  I did not see

18   anybody show him.

19   Q.   And to clarify by "him," I meant Mr. Purbeck.

20   A.   Correct.

21   Q.   Was -- so was Mr. Mr. Purbeck allowed to roam freely

22   within the house?

23   A.   No.

24   Q.   And why is that?

25   A.   Well, for a number of reasons.  For safety reasons of

1    everyone in the house, we -- it's a stressful situation for
2    people, and, you know, there may be weapons in the house.
3    Someone may, you know, reach for a weapon.  It's also for
4    evidentiary reasons.  We don't want people to hide evidence
5    or destroy it when the search is being conducted.
6    Q.  And at any point, did Mr. Purbeck ask to leave?
7    A.  No.
8    Q.  Did anybody ask for his car keys?
9    A.  Not to my recollection.
10   Q.  So your initial interaction with him, where did that
11   take place?
12   A.  Outside in -- over by his vehicle kind of up by the
13   garage door.
14   Q.  And what was Mr. Purbeck's demeanor at that point in
15   time?
16   A.  He was calm.
17   Q.  And what was your demeanor at that time?
18   A.  The same.  Calm.
19   Q.  And was there anyone else there with you as you were
20   speaking with Mr. Purbeck by his vehicle, by the garage?
21   A.  Agent Coffin was.
22   Q.  And what was Special Agent Coffin's demeanor at that
23   time?
24   A.  The same.  Calm.
25   Q.  Did anyone point a firearm at Mr. Purbeck at any point

```
 1   in time?
 2   A.   Not that I saw.
 3   Q.   Did anyone yell at Mr. Purbeck?
 4   A.   Not that I heard.
 5   Q.   Did you see anyone grab Mr. Purbeck at any point in
 6   time?
 7   A.   No.
 8   Q.   Special Agent Pinette, did you grab Mr. Purbeck at any
 9   point in time?
10   A.   No.
11   Q.   You mentioned that there was a clear -- there was a
12   clearing that was happening at the house?
13   A.   Yes.  There was an initial like safety clear of the
14   residence.
15   Q.   And about how long did it take to clear the residence?
16   A.   The initial clear, probably ten minutes.  Five, ten
17   minutes.
18   Q.   And did you continue the -- did you continue speaking
19   with Mr. Purbeck in the driveway at that time?
20   A.   No.
21   Q.   Where did you continue the conversation or the
22   interview?  Where did that take place?
23   A.   Well, after we walked into the house, we looked around
24   for a place to talk to Mr. Purbeck, and realized the house
25   might not be the best place to talk to Mr. Purbeck.
```

1    Q.  And when you say, "We looked around the house," "we" --

2    who is "we" in that?

3    A.  Agent Coffin and I myself.  We were looking for a

4    suitable place to talk to Mr. Purbeck, and there was no

5    place to sit in the house.  And there was a lot of activity

6    going on and so we thought the backyard might be a good

7    idea.

8    Q.  Do you recall how the house smelled?

9    A.  Well, I mean, it didn't smell good.  It smelled like --

10   it was a strong ammonia in the air, like a cat, and feces.

11   Q.  So how did you and Special Agent Coffin and Mr. Purbeck

12   go from the driveway to the backyard?

13   A.  We went through the house and through the kitchen into

14   the backyard.

15   Q.  And did you go direct -- did you walk directly through

16   the house?

17   A.  No.  We walked in, looked around for a moment for a

18   suitable place, decided that we would go outside.  We

19   started to make our way through the kitchen.  Mr. Purbeck

20   asked to refill his coffee, so he did that, and we went out

21   back.

22   Q.  Was Mr. Purbeck physically restrained as you were

23   walking through the house?

24   A.  No.

25   Q.  Was Mr. Purbeck physically restrained at any point in

1    time that day?

2    A.   No.

3    Q.   So who decided to -- the location of where the interview

4    would take place?

5    A.   I don't recall.

6    Q.   Did Mr. Purbeck object to the -- holding the interview

7    in the backyard?

8    A.   No.

9    Q.   Did he suggest any other place to go?

10   A.   No.

11   Q.   Can you describe the interview setting?

12   A.   Well, it was initially just outside his back door.  We

13   found some lawn chairs and sat down to talk.

14   Q.   Was there any way to exit the backyard?

15   A.   I have no -- I don't -- I don't recall.  I mean, other

16   than through the house, I'm not sure if there was a clear

17   passage on either side of the house or not.

18   Q.   Could Mr. Purbeck have left the backyard?

19   A.   Yes.

20   Q.   What was the weather like outside?

21   A.   It was -- I mean, it was pleasant outside.

22   Q.   And this is when you first went outside; correct?

23   A.   Yes.

24   Q.   What was Mr. Purbeck wearing?

25   A.   He had a polo shirt on and khaki pants, I believe.

1    Yeah.

2    Q.  And you mentioned lawn chairs.  How were the lawn chairs

3    arranged?

4    A.  Just like in a triangle.

5    Q.  And who arranged that triangle?

6    A.  I don't recall.

7    Q.  Did you tell Mr. Purbeck where to sit?

8    A.  No.  I think we just all sat in chairs.

9    Q.  Where were you located with respect to Mr. Purbeck?

10   About how far apart were you guys?

11   A.  Three feet maybe.

12   Q.  And how about the distance between you -- or Mr. Purbeck

13   and Special Agent Coffin?

14   A.  Same, same distance.

15   Q.  Was there anyone else participating in the interview

16   outside?

17   A.  No.

18   Q.  Anyone else, I should say, besides you, Mr. Purbeck, and

19   Special Agent Coffin?

20   A.  No.

21   Q.  And about what time was it when you went through in

22   backyard?

23   A.  It had to be right around 8 o'clock.

24   Q.  Did you read Mr. Purbeck or advise Mr. Purbeck of his

25   Miranda rights?

1    A.  No.

2    Q.  And why is that?

3    A.  Well, he wasn't in custody, so we don't typically

4    Mirandize somebody who's not in custody.

5    Q.  And what was Mr. Purbeck's demeanor at this point in

6    time?

7    A.  He was still calm.

8    Q.  Did he appear nervous?

9    A.  No.

10   Q.  Did he appear willing to speak with you?

11   A.  Yes.

12   Q.  Did he say that he was going to speak with you?

13   A.  Yes.

14   Q.  Had he asked to leave?

15   A.  No.

16   Q.  Did you or Special Agent Coffin ask him for his phones,

17   any cell phones?

18   A.  I didn't ask him for his phone.  I don't recall Agent

19   Coffin asking him for his phone.

20   Q.  Okay.  Do you recall whether Mr. Purbeck was searched or

21   patted down prior to the beginning of the interview?

22   A.  I don't recall the agent's name who had first talked to

23   Mr. Purbeck.  I recall him saying that he had done a

24   high-risk search on Mr. Purbeck.

25   Q.  What does a high-risk search entail?

1   A.   It is just like a quick search of your waist area for --

2   you know, for weapons.

3   Q.   So when you began the interview, was it -- did you audio

4   record it?

5   A.   No.

6   Q.   Why not?

7   A.   Well, it wasn't standard procedure to interview -- to

8   record interviews, audio record them.  We just -- we record

9   them by taking notes.

10  Q.   And did you have an audio recorder on you that day?

11  A.   No.

12  Q.   You said you record them by taking notes.  Did you take

13  notes during this interview?

14  A.   Yes.

15  Q.   And did you subsequently create any other documents or

16  records of that interview?

17  A.   Well, from the notes, from both my notes and Agent

18  Coffin's, and my recollection, I drafted a 302, a document

19  that summarizes the interview.

20  Q.   And during the course of the interview, did you ask any

21  questions related to Mr. Purbeck's online activities?

22  A.   Yes.

23  Q.   Did Mr. Purbeck provide any online usernames that he

24  uses?

25  A.   Yes.

1    Q.  And were any of those usernames of particular interest?

2    A.  Yes.

3    Q.  And why is that?

4    A.  Well, we -- because one of them was a username of a

5    hacker that was part of our investigation.

6    Q.  Did Mr. Purbeck ask to speak to a lawyer at any point

7    during the interview?

8    A.  He didn't ask to speak to a lawyer.  At some point in

9    the interview he mentioned it.  He wasn't -- trying to think

10   of the exact wording.  I -- something to the effect, I don't

11   know if I need an attorney, or something like that.

12   Q.  And did -- in what context did his -- did this statement

13   arise?

14   A.  Well, we were talking about his online identities in

15   different markets, darknet markets he was in, and at some

16   point we challenged him on additional -- an additional

17   Alphabay usernames.  And at that point -- I believe it was

18   at that point that he asked if -- should I get an attorney

19   or something to that effect.  Like I said, I can't remember

20   exactly.

21   Q.  Was this exchange summarized and documented in the 302?

22   A.  Yes.

23   Q.  You said that you challenged him.  Did you raise your

24   voice when you challenged Mr. Purbeck?

25   A.  No.

1   Q.  Did you tell -- so how did you respond when this subject

2   came up?

3   A.   About the attorney?

4   Q.  So I believe you just -- well, take a step back.  So I

5   believe you just testified that at some point -- well, let

6   me ask --

7            MR. MUND:  Can I ask the question again, Your

8   Honor?

9            THE COURT:  Yes, sir.

10  BY MR. MUND:

11  Q.  So in what -- how did the subject of a lawyer come up in

12  the course of the interview?

13  A.   Well, we were -- we were asking about his online

14  identities, and at some point, you know, we asked him if

15  there was any other usernames that he was using on Alphabay.

16  And at some point -- at some point there he asked, do I need

17  an attorney, or something to that effect.

18  Q.   And how did you respond?

19  A.   I said I couldn't offer legal advice.  That he was under

20  no obligation to speak to us.

21  Q.   And how did Mr. Purbeck respond to that?

22  A.   He -- after that, I believe he asked how much time he

23  was looking at.

24  Q.   Did Mr. Purbeck ever subsequently mention a lawyer

25  during the interview?

1    A.   No.

2    Q.   Did he ever ask to call a lawyer?

3    A.   No.

4    Q.   Did he ever ask to use a phone?

5    A.   No.

6    Q.   Did Mr. Purbeck ever ask to borrow a phone from either

7    you or Special Agent Coffin?

8    A.   No.

9    Q.   Was there any point during the interview that you

10   interviewed Mr. Purbeck by yourself?

11   A.   No.   There was a point where Agent Coffin had -- someone

12   conducting the search had come out and had a question for

13   Agent Coffin and he left.   And I might have been finishing

14   up a conversation.   But as soon as that topic ended, we

15   stopped talking.

16   Q.   And why was that?

17   A.   Well, because -- there's a number of reasons.

18   Typically, we have two agents participate in these

19   interviews.   And it's part of a story where -- that everyone

20   is involved, and I didn't want Agent Coffin to be -- you

21   know, to come back and we're on some new topic.   And he was

22   the case agent, so we just waited.

23   Q.   And what was the tone or tenor of the conversation?

24   A.   The entire interview was calm.

25   Q.   Were there any points of levity?

1  A.  Yes.  At some point when we were talking about his

2  Alphabay usernames, one of his usernames that he used, you

3  know, he said that he was given the name by his friends in

4  college because he wasn't good with girls, so we kind of all

5  chuckled about that.

6  Q.  Did anyone threaten Mr. Purbeck at any time?

7  A.  No.

8  Q.  Did anyone make any promises to Mr. Purbeck at any

9  point?

10  A.  No.

11  Q.  About how long did the interview last for?

12  A.  Two hours or less.

13  Q.  Did you move the chairs, the lawn chairs or the seats

14  during the course of the interview?

15  A.  Yeah.  We moved them a couple times.

16  Q.  Why was that?

17  A.  I mean, as the sun was moving, we -- you know, if we

18  were in direct sun, we would be hot.  We would move the

19  chairs.

20  Q.  And who moved Mr. Purbeck's chair?

21  A.  He did.

22  Q.  Did you ever intentionally place Mr. Purbeck's chair in

23  the sunlight?

24  A.  No.

25  Q.  Did Mr. Purbeck at any point appear to be sick or ill at

1    any point?

2    A.   No.

3    Q.   Did Mr. Purbeck ever appear to be drenched in sweat?

4    A.   No.

5    Q.   Did Mr. Purbeck at any point mention any medical

6    conditions?

7    A.   No.

8    Q.   Did Mr. Purbeck at any point express discomfort?

9    A.   No.

10   Q.   Did Mr. Purbeck ever get up from his chair during the

11   course of the interview?

12   A.   Yes.  At some point he had gone into the house to get a

13   drink and use the restroom, I believe.

14   Q.   And did -- at any point in time, was Mr. Purbeck ordered

15   to remain seated in his chair during the interview?

16   A.   No.

17   Q.   Did any of the chairs collapse during the interview?

18   A.   Yes.  Mr. Purbeck's chair collapsed at some point during

19   the interview.

20   Q.   And -- I'm sorry?

21   A.   Mr. Purbeck's chair.

22   Q.   And what happened then?

23   A.   We just helped him up and got him another chair.

24   Q.   Did you take any breaks during the interview?

25   A.   Well, like I said, we -- Mr. Purbeck had gone into the

1    residence.  That was a break.  There were a couple of times

2    that Agent Coffin got called away we stopped talking.

3    Q.  When Mr. Purbeck went into the residence, did he go by

4    himself?

5    A.  No.

6    Q.  And why is that?

7    A.  Kind of the same reason for, you know, not -- you know,

8    just safety reasons and evidentiary reasons, you know.

9    Typically, control the space a little bit.  We don't want

10   people going for, you know, hidden weapons or to destroy

11   evidence at some point, so we usually control the

12   environment while we're there.

13   Q.  And while outside, did Mr. Purbeck ever request any food

14   or water?

15   A.  No.

16   Q.  Had Mr. Purbeck requested food or water outside, would

17   it have been -- would he have received it?

18   A.  Of course.

19   Q.  Did Mr. Purbeck ever ask to end the interview?

20   A.  No.

21   Q.  How did the interview end?

22   A.  I don't -- I don't recall like an official end to the

23   interview.  I think at some point we had been made aware

24   that someone from Ada County was there, and we were kind of

25   wrapping up our interview.  So I don't remember an official

1    end.

2    Q.   And -- you mentioned Ada County.  What do you mean by

3    Ada County?

4    A.   Somebody from Ada County, I believe it's the Sheriff's

5    office, was there to talk to Mr. Purbeck.

6    Q.   Did you leave Mr. Purbeck at that time?

7    A.   No.

8    Q.   Why not?

9    A.   Because I listened to the Ada County interview in case

10   Mr. Purbeck provided information relevant to the FBI

11   investigation.

12   Q.   And were there other FBI agents there present besides

13   yourself?

14   A.   No.

15   Q.   Did Mr. Purbeck appear to be sick or ill during that

16   interview?

17   A.   No.

18   Q.   What was the tone of that interview?

19   A.   Calm.  Same.

20   Q.   Did you ask any questions of Mr. Purbeck during the Ada

21   County interview?

22   A.   No.

23   Q.   Did you direct Ada County to ask any questions on your

24   behalf during that interview?

25   A.   No.

1    Q.   Did you audio record that interview?

2    A.   No.

3    Q.   Did you otherwise document that interview?

4    A.   I took notes and created a 302, a summary of the

5    interview.

6    Q.   And during the course of that interview, did anyone

7    search Mr. Purbeck?

8    A.   I did.

9    Q.   And what prompted the search?

10   A.   At some point during the Ada County interview,

11   Mr. Purbeck said that he had a hard drive in his pocket, and

12   he stood up and took a hard drive out of his pocket.  And at

13   that point it made me wonder if anyone had ever, you know --

14   and I heard they did a high-risk search, but did anyone look

15   for other evidence or weapons.  So at that point I did a

16   quick search of Mr. Purbeck.

17   Q.   And how long was the search of Mr. Purbeck about?

18   A.   It was really quick.  Five, ten seconds, maybe.

19   Q.   Did you touch Mr. Purbeck's genitals?

20   A.   No.

21   Q.   Did you arrest Mr. Purbeck that day?

22   A.   No.

23   Q.   Did you arrest anyone that day?

24   A.   No.

25   Q.   At any point during that day, were any prosecutors,

1    assistant US attorneys either inside or in the immediate

2    vicinity of Mr. Purbeck's home?

3    A.   Not that I was aware of.

4    Q.   Did you see Mr. Purbeck again after the August 21, 2019

5    search and interview?

6    A.   Yes.

7    Q.   And when was that?

8    A.   Mr. Purbeck had flown to Atlanta for a proffer session

9    with the Government.

10   Q.   And was he accompanied by an attorney?

11   A.   Yes.

12   Q.   What was Mr. Purbeck's demeanor at that meeting?

13   A.   It was the same as his first interview; he was calm, he

14   was relaxed.

15   Q.   Has Mr. Purbeck ever called you by phone?

16   A.   Yes.

17   Q.   Has Mr. Purbeck ever left you a voice mail?

18   A.   He left me a voice mail once.  Yeah.

19   Q.   And when was that?

20   A.   December that year.

21   Q.   I show you what is marked as Government's Exhibit 7,

22   which is a CD initialed  -- let me take that out.  So are

23   you familiar with this --

24           MR. MUND:  Your Honor, may I approach?

25           THE COURT:  You may.

1   BY MR. MUND:

2   Q.  Are you familiar with this CD marked Government's

3   Exhibit 7?

4   A.  Yes.

5   Q.  In it --

6   A.  Those are my initials.

7   Q.  Your initials?

8   A.  Uh-huh (affirmative).

9   Q.  And is this CD a fair and accurate representation of

10  your documentation of the voice mail you received?

11  A.  Yes.

12          MR. MUND:  Your Honor, we would like to move to

13  enter Government's Exhibit 7, a CD disc with an audio

14  recording of a voice mail Special Agent Pinette received

15  into evidence.

16          MR. HALL:  I'm going to object, but not -- I'm

17  fine with it coming in.  I just wanted it stated its purpose

18  for coming in, the relevance of it, I understand.  But for

19  purposes of the record, I would like the relevance stated by

20  the Government.  That's what I'm asking.

21          THE COURT:  Mr. Mund.

22          MR. MUND:  Yeah.  So the purpose is not for the

23  truth of the statements, but rather the tone and demeanor of

24  the voice mail.

25          MR. HALL:  Okay.  I think with that statement, I

1    won't raise an objection.

2              THE COURT:  It is admitted.

3              MR. MUND:  Your Honor, I'd like to play the

4    recording, please.

5              THE COURT:  Yes.

6              MR. MUND:  I'm having technical difficulties.  If

7    I could have one moment, please.

8              THE COURT:  Yes, sir.

9              MR. SISTLA:  So I will just represent for the

10   counsel, I have it on my laptop.  Just one second.

11                      (Audio is played.)

12             MR. MUND:  May I please confer with counsel?

13             THE COURT:  You may.

14                      (Pause).

15   BY MR. MUND:

16   Q.  Special Agent Pinette, do you recognize the voice on the

17   voice mail, or that -- on the audio recording?

18   A.  Yes.  Mr. Purbeck.

19   Q.  How would you describe Mr. Purbeck's tone during this

20   call?

21             MR. HALL:  Objection.  Speculation.  It speaks for

22   itself.

23             THE COURT:  Overruled.

24   A.  It was like his interview.  Calm.

25   BY MR. MUND:

1   Q.  And one last question.  Are you -- two questions.  Are

2   you familiar with AUSA Nathan Kitchens?

3   A.  Yes.

4   Q.  And was Nathan Kitchens present during the search or

5   otherwise near the vicinity of Mr. Purbeck's house on August

6   21, 2019?

7   A.  No.

8           MR. MUND:  No more questions, Your Honor.  Thank

9   you.

10          THE COURT:  Mr. Hall, you may cross-examine.

11          MR. HALL:  Yes, sir.

12                      Cross-Examination

13  BY MR. HALL:

14  Q.  Good afternoon, Agent Pinette, I'm Andrew Hall.  I don't

15  believe that we've actually met before, have we?

16  A.  Just out in the hallway a minute ago.

17  Q.  Okay.  Well, other than that, so I just wanted to make

18  sure you remember who I was.  So, good afternoon.  I'm going

19  to have some questions for you, as I know you know.  So you

20  and Agent Coffin prepared an FBI 302 report regarding the

21  interview that you and Agent Coffin conducted with Robert

22  Purbeck on August 21, 2019; correct?

23  A.  Right.

24  Q.  All right.  It's a nine-page affair; correct?

25  A.  Correct.

1    Q.   All right.  Have you had a chance to look at that

2    recently?

3    A.   Yes, I have.

4    Q.   Okay.  Do you feel pretty familiar with it, or would it

5    help you to take a look at it?

6    A.   I'm fairly familiar with it.

7    Q.   All right.  At any point you want to take a look at it,

8    I'll grab you one.  Okay?

9    A.   Okay.

10   Q.   All right.  So, do you recall in the beginning, first

11   page of it, first paragraph, there's a sentence in there

12   that reads, "Interviewing agents observed no weapons visible

13   during this approach"?

14   A.   Correct.

15   Q.   All right.  Did you put that in there?

16   A.   I don't know if I was a contributor to that or Agent

17   Coffin was.

18   Q.   It's a joint report though; right?

19   A.   Yes.

20   Q.   Why is that sentence in there?

21   A.   Because it was kind of like a low-key search.  We didn't

22   want to alarm Mr. Purbeck.  That's it.

23   Q.   I probably didn't ask a good question, so I want to ask

24   it slightly differently.  Okay?  I'm asking that that

25   particular sentence I just read to you --

1    A.   Right.

2    Q.   All right.  Let me back up.  302 is an official FBI

3    document; correct?

4    A.   Correct.

5    Q.   It's designed to memorialize the events that you or

6    whomever the author may be, in this case, you, say occurred

7    in any given instance; correct?

8    A.   Correct.

9    Q.   All right.  And one way to memorialize events is to

10   record them; correct?

11   A.   Correct.

12   Q.   I mean, in the abstract; right?  That's one way to do

13   it; correct?

14   A.   Correct.

15   Q.   And on occasions in the past, you have, in fact,

16   recorded, audio or video recorded interviews you've had with

17   individuals; correct?

18   A.   Not in a noncustodial situation.

19   Q.   That's fine, but somewhere in your law -- how long have

20   you been a law enforcement officer?

21   A.   18 years.

22   Q.   All right.  How long have you been with the FBI?

23   A.   18 years.

24   Q.   Okay.  So somewhere in those 18 years, on more than one

25   occasion, you've recorded some kind of interview you had

1   with another person who's not an FBI person; correct?

2   A.   Correct.

3   Q.   Okay.  So it's possible, but when that doesn't happen,

4   then the FBI 302 serves as the FBI's memorialization of the

5   events that occurred; correct?

6   A.   It's a summary.

7   Q.   Fine.  It's not verbatim, but it's -- you don't have

8   anything else; right?  You have your memory and you have the

9   302; correct?

10  A.   Correct.

11  Q.   All right.  So my question is specific to that sentence.

12  Why was the sentence, "Interviewing agents observed no

13  weapons visible during this approach, interviewing agents

14  observed no weapons visible during this approach," why was

15  that sentence included in the 302?

16  A.   I don't know, sir.  I don't believe I put that one in

17  there, but it was a statement that --

18  Q.   What do you understand that sentence to mean?

19  A.   That as the team of people were approaching the house,

20  that there was no drawn weapons.

21  Q.   Why wouldn't you just say there were no drawn weapons?

22  A.   I don't know.  I mean, they were probably underneath

23  their shirts.  They weren't visible.

24  Q.   In your mind, as one of the authors of this report, what

25  is significant for memorializing that in an FBI 302?

1   A.   In -- can you repeat that?

2   Q.   Of course.  I'll repeat any question you ever want.  So

3   you're the -- one of the co-authors of this 302.

4   A.   Yes.

5   Q.   And I'm trying to understand why, as one of the

6   co-authors, you thought it was important, significant, if

7   you'd rather use the word "significant," to include that

8   particular sentence in your memorialization of your

9   interactions with Robert Purbeck?

10  A.   I didn't think -- I didn't think it was a

11  misinterpretation.  So I didn't ask to take it out or -- I

12  don't exactly know.

13  Q.   Let me ask you a different way.

14  A.   Yeah.

15  Q.   So is your testimony that that means, well, no agents

16  had their guns out, is what we were conveying with that

17  sentence?

18  A.   Yes.

19  Q.   Okay.  And as one of the authors, you apparently thought

20  that was a -- had some significance, there was some reason

21  to include that.  I'm asking what is the reason to include

22  that in the report?  What are you trying to convey?

23  A.   Just that it wasn't an aggressive approach on the house

24  maybe.  That's it.

25  Q.   Okay.  Now, you also testified, if memory serves, that

1    you interacted with Mr. Purbeck when you first approached

2    him in the driveway; correct?

3    A.  Correct.

4    Q.  All right.  Did you -- let me ask you this:  Are you an

5    Atlanta-based FBI agent?

6    A.  Yes.

7    Q.  And so you and Agent Coffin went from Atlanta out to

8    Boise to conduct the search; right?

9    A.  Correct.

10   Q.  Boise area?

11   A.  Correct.

12   Q.  And so most of the agents who were out there were

13   Boise-based agents; correct?

14   A.  Yes.

15   Q.  You and Agent Coffin were the only Atlanta agents?

16   A.  Correct.

17   Q.  All right.  How well do you remember the events from

18   August 21, 2019?

19   A.  I remember -- I remember them fairly well, but it was

20   three years ago.

21   Q.  Okay.  When you approached Mr. Purbeck, he was in the

22   driveway?

23   A.  Yes.

24   Q.  You saw him come out of the house and go to his car?

25   A.  Correct.

1    Q.   All right.   And then you received some kind of signal to

2    go ahead and execute the search warrant?

3    A.   Correct.

4    Q.   All right.   Who gave that signal?

5    A.   I don't know.

6    Q.   All right.

7    A.   It was over the radio.

8    Q.   All right.   And at that point you and others got out of

9    their cars and approached Mr. Mr. Purbeck in his driveway?

10   A.   Correct.

11   Q.   You were one of the first ones -- one of the first law

12   enforcement officers to reach Mr. Purbeck?

13   A.   No.

14   Q.   All right.   Who got there first?

15   A.   I don't know.

16   Q.   All right.   Did you walk directly from your car over to

17   Mr. Purbeck?

18   A.   I did.

19   Q.   So it is just one of these situations where you just

20   weren't the first one there, for lack of a better phrase,

21   some other agents beat you to him?

22   A.   Some other agents.   Yeah.

23   Q.   Arrived first?

24   A.   Yes.

25   Q.   Okay.   But you, when you got out of your car, you saw

1   him and so you walked to him, watching him the whole time;

2   correct?

3   A.  I mean, I was looking around the house.  But yes, my

4   goal was to reach him.

5   Q.  Okay.  When you say you were looking around the house,

6   you weren't inside the house, you were outside approaching

7   him while he was on the outside; correct?

8   A.  Correct.

9   Q.  Okay.  So, I understand maybe you looked around to see

10  what else was happening, but your main purpose was to walk

11  from where you were to where Mr. Purbeck was?

12  A.  Yes.

13  Q.  Okay.  So whether you happened to glance here or glance

14  there quickly, for the most part your attention was directed

15  toward Mr. Purbeck?

16  A.  Correct.

17  Q.  All right.  Because as you stated, and obviously what

18  you were trying to do, is to make contact with him.  All

19  right.  Did you see him get patted down or searched by any

20  agents?

21  A.  I did not.

22  Q.  Okay.  Now, when you approached him, was Agent Coffin

23  there too?

24  A.  Yes.  He was in the vicinity.  I don't know exactly

25  where he was standing, but he was -- he was around.

1    Q.  Who interacted with Mr. Purbeck -- between you and Agent

2    Coffin, who interacted with Mr. Purbeck more at that initial

3    encounter with him, you or Agent Coffin?

4    A.  I don't recall.  I think it was pretty even.  I might

5    have been the first one speaking.

6    Q.  Do you recall Agent Coffin reaching over and laying his

7    hand on Mr. Purbeck and saying something to the effect of,

8    "Robert," to get his attention?

9    A.  I don't recall that.

10   Q.  Do you recall Agent Coffin saying anything to get

11   Mr. Purbeck's attention?

12   A.  No, I don't recall that either.  No.

13   Q.  From your perspective as you approached, what drew

14   Mr. Purbeck's attention to you and Agent Coffin and the

15   other approaching agents?

16   A.  What drew our attention to him?

17   Q.  From -- as you walked toward him, watching him --

18   A.  Right.

19   Q.  -- from your perspective, what caused Mr. Purbeck to

20   look around and interact with you guys?  Did someone say,

21   "Hey," or, "You," or, "Mr. Purbeck," or, "Robert," or what

22   caused him to --

23   A.  Yeah, I don't recall.  I mean, someone, I don't recall

24   who, was -- had initial contact with Mr. Purbeck.  And we

25   approached, and I just said, "Hello, Mr. Purbeck, I'm Agent

1    Pinette with the FBI."

2    Q.  Is that the time that you told him, hey, if you want to

3    leave you can, but if you want to stay, we're going to have

4    to kind of confine where you go?

5    A.  Not in those words, but yes.

6    Q.  Tell me the words -- to the best of your recollection,

7    the words that you used to convey that message.

8    A.  Well, on initial approach, we -- I told Mr. Purbeck who

9    I was, that we were there with the FBI, and that we had a --

10   that he wasn't under arrest, and that we had a search

11   warrant for his residence.

12   Q.  Okay.

13   A.  And that if he was willing to talk to us, we would

14   explain further, and that he might be in a position to offer

15   assistance.

16   Q.  So you conveyed all that to him in the driveway when you

17   first approached?

18   A.  Yes.  In -- over by the front of his car.  We were

19   standing by the garage.

20   Q.  I heard on direct, when you were testifying, you said

21   something to the effect of, if he chose to stay, he was

22   going to be kind of kept in some kind of restricted fashion.

23   Those are my words, not yours.  Something to that effect.

24   A.  Correct.

25   Q.  That's the part I want to hear about.  To the best of

1    your recollection, what did you say with respect to that
2    message, and where and when did you say it?
3    A.   I said it as -- after the house was initially cleared
4    and we were moving towards entering the house, was when I
5    said that.
6    Q.   And what, to your recollection, did you say
7    specifically?
8    A.   "You don't have to stay, but if you do, we're going to
9    restrict your movement."
10   Q.   Okay.  So if I understand what you're saying, is you
11   expressly told him that he's allowed to leave.  Is that what
12   you're testifying to?
13   A.   I inferred that.  I guess he knew that.  I told him if
14   he stayed --
15   Q.   Here's -- it's -- here's what I'm trying to get at.  Did
16   you say to him, hey, you don't have to stay, your words, but
17   if you do stay --
18   A.   Right.
19   Q.   -- we're going to have to kind of limit your movements,
20   or did you only say the second part of that, if you stay,
21   we're going to have to limit your movements?  Because I've
22   heard it -- I think I've heard it both ways from you, and
23   maybe I am not hearing it correctly so that's why I'm asking
24   you this question.  In other words, you tell him, yeah, you
25   can go, or did you never tell him that, you just told him,

1    if you stay, we're going to restrict your movements, and you

2    inferred from that message --

3    A.  No, I understand what you're saying.  No.  I said, "You

4    don't have to stay, but if you do, we're going to restrict

5    your movements."

6    Q.  All right.  So you specifically told him he didn't have

7    to stay?

8    A.  Yes.

9    Q.  Okay.  And in your 18 years of law enforcement training,

10   that's a significant fact; correct?

11   A.  Yes.

12   Q.  We'll keep going.  It's a significant fact because it

13   would demonstrate that you weren't arresting him or

14   detaining him or taking him into custody.  It was that you

15   had offered him a free will choice; correct?

16   A.  Uh-huh (affirmative).  Correct.

17   Q.  Okay.  Let me show you what I've marked for

18   identification as Defendant's Exhibit 17.  Do you recognize

19   that as a copy of your 302?

20   A.  Yes.

21   Q.  All right.  I know you read it recently, but I want to

22   give it to you.

23   A.  Okay.

24   Q.  Because I'm going to ask you this question, so it's only

25   fair for you to look and double-check me.  You don't see say

1   that anywhere in your 302, do you?

2   A.  No, I don't believe it's in here.  No.

3   Q.  Okay.  And you and Agent Coffin worked on this together.

4   It's a joint -- you're the two point people out there

5   interacting with Mr. Purbeck, and you worked on this jointly

6   together to put not just your recollection but both of your

7   recollection to this 302; correct?

8   A.  Correct.

9   Q.  All right.  And yet nowhere in this 302 is any reference

10  to this testimony you've just given that you gave

11  Mr. Purbeck a free will choice that he can leave or he can

12  stay; correct?

13  A.  It's not in here.  You're correct.

14  Q.  You would agree with me that as between that point, you

15  can leave or you can stay, and interviewing agents observed

16  no weapons, that the you can leave or you can stay is by far

17  more significant; right?

18  A.  In this context, that is.  Yes.

19  Q.  If, in fact -- let me ask you this:  Where would you

20  think Mr. Purbeck was going to go?  Could he get in his car

21  and drive away?

22  A.  I'm not aware.  I don't know where his keys were.  I

23  mean, he was certainly allowed to.  But I don't know -- if

24  he had his keys, he could have drove away.  Although we had

25  a -- no.

1    Q.   You want to correct that?

2    A.   Yes.

3    Q.   Okay.  Go ahead.  Correct it.

4    A.   I believe we did have a search warrant for the vehicles

5    as well, so he wouldn't have been able to drive away.

6    Q.   I got you.  That's right.  So the truth is that he could

7    not get in his vehicle and drive away; correct?

8    A.   Correct.

9    Q.   In fact, had he tried to do that, you would have

10   prevented him from doing so; correct?

11   A.   Correct.

12   Q.   So the where would he have gone, am I right in saying

13   that to the extent that was -- even existed, it was that he

14   could have wandered on down the street somewhere?

15   A.   Correct.

16   Q.   To your recollection, am I right that you and your other

17   agents arrived a little bit after 7:30 a.m. in the morning?

18   A.   Yes.  Approximately.

19   Q.   I mean, you first approached and encountered Mr. Purbeck

20   a little bit after 7:30 in the morning?

21   A.   It was between 7:30 and 8:00.

22   Q.   And if I understand your testimony, to your

23   recollection, no agents had their guns drawn; correct?

24   A.   Correct.

25   Q.   All right.  And you certainly didn't see any agents

1    point guns at Mr. Purbeck?

2    A.   No.

3    Q.   You're sure about that?

4    A.   Yes.

5    Q.   Were you wearing what I will refer to as tactical body

6    armor or body armor or anything like that?

7    A.   I had -- I believe I had soft body armor underneath my

8    clothes.  I had body armor on.

9    Q.   Did you see any agents with long guns?

10   A.   No.

11   Q.   I use the phrase "long guns."  Is that --

12   A.   Yeah, I know what you're talking about.

13   Q.   All right.  Somebody shared sometimes that's not

14   specific enough.  All right.  In the driveway, did you grab

15   Mr. -- don't focus on grab.  Put your hands on is fine, but

16   grab Mr. Purbeck by his arm or any other part of his body?

17   A.   No.

18   Q.   Did you lay your hands on Mr. Purbeck?

19   A.   Not then.

20   Q.   Okay.  When did you?

21   A.   Later during the Ada County interview, I had to frisk

22   him.  That was the only time.

23   Q.   That is the first time you put your hands on Mr. Purbeck

24   was during the Ada County interview?

25   A.   Yes.

1   Q.  Am I correct in stating that you would not allow
2   Mr. Purbeck -- well, first of all, do you know who Sarah
3   Ganger is?
4   A.  His girlfriend?
5   Q.  Yes.  Do you remember her?
6   A.  I remember seeing her.  Yes.
7   Q.  Okay.  You're aware of her presence as someone who lives
8   in that home; correct?
9   A.  Yes.
10  Q.  All right.  And she was present that day of the search;
11  correct?
12  A.  Yes.
13  Q.  Is it accurate to say that you would not let Mr. Purbeck
14  see Ms. Ganger?
15  A.  No.
16  Q.  Okay.  To be more specific, from the time you first
17  encountered Mr. Purbeck until the FBI left, did you refuse
18  or prevent Mr. Purbeck from seeing Ms. Ganger?
19  A.  No.
20  Q.  Or to flip it around, take any steps or have anyone else
21  take any steps on your behalf or anyone else's behalf to
22  prevent Ms. Ganger from seeing Mr. Purbeck?
23  A.  No.
24  Q.  Are you aware or were you involved at all when the FBI
25  agents first encountered Ms. Ganger inside the home?

1    A.   No.

2    Q.   So whatever happened, that's not something that's within

3    your scope of personal knowledge?

4    A.   Right.

5    Q.   Did you hang on to Mr. Purbeck's arm in any form or

6    fashion while you walked him from the driveway into the

7    house?

8    A.   No.

9    Q.   Okay.  Or from the house into the backyard?

10   A.   No.

11   Q.   So, because you already testified you only touched him

12   when you searched him sometime later.  So at no point did

13   you grab him, guide him, or otherwise put your hands on him

14   to usher him from the driveway to the house and the house to

15   the backyard?

16   A.   No.

17   Q.   You feel like you would remember that if you had?

18   A.   Yeah.  I -- there was no reason to touch him.  But --

19   yeah.  There was no reason to touch him.  I am trying to

20   remember the activity that was going on inside the house, if

21   there would have been occasion to touch or guide him.  But I

22   don't believe so.  I don't recall exactly as we transited

23   the house.

24   Q.   Okay.  Did you say in your testimony something about it

25   was a hybrid search?  Is that what you said?

1   A.   No.  I don't recall that.

2   Q.   High risk?

3   A.   High risk.

4   Q.   High risk.  I'm sorry, I just didn't hear you from where

5   I was sitting.  How did that come into your knowledge?

6   A.   As I approached Mr. Purbeck, the other agent who had

7   gotten to him first said, "I conducted a high-risk search."

8   Q.   To your understanding, what does that mean?

9   A.   That just means a quick search of the area around your

10  waist for weapons.  It's a safety search.

11  Q.   Like a frisk for weapons.  A pat down.

12  A.   Well, it's not a full pat down.  We don't use the term

13  "pat down," but it's just checking somebody's waist to make

14  sure they don't have a gun or weapon that they can easily

15  get to.

16  Q.   When you -- did you and Mr. Purbeck walk outside

17  together from inside the house to the backyard?

18  A.   Yes.

19  Q.   All right.  Agent Coffin was with you?

20  A.   He -- he was with us or very shortly after.  Yes.

21  Q.   So you were the one who principally went with

22  Mr. Purbeck from inside the house to go outside the house to

23  speak together?

24  A.   Yeah.  I mean, I remember us all kind of going out

25  together, but I don't remember the exact order of who

1    stepped out first.

2    Q.   Okay.  Regardless, you and Mr. Purbeck and Agent Coffin

3    went outside the home to speak with one another; correct?

4    A.   Yes.

5    Q.   I'm showing you what's already been introduced -- what's

6    already been introduced as Defendant's Exhibit 5, and you

7    can take a second and kind of orient yourself to that photo,

8    and then I'm going to ask you a specific question, okay?

9    A.   Okay.

10             THE COURT:  Is there any way to remove the

11   markings?

12                  (Discussion held off record.)

13             MR. HALL:  The answer is yes, Judge.

14   BY MR. HALL:

15   Q.   Did you have a chance to orient yourself with it?

16   A.   Yes.

17   Q.   Do you recognize what's being depicted in Defendant's 5?

18   A.   Yes.

19   Q.   Can you tell from where you are sitting who that is

20   right there seated outside?

21   A.   I mean, I can't tell from here.

22   Q.   Okay.  I will show you what has been marked and

23   introduced as Defendant's 6.  Does that give you a better

24   image?

25   A.   Yes.

1    Q.  I am happy -- I am happy to put it side by side for you

2    to look at.

3    A.  No, no.

4    Q.  But is that essentially a closer-up view of the shot you

5    just looked at?

6    A.  Yes.

7    Q.  All right.  Now, do you recognize the person right

8    there?

9    A.  That kind of looks like me.

10   Q.  Okay.  Do you believe it is you?

11   A.  Yes.  That is probably me.

12   Q.  Okay.  Would it make sense that would be you?

13   A.  Yes.

14   Q.  Fair to say that the people who would be outside would

15   be you, Agent Coffin, and Mr. Purbeck; correct?

16   A.  Yes.

17   Q.  And to the best of your recollection, as between the

18   three of you, that's most likely you; correct?

19   A.  Correct.

20   Q.  All right.  And saying that that is so, would you agree

21   with me that at that point, you and Mr. Purbeck and Agent

22   Coffin had moved from outside the driveway, into the house,

23   from inside the house to the backyard, had found the chairs

24   and set them up in the triangle fashion that you had

25   described during your direct?

1    A.   Yes.

2    Q.   I mean, I can show it to you again.

3    A.   No, no.  Yes.

4    Q.   All right.  So at that point, would it be fair to say

5    that you had begun speaking to Mr. Purbeck?  You obviously

6    don't know at what point or how far into it, but at least at

7    that point the conversation with Mr. Purbeck had began?

8    A.   Yes.

9    Q.   I am going to go back to this real quick.  And looking

10   at this again, given the direction that you are facing, am I

11   right that Mr. Purbeck would be somewhere we can't see

12   because of the curtain but would be somewhere over in this

13   direction where I put the X?

14   A.   Yes.

15   Q.   You seem doubtful.  Do you think that is wrong?

16   A.   No.  It looks like it is probably correct.

17   Q.   All right.  And so because of the direction you are

18   facing, he would be facing towards you; correct?

19   A.   Well, I mean, he is not directly in front of me, but

20   where you see him on the picture, he is a little bit off to

21   the side.  But he's over there somewhere.  Yeah.

22   Q.   Okay.  From your recollection, were you and Agent Coffin

23   kind of side by side and Mr. Purbeck was in front of you

24   facing the two of you?

25   A.   No, my recollection is that we were more of a triangle.

1    We were bot -- or we were all each equal distance apart.

2    Q.   Okay.  So you're just one -- I forget my trigonometry,

3    but you're point of the triangle?

4    A.   Correct.

5    Q.   Okay.  And the other points would be over -- would be

6    over here to the right for both Agent Coffin and yourself?

7    Excuse me.  Yourself is right there.  Agent Coffin and

8    Mr. Purbeck?

9    A.   Well, I mean, Agent Coffin is probably right next to me.

10   Q.   To your right?

11   A.   Yeah.  I mean, I don't see him, but I am assuming he is

12   sitting there.

13   Q.   Well, I am asking you for your recollection.

14   A.   I don't recall exactly when we initially sat down where

15   in the backyard we were.  I mean --

16   Q.   All right.  Let me ask you --

17   A.   -- you can see me there.

18   Q.   Fair enough.  Let me ask you a different way.  So in a

19   triangle formation, regards to this orientation, we can see

20   where you are, Agent Coffin is somewhere else on the

21   triangle, and then Mr. Purbeck is kind of at the other point

22   of the triangle; correct?

23   A.   Correct.  Yes.

24   Q.   And you would agree, from looking at that photograph and

25   the angle that the sun was shining, that Mr. Purbeck was

1  facing the sun; correct?  I can show you the photograph

2  again if you want.

3  A.  Well, I can't see Mr. Purbeck.  I can speak that it was

4   -- how it was on me.

5  Q.  All right.  Fair enough.  How it was on you is coming

6  back over from behind you; correct?

7  A.  Kind of coming to the side, it looked like.

8  Q.  All right.  Mr. Purbeck was not in the shade; correct?

9  A.  Oh, he could have been in the shade.

10  Q.  Do you recollect him being in the shade, or are you just

11  saying, well, I can't see him, so therefore I can't say

12  whether he is in the sun or the shade?

13  A.  What I am saying is I wouldn't have put him in the sun

14  facing -- I wouldn't have sat him in a chair facing the sun.

15  So he was either in the shade, or he was wasn't directly

16  facing the sun.

17  Q.  All right.  Let me ask that question again.  So are you

18  saying that Mr. Purbeck was not facing the sun when you sat

19  down and started interviewing him on the morning of August

20  21, 2019?

21  A.  I don't -- I don't recollect him sitting in the sun, his

22  face in the sun.

23  Q.  You don't recollect one way or the other?

24  A.  I mean, you asked me about the photo.  I just told you

25  that I -- you can see from the photo where the sun is on me.

1    Q.  Okay.  Yeah.  When you and Agent Coffin and Mr. Purbeck

2    went outside to speak, Mr. Purbeck tried to sit in one chair

3    and you directed him to a different chair; correct?

4    A.  No.

5    Q.  All right.  Did you tell Mr. Purbeck where to sit?

6    A.  No.

7    Q.  Do you recall Agent Coffin telling Mr. Purbeck, when you

8    guys first sat down or soon thereafter, that Mr. Purbeck

9    needed to turn over his phones to the FBI?

10   A.  I don't recall.  I don't recall that.

11   Q.  Do you understand the phones would have been within the

12   scope of the search warrant?

13   A.  I do.

14   Q.  Okay.  And so that would be something that the FBI, as

15   part of the search warrant, would be seeking whether they

16   were in the house or on Mr. Purbeck's person?

17   A.  Correct.  I just don't remember him asking the statement

18   at the time.

19   Q.  Okay.  But you remember that statement of saying turn

20   over your phones occurring, you're just not sure as to when

21   it occurred?

22   A.  Yeah.  I can't say.  I don't recall a statement -- I

23   don't recall at that time if there was a statement made

24   about that.

25   Q.  All right.  Do you recall Mr. Purbeck -- regardless of

1  the statement, do you recall Mr. Purbeck turning over his

2  phones early during your encounter with him?

3  A.  I would imagine that he did, but I don't -- I don't

4  recall exactly when, at what point phones were turned over.

5  Q.  When you did your search of Mr. Purbeck when Ada County

6  was there and he reached in there and found the hard drive,

7  you didn't recover any phones at that point; correct?

8  A.  Correct.

9  Q.  So whenever it happened, it happened prior to that

10 search that you conducted; correct?

11 A.  I would be speculating.  Yes.

12 Q.  Don't speculate.  Do you know or not know?

13 A.  I don't know.

14 Q.  Am I right that Mr. Purbeck's cat ran out of the house,

15 and Mr. Purbeck stood up to get the cat and put the cat back

16 in the house and you told him to sit back down?

17 A.  No.

18 Q.  All right.  And then at that point, after telling him to

19 sit back down, you, in fact, scooped up the cat and put the

20 cat back inside the house?

21 A.  No, I never touched the cat.

22 Q.  Okay.  So just to break that down in two levels, number

23 one, as I -- and look, if I get it wrong, you just tell me,

24 hey, Mr. Hall, that's not what I said.  But as I understand

25 what you're saying, is, number one, Mr. Purbeck never stood

1    up to get the cat, one; correct?

2    A.   I don't remember anything about a cat.

3    Q.   Fair enough.  I'll move on.  You feel confident you

4    didn't pick up the cat and put it back in the house though?

5    A.   Yes.

6    Q.   Whether it was in the driveway or once you got guys made

7    your ways way to the house or made your way to the backyard,

8    did you tell Mr. Purbeck that Ada County was on its way to

9    interview him?

10   A.   No.   I think at the very end of our interview I became

11   aware of Ada County coming there, and I think at that point

12   we told him.  It was at the conclusion of our interview.

13   Q.   Had Ada County arrived by the time you told him that?

14   A.   Well, I didn't -- I think they might have, because I was

15   unaware they were coming.  I was told, and I think it might

16   have been in his presence, that Ada County was there.  So.

17   It was at the end of our interview.

18   Q.   All right.  And either right there or within minutes

19   after Ada County, in fact, walked out or appear or whatever

20   they did?

21   A.   Yes.

22   Q.   So prior to -- prior to that, did you ever mention Ada

23   County in any way to Mr. Purbeck?  Is that too broad?  I can

24   ask the question --

25   A.   Yes.

1    Q.  Sorry.  That's probably not a fair question.  Let me try

2    it differently.  Did you ever, in any form or fashion prior

3    to that time when Ada County actually appeared, tell

4    Mr. Purbeck that Ada County is on the way to see you, going

5    to come see you, wants to interview you, will be here?

6    Don't bog down in my verb choice, but just anything along

7    the lines with Ada County coming out that day to interact

8    with Mr. Purbeck?

9    A.  No.

10   Q.  Did you tell Mr. Purbeck anything to the effect that

11   this -- that you were there in any kind of capacity that

12   also involved an investigation by Ada County?

13   A.  No.

14   Q.  Do you know who contacted Ada County to have them come

15   out there?

16   A.  I don't.

17   Q.  Were you in charge of the search, or was someone else in

18   charge of the search?

19   A.  I wasn't in charge of the search.

20   Q.  Who was, to your understanding?

21   A.  Well, I mean, administratively, it was the on-scene

22   commander there would have been the Supervisor Special

23   Agent.

24   Q.  Who's that?

25   A.  Doug.  I can't remember his last name.

1    Q.  Doug Hart?

2    A.  Doug Hart.  Yes.

3    Q.  I don't know.  I'm just asking.  I know Doug is Doug

4    Hart.  Does that sound right?

5    A.  Yes.

6    Q.  All right.  Am I right that Mr. Purbeck was kept outside

7    from whatever point you -- excuse me, that he was kept

8    outside in the backyard from whatever point you and Agent

9    Coffin brought him from the driveway to the house to the

10   backyard until the search concluded by the FBI that

11   afternoon, with the exception of coming in for the bathroom

12   break?

13   A.  I'm sorry, could you repeat that?

14   Q.  Sure.  It was convoluted.  Here's what I want to know.

15   Was Mr. Purbeck in the backyard for the entire time that you

16   guys were out there, with the exceptions of he was initially

17   in the driveway, he was briefly in the house as you guys

18   walked him through to go to the backyard, and maybe for a

19   bathroom break that was taken at some point.  Was he

20   otherwise in the backyard?

21   A.  He was -- for the most part, I believe he was in the

22   backyard.  I can't say after the Ada County interview where

23   exactly Mr. Purbeck was.  At that point I had come in the

24   house and was being part of the search that was going on.

25   So I don't know after that.  But for the most part, I think

1    he was in the backyard.

2    Q.  Are you the agent who turned Mr. Purbeck over to Agent

3    Heap, Tucker Heap?

4    A.  Well, I don't think there was a turnover.  The Ada

5    County interview was done, and I went back in the house and

6    became part of the interview -- or part of search then.  I

7    don't remember exactly who ended up talking to Mr. Purbeck

8    after that.

9    Q.  Here's what I understood from your direct testimony --

10    correct me -- is that you and Agent Coffin took, escorted,

11    went, however you want to phrase it, with Mr. Purbeck into

12    the backyard.

13    A.  Correct.

14    Q.  And you -- the two of you were there, and Mr. Purbeck

15    was not allowed to go inside the house by himself.  And so

16    whatever phrase you want to use, you and Agent Coffin were

17    the agents who were responsible for his movements --

18    A.  Correct.

19    Q.  -- and his whereabouts --

20    A.  Correct.

21    Q.  -- all the way through this interview.  Then Ada County

22    shows up.

23    A.  Correct.

24    Q.  And then you are still there --

25    A.  Yes.

1    Q.   -- as the FBI person on scene.

2    A.   Uh-huh.

3    Q.   And Ada County leaves.  According to your direct

4    testimony, there is no other FBI agent out there at that

5    time?

6    A.   No.

7    Q.   Go ahead.

8    A.   There was -- there was no agent participating in the

9    interview when the interview was being conducted.

10   Q.   You mean the Ada County interview?

11   A.   Yes.

12   Q.   Right.  But you were present?

13   A.   Correct.

14   Q.   Right.  Now we have Ada County which is -- composes of

15   two people; right?  We have the Sheriff's detective and the

16   another person who was there.

17   A.   Correct.

18   Q.   And the third person was there, was you; correct?

19   A.   Correct.

20   Q.   Were there any other FBI agents there during that time?

21   A.   Nobody was right in the vicinity where the interview was

22   happening.  It's possible that people were occasionally

23   coming out to the backyard for air and going back in.  There

24   was a shed on the side of the house that people at some

25   point started to look at.  So there were other people at

1   points during that time in the backyard doing things.

2   Q.  Fair enough.  It's probably because I didn't ask a good

3   question.  But here's my point.  Once Ada County left --

4   A.  Yeah.

5   Q.  -- and you were the only FBI agent who was really there

6   right responsible for Mr. Purbeck, did you stay out there

7   with him, or did you turn him over to someone else?

8   A.  Well, it was either -- I in turn -- I don't know.  At

9   some -- it must have been me or somebody else.  At some

10  point there was somebody else there.  I -- I don't want to

11  speculate, but I'm remembering being asked to come back

12  inside.  So somebody had exchanged with me and started

13  talking to Mr. Purbeck.

14  Q.  Fair enough.  I'll move on.  Am I right that when you

15  first walked through the house, you and/or Agent Coffin got

16  Mr. Purbeck a cup of coffee; correct?

17  A.  He got his own coffee.

18  Q.  All right.  But he obtained coffee; correct?

19  A.  Yes.

20  Q.  All right.  Am I correct that the only other time he was

21  given any liquid was when he was taken to the bathroom in

22  the house on one occasion; is that correct?

23  A.  I don't recall if it was once or twice.

24  Q.  All right.  Are you the one who took him to the

25  bathroom?

1    A.   I didn't -- I don't remember that.  I don't recall.

2    Q.   Am I right that Mr. Purbeck was never given any water?

3    A.   He was offered water.

4    Q.   Who offered him water?

5    A.   Both Agent Coffin and I did.

6    Q.   When did you offer him water?

7    A.   Multiple times.

8    Q.   What did he say?

9    A.   He said no, he was good.

10   Q.   The water that you offered him, was that the bottle of

11   water that you and Agent Coffin were drinking?

12   A.   I didn't have any water.

13   Q.   Okay.  You have a distinct recollection of offering

14   Mr. Purbeck water?

15   A.   Either I or Agent Coffin did multiple times.

16   Q.   Fair enough.  I didn't ask --

17   A.   Yes.

18   Q.   One or both of you, in your -- you asked -- you offered

19   it, or Agent Coffin offered it in your presence such that

20   you would have heard it, is what you're saying; right?

21   A.   Yes.

22   Q.   Did you or other FBI agents keep him away from seeing

23   Ms. Ganger throughout the day?

24   A.   No.

25   Q.   Did you or Agent Coffin or other FBI agents keep

1    Mr. Purbeck from being able to speak to Ms. Ganger?

2    A.   No.

3    Q.   Was he allowed to go see Ms. Ganger if he wanted to?

4    A.   Yes.   He never asked me to.   I would have let him.

5    Q.   Would he have been allowed to speak to Ms. Ganger?

6    A.   We would have wanted probably to be there, but yes.

7    Q.   Did any kind of conversation -- and don't -- this is a

8    paraphrase, so don't bog down in my word choice, but any

9    kind of conversation occur when Mr. Purbeck asked whether he

10   would be allowed to see Sarah before he went to jail or

11   before you guys took him away or something along those

12   lines, and the response from you or Agent Coffin was it all

13   depended on whether Mr. Purbeck cooperated and how much he

14   cooperated?

15   A.   No.

16   Q.   That never happened?

17   A.   No.

18   Q.   That's a bad question.   You mean yes, that never

19   happened; correct?

20   A.   That never happened.

21   Q.   Thank you.   While you were in the backyard with

22   Mr. Purbeck, and he was sitting out there with you and Agent

23   Coffin, did either you ask Mr. Purbeck or hear Agent Coffin

24   ask in your presence, whether the sun was in Mr. Purbeck's

25   eyes and Mr. Purbeck said yes?

1   A.   I don't recall anything like that.

2   Q.   Okay.  The same kind of idea, whether you ask was the

3   sun in his eyes and he said yes, the sun was in his eyes,

4   and either you or Agent Coffin or another member of the FBI,

5   in fact, moved or had Mr. Purbeck move but placed him back

6   in a sunny spot?

7   A.   No.

8   Q.   Never happened?

9   A.   No.

10  Q.   Do you recall an occasion where an FBI agent or

11  employee -- don't bog down, but some FBI personnel, came

12  outside the house and started yelling or speaking in a loud

13  fashion or an excited fashion, and Mr. Purbeck understood

14  the presence of where a firearm was located inside the

15  house?

16  A.   No.

17  Q.   Okay.  Do you recall an agent coming out and inquiring,

18  in whatever manner or fashion, about was there a firearm

19  present in the house?

20  A.   No, I don't recall that.

21  Q.   Is that the kind of thing you think you would have

22  recalled?

23  A.   I'm not sure if I would have recalled that or not.  I

24  mean, I was kind of focused on the interview, but it is

25  certainly possible.  I don't recall though.

```
1              THE COURT:  Mr. Hall, about how much longer do you
2     have on cross of this witness?
3              MR. HALL:  It will start rolling pretty quick
4     here.  So I think we're getting ready to roll.  15, 20
5     minutes.
6              THE COURT:  We will go ahead and take a break if
7     he's going to be at it that much longer.  We've been at it
8     two hours.
9              MR. HALL:  Yes, sir.
10             THE COURT:  We'll take a ten-minute recess this
11    time.
12             (Break from 2:50 until 3:01 p.m.)
13    BY MR. HALL:
14    Q.  Agent Pinette, when we broke, I was asking you about an
15    interaction involving a gun.  If you would take a look at
16    that 302 in front of you.
17    A.  Okay.
18    Q.  Page 8.  Bottom of the last full paragraph on page 8, if
19    you read the first two lines starting at, "Purbeck advised
20    ... not be kept in his residence."  You can read it to
21    yourself, I'm sorry.
22    A.  Okay.
23    Q.  Did that refresh your recollection about some kind of
24    interaction involving Mr. Purbeck and the FBI regarding the
25    a location of a gun?
```

1    A.   It does.  But I remember your question, that somebody

2    came out of the house and asked about a gun.  This talks

3    about a gun, but --

4    Q.   That's why I was asking -- I did.  My question was, do

5    you remember an FBI agent, not you or Agent Coffin, coming

6    out of the house and inquiring about the location of a

7    firearm.  I understood you to say no.

8    A.   Correct.

9    Q.   I found this reference in your 302, and I'm asking if

10   you read it, does that refresh -- if it does, great.  If it

11   doesn't, so be it.

12   A.   Yeah.  No, it doesn't.

13   Q.   It does not refresh your recollection?

14   A.   No.

15            MR. MUND:  Objection, Your Honor.  He answered

16   that.

17            THE COURT:  Asked and answered.  Are you ready to

18   move on?

19            MR. HALL:  Yes.  I am ready to move on.

20   BY MR. HALL:

21   Q.   There did come a time when Mr. Purbeck asked about an

22   attorney; correct?

23   A.   Yes.

24   Q.   All right.  And that happened right about the time that

25   either you or Agent Coffin inquired about Mr. Purbeck's dark

1    market vendor name; correct?

2    A.   Correct.

3    Q.   And before you obtained any of the kind of information

4    or admissions that he made about any of his online hacking

5    activities or passwords and that kind of stuff; correct?

6    A.   I know that he had talked about some of his monikers

7    before the question of the attorney came up.

8    Q.   Okay.  He asked if he needed at an attorney or something

9    to that effect; correct?

10   A.   Yes.  Something to that effect.

11   Q.   And he also asked to use his phone to call an attorney?

12   A.   No.

13   Q.   He asked to use your phone or Agent Coffin's phone or

14   some FBI agent's phone to call an attorney?

15   A.   No.

16   Q.   Did he ask to be allowed to use someone else's, save the

17   FBI phones, but anyone else's phone, a land line, in any

18   way, to be able to reach out and call for an attorney?

19   A.   No.

20   Q.   Did you tell Mr. Purbeck or were you present -- in the

21   presence when Agent Coffin said something to the effect of

22   there are simultaneous raids being conducted around the

23   country and, quote/unquote, whomever talks first would get

24   the best deal, or something to that effect?

25   A.   No.

1   Q.  It just never happened?

2   A.  I don't remember that.

3   Q.  Did you tell Mr. Purbeck that if he did seek an

4   attorney, he would not get the best deal from the

5   prosecutor, from the FBI, from the Court, however you want

6   to phrase it?

7   A.  No.

8   Q.  At some point, Mr. Purbeck signed -- and I can show you

9   just to help refresh your recollection -- an online Consent

10  to Assume Identity form; correct?

11  A.  Correct.

12  Q.  Okay.  That has already been introduced as Government's

13  Exhibit 6.  And that's your signature over here to the

14  right?

15  A.  Yes, it is.

16  Q.  Okay.  Now, after that form was signed -- or before

17  that, at any point, did you come back -- and listen to the

18  whole question -- first of all, if I say a Miranda form, you

19  know what I am talking about; correct?

20  A.  Yes.

21  Q.  Like a standard FBI Waiver of Miranda Rights form.

22  A.  Yes.

23  Q.  Did you hand him a Miranda rights form and say to him

24  something to the effect of, if you agree with this, then say

25  yes, while holding some kind of recorder up so that he could

1   speak into the recorder?

2   A.   No.

3   Q.   All right.  Recognizing that you are saying that no

4   Miranda form existed --

5   A.   Correct.

6   Q.   -- I will preface my next question with that comment.

7   Did you ever sign any kind of Miranda waiver form as a

8   witness with respect to Mr. Purbeck on that date?

9   A.   No.

10  Q.   Again, my understanding is you said there is no Miranda

11  form that exists, and so I want to know did the following

12  occur, that you, Agent Pinette, looked at your watch, got

13  the time, and then put the time on the Miranda rights waiver

14  form?

15  A.   No.  I don't recall any of that.

16  Q.   Is that all because you are saying no Miranda form

17  existed in the first place?

18  A.   Yes.  I don't recall any of that, a Miranda form, a

19  time, or writing anything down.

20  Q.   Do you recall anything, in any form or fashion, about a

21  Miranda rights form and Mr. Purbeck on August 21, 2019?

22  A.   No.

23  Q.   And do you recall, in any form or fashion, having -- you

24  or Agent Coffin or anyone else having some kind of recorder

25  recording some kind of exchange with Mr. Purbeck about

1    Miranda rights or about anything else that day?

2    A.   Not the FBI.

3    Q.   I am asking about the FBI.

4    A.   No.

5    Q.   You are referring to Ada County; correct?

6    A.   Correct.

7    Q.   We want to exclude Ada County from this conversation.

8    A.   Yes.

9    Q.   All right.  Excluding Ada County --

10   A.   Yes.

11   Q.   -- anything else where you, Agent Coffin, or anyone

12   else, in any way, recorded any kind of interaction with

13   Mr. Purbeck?

14   A.   No.

15   Q.   Do you recall coming back at some point, or Agent Coffin

16   or a different agent in your presence, coming back and

17   seeking the passwords or pass codes for Mr. Purbeck's

18   phones?

19   A.   I remember something like that.  I don't remember exact

20   details, but I remember something about that.

21   Q.   Were you involved in that, or is that just something you

22   observed?

23   A.   No, I wasn't involved in it.

24   Q.   And I apologize if I asked this, but I just want to be

25   clear.  Are you the agent who took Mr. Purbeck to the

1    bathroom?

2    A.  I -- I don't recall that.  No.

3    Q.  All right.  Do you recall when -- on the occasion,

4    whether it was you or someone else who took him to the

5    bathroom, did he need any assistance or help in getting to

6    the bathroom?

7    A.  He didn't need assistance.

8    Q.  During the time that you were interviewing Mr. Purbeck

9    in the backyard, was he in the sun?  Was he in the shade?

10   Was he in both?  What was he in?

11   A.  I mean, I think at times it was both.  We moved our

12   chairs a couple of times.  So as the sun moved, I believe

13   all of us would come in and out of the shade and we would

14   move.

15   Q.  Was there an occasion where you all got -- when that

16   happened, who moved Mr. Purbeck's chair?

17   A.  He did.

18   Q.  On those occasions where the chairs are being moved from

19   sun to shade, did an occasion come where Mr. Purbeck decided

20   he didn't want to go in the shade and decided he wanted to

21   stay in the sun?

22   A.  I remember -- I remember at one point asking if he

23   wanted to move and he said no, he was good.  I don't know

24   whether he was in the sun or not at that point.

25   Q.  After Ada County left and -- did you come back out and

1   conduct a search of Mr. Purbeck in which you obtained his

2   wallet?

3   A.   No.

4   Q.   Did you ever search Mr. Purbeck's wallet and found a

5   BitPay card inside the wallet?

6   A.   No.

7   Q.   If that had occurred, would you have remembered it, you

8   believe?

9   A.   Oh, yeah.

10  Q.   Did you actually participate in the search, or were you

11  mostly involved with Agent Coffin sitting outside and

12  interviewing Mr. Purbeck?

13  A.   Correct.  I was not heavily involved in the search.

14  Q.   Okay.  Your main goal, along with Agent Coffin, was to

15  interview Mr. Purbeck once he indicated he wanted to talk to

16  you.  That's kind of what maintained your focus?

17  A.   Correct.

18  Q.   Toward the end of the -- let me ask you this:  When Ada

19  County showed up, is that the conclusion of the interview

20  that the FBI was conducting with Mr. Purbeck, or did that

21  interview continue after Ada County left?

22  A.   No, that was the conclusion and then -- and then Ada

23  County.  It was nothing after that.

24  Q.   So about the time that Ada County showed up was about

25  the time you were wrapping up the interview?

1    A.   Correct.

2    Q.   And then how -- approximately, to the best of your

3    recollection, how long after Ada County left did the FBI

4    wrap up and leave?

5    A.   I am not sure.  An hour maybe.  But that would be a

6    guess.

7    Q.   Prior to leaving, did you receive a phone call from a

8    prosecutor or anyone else indicating to you that Mr. Purbeck

9    was not to be detained?  Later in the day, towards the end

10   of the day at some point, did you receive some phone call

11   saying don't arrest him or he's not to be detained or

12   released or however you want to phrase it?

13   A.   No.

14   Q.   Does any of that sound familiar?

15   A.   I did not receive any phone calls.

16   Q.   Okay.  I think my last question, and then I will check

17   my notes, is, that phone call that was played during direct?

18   A.   Yes.

19   Q.   All right.  There was a prior phone call that

20   Mr. Purbeck made to you as well regarding some stolen

21   property?

22   A.   That was a subsequent phone call.

23   Q.   So this was the first phone call.

24   A.   Correct.

25   Q.   And the stolen coins was the subsequent phone call?

1    A.   Correct.

2    Q.   Okay.  At that time, was Mr. Purbeck represented by

3    counsel?

4    A.   No.

5    Q.   Okay.  Did you reach back out to Mr. Purbeck?

6    A.   Yes.

7    Q.   In response to those calls?

8    A.   Yes.

9            MR. HALL:  If I could have one quick second?

10           THE COURT:  Yes, sir.

11           MR. HALL:  Thank you.  That's all my questions,

12   Judge.

13           THE COURT:  All right.  Any redirect?

14           MR. MUND:  No, Your Honor.

15           THE COURT:  All right.  Agent, you may step down.

16           Does that conclude the government's evidence,

17   Mr. Herskowitz?

18           MR. HERSKOWITZ:  It does.  We rest, Your Honor.

19           THE COURT:  Okay.  Mr. Hall?

20           MR. HALL:  Yes, we call Agent Harshbarger.

21           THE COURT:  Let me discuss with you timing-wise,

22   because we need to let our CSOs know how late we think we're

23   going.  It's 3:15 right now.

24           MR. HALL:  Yes, sir.

25           THE COURT:  Do you have an idea about whether

1    you'll complete your evidence this afternoon or we'll need

2    to come back tomorrow?

3              MR. HALL:  Yes, sir.  I think unfortunately we'll

4    have to come back tomorrow.  I'll tell you, just to give you

5    a flavor of it, I will call Agent Harshbarger.  I told the

6    Government all of this.  So Agent Harshbarger, he'll be a

7    lot shorter than both of these witnesses who are the

8    principal witnesses in the case, but he'll be -- I will

9    question him about many of the same topics we have just

10   heard to get his perspective on it.

11             I will question Agent Tucker Heap, and I -- he

12   will be, I think, very short, because I think he is involved

13   in a very discrete portion of the case that I am going to

14   ask him about.  I'll probably ask him preliminary questions,

15   then get to the heart of the matter.  So I'd expect him to

16   be very short.  Now, I'm holding the Government, from some

17   conversations, I believe the cross-examinations will be

18   pretty short for both of them.

19             I have Detective Ryan Pacheco, the Ada County

20   Sheriff's Office.  He is under subpoena.  We have all agreed

21   that he can appear by Zoom.  Ms. Zarkowsky has kindly set

22   that up by Zoom.

23             I would very much like to get Agent Harshbarger

24   and Heap up and out, because they flew in and, if possible,

25   I would like to get Detective Pacheco done because he has

1   been on standby for Zoom.  I then have, potentially,

2   Ms. Sarah Ganger.  I have potentially, if the -- if

3   Mr. Purbeck chooses to testify.  Then of course I have

4   Dr. Allen.

5           So I think those are the matters I think that will

6   carry us over and require a second day.  I am happy to do

7   whatever the Court wants, but I understand there are many

8   moving pieces and parts here, and I am just wanting to tell

9   you that is kind of what I see.  And I am happy to answer

10  any questions the Court has.

11          THE COURT:  Okay.  For the benefit of the building

12  and the CSOs, they need to be out of here by 5 o'clock if we

13  know we are coming back.  If we thought we could finish

14  something by 5:30, 6 o'clock, we can make arrangements to

15  stay longer.  But if we know we'll be out of here by 5, then

16  I would like to conclude the matters in time for the CSOs to

17  close the building at 5 o'clock.

18          MR. HALL:  Yes, sir.

19          THE COURT:  Does that work?

20          MR. HALL:  Yes, sir.

21          THE COURT:  If we can get these three done this

22  afternoon in the time we have then.

23          MR. HALL:  Yes, sir.

24          THE COURT:  Mr. Herskowitz?

25          MR. HERSKOWITZ:  That is fine.  I agree.

1         THE COURT:  Okay.  All right.  Call your witness.

2         MR. SISTLA:  Your Honor, just one more thing.  We

3    inquired with your deputy if we could start at 9:30 tomorrow

4    morning.  Would that be okay with the Court?

5         THE COURT:  That's fine.  That will be fine.

6         Come forward, sir, to the witness stand and just

7    remain standing and take the oath, please.

8                     Sp. Agt. Clark Harshbarger

9                              Sworn

10        THE CLERK:  Please be seated and state and spell

11   your name for the record.

12        THE WITNESS:  Clark Harshbarger, C-l-a-r-k

13   H-a-r-s-h-b-a-r-g-e-r.

14        THE COURT:  You can have a set.

15        THE WITNESS:  Thank you.

16                      Direct Examination

17   BY MR. HALL:

18   Q.  Good afternoon, Agent Harshbarger.  Before we get

19   started, I am Andrew Hall.  We met briefly in the hallway.

20   I represent Mr. Purbeck.  I'm going to have some questions

21   for you.  I understand that you are retired.  I plan to

22   refer to you as Agent Harshbarger given we are talking about

23   times that -- unless that is not going to be acceptable to

24   you.

25   A.  That is fine.  I am not retired, I am resigned,

1    technically.

2    Q.   Okay.  I wasn't going to quibble.  I don't know what the

3    status was.  I just didn't want to -- if for some reason you

4    don't want to be referred to as Agent, I wanted to respect

5    your preference.

6    A.   Appreciate that.

7    Q.   Do you prefer Mr. Harshbarger?

8    A.   Mr. Harshbarger is probably more accurate.

9    Q.   Let's go with that then, yes, sir.  Okay.

10   Mr. Harshbarger, will you give the Court, and it can be in

11   brief summary form, a little bit of background about your

12   law enforcement history as relates to being involved in the

13   FBI, period?

14   A.   Certainly.  I joined the FBI in 2003.  Served in

15   Anchorage, Alaska, in Kiev, Ukraine, and Washington, D.C.,

16   and my last location was in Boise, Idaho out of the Salt

17   Lake City Division.

18   Q.   How long were you in the Boise, Idaho office,

19   approximately?

20   A.   As an FBI -- so I've been in Boise, Idaho since 2013.

21   So I left in 2020.  So approximately seven years in the

22   Boise, Idaho resident agency as a Special Agent with the

23   FBI.

24   Q.   All right.  Yes, sir.  And in your capacity as a Special

25   Agent with the FBI out of Boise, did you become involved

1  with the search warrant being executed at the house of
2  Robert Purbeck?
3  A.  Yes.
4  Q.  All right.  I can refresh your recollection with
5  addresses and stuff, but is it sufficient for our purposes
6  to refer to it as Mr. Purbeck's residence, or do you need a
7  more specific address?
8  A.  It is sufficient to refer to it as Mr. Purbeck's
9  residence.
10 Q.  Okay.  How is your recollection of the events regarding
11 that search?
12 A.  I recollect some of the things from that search,
13 certainly.
14 Q.  Fair enough.  Tell us, when you first arrive, were you
15 part of the FBI agents who arrived at the beginning of the
16 search?
17 A.  Yes.
18 Q.  Okay.  And did you have a specific role?
19 A.  I was the search team leader.
20 Q.  And in brief terms, what does that mean?
21 A.  That means that I organize the evidence that is seized,
22 and document it after the fact.
23 Q.  All right.  And you were there with other FBI agents as
24 well as FBI personnel who are not agents.  Is that accurate?
25 A.  That's accurate.

1   Q.  A quick side question, are you familiar with Nicole

2   Hideman?

3   A.  Yes.

4   Q.  Is she an agent or a non-agent?

5   A.  She is not an agent.

6   Q.  What is or was her capacity back in August of 2019?

7   A.  I am not certain.

8   Q.  Photographer?

9   A.  That's not her official position within the FBI.  That

10  may have been her role at the search.

11  Q.  Yes, sir.  All right.  How were you dressed that day?

12  A.  I don't recall.

13  Q.  Without getting into all the minutia of how one conducts

14  a search warrant, were you one of the first agents through

15  the front door?

16  A.  Yes.

17  Q.  All right.  Were you the point person or not sure?

18  A.  I would have been number one or two.

19  Q.  Okay.

20  A.  I don't recall.

21  Q.  Were you wearing -- if I use the wrong phrase, you

22  correct me, but, you know, body armor, tactical gear,

23  something along those lines?

24  A.  Well, I would not have been dressed like this.

25  Q.  Yes, sir.

1    A.  I would have been wearing typical like BTU-style

2    clothing.

3    Q.  Is that like SWAT Team gear or?

4    A.  Different.  Like that style of clothing, but not the

5    appearance that would be SWAT Team.  Yeah.  Comfortable

6    pants that you would wear that would have cargo pockets, a

7    belt.

8    Q.  Okay.  And some kind of --

9    A.  A polo shirt probably.

10   Q.  Okay.  And then ballistic vest of some variety?

11   A.  Yes.  Anytime we are making an entry into an unknown

12   residence, we would wear ballistic vests.  In cases where it

13   is low threat, traditionally I would wear something under a

14   shirt.  So undercover-type armor is what I would refer to it

15   as.

16   Q.  Do you remember on that particular day which way you had

17   gone?

18   A.  No.  But from my experience, I would, for this type of a

19   search, very -- yes.  I would likely have been wearing

20   undercover armor.

21   Q.  Okay.  Helmet?

22   A.  No.

23   Q.  I don't know the right word, but shield?

24   A.  No.

25   Q.  When I say a shield, like one of those entry shields?

1    A.   No.

2    Q.   Nothing like that?

3    A.   I know what you are talking about.  No.

4    Q.   Okay.  Were you armed?

5    A.   Yes.

6    Q.   Did you have a -- if I don't use the right lingo, fix

7    me.  But was it a handgun, a long gun?  What kind of weapons

8    did you have?

9    A.   I would have had my duty pistol, which was a Glock 22,

10   which was my issue pistol.  Next to where I wear my pistol

11   would have been my FBI badge.  That was my standard

12   configuration.

13   Q.   Okay.  When you approached the house, was your gun drawn

14   or holstered?

15   A.   I don't recall.

16   Q.   All right.  How many agents would have made up the

17   search team?  Approximately?  Approximately is fine.

18   A.   Approximately 8 to 10.

19   Q.   And would any of them, would they have -- were they all

20   dressed similar to the way you just described for the Court,

21   or would they have had other kinds of body armor or tactical

22   gear or helmets or shields or anything along those lines?

23   A.   They would have been dressed similarly to me.  I don't

24   believe anybody had a helmet.  That is another level of

25   entry.

1    Q.  Yes, sir.  How about any of them having weapons out?  Do

2    you recall any of them having their weapons drawn when they

3    approached the house or went in the house?  Anything along

4    those lines?

5    A.  I don't recall.  We -- as law enforcement officers, when

6    you are initially making entrance into a location, it would

7    be standard operating procedure to have your gun drawn,

8    typically in a depressed manner.

9    Q.  By "depressed manner," do you mean lowered?

10    A.  Yes, not pointing straight out in front of you.

11    Q.  Okay.  Do you recollect -- I guess you arrived in some

12    kind of vehicle?

13    A.  Yes.

14    Q.  All right.  Obviously.  And do you recall -- I guess my

15    question will be:  From the time you left that vehicle till

16    you made the approach, do you remember anyone coming out of

17    the house?

18    A.  Yes.

19    Q.  What do you recall?

20    A.  Mr. Purbeck came out of the house and walked towards the

21    driver side of his car, which was parked in the driveway.

22    Q.  All right.  What did you see insofar as involved FBI

23    agents approaching Mr. Purbeck and interacting with him?

24    A.  At least two FBI agents approached Mr. Purbeck and began

25    a conversation with him, let him know that -- I continued

1   on, but I heard them admonish him that we were the FBI, had
2   a search warrant, and then I was towards the house.
3   Q.  Did you have any -- did you see anyone patting
4   Mr. Purbeck down or searching him or anything along those
5   lines?
6   A.  No.
7   Q.  Am I right that -- if I am not, you, by all means,
8   correct me, but am I right that you entered the house,
9   whether one or two, and you were either the first FBI agent
10  or one of the first FBI agents to encounter Ms. Sarah Ganger
11  inside the house?
12  A.  I don't recall if I was one of the first, but I did
13  encounter Ms. Ganger inside the house.
14  Q.  All right.  Do you recall where you guys found
15  Ms. Ganger?
16  A.  So, yes.
17  Q.  Where?
18  A.  We made entry into the house, and initially it was
19  pretty overwhelming because of how much stuff and the smell.
20  There was a doorway on the right that led to two bedrooms
21  and a bathroom, and Ms. Ganger was in one of those bedrooms.
22  Q.  Was she asleep?
23  A.  She was on the bed, as I recall.  I don't -- I don't
24  recall if she was asleep.
25  Q.  In a state of undress?

1    A.  In a state of less dress.

2    Q.  Okay.  And did you or any other FBI agents point your

3    gun at her and say -- I won't pick up on the word, but, you

4    know, "freeze" or "stop" or "don't move" or anything along

5    those lines?

6    A.  I don't recall.

7    Q.  Okay.  Tell us, in brief terms, after encountering

8    Ms. Ganger, what did you and the other FBI agents who made

9    entry into the house do?

10   A.  What I recall, as she was a female, we had a female

11   agent make sure that she didn't have any weapons on her and

12   help gather some clothing so that we could get Ms. Ganger

13   into a state of more dress while the rest of us continued to

14   clear the location.

15   Q.  How long you think it took, approximately, to clear the

16   location?

17   A.  To clear the location?  Because of the level of stuff,

18   it took significantly longer than it would have if it was

19   the same size house without all of the stuff.

20   Q.  And to your recollection, how long was that?

21   A.  I don't -- I don't have an idea.  I would have to

22   speculate.

23   Q.  Don't speculate.  But can you ballpark it?

24   A.  Not comfortably.

25   Q.  Okay.  Fair enough.  How long are the standard -- how

1    many times have you done entries into houses?

2    A.   Hundreds.

3    Q.   Okay.  So you have a pretty good sense, recognizing that

4    whatever you encounter may change that, as to how long it

5    takes to clear a particular house?

6    A.   Yes.  Right.

7    Q.   Again, kind of an over/under, but for what you

8    encountered at Mr. Purbeck's house, what is, in your past

9    specious experience, has it been to clear a house of that

10   size?

11   A.   Of that size, to do primary clears, which is where we

12   make sure there is no individuals or people that could hurt

13   us, and then secondary clears to make sure there are no

14   hiding spots that we might have missed, total time for a

15   house like that would have been less than 20 minutes.

16   Q.   Okay.  And while I understand -- I don't want you to

17   speculate, and you can ballpark it, please tell us whether

18   or not, to clear Mr. Purbeck's house, because of the

19   conditions you encountered, was more than 20 minutes or less

20   than 20 minutes?

21   A.   Significantly more.

22   Q.   Than 20 minutes?

23   A.   Yes.

24   Q.   Once you cleared the home, what was your role, or what

25   did you do next?

1    A.   I was part of the search team, searching locations, but
2    also administratively labeling rooms, for example, so that
3    we could classify where evidence was taken from.  And then
4    as items were identified, making sure that we had
5    photographs, all of the administrative procedures for
6    entering -- making them so we could enter them into evidence
7    for the FBI.
8    Q.   Did you have any interactions -- I'm going to break it
9    down into phases.  Did you have any interactions with Mr.
10   Purbeck while he was outside in the driveway of his home?
11   A.   I don't recall any interactions with Mr. Purbeck out
12   there.
13   Q.   All right.  And then at some point, did it come into
14   your knowledge that Mr. Purbeck was outside in the backyard?
15   A.   Yes.
16   Q.   Were you involved at all in the process of getting him
17   from the driveway to the backyard?
18   A.   My recollection is that he came through the house.  So I
19   wasn't involved, but I observed that he came in with the two
20   agents, was allowed to refill his coffee cup.  I recall them
21   asking if he needed to use the restroom before going out.
22   Other than that, could see through the glass door that was
23   in the backyard from there on.  But no direct interaction,
24   just observations.
25   Q.   All right.  Did you see -- when you saw Mr. Purbeck

1    coming through from the driveway through the house to the
2    backyard, did you see any of the agents kind of ushering him
3    or hanging on to him or any kind of contact to help escort
4    him out to the backyard?
5    A.   I don't recall seeing that.
6    Q.   Okay.  With respect to his time in the backyard, were
7    you out there involved in any of the questioning or
8    interviewing?
9    A.   No.
10   Q.   Did you see how the -- from what you saw, who was
11   outside with Mr. Purbeck?
12   A.   For most of the time, the two agents who encountered him
13   in the driveway, Mr. Pinette, or Special Agent Pinette, and
14   Special Agent Coffin.
15   Q.   Okay.  The Atlanta agents?
16   A.   Correct.
17   Q.   All right.  And did you see where they were sitting in
18   the backyard?
19   A.   Yes.
20   Q.   Were they in the sun, shade, or where?
21   A.   So there were some significantly tall trees back there
22   as well as the house and the patio.  So Mr. Purbeck was in
23   the shade.  Obviously the sun moves through the day, so at
24   various times I saw them change orientation, I presumed to
25   keep him comfortable.  The only person that I saw in the sun

1  on occasion was Agent Pinette.

2  Q.  Did you ever see Mr. Purbeck in the sun?

3  A.  No.

4  Q.  At some pint in the search of the house, did it come to

5  your attention or -- either directly because you saw it or

6  the attention of one of your other agents, anything to do

7  with a possible firearm being in the house?

8  A.  I don't recall.

9  Q.  Okay.  Just to expand on that a little bit, it may not

10  have been the firearm itself, but a box or something that

11  would lead someone to inquire as to whether a firearm was,

12  in fact, in the house.

13  A.  I don't recall.

14  Q.  Do you recall any occasion where you or any other agents

15  asked Mr. Purbeck in any manner whatsoever about the

16  presence of a firearm?

17  A.  I don't recall that, but it would be standard.

18  Q.  At what would that conversation have taken place?

19  A.  It could happen at any point.  Typically it would be at

20  the beginning, just so that we could make safe any weapons

21  that were out in the open and not secured.

22  Q.  Do you remember any details about that, or you're just

23  saying --

24  A.  That's just standard.

25  Q.  Okay.

1    A.   I don't recall that at all in this case.

2    Q.   Yes, sir.  Were you involved at all in bringing

3    Mr. Purbeck inside to use the bathroom or for any other

4    reason?

5    A.   No.

6    Q.   Okay.

7    A.   I observed that happen, but I didn't directly

8    participate.

9    Q.   Okay.  When you saw that happen, was he escorted or

10   unescorted?

11   A.   An agent would have been nearby.  But so if -- that, I

12   would call escorted, but not controlled or held.

13   Q.   Okay.  That was going to be my next question.  You

14   see -- when he came inside from the outside, he came in with

15   an agent, it sounds like?

16   A.   Yes.

17   Q.   Okay.  And then my question is, is that agent, who is

18   going with him, did that agent have his hand on Mr. Purbeck

19   in any form or fashion, to your recollection?

20   A.   I don't recall that.

21   Q.   Were you involved in any way in searching Mr. Purbeck at

22   any point?

23   A.   No.

24   Q.   Okay.  I don't want to bog down in the search, that may

25   be my bad question.  Frisk him, pat him down, anything?

1    A.   No.

2    Q.   Did you observe anyone else searching him, patting him

3    doing, or anything along those lines?

4    A.   I didn't observe that.   No.

5    Q.   All right.   Did you have any occasion where you actually

6    spoke with Mr. Purbeck, other than possibly initially when

7    you were asking, whether it was you who was asking him about

8    a firearm, but were there any other conversations during the

9    course of the day that you had with Mr. Purbeck?

10   A.   Not to my recollection.

11   Q.   All right.   I'm going to ask you specifically about

12   this.   Did you have any questions involving Mr. Purbeck in

13   obtaining passwords or pass codes from a phone or phones

14   that were attributed to him?

15   A.   I don't recall that.

16   Q.   Okay.   Any recollection of interacting with Mr. Purbeck

17   when he came into the house to go to the bathroom, whether

18   it was about passwords or pass codes or for any other

19   reason?

20   A.   I don't recall.

21   Q.   At the end of the day, were you one of the last -- did

22   you stay there the whole day?

23   A.   Yes.

24   Q.   Okay.   And at the end of the day, did you interact with

25   Mr. Purbeck at all?

1    A.  I would have been one of the last agents there.  I don't

2    recall interacting with Mr. Purbeck, but as I was the search

3    team leader, I fill out the search documents, which includes

4    an inventory of the items that we seized.  I don't recall if

5    I handed that directly to Mr. Purbeck or if it was some

6    other capacity that I gave it to somebody else.

7    Q.  Yes, sir.  I want to show you on the ELMO what's already

8    been introduced as Defense Exhibit 14.  It may be too hard

9    for you to see.  If that's the case, I'm going to pick it up

10   and bring it up to you see you can see it.

11   A.  It is not particularly clear, but this looks like an FD

12   597 receipt.

13   Q.  All right.  And whose name is down there at the bottom,

14   if you can see, and if not, I am happy to bring it up to

15   you.

16   A.  I can see my name there on one, two, three, four -- four

17   of the pages.

18   Q.  All right.  And would you have shown that to Mr. Purbeck

19   and have him sign it?

20   A.  Yes.  That would be the typical process unless he is

21   unavailable, and then somebody who has authority, that

22   there's other ways we can handle that.  But typically I

23   would hand it directly to Mr. Purbeck and ask him to sign.

24   Q.  Is that what happened in this case?

25   A.  It appears so, because I can see a signature with

1    Mr. Purbeck's name there.

2    Q.  Okay.  Are you, as the search team leader, the person

3    who's responsible for having the search warrant with you?

4    A.  Yes.

5    Q.  Okay.  And at least the front page of the search warrant

6    is reflected in Defendant's 14 as well?

7    A.  Yes.  It appears so.

8    Q.  Okay.  Once you had those documents signed and then

9    photographed, what happened to them?

10            MR. HERSKOWITZ:  Judge, I'm going to object to

11   outside the scope of the hearing at this point as to these

12   questions.

13            THE COURT:  Sustained.

14            MR. HALL:  All right.  That is fine.  I think that

15   is right.  I apologize, Your Honor.  I withdraw the

16   question.  It's sustained, but I'll move on.

17   BY MR. HALL:

18   Q.  After you signed those documents, did you do anything

19   else with respect to the house?

20   A.  I don't recall.

21   Q.  Okay.  Other than what we've described or talked about

22   today -- well, let me say that differently.  Other than your

23   involvement on August 21 of 2019, have you had any other

24   involvement in this case?

25   A.  Yes.

1    Q.   Okay.  Don't answer the rest of it yet.  Did any of that

2    involve the interviews or interactions with Mr. Purbeck --

3    between Mr. Purbeck and the FBI on August 21, 2019?

4    A.   Possibly.

5    Q.   Let me ask it a different way.  Other than the questions

6    I have just asked you, on August 21, 2019, did you have any

7    other interactions or conversations with Mr. Purbeck, or

8    have we covered all of that?

9    A.   We have covered it all.

10            MR. HALL:  Okay.  If I can have one second, Judge.

11            THE COURT:  Yes.

12   BY MR. HALL:

13   Q.   Going back to the search, did you ask or otherwise

14   obtain the keys to Mr. Purbeck's car on August 21, 2019?

15   A.   I don't recall that.

16   Q.   Okay.  Do you recall their cars being there?

17   A.   I recall at least one car being there.

18   Q.   You have no recollection about either asking for or

19   otherwise obtaining the keys to any cars?

20   A.   No.  I mean, that would be standard again, but I don't

21   recall that at all in this case.

22   Q.   Okay.  Did you or -- please tell us whether or not you

23   brought any iPhones out from any kind of sealed or unsealed

24   evidence bag to try to enter the passwords or pass codes to

25   enter into the phones in some kind -- and showing them to

1    Mr. Purbeck or anything along those lines?  Does that jog?

2    A.   I don't recall.

3    Q.   All right.  And did you ever inquire of Mr. Purbeck

4    anything about any kind of -- here is the question I'll ask

5    you, were you ever in a situation where you had your phone

6    or another phone, that you were using, where you were trying

7    to get a pass code or password from Mr. Purbeck to enter it

8    to access some kind of Proton Mail account some other

9    account?

10   A.   No.

11   Q.   And do you know which agent escorted Mr. Purbeck to the

12   bathroom?

13   A.   No.

14            MR. HALL:  All right.

15            THE COURT:  Any cross-examination?

16            MR. HERSKOWITZ:  No questions.  Thank you, sir.

17            THE COURT:  May Mr. Harshbarger be excused?

18            MR. HALL:  Yes.

19            THE COURT:  Mr. Harshbarger, you are excused, sir.

20            Call your next witness, Mr. Hall.

21            MR. HALL:  We call Agent Heap.  I will go get him.

22                         Agent Heap

23                           Sworn

24                     Direct Examination

25   BY MR. HALL:

1   Q.  Agent Heap, where are you -- well, first of all, I am

2   Andrew Hall again.  Good afternoon.

3   A.  Pleasure to meet you.

4   Q.  Where are you employed?

5   A.  I am employed as an FBI agent in Boise, Idaho.

6   Q.  How long have you been employed with the FBI?

7   A.  A little over 16 years.

8   Q.  How long have you been in law enforcement?

9   A.  The same time.

10  Q.  How long have you been based out in Boise?

11  A.  I first came out to Boise to work as an agent in

12  February of 2017.

13  Q.  And were you -- sounds like you were in the Boise office

14  in August of 2019?

15  A.  I was.

16  Q.  Do you remember being involved in a search of a house in

17  Meridian, Idaho, belonging to Mr. Robert Purbeck?

18  A.  I do.

19  Q.  And how well do you recall the events of that day?

20  A.  Pretty well.  I have tried -- since I knew I was coming

21  to testify, I have tried to recall some different things

22  from that day.  I -- I think I recall them pretty well.

23  Q.  What was your role or roles with the FBI on that day

24  with respect to the search of Mr. Purbeck's house?

25  A.  My role was to act as one of the members of the entry

1    team to clear the house and help with the search warrant.

2    Q.   How were you dressed?

3    A.   I was dressed in -- I was dressed in civilian clothes,

4    Levis and T-shirt, I remember, with a Kevlar vest and Array

5    jacket over the top of it that was blue that had letters in

6    yellow with FBI on it.

7    Q.   Were you armed?

8    A.   I was.

9    Q.   What kind of gun?

10   A.   At the time, we just switched over, I believe I still

11   carrying my Glock 22, which was a 40 caliber.

12   Q.   So a handgun?

13   A.   A handgun, correct.

14   Q.   Did you have a long gun with you?

15   A.   I did not.

16   Q.   Only the handgun?

17   A.   Correct.

18   Q.   All right.  Other members of the entry team, were

19   they -- how were they attired?  Similarly or differently?

20   A.   Yes.  Some may not have had like the FBI jacket I had.

21   I know others did.  Some just use -- they have their Kevlar

22   vest with like FBI identifying letters on the front, and so

23   it was a mix of that.  Like they all had identifying

24   markings on them with the Kevlar vest on.

25   Q.   Any long guns or all handguns?

1   A.  Not that I recall.  I think everything was handguns.

2   Q.  As part of the entry team, are you toward the front, in

3   the middle, toward the back?  Where do you fall?

4   A.  I remember I was more in the middle.  There was -- I

5   can't remember -- there was one to two agents ahead of me, I

6   believe.  If I recall directly, my boss, Doug Hart, was

7   ahead of me.

8   Q.  Okay.

9   A.  Near the door when we approached the door.

10  Q.  When you first got out of your vehicle that you arrived

11  in, had you seen anyone leave the residence to walk out

12  towards the driveway?

13  A.  I don't recall that, but I know someone did because we

14  got our calls to approach the house.  I don't recall seeing

15  anybody come out into the driveway.

16  Q.  Out into the driveway, you mean?

17  A.  Yes.

18  Q.  Okay.  When you approached the house, did you see

19  someone in the driveway?

20  A.  Very quickly, an agent that was with me named Ryan

21  O'Neil dealt with someone who we thought at the time was the

22  subject, and I just proceeded to the door.  I didn't have

23  any dealings with who he believed who that was.

24  Q.  Okay.  Do you recall anything about those interactions

25  or not?

1   A.   Nothing.   No.   He went and confronted this person.   I

2   went straight to the door.

3   Q.   Okay.   Do you know whether he grabbed him or didn't grab

4   him, or do you not even know whether or not --

5   A.   No, my back was turned.

6   Q.   Got it.   When you went into the house, was your gun

7   holstered or drawn?

8   A.   It was drawn.

9   Q.   All right.   Was it pointed up or pointed down?

10  A.   I had it what we call at the ready.   I had it pointed

11  down, because you don't want to cross your muzzle at

12  somebody.   So it was down, but it was definitely out of its

13  holster.

14  Q.   Okay.   With respect to other members of the entry team,

15  were they also -- similarly had their weapons out?

16  A.   Yes, I believe so.

17  Q.   And what is the ballpark number on the entry team?

18  A.   I would say five to six.

19  Q.   Okay.   Agent O'Neil, the one who peeled off, would he

20  have had his weapon out as well?

21  A.   I don't recall.   I don't recall.

22  Q.   Okay.   Do you recall, other than the entry team, whether

23  any other agents had their weapons out?

24  A.   Yes, I remember seeing -- I can't remember who, but I

25  know other people had their weapons out.

1    Q.   Okay.  Are you familiar with the two Atlanta-based

2    agents who came out, Agents Coffin and Pinette?

3    A.   Yes.

4    Q.   Did they have their weapons out?

5    A.   I don't recall.

6    Q.   Upon entry into the house, tell us what you did.

7    A.   Well, usually, per our training, we go in and we split

8    off in like teams of two to go clear rooms.  And that is

9    what we did.  There was -- I remember when we came in, Doug

10   and another agent went to the right where we -- there was --

11   we believe there was a bedroom there, because there was a

12   woman calling to us when we came through the door through

13   the front window.  And so when we went through the front

14   door, they went to the right, and we went to the left where

15   there was a couple of bedrooms in there.

16   Q.   Did you --

17   A.   And the kitchen was in front of us.

18   Q.   I sorry, I interrupted you.

19   A.   The kitchen was in front of us.  So the kitchen,

20   bedroom, and then a couple -- the living room was right

21   out -- as you went through the front door, you were

22   immediately in the living room and then you went to the left

23   and there was a couple of bedrooms.

24   Q.   When you entered the house, were you guys yelling out

25   stuff like "FBI," "police, police," or anything along those

1    lines?

2    A.   Yes, "FBI, search warrant."

3    Q.   All right.  And how -- give me a volume sense, was it

4    loud, quiet, like a calm voice, or was it designed to

5    project?  Give me a sense of it.

6    A.   It was loud.  It's meant to project and let people know

7    that we're there, for their safety and for ours, just to let

8    them know we're in the louse.

9    Q.   Okay.  Is that when you -- the FBI team hits the -- goes

10   through the front door, or is it when you're first making

11   the approach all the way up, you're yelling that out?

12   A.   It was right from the initial part.  It's called

13   knocking and announcing.

14   Q.   Okay.  With respect to when Agent O'Neil peeled off to

15   go deal with the person in the driveway, was he also yelling

16   out who he was?

17   A.   I don't recall if he identified himself.

18   Q.   Okay.  Were you one of the agents who encountered a

19   person by the name of Ms. Sarah Ganger in the home?

20   A.   I don't remember her name, but I -- we encountered

21   someone who we believe was the defendant's girlfriend.

22   Q.   Okay.  Fair enough on the name.  But you encountered a

23   female who you believed to be Mr. Purbeck's girlfriend?

24   A.   Yes.

25   Q.   Okay.  And were you the one who encountered her, or you

1   just know some of your other fellow agents did?

2   A.   First encounter was some other agents.

3   Q.   Okay.

4   A.   She was -- I believe that they encountered her somewhere

5   near the bedroom after we went left to go to the other two

6   bedrooms to our left.   Later I encountered her but not

7   initially.

8   Q.   Okay.   Were you able to see in the bedroom and see

9   whether the agents who were going in there had their guns

10  drawn or not drawn, or do you not know?

11  A.   I do not know.

12  Q.   All right.   During this time, when you were going

13  through the house, was your gun still out?

14  A.   Yes.

15  Q.   Okay.   And the other search team members that you could

16  see, were their guns still out?

17  A.   Yes.

18  Q.   All right.   Is that pretty much standard operating

19  procedure for going through a house?

20  A.   Yes.

21  Q.   And to use a colloquialism, is this what is known as

22  clearing the house?

23  A.   Correct.

24  Q.   All right.   Following the FBI's clearing of the house,

25  what was your role?

1    A.   I was designated as a member of the search team, and so

2    we went out of the house, and what we do at that point is we

3    have a photographer and someone who is logging the

4    photographer's photo by photo, like literally numbering

5    them, and they go through and they put a letter in every

6    room on the house, take a picture of how the state of the

7    house at the time of the -- as we are about to begin the

8    search warrant.  So if there's -- if we say we -- you know,

9    if we had destroyed something or there was some damage, we

10   could show the before and after.  And so it's to preserve

11   the search scene at the time that we began the search

12   warrant.

13   Q.   Okay.  And so make sure I get my order right, so first

14   you guys go and clear the house.  Once the clearing is done,

15   then the photography begins?

16   A.   Yes.

17   Q.   With respect to once all that had begun and the search

18   is under way, what role did you undertake?

19   A.   I was assigned a room, and I began to search with other

20   agents.

21   Q.   Okay.  So I want to kind of fast-forward past all that.

22   What I really want to ask you about is any interactions you

23   had with Mr. Purbeck.  So sounds like you didn't have any

24   interactions with Mr. Purbeck during your initial entry.  Is

25   that right?

1    A.   No.

2    Q.   Okay.  Did you see someone that either you knew to be

3    Mr. Purbeck or later you learned to be Mr. Purbeck be

4    brought through the house into the backyard?

5    A.   I vaguely remember him being brought through the house

6    into the backyard as I was, you know, walking around the

7    house.  I did see him.  They did bring him through the house

8    into the backyard.

9    Q.   Okay.  Did you -- do you know who brought him through

10   the house?

11   A.   I don't remember.

12   Q.   FBI agents, though?

13   A.   Yes.

14   Q.   All right.  Do you recall whether they had hands on him

15   or they were just walking all the way through or did they

16   have a hand on his back or how that was being handled?

17   A.   They were walking by his side.  They were -- he was just

18   walking through the house.  And I don't remember if it was

19   one or two agents.  I just remember somebody was with him,

20   and they were just going from inside the house into the

21   backyard.

22   Q.   Okay.  And then once they're in the backyard, did you

23   see what happened?

24   A.   No.

25   Q.   All right.  Did you have an occasion to look out the

1    back windows to see who might be out in the backyard?
2    A.   No.
3    Q.   All right.  As far as you know, while you're doing the
4    search in the house, you have no idea whether people are out
5    there or not out there or what is going on?
6    A.   That's correct.
7    Q.   Okay.  Got it.  That was a long question.
8    A.   That's okay.
9    Q.   Okay.  With respect to -- did you have an occasion then
10   to go outside at some point and be with Mr. Purbeck outside
11   in the backyard?
12   A.   Yes.
13   Q.   Okay.  So I am going to use that -- stop right there.
14   Let's back up a little bit.  All right.  So when you are
15   saying you never saw Mr. Purbeck outside, is that from that
16   point when you're in the house up until you went outside?
17   A.   Yeah.  The first time I saw him in the back is when I
18   was asked to go outside.  That is when I first laid eyes on
19   him in the backyard physically.
20   Q.   Okay.  And if you were to -- or if you know, where -- at
21   what point in the search process was that?  Was it close to
22   end or not?
23   A.   No, we were -- we were close to being finished, yeah,
24   from what I remember.  We were about, I would say, maybe
25   halfway to two-thirds through, because I remember we had

1    searched a couple of bedrooms, and some other agents had

2    finished some other rooms.  But we weren't -- we weren't

3    complete.  When I say complete with the search warrant,

4    meaning that they are doing the exit photos or finalizing

5    the paperwork, they're writing the log for the receipt of

6    property for the things we've seized.  That is what I mean

7    when we say we're finished.  So when I look at that, maybe

8    60 percent it was -- you know, we were -- we had done a lot

9    of the work, but we were close to being finished, yeah.

10   Q.  During your time you were there, do you recall an Ada

11   County Sheriff's detective and/or another Ada County

12   employee coming through the house and coming out there?

13   A.  While I was still searching?

14   Q.  At any point while you were there on the premises.

15   A.  Yes.  Later.

16   Q.  Okay.  From your recollection, did the Ada County

17   appearing, did that happen before or after you went outside

18   and interacted with Mr. Purbeck?

19   A.  After.

20   Q.  You happened after or Ada County happened after?

21   A.  I went outside first and had my interaction with the

22   defendant, and then later they came out.  But not while I

23   was inside.  I didn't see any Ada County detectives.  While

24   I was part of the search team, I did not see anybody come

25   through the house from the Ada County Sheriff's Department.

1    Q.   Okay.  So tell us then, please, when you did go outside,
2    what caused you to go outside and what -- well, what caused
3    you to go outside?
4    A.   I was completing the search of a room, and my
5    supervisor, Doug Hart, came in and said we would like you to
6    go out and sit with the defendant.  A couple of detectives
7    from Ada County, the Sheriff's office are going to come over
8    here, will you just sit with him.
9    Q.   Okay.
10   A.   And I said yes.
11   Q.   All right.  Had you heard anything about Ada County up
12   to that point?
13   A.   I asked my -- I asked my supervisor why, and he
14   mentioned some general -- made some general statement about
15   there is some sort of link that he worked with the county,
16   he made some statement, and the detectives want to interview
17   him.  I just asked him, you know, why do you want me to sit
18   with him. He said, well, this is what's happening.  I was
19   like, okay.
20   Q.   When you went outside, what did you see?
21   A.   When I went outside, I saw -- I can't remember, but
22   there was an agent or two with him.  There was somebody with
23   him.  He was sitting down, and there was like three chairs
24   set out on the back lawn.  There was a -- as you went out
25   the back door, there was like a covered porch and then there

1    was the lawn outside there, and the three chairs were on the
2    lawn, not on the back porch.
3    Q.  All right.  Were the three chairs in the sun or the
4    shade?
5    A.  At the time I believe they were in the sun.
6    Q.  Was Mr. Purbeck sitting in one of the chairs?
7    A.  Yes.
8    Q.  How were the chairs arranged?
9    A.  They were arranged facing each other if you sat in them,
10   or sort of like a -- kind of like a U shape.  But if you sat
11   in one of them, it wasn't like we would all be looking in
12   one direction, we would have all been looking at each other.
13   Q.  Okay.  So -- okay.  I got it.
14   A.  So semicircle sort of thing.
15   Q.  Okay.  When you went out there, did you move Mr. Purbeck
16   to the shade?
17   A.  No, I just sat where the chairs were.
18   Q.  Did he ask to move to the shade?
19   A.  Not that I recall.
20   Q.  Do you recall anything about you moving to the shade or
21   him moving to the shade while you were out there?
22   A.  No.  We just -- I sat -- I can still remember clearly, I
23   just sat down.  He was in a chair where his back was facing
24   the house, and I sat down in a chair that was sort of facing
25   him.  And he would have been right here and I was here, and

1    I could see the back door, and we were both just sitting in

2    the sun.

3    Q.  All right.  What was the weather like?

4    A.  I don't recall thinking to myself that it was overly hot

5    at that point in the day.  I would have remembered.  I just

6    remember -- I don't remember the heat being an issue at that

7    point.  I don't remember being really hot.  I would have

8    remembered, and I don't remember being too hot sitting

9    there.

10   Q.  How long were you outside with him?

11   A.  I would say at least 45 minutes.  At least.  Maybe an

12   hour.

13   Q.  That entire time, was he still sitting in there in the

14   same chair in the sun?

15   A.  Yes.

16   Q.  And you were as well?

17   A.  Yes.

18   Q.  Okay.  Did he ever ask for any water?

19   A.  No.

20   Q.  Did you ever offer him any water?

21   A.  No.

22   Q.  Did you have any interaction with him whatsoever?

23   A.  I did.  We -- because you have to be really sensitive

24   about the fact that I don't know anything about the case,

25   and some people, I assumed -- I didn't see it, I

1    assumed someone had spoken to him, so I didn't want to talk

2    about the case.  So we just engaged in smalltalk.  And it

3    was pleasant, you know, we just kind of talked back and

4    forth.  Sometimes it would be a little quiet.  We would just

5    sit there.  I didn't want to kind of force him to interact

6    with me.  But it was just -- we just sat there.

7    Q.  How did he seem to you from the -- you know, just

8    interaction standpoint?

9    A.  He seemed -- because of the circumstances, he seemed

10   concerned a little bit.  You know, I think he was a little

11   worried.  But he seemed -- as much as he could have been, he

12   seemed relaxed.  I remember he was leaning back into his

13   chair and his hands were on his thighs, you know, when I was

14   speaking with him.

15   Q.  Did you see a broken -- these were like plastic lawn

16   chairs that you're talking about?

17   A.  I don't remember what kind of chairs they were.

18   Q.  Okay.  Do you remember any broken chairs sitting and

19   being outside?

20   A.  No, I don't.  No.

21   Q.  That just means you don't recollect or you --

22   A.  I don't recollect.

23   Q.  Okay.

24   A.  Yeah, I don't -- I don't recollect.

25   Q.  Did he seem sunburned at all?

1    A.   No.

2    Q.   All right.  Getting color in his face or anything?

3    A.   Color, meaning red?

4    Q.   Yeah, like sun, sun color, yeah.

5    A.   I don't recall that.  No.

6    Q.   All right.  How about sweaty?

7    A.   I don't recall that.

8    Q.   Did he have any kind of refreshments or liquids you saw

9    when you were sitting out there?

10   A.   Not that I can recall.  No.

11   Q.   After that interaction with him, at some point, it

12   sounded like you went back inside?

13   A.   Yes.  I remember two Ada County detectives, officers

14   showed up, and I -- they just said you can go in the house,

15   and so I went in the house and just started to finish.  They

16   were finishing up by that point.

17   Q.   Okay.

18   A.   I remember there were more -- walking through the house,

19   and there were more people kind of on the front lawn.  And

20   they were starting to kind of -- they were starting to --

21   they were starting to search through his car, and they were

22   also categorizing some of the different things that they

23   were going to seize.

24   Q.   All right.  Looking back on it, how long from when you

25   went back inside and stopped interacting with Mr. Purbeck

1   till you actually left the scene?

2   A.  I can't -- I can't recall exactly.  It didn't seem like

3   it was more than an hour.  Maybe.  It wasn't -- they were

4   finishing up.  And, you know, that part, when you do a

5   search warrant, slows down, because after the exit photos,

6   you have to make sure the paperwork is done properly.  But I

7   don't recall us being there more than an hour, hour and a

8   half at that point, after I left him in the backyard.

9   Q.  Okay.  At any point that you saw him in the backyard --

10  well, let me ask you, was the only pint that you saw him in

11  the backyard was when you were sitting out there with him?

12  A.  Yes.

13  Q.  All right.  After you came back inside, did you have any

14  further interactions with Mr. Purbeck?

15  A.  No.

16  Q.  Did you see him, whether up close or through the window

17  or in any other way?

18  A.  I don't recall.

19  Q.  Okay.  All right.

20          MR. HALL:  If I can have one second, Judge.

21          THE COURT:  Yes, sir.

22  BY MR. HALL:

23  Q.  Were you there from the -- sounds like you were there at

24  the beginning.  Were you there through the very end, when

25  everything got wrapped up and left?

1    A.   As they were wrapping up.  What happens usually in those

2    situations, people who have things, they're going to take

3    custody of those things and move them back to the office.

4    They -- you know, they start releasing people.  But I was

5    there -- from what I recall, I was there until the end.

6    Q.   Okay.  And from your knowledge, Mr. Purbeck was there

7    that entire time?

8    A.   Yeah.  I don't know where -- if he was went somewhere

9    else after the backyard, I don't know where --

10   Q.   I'm not saying he did.  I'm just asking.

11   A.   No, no, I know.  I'm just saying --

12   Q.   That's what I mean.

13   A.   Yeah, I -- I don't know about his -- after I left him, I

14   don't know if he stayed in the backyard or if he went

15   somewhere else.

16   Q.   Okay.  Remind me again how long you've been in law

17   enforcement?

18   A.   A little over 16 years.

19   Q.   Okay.  And the whole time with the FBI?

20   A.   Correct.

21   Q.   Okay.  So from watching Mr. Purbeck when you were out

22   there with him, did you have a sense as to whether he was

23   being detained, not detained, was he free to leave?  What

24   was your impression as a law enforcement officer?

25          MR. HERSKOWITZ:  I'm going to object to the extent

1    that it calls for a legal conclusion.  Just my objection,

2    Your Honor.

3            THE COURT:  Sustained.

4    BY MR. HALL:

5    Q.  Why did you go outside to sit with Mr. Purbeck?

6    A.  Really for two reasons.  I was never told that he was in

7    custody or anything like that or he is being detained at the

8    time.  When that usually happens, at this point in my

9    career, at least physical search warrants of houses,

10   probably at least three dozen, you know, at this point, and

11   one of the things that we have to be aware of when -- your

12   subjects can either stay but they can't interfere with the

13   search, or they're allowed to leave if they're not in

14   custody.  If they are going to stay, we usually have

15   somebody stay with them so that, A, you preserve the

16   integrity of the scene.  You can't have a defendant walking

17   through the search scene while it is being done.  And

18   second, for their protection and the agents in case

19   something happens.  So they usually assign an agent to sit

20   with someone if they choose to sit at the scene.

21   Q.  All right.  When you were asked to go out there and sit

22   with him, did anyone express to him that he was being

23   detained or not being detained or he was free to leave or

24   not free to leave?

25   A.  Nobody said that in front of me.

1    Q.  Okay.  Did Mr. -- did you ever say anything to

2    Mr. Purbeck along the lines of that you're welcome to leave

3    or you need to stay here or anything to that effect?

4    A.  No, I never told him that.

5    Q.  All right.  Did Mr. Purbeck stand up or seek to stretch,

6    move, move his chair, go inside, go outside, anything along

7    those lines?

8    A.  No, not that I recall.

9    Q.  He just sat there the entire time?

10   A.  Uh-huh (affirmative).

11          MR. HALL:  That is all the questions I have,

12   Judge.

13          THE COURT:  Any cross?

14          MR. HERSKOWITZ:  Very briefly.

15                    Cross-examination

16   BY MR. HERSKOWITZ:

17   Q.  Good afternoon, Special Agent Heap.  You testified

18   before about guns being drawn when you were clearing the

19   house.  Is that correct?

20   A.  Correct.

21   Q.  That was inside the house; correct?

22   A.  Yes, inside the house.

23   Q.  Okay.  Were any guns pointed at Mr. Purbeck in your

24   presence?

25   A.  No.  Not that I recall.

1    Q.  Is it true, the reason for unholstering your gun when

2    clearing a house inside is for agent safety.  Isn't that

3    correct?

4    A.  Correct.

5    Q.  Agents could encounter someone with a gun or a weapon.

6    Isn't that correct?

7    A.  Correct.

8    Q.  But sitting here, you cannot or you have no recollection

9    of anyone pointing or unholstering a gun in the presence of

10   Mr. Purbeck who was outside.  Isn't that correct?

11   A.  I don't recall anyone ever pointing a weapon at

12   Mr. Purbeck.

13   Q.  Okay.  Thank you, sir.

14            THE COURT:  Redirect?

15            MR. HALL:  Briefly.

16                    Redirect Examination

17   BY MR. HALL:

18   Q.  Am I right that when the guns were unholstered by the

19   entry team, you had them unholstered and held at your ready

20   position prior to entering the home; correct?

21   A.  Correct.

22   Q.  So please tell us whether or not, as you approached the

23   house, were your guns out as you kind of came out into the

24   yard and went into the house?

25   A.  Yeah.  When we came up to the door, it's a -- it's a

1    term that we use as far as tactics, it's called stacking on

2    the door where we all line up.  That's when everybody pulled

3    out their guns.  And we got up to the walkway before the

4    house, and everyone started pulling their guns out and

5    getting them at the ready.

6    Q.  Let me show you what has already been introduced as

7    Defendant's Exhibit 16.  Do you recognize that home?

8    A.  I do.

9    Q.  All right.  So you may be able to tap that screen

10   actually.  When you say that you -- that the team lined up

11   and started stacking when you reached the walkway, can you

12   identify the point in which you're referring to,

13   approximately?

14   A.  Yes.  I believe -- can I touch the screen?

15   Q.  Yeah, I believe so.

16   A.  Right here.  This right here is where -- what I

17   recollect where the team was stacking up.  And I believe

18   that Agent Doug Hart, what I recall, he was knocking and

19   announcing at the door right there.

20   Q.  All right.  And that's when the guns were drawn, or the

21   guns were drawn prior to that and that's when you guys lined

22   up to get going?

23   A.  It would -- it would be safe to say as we were coming up

24   on the walkway here, we would have been pulling our guns out

25   at that point.

1    Q.   Okay.

2    A.   And even coming up the driveway, we would have started

3    getting ready.

4    Q.   Say that last part again.

5    A.   Coming up the driveway here, converging to where we

6    stacked up, people would have been pulling out their guns

7    and getting them at the ready at that point.

8    Q.   Okay.  And is that the point where Agent O'Neil peeled

9    off?

10   A.   What I remember, I was -- I know that Agent O'Neil --

11   from what I recall, I think someone said something that they

12   saw the defendant in the driveway, and that's why we started

13   to approach.  Agent O'Neil approached him.  And because

14   Agent O'Neil was dealing with whoever was in the driveway

15   and I was assigned to be on the entry team, I focused solely

16   on, you know, getting lined up and getting in position.

17   Q.   Let me show you a different photo that may -- I will

18   show you what is introduced as Government's Exhibit 1.  Is

19   that a kind of more pulled-back view of the same home?

20   A.   Yes.

21   Q.   All right.  So show us again kind of the interactions as

22   you and the other FBI agents pulled your guns and approached

23   the house.

24   A.   I would say we came, we converged on this spot right

25   here at the beginning of the walkway, because people were

1   parked in different places, so we are all converging.  And
2   all I remember is -- I don't remember the exact spot, but it
3   was somewhere in the driveway where Agent O'Neil encountered
4   Mr. Purbeck -- who I learned later was him.  I didn't know
5   who it was at the time.
6   Q.  Understood.  Okay.
7           MR. HALL:  No more questions, Judge.
8           THE COURT:  All right.  May Agent Heap be excused?
9           MR. HALL:  Yes.
10          THE COURT:  Agent Heap, you are excused, sir.
11          THE WITNESS:  Thank you, Your Honor.
12          MR. HALL:  So, Judge, our next witness is
13  Detective Ryan Pacheco.  If we could have a brief break,
14  we're going to Zoom him in, and I just need to connect with
15  him and tell him that is what is happening.
16          THE COURT:  Anything else, Mr. Herskowitz?
17          MR. HERSKOWITZ:  Oh, no.
18          THE COURT:  Okay.  We will take a recess while the
19  Zoom is set up.
20                  (Break until 4:15 p.m.)
21          THE COURT:  Mr. Hall?
22          MR. HALL:  Yes, sir.
23          THE COURT:  Call your witness and let our clerk do
24  the swearing in.
25          MR. HALL:  All right.  I call Detective Ryan

```
1    Pacheco.
2                        Detective Ryan Pacheco
3                              Sworn
4         THE CLERK:  Please state your name for the record.
5         THE WITNESS:  Ryan Pacheco.
6                        Direct Examination
7    BY MR. HALL:
8    Q.  Where are you employed?
9    A.  I work for the Ada County Sheriff's office in Boise,
10   Idaho.
11   Q.  How long have you worked there?
12   A.  About 17 years.
13   Q.  How long you been in law enforcement?
14   A.  Almost 20.
15   Q.  You were working for the Ada County Sheriff's Department
16   on August 21, 2019?
17   A.  I was.
18   Q.  All right.  Did you have occasion to go out to the
19   residence of Robert Purbeck on August 21, 2019?
20   A.  I did.
21   Q.  All right.  Please tell us what prompted you to go out
22   to the residence.
23   A.  I was called to a meeting with the Sheriff who informed
24   me that the FBI was out at a residence of an employee who
25   worked for the county, who at one point had been housed out
```

1   of the Ada County Sheriff's Office, and the Sheriff wanted
2   me to go to the residence and not get involved in their
3   case, but to see if there was any exposure that we needed to
4   be aware of from the county side.
5   Q.   Did you go by yourself or with someone else?
6   A.   I went with Steve O'Meara.
7   Q.   Who is he?
8   A.   He is the -- I don't know his exact title, but he
9   oversees our IT department for the county.
10  Q.   Did you drive out there together or arrive separately?
11  A.   We took separate vehicles.
12  Q.   At the same time you arrived approximately?
13  A.   Yes.
14  Q.   Please tell the Court, once you arrived, what did you
15  see outside when you first pulled up?
16  A.   There was a lot of vehicles in front.  Took me a little
17  bit to find some parking, but there was FBI agents coming in
18  and out of the house.  A lot of activity, I guess I would
19  say.
20  Q.   The FBI agents who were coming in and out of the house,
21  did you observe what they were doing?
22  A.   Looked like they were gathering things, collecting
23  evidence.
24  Q.   Where did you go then?
25  A.   Went -- I was escorted through the front door.  We went

1    through -- I think it was a living room area.  Went through
2    the kitchen or dining room area and then out to the backyard
3    through the back door.
4    Q.  All right.  When you went through the house, what did
5    you see inside the house with respect --
6    A.  More of the same --
7    Q.  I'm sorry.  With respect to the agents, what did you see
8    with respect to law enforcement agents inside the house?
9    A.  It was a very brief walk.  I didn't pay a whole lot of
10   attention, but it was more of the same.  They appeared to be
11   conducting -- well, I knew they were conducting a warrant,
12   collecting evidence.
13   Q.  Did you see -- do you know who Sarah Ganger is?
14   A.  No.
15   Q.  All right.  Did you see someone who appeared to not be
16   involved in the law enforcement search process in the house
17   when you went through?
18   A.  Not that I recall.
19   Q.  How -- did someone escort you through the house, or did
20   you find your own way?
21   A.  No, I was escorted.
22   Q.  Do you know by whom?
23   A.  I believe it was the local FBI agent.  I could refresh
24   with my notes if you want.  Maybe Mr. Hart?
25   Q.  It's fine.  So once you arrived, did you and Mr. O'Meara

1    go into the backyard?

2    A.   We did.

3    Q.   Once you stepped out, describe for the Court what you

4    saw.

5    A.   There were some more agents out in the backyard.

6    Mr. Purbeck was sitting in a lawn chair out there a ways

7    from the house towards the back of the yard.

8    Q.   Was he in the sun or in the shade?

9    A.   I think he was in the sun.  But I don't recall exactly

10   where we were sitting.  But I don't remember us being under

11   a shaded area.

12   Q.   Were there other law enforcement -- other than yourself

13   and Mr. O'Meara, were there other law enforcement agents in

14   the backyard?

15   A.   Yes.

16   Q.   Do you remember approximately how many?

17   A.   I don't.

18   Q.   Okay.  With relation to where Mr. Purbeck was sitting,

19   did you see where the other agents were located?

20   A.   I just recall there being agents out in the backyard.  I

21   don't recall any being directly around him.  But not --

22   within a decent amount of proximity.  We were all in the

23   backyard.  It isn't a huge backyard.  But I can't recall

24   somebody standing right next to him.

25   Q.   Okay.  When you walked out there, tell the Court, what

1    did you do?

2    A.   So Mr. O'Meara and I had a couple of seats, and we sat

3    down and had a conversation with Mr. Purbeck.

4    Q.   And at that time, did you advise him of Miranda rights?

5    A.   I did.

6    Q.   All right.  Why?

7    A.   I was told by the Sheriff that we were not going to get

8    involved in a local case, that this was the FBI's show, but

9    there were concerns about some of our -- whether or not we

10   had any exposure.  I didn't know what he was going to tell

11   us, so I made a judgment call.  Because it was unknown, I

12   went ahead and read him his rights just in case there was

13   something that was unexpected that was said.

14   Q.   Did you believe him to be in custody at the time?

15           MR. MUND:  Objection, Your Honor.  That calls for

16   a legal conclusion.

17           MR. HALL:  It goes to why he read him Miranda

18   rights and his impression of.  How he's behaving.  That's

19   what I'm tendering him for.

20           THE COURT:  I'll overrule the objection.

21   BY MR. HALL:

22   Q.   Did you believe him to be in custody at the time?

23   A.   No.

24   Q.   Okay.  What did you understand or what did you believe

25   his status to be?

1    A.   Well, he wasn't in handcuffs.  But the way I -- the way

2    it perceived to me was that -- which is typical when you

3    serve a search warrant.  We have the people either step out

4    front or step out back.  So, you know, it was my impression

5    that he was away from the action that was going on in the

6    house.  But I didn't -- he wasn't handcuffed.

7    Q.   Okay.  If he was not in custody, why did you decide

8    reading him his Miranda rights was the appropriate choice?

9    A.   Again, because again, as far as -- from my conversation,

10   I didn't know what he was going to tell me as far as why I

11   was there.

12   Q.   Do you have an understanding as to whether county

13   employees are obligated to cooperate with investigations by

14   the county?

15   A.   I work for the Sheriff's office.  I can't speak to what

16   the county employee manual might say.

17   Q.   Fair enough.  With respect to -- what time of the day

18   did you get out there, approximately?

19   A.   It was late morning.  I don't -- I don't recall the

20   exact time, but it was before lunch.

21   Q.   Okay.  And how long were you out there?

22   A.   I would estimate somewhere around 45 minutes, half hour

23   to an hour, somewhere in between there.  It wasn't a real

24   long interview.

25   Q.   Where did you sit?

1    A.   I sat in a chair in the backyard.

2    Q.   Where did Mr. O'Meara sit?

3    A.   He sat in front of me.   My back was -- my back was to

4    the house facing Mr. Purbeck who was facing the house area.

5    Q.   With respect to -- were there other FBI agents who --

6    let me back up.   So you were sitting down, Mr. O'Meara was

7    sitting down, and Mr. Purbeck was sitting down, and you and

8    Mr. O'Meara were facing Mr. Purbeck.   Did I get my

9    orientation correct?

10   A.   That's correct.

11   Q.   Okay.   And were there chairs already near Mr. Purbeck

12   that you sat near, or did you have to go get them and bring

13   them over to talk to him?

14   A.   I don't remember if they were already set up for us.   I

15   didn't -- I didn't grab a chair myself.   I don't -- I don't

16   recall somebody bringing us chairs.   To my best

17   recollection, they might have already been sitting there.   I

18   don't remember for sure.

19   Q.   Okay.   And how close were the chairs -- or how close

20   were you to Mr. Purbeck?

21   A.   Six feet maybe.   We were pretty close.

22   Q.   All right.   Were the chairs arranged like in a circle, a

23   semicircle, a triangle?   How would you describe the kind of

24   orientation of the chairs?

25   A.   Mr. Purbeck was sitting in front of us in one chair.

1    His back was towards the back end of the backyard.  We were

2    sitting in front of our two chairs -- Mr. O'Meara and myself

3    were sitting in front of Mr. Purbeck with our backs towards

4    the house.

5    Q.  Did you record your interview with Mr. Purbeck?

6    A.  I did.

7    Q.  What happened to the recording?

8    A.  So that recording was on a handheld digital recorder.

9    It is a recorder that I used when I wrote my report.  I

10   don't know if you want to know the background of how I use

11   that.  But sometime later when I had recorded another

12   interview on a criminal case, I had found out that that

13   recorder was recording in an MP4 format and when I went to

14   try to download it into our report-writing system, it

15   requires an MP3 format.  And when I changed the settings on

16   the recorder, I lost all of the MP4 recordings that were on

17   that recorder.

18   Q.  Does that include the recorded interview of Mr. Purbeck?

19   A.  Yes.

20   Q.  Did you attempt to recover the recording of Mr. Purbeck?

21   A.  I called our IT person here who said it wouldn't be

22   possible.

23   Q.  What is that person's name?

24   A.  Cody Storms.

25   Q.  With respect to turning on the recorder, did you do it

1    when you first arrived?

2    A.  I don't remember exactly when I started recording.

3    Q.  Would the Miranda rights that you read have been on the

4    recording that you made?

5    A.  Yes.  They were.  I noted that.

6    Q.  With respect to sitting there, you and Mr. O'Meara

7    sitting there and Mr. Purbeck was facing you, were there

8    other FBI agents observing your interview with Mr. Purbeck?

9    A.  I don't remember seeing that.  They weren't standing in

10   my field of view, so I didn't see them.  What was happening

11   behind me, I don't know.

12   Q.  All right.  When you ended the interview and stood up,

13   were there FBI agents still outside?  I mean outside in the

14   backyard with you and Mr. O'Meara.

15   A.  There were still agents out back, yes.

16   Q.  Okay.

17   A.  In the backyard.

18   Q.  And where were they at the time you stood up, roughly,

19   in relation to where you and Mr. O'Meara and Mr. Purbeck

20   were seated?

21   A.  I don't recall exactly.

22   Q.  Do you have a sense, were they way across the yard, or

23   were they kind of generally within the same area as you and

24   Mr. Purbeck?

25   A.  Yeah, I'm not sure.  I know there were guys around.  How

1    close they were to us, I don't remember.

2    Q.  All right.  Other than interacting with Agent Hart or

3    whomever the agent was that escorted you through the home

4    initially, did you talk with any of the other agents outside

5    in the backyard?

6    A.  No.

7    Q.  Okay.  When you observed Mr. Purbeck, did he seem

8    sunburned, not sunburned?  How did his skin appearance

9    appear, if you recall?

10   A.  Yeah, I didn't notice anything that struck me that, you

11   know, he was having a health issue or something like that,

12   if that's what you're asking.

13   Q.  Not so much a health issue.  I'm just asking if he's

14   seated outside in the sun, I'm trying to get a sense of did

15   you observe any kind of coloring from the sun, or maybe

16   not -- sunburned is the wrong word, but any kind of sun

17   exposure?

18   A.  Oh, no, not that I remember.

19   Q.  Do you remember Mr. --

20   A.  We were both kind of sitting in the same area.

21   Q.  I'm sorry.  I interrupted you.  I'm sorry.  Keep going.

22   A.  We were both kind of sitting in the same area, so I -- I

23   didn't get a sunburn.

24   Q.  Okay.  Am I right that your back was to the sun,

25   Mr. Purbeck's face was to the sun?

1    A.  I don't recall that, which -- who was facing the sun.

2    Q.  Do you recall Mr. Purbeck having any refreshments or

3    liquids with him while you were interviewing him?

4    A.  I don't recall seeing that.

5    Q.  Did that come up, whether you offered some or asked for

6    some for him or vice versa?

7    A.  No.  Not that I remember.

8    Q.  All right.  And when you were speaking to Mr. Purbeck,

9    how did he seem when you were talking to him?  Did he seem

10   to be able to respond and speak to you or not?

11   A.  Yeah.  I thought we had a good conversation.  It was

12   pleasant.  There was no attitude or there was no heavy back

13   and forth or anything like that.  He was very pleasant to

14   speak with.

15   Q.  All right.  Once you completed speaking to Mr. Purbeck,

16   what did you do next?

17   A.  I left.

18   Q.  All right.  With Mr. O'Meara?

19   A.  Well, we came in separate cars, but yes, we both exited

20   at the same time.

21   Q.  That's me being inartful with my question.  Did you and

22   Mr. O'Meara leave the residence at the same time?

23   A.  Yes.

24   Q.  Leave the interior -- the backyard at around the same

25   time and go out to your respective vehicles?

1    A.   Correct.

2    Q.   Got it.

3    A.   Yes.

4    Q.   All right.  And other than what you just described to

5    the Court, did you have any other interactions with

6    Mr. Purbeck on August 21, 2019?

7    A.   After I left?

8    Q.   Yes.

9    A.   No.

10   Q.   All right.  And when you left, as you stood up to walk

11   away, where was Mr. Purbeck?

12   A.   He was still seated in the chair --

13   Q.   All right.  And -- sorry, I interrupted you again.

14   A.   In the backyard.

15   Q.   Is that the last place that you saw him on that day?

16   A.   Yes.

17   Q.   So you left, and he was still seated out there in the

18   same chair that you saw when you first arrived?

19   A.   Yes.

20           MR. MUND:  Objection, Your Honor.  That's a

21   leading question.

22           MR. HALL:  All right.  I'll rephrase it.

23           THE COURT:  Overruled.  Proceed on.

24           MR. HALL:  Okay.

25   BY MR. HALL:

1    Q.  All right.  So when you -- let me re-ask the question.

2    So when you left, Mr. Purbeck was still seated in the same

3    chair in the backyard as what you found him in when you

4    first arrived, whatever it was, you said 45 minutes earlier?

5    A.  Yes.

6    Q.  All right.

7              MR. HALL:  One second, Your Honor.

8              That is all the questions I have for right now.

9              THE COURT:  Any cross-examination?

10             MR. MUND:  No cross-examination, Your Honor.

11   Thank you.

12             THE COURT:  All right.  Detective Pacheco, you are

13   excused, sir.  Thank you.

14             MR. HALL:  Thank you, Detective.  Appreciate your

15   time.

16             THE WITNESS:  Thank you.

17             THE COURT:  All right.  It is 4:30.  Mr. Hall, do

18   you want to put another witness on if we can get him

19   completed it in the next half hour?

20             MR. HALL:  I don't think I'm going to be able to

21   pull that off, Your Honor.  I think my next witness will run

22   longer than a half hour any way we slice it and dice it.  So

23   my apologies to the Court.

24             THE COURT:  All right.  We will plan to resume

25   tomorrow morning at 9:30 then.  Does the government

1    anticipate having any rebuttal witnesses at this time?

2              MR. HERSKOWITZ:  Not at this time, Your Honor, but

3    that may change after tomorrow.

4              THE COURT:  Sure.  Okay.  And how long tomorrow

5    witnesses do you think the witnesses are going to take if we

6    get started at 9:30?

7              MR. HALL:  I would expect to be done by noon with

8    the caveat being, Judge, that if Mr. Purbeck chooses to

9    testify, that may change the dynamic of how long things

10   take, because that would depend both on cross -- it needs to

11   be both on direct as well as cross.  I think that's the --

12   that's what might run us over.  In any event, I don't think

13   we would go way past that.  I mean, we're going to get in

14   and get out.  The first witness will take us a little longer

15   than a half hour, so 9:30, about 10:15, maybe 10:30.

16   Depending on the amount of cross that takes place, 11:30,

17   12:30, I think --

18             THE COURT:  That's Ms. Ganger?

19             MR. HALL:  Ms. Ganger, yeah.  I think Ms. Ganger

20   is going to take 45 minutes to 60 minutes, just ballpark

21   figure, which is why I say we can't do her today.  And then

22   if Mr. Purbeck does testify, I think that will expand the

23   time.  If he does not testify, then we go straight to

24   Dr. Allen, and I think Dr. Allen will be pretty short and

25   sweet and to the point.  So I think -- I understand that's

1    not what the Court asked me, I'm just doing the best to give

2    you a sense if there is an unknown component here.

3            THE COURT:  Sure.

4            MR. HALL:  But anticipating that Mr. Purbeck very

5    likely may testify, I think we will run over into early

6    afternoon.

7            THE COURT:  All right.  That will be helpful.  All

8    right.  Thank you, Mr. Hall.

9            MR. HALL:  Yes, sir.

10           THE COURT:  Mr. Herskowitz, anything else for the

11   government this evening?

12           MR. HERSKOWITZ:  No, Your Honor.  Thank you.

13           THE COURT:  All right.  Very good.  We'll see you

14   all tomorrow morning at 9:30.  Court is adjourned for today.

15               (Hearing adjourns at 4:35 p.m.)

16                         * * * * *

17                   REPORTER'S CERTIFICATION

18       I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21                          *s/Lori Burgess*
                           Lori Burgess
22                         Official Court Reporter
                           United States District Court
23                         Northern District of Georgia

24                         Date:  January 3, 2023

25