1                    United States District Court
                     Northern District Of Georgia
2                          Newnan Division

3

4    United States Of America )
                              )
5                 Plaintiff, )
                              )          Criminal Action
6            vs.              )          File No. 3:21-CR-004-TCB
                              )
7                             )          Atlanta, Georgia
     Robert Purbeck,          )          September 2, 2022
8                             )          9:30 a.m.
                  Defendant. )
9    _____)

10

11              Day 2 of 2 / Volume 2 of 2

12           Transcript Evidentiary Hearing Hearing
             Before The Honorable Russell G. Vineyard
13                United States Magistrate Judge

14

15

16   APPEARANCES:

17       FOR THE GOVERNMENT:          Michael Herskowitz
                                      Alex Sistla
18                                    Brian Mund
                                      Assistant U.S. Attorneys
19
         FOR THE DEFENDANT:           Andrew Hall
20                                    Attorney at Law

21

22

23   Lori Burgess, Official Court Reporter
     (404) 215-1528
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by CAT.

**INDEX OF EXAMINATIONS**

| Witness Name | Page |
|---|---|
| Sarah Ganger | |
| Direct By Mr. Hall | 3 |
| Cross By Mr. Herskowitz | 19 |
| Redirect By Mr. Hall | 32 |
| Recross By Mr. Herskowitz | 36 |
| Robert Purbeck | |
| Direct By Mr. Hall | 38 |
| Cross By Mr. Sistla | 119 |
| Redirect By Mr. Hall | 213 |
| Dr. Jonathon Allen | |
| Direct By Mr. Hall | 218 |
| Cross By Mr. Sistla | 243 |
| Redirect By Mr. Hall | 267 |

1          THE COURT:  This is the case of the United States

2  of America versus Robert Purbeck.  Case No. 3:21-CR-4.  We

3  are here for the continuation of the evidentiary hearing.

4  Mr. Herskowitz and Mr. Sistla on behalf of the United

5  States.  Mr. Hall on behalf of the defendant who is present.

6          Are you ready to proceed, Mr. Hall, with your next

7  witness?

8          MR. HALL:  I am.  Ms. Ganger, who's already on the

9  stand.  Just a couple minutes longer.

10          THE COURT:  All right.  Ms. Ganger, you may remain

11  seated, but take the oath from Ms. Zarkowsky.

12                          Sarah Ganger

13                            Sworn

14          THE CLERK:  If you would, please state and spell

15  your name for the record.

16          THE WITNESS:  Sarah Ganger.  S-a-r-a-h.

17  G-a-n-g-e-r.

18                      Direct Examination

19  BY MR. HALL:

20  Q.  Good morning, Ms. Ganger.

21  A.  Good morning.

22  Q.  I see that you're wearing a mask.  Is that for

23  health-related reasons?

24  A.  Yes.

25  Q.  Okay.  Related to the Covid pandemic?

1    A.  Yes.

2    Q.  Understood.  Tell us, do you know Robert Purbeck?

3    A.  Yes, I do.

4    Q.  How do you know him?

5    A.  He is my partner.

6    Q.  How long have you known him, approximately?

7    A.  Ten years.

8    Q.  How long have y'all been companions or partners

9    together?

10   A.  Ten years.

11   Q.  Where do you live?

12   A.  Meridian, Idaho.

13   Q.  And what's the address?

14   A.  451 West Waterbury Drive, Meridian.

15   Q.  Is that the same house that you live in with

16   Mr. Purbeck?

17   A.  Yes.

18   Q.  And approximately how long have you lived there?

19   A.  Ten years.

20   Q.  I want to draw your attention to the morning of August

21   21, 2019.  And ask you, do you recall the events that

22   morning or that whole day, really?

23   A.  Yes.

24   Q.  All right.  So tell us kind of that morning, where were

25   you at the beginning?

1    A.   In the beginning, I was sleeping in the second bedroom.

2    It's -- you enter the house, go through the living room,

3    turn to your right, and then back down a hallway and it's

4    right there at the front of the house.  And I was asleep in

5    there when it started.

6    Q.   All right.  And wearing pajamas or how do you sleep?

7    A.   I have a back problem and anything that rubs against my

8    back really hurts, so I sleep without bottoms on and only a

9    top.

10   Q.   Did something awaken you that morning?

11   A.   Yes.

12   Q.   What?

13   A.   At the time, I didn't realize what was happening.  I

14   just heard yelling.  And somebody came into the room yelling

15   with a gun on me, and I later found out that that was Agent

16   Clark.  And he was yelling, don't touch that f-ing phone.  I

17   was probably -- I was faced away from him reaching for my

18   glasses, actually, when he assumed it was my phone.  And he

19   came around the bed pointing the gun at me and had me

20   straighten up.

21   Q.   And what did you do when he told you not to reach for

22   the phone?

23   A.   I sat up, saying I am disabled, I am not reaching for my

24   phone.  What's going on?

25   Q.   All right.  And what did he advise you?

```
1    A.  He advised me to not move, to wait, to not touch my
2    phone again.  And I said, I am not wearing any bottoms.  Can
3    I put some pants on?  He then asked for a female agent to
4    come in, check my pants, and allowed me to put them on.
5    Q.  All right.  When he first came in, was he by himself or
6    was he with other agents?
7    A.  He entered the room alone --
8              MR. HERSKOWITZ:  Your Honor -- sorry.  I object to
9    the question to the extent it involves her interaction with
10   agents that did not interact with Mr. Purbeck.  It's beyond
11   the scope of this hearing.
12             THE COURT:  How about that, Mr. Hall?
13             MR. HALL:  Yes.  I understand the objection.  I
14   think it is within the scope of the hearing for this reason.
15   One of the factors that we're asking the Court to consider
16   is whether this is a police-dominated environment which is
17   one of the criterias under both the *Craighead* and *Kim* and
18   other cases we cited in our motion.  Specifically in
19   deciding that, among the factors that courts look at are not
20   only was how was the defendant treated, but how were other
21   people in the house treated, where were they kept, were they
22   kept separate from the defendant, were they kept isolated
23   from the defendant, were they kept isolated from other
24   people.  And so it's part of the overall course of
25   police-dominated environment which we submit is exactly what
```

1    the point of this questioning is.

2                    THE COURT:  But if Mr. Purbeck is not aware of any

3    of that, based on the testimony yesterday at least, there

4    was no indication that he had any communication with Ms.

5    Ganger, was outside when this incident occurred.  I don't

6    see the relevance, so I will sustain the objection.

7                    MR. HALL:  Yes, sir.  All right.

8    BY MR. HALL:

9    Q.  Where did you move after that?

10   A.  First, for a brief moment, I was moved into the living

11   room, and then I was moved into our master bedroom.

12   Q.  All right.  During the time you are being moved, did you

13   see Mr. Purbeck?

14   A.  No, I did not.

15   Q.  Okay.  Did you have any understanding or glean any

16   information as to where you believed Mr. Purbeck was during

17   this initial period?

18   A.  I asked them what was going on, and they said they could

19   not tell me.  I asked them where Rob was.  They said they

20   could not tell me.  They had closed all of the curtains off

21   to the back yard and there were people going out to it and I

22   assume that that's where he was.

23   Q.  All right.  At any point were you able to confirm or

24   corroborate your assumption as to where Mr. Purbeck was?

25   A.  Yes.

1   Q.  All right.  Tell us what you -- how you did that and

2   what you saw?

3   A.  Initially, when I was in our master bedroom, it faces

4   the back yard of the house, and I was able to look out

5   through our curtains and I saw him sitting in the back left

6   corner with several agents in some white chairs.

7   Q.  All right.  And did you, from your point of -- or

8   vantage point of observing this, were you able to see

9   whether Mr. Purbeck was in the sun or the shade?

10  A.  He was in the sun.

11  Q.  All right.  And how about the agents, were they in the

12  sun or the shade, or do you recall?

13  A.  I recall that the agents at the time were in the sun as

14  well.

15  Q.  Okay.  And do you know what time this occurred at that

16  you were able to look out?  Or if you don't know the time,

17  can you give us kind of a sense of where in the, you know,

18  process this was?

19  A.  For the first time that I did see him out there, I am

20  able to guess it was around 10:00 a.m.  I take medicine

21  throughout the day, and even though I did not have my phone,

22  I was asking agents the time.  And one of them told me when

23  it was roughly 10:00 a.m.  And I was able to take some of my

24  medication at the time.

25  Q.  So in using the taking of your medication at

1  approximately 10:00 a.m. as kind of a sign post or -- the
2  first time you observed Mr. Purbeck in the back yard as you
3  just described, is that -- where was that in relation to
4  your taking the medication?
5  A.  Probably 30 to 45 minutes before that is when I saw him,
6  and then I was moved again after that to the living room.
7  Q.  Okay.  So after you're taking your medication, did you
8  see Mr. Purbeck again in the back yard?
9  A.  Yes, I did.
10  Q.  All right.  Please describe for the Court the
11  circumstances of that.
12  A.  After I saw him initially out the window, I don't know
13  if they saw me see him, but relatively soon after that, they
14  moved me again.  I was moved from our master bedroom to the
15  living room which is by the front door, in between the front
16  door, the back door, the kitchen.  And there were agents
17  coming in and out and I was able to see him.  There was an
18  agent taking chairs from the left side to the right side.
19  And I saw him walking with some other agents as well.
20  Q.  When you say him, walking with other agents, who is the
21  him you're referring to?
22  A.  Mr. Purbeck.
23  Q.  All right.  And in relation, approximately, to when you
24  took the medication, when was this event that you just
25  described?

1   A.   I would assume that was an hour afterwards, probably

2   because I'd been moved to the living room and had been

3   sitting there for a little bit.

4   Q.   Okay.  And when you saw him, did you see -- as they

5   passed by your viewing point, did you see them stop or did

6   they pass by your viewing point and go out of sight?

7   A.   They passed by my viewing point and they continued on,

8   and I could see movement from the kitchen window that I also

9   could see from the couch where I was sitting, and they sat

10  him in the right corner of the yard.

11  Q.   Were you able to observe the right corner of the yard,

12  or you just had a sense from your vantage point that that's

13  kind of where some activity was occurring?

14  A.   I could see people moving in that area.

15  Q.   All right.  So the distinction I'm drawing a little bit,

16  Ms. Ganger, is, could you see just people moving so you kind

17  of knew that there was activity over there, or were you

18  actually able to make observations and distinguish between

19  the people who were in that corner?

20  A.   I believe I could distinguish the people who were in

21  that corner.

22  Q.   Okay.  Tell the Court what you saw?

23  A.   I saw one agent placing the chairs and another one

24  walking and standing with Mr. Purbeck.  Then they had him

25  sit down and they were standing with him.

1  Q.  Okay.  And this is -- I understand we're doing ishes and

2  approximatelys here.  This is approximately an hour after

3  you took your medication?

4  A.  I would assume so.  Yes.

5  Q.  Okay.  And the agents -- or when you saw Mr. Purbeck sit

6  down, was he sitting in the sun, in the shade, or could you

7  tell?

8  A.  He was sitting in the sun and the agents were sitting in

9  the shade.

10  Q.  How long were you able to observe Mr. Purbeck at that

11  point?

12  A.  Probably maybe 20 minutes before I was moved again.

13  Q.  Okay.  And when you were moved -- let me ask you first.

14  During the 20 minutes that you were able to observe him, did

15  he remain in the same place, or during that 20 minutes --

16  A.  Yes.  He remained --

17  Q.  -- did Mr. Purbeck move again?

18  A.  He remained in the same spot.

19  Q.  Okay.  And the agents who were with him, were they there

20  or did they also move?

21  A.  The agents -- there was one with him almost constantly

22  that I saw.  The other agents would come inside and go back

23  out to him.

24  Q.  Okay.  After this observational event you've just

25  described, you say the agents, the FBI moved you to a

1    different spot of the house?

2    A.   Yes, I was moved back into the bedroom.  At one point

3    during the day, I had asked to go to the bathroom.  I was

4    taken to the bathroom and I could see him again when I

5    walked past the living room, and then I was pretty much kept

6    in the main bedroom after that.

7    Q.   From the main bedroom, were you able to look out in the

8    back yard and see him or not?

9    A.   No, I did not look out in the back yard again to see

10   him.  I would not have been able to see him because he was

11   in the far corner.

12   Q.   When you left to go to use the bathroom, and you say

13   that you saw him through the -- was it the living room

14   window?

15   A.   So the way it's set up is we have a big sliding glass

16   back door.  And it just so happened when I went to the

17   bathroom, I was able to see him when somebody was coming in

18   and out, and again through the kitchen, I could see out the

19   back right.

20   Q.   All right.  And with respect to -- was he sitting,

21   standing, describe for the Court where he was, what you saw?

22   A.   He was sitting in the same spot as he was when I had

23   seen him previously there.

24   Q.    In contrast to your previous testimony about observing

25   him for approximately 20 minutes, when you were coming to

1    and from the bathroom, was this more of a momentary passing

2    observation?

3    A.   Momentary passing, yes.

4    Q.   All right.  Were you able to see any agents with him at

5    that time?

6    A.   Yes.

7    Q.   Was he in the -- from what you could see, was he in the

8    sun or the shade?

9    A.   The sun.

10   Q.   And were the agents -- could you tell whether they were

11   in the sun or shade?

12   A.   I would guess in the shade again because they hadn't

13   really moved that much.

14   Q.   Okay.  All right.  Finally, returning to the main

15   bedroom after your trip to the bathroom, did you have

16   another occasion to see Mr. Purbeck?

17   A.   Yes.  Then that was the end of the day when everybody

18   came inside, I saw him again.

19   Q.   All right.  And describe for the Court when you next saw

20   him and how he appeared?

21   A.   So I heard a lot of talking, and all of the agents in

22   the house kind of were moving towards the same central area.

23   So I stood up and peeked around the door because our bedroom

24   is situated here, against the back, and the dining room

25   kitchen area is right next to it.  So I was peeking around

1    the door.  There were a bunch of agents around him.  He was

2    very somber and kind of seemed disoriented.  Was kind of

3    wobbly on his feet.  Was still talking to the agents.  They

4    were asking him a few questions.  And he just kind of seemed

5    out of it.

6    Q.  All right.  After -- how soon in relation to what you

7    just described did the law enforcement officials leave the

8    residence?

9    A.  It felt very quickly.  I could not give you a time.

10   That was probably what felt like the quickest part of the

11   day is once they came back inside, it was kind of like they

12   were wrapping everything up.  I would assume that was pretty

13   close to when they left.

14   Q.  Okay.  And what did he -- when you say you assume it's

15   pretty close to when he left, don't assume.  From your

16   recollection, you know, how close in time was that to the

17   agents leaving?  It's fine to estimate or approximate.

18   A.  I would estimate ten minutes.

19   Q.  Okay.  And after that, did you stay in the house?  Did

20   you leave the house?

21   A.  We stayed in the house for awhile.  We were trying to

22   find a way to contact other people.  He was drinking a lot

23   of water.  I was -- he was shaking.  I was trying to recall

24   what I had done for my sister when she had bad sunburns.  We

25   were looking for aloe.  And then after we contacted a few

1   people, we went to my parents' house.

2   Q.  Okay.  And how did you get to your parents' house?

3   A.  My car.

4   Q.  Came and picked you up?

5   A.  My car.

6   Q.  I probably misspoke when I asked the question.  Let me

7   just start again.

8   A.  Okay.

9   Q.  Did you go to your parents' or someone else's parents'

10  house?

11  A.  My parents.

12  Q.  That's what I thought you had said and I just -- maybe I

13  didn't speak clearly.  How did you get to your parents'

14  house?

15  A.  With my car.

16  Q.  Okay.  And did Mr. -- was Mr. Purbeck with you or did he

17  stay at the house?

18  A.  Yes.  He was with me.

19  Q.  And during this time that you observed him, describe for

20  the Court how his skin condition appeared.

21  A.  So he was bright red, already starting to seem like --

22  so have you ever seen a third-degree sunburn?

23  Q.  I don't know.

24  A.  It seems like their skin is almost a little bit waxy at

25  the time.  He -- he was shaking.  His -- it was painful to

1     touch his skin.  It was painful for him to touch himself.  I
2     was putting different things on it to try and help alleviate
3     some of the pain, but basically all you can do is wait and
4     give it time to heal.  He -- it's painful to sleep.  It's
5     painful to move.  Even like the clothes on you, if it
6     touches, it's painful then.  It's just very red, very angry.
7     Q.  Not to get into your personal affairs too much, but in
8     general terms, at least that evening and the immediate
9     following evenings, please tell the judge whether or not you
10    observed whether or not it was difficult for Mr. Purbeck to
11    sleep, go to sleep in the evening?
12    A.  Oh, it was very difficult for him.  And he woke up
13    several times.  And even if you -- when you're laying in bed
14    and if you move slightly or even if the covers move on you,
15    it -- I assume it feels like sandpaper.
16    Q.  Don't -- let's not assume, but just tell us what you
17    saw, heard, observed.
18    A.  He was in a lot of pain.  It was difficult for him to
19    maneuver, for him to sleep.
20    Q.  Do you share -- again, I apologize for getting into your
21    personal business, but do you and Mr. Purbeck share a bed?
22    A.  Yes, we do.
23    Q.  And so that day of the 21st after the agents left, can
24    you describe for the Court, you know, Mr. Purbeck's, I
25    guess -- did he drink water, not drink water?  Discuss --

1    describe for the Court, you know, any hydration efforts that

2    Mr. Purbeck made.

3    A.  He drank a lot of water.  It was like he could not

4    quench his thirst.  He also was going to the bathroom a lot

5    because of that.  He -- anytime he would finish the water, I

6    would go get him some more right away and he would keep

7    drinking it.  It got to the point where I was like, I know

8    you can drink too much water.  You need to be careful of

9    that, but he just kept drinking because it seemed like he

10   just couldn't get enough.

11   Q.  All right.  To the extent you know, one way or the

12   other, do you know whether Mr. Purbeck ever went and sought

13   any medical attention for this?

14   A.  I do not -- I believe he did not.

15   Q.  Maybe I should describe it differently.  Other than the

16   kind of home remedies that you and he were providing

17   together, did you seek any outside medical attention?

18   A.  No.

19   Q.  When was the first time, to the best of your

20   recollection -- you described -- let me back up.  You

21   described seeing Mr. Purbeck at different points from the

22   inside of the house while he was outside of the house on

23   August 21st.

24   A.  Yes.

25   Q.  Okay.  Now, with respect to those different points in

1    time that you saw Mr. Purbeck, when to your recollection was

2    the first time, if at all, that you saw him and he appeared

3    to you to be getting sunburned, be sunburned, anything along

4    those lines, if at all?

5    A.   The first time I saw him from out our bedroom window he

6    was already bright red.

7    Q.   Okay.  In the sequence of events, is that the first one,

8    second one, third one or subsequent --

9    A.   That would have been the first one.  He was already

10   turning red.

11   Q.   Okay.  And approximately how far into the -- into the --

12   from the time that you had -- let me ask you first, was

13   that -- remind us, was that before or after you took the

14   medication?

15   A.   Before.

16   Q.   And then how about on subsequent occasions when you

17   observed Mr. Purbeck, how did his skin tone appear?

18   A.   It was just getting redder and redder and instead of

19   like, you know, when fair people are out, it's like a pink.

20   It was turning a deep angry red.

21   Q.   Did you stay with Mr. Purbeck or were you with him --

22   A.   Yes.

23   Q.   -- frequently from the days of the 21st, 22nd, going

24   forward in August 2019?

25   A.   Yes.

1    Q.  All right.  Did you observe any changes to his skin?

2    A.  Yes.

3    Q.  All right.  Please describe those?

4    A.  So oftentimes with a sunburn, it will be a day or a few

5    weeks and you will start peeling.  You will have some relief

6    from that.  He actually peeled twice, which is apparently

7    how it works with the worse it gets.  The first few days it

8    was the same, the pain, not being really able to move,

9    clothes irritating the skin, every small movement irritating

10   the skin.  Probably after the first week, it was starting to

11   heal itself.  And then a week or so later it was -- it

12   started peeling the first time, and then a few weeks later

13   it peeled a second time.

14              MR. HALL:  Okay.  One moment, Judge.

15              THE COURT:  Yes, sir.

16              MR. HALL:  That's all the questions that I have

17   for now.

18              THE COURT:  Mr. Herskowitz, do you have any

19   cross-examination?

20              MR. HERSKOWITZ:  I do.  Thank you, Your Honor.

21                        Cross-Examination

22   BY MR. HERSKOWITZ:

23   Q.  Good morning, Ms. Ganger.

24   A.  Good morning.

25   Q.  My name is Mike Herskowitz.  I'm one of the prosecutors.

1   I will have some questions for you this morning.  Now,

2   you've testified you've been companions with Mr. Purbeck for

3   ten years?

4   A.  Yes.

5   Q.  Okay.  And you rely on him daily; correct?

6   A.  Uh-huh (affirmative).

7   Q.  For even the most basic things.  Isn't that true?

8   A.  Yes.

9   Q.  And you claim that you cannot stand longer than five

10  minutes?

11  A.  Yes.

12  Q.  So Mr. Purbeck helps you with even the most basic

13  things; correct?

14  A.  He does, yes.

15  Q.  And in fact, you stated that you wouldn't know what to

16  do without him.  Isn't that correct?

17  A.  Yes.

18  Q.  You care for him very much.  True?

19  A.  I do.

20  Q.  And you want to help him; correct?

21  A.  Uh-huh (affirmative).

22  Q.  You have to answer "yes" or "no."

23  A.  Yes.

24  Q.  Now, you filed an affidavit previously in Mr. Purbeck's

25  civil case.  Isn't that true?

1    A.  Yes.

2    Q.  That's a civil case dealing with -- against authorities

3    and the subject matter deals with the events you are

4    testifying to here today; correct?

5    A.  Yes.

6    Q.  And are you familiar with that affidavit you filed?

7    A.  Yes.

8    Q.  And you filed it in Mr. Purbeck's civil case on

9    September 17 of 2021; correct?

10   A.  Yes.

11   Q.  And it was actually signed by you on September 12th,

12   2021; correct?

13   A.  Yes.

14   Q.  About a year ago?

15   A.  Yes.

16   Q.  And it was about two years after the search; right?

17   A.  Yes.

18   Q.  Okay.  Now, did you type up this affidavit yourself?

19   A.  Yes.

20   Q.  You typed it yourself?

21   A.  Yes.

22   Q.  And you signed it?

23   A.  Yes.

24   Q.  Did you consult at all with Mr. Purbeck when you

25   prepared this affidavit?

1    A.   No.

2    Q.   Did he see the affidavit before you finalized it?

3    A.   I don't know.  I would assume not.  I typed it up,

4    signed it, and then it was sent off.

5    Q.   What did you do with that after you typed it up and

6    signed it?

7    A.   It was put into an envelope, I believe.

8    Q.   Did you put it in the envelope?

9    A.   Yes.

10   Q.   Did you give it to Mr. Purbeck?

11   A.   Yes.

12   Q.   Who asked you to prepare the affidavit?

13   A.   Mr. Purbeck.

14   Q.   Was everything that you wrote in that affidavit and you

15   typed up true and correct?

16   A.   Yes.

17   Q.   And you realize if you are filing something in this

18   case, the Court of Appeals for the Ninth Circuit, it should

19   be true and accurate and correct?

20   A.   Yes.

21   Q.   Did you also type Mr. Purbeck's name and address and

22   email address in the top left-hand corner of the affidavit?

23   A.   Yes.

24   Q.   Now, it's fair to say that -- and did you want to refer

25   to a copy of the affidavit?  Would that be helpful to you?

1    A.   Sure.

2              MR. HERSKOWITZ:  May I approach, Your Honor?

3              THE COURT:  You may.

4              MR. HERSKOWITZ:  I have marked the affidavit

5    Government's Exhibit 8.  I'm just marking it for

6    identification.

7              THE WITNESS:  Thank you.

8    BY MR. HERSKOWITZ:

9    Q.   Now, if I could refer you to page 2 of the affidavit,

10   line 23.  You said you could see Rob sitting in the hot sun

11   in the back yard and there was plenty of shade just next to

12   him?

13   A.   Uh-huh (affirmative).

14   Q.   He was bright red and already badly sunburned?

15   A.   Yes.

16   Q.   Was that the first time you saw him?

17   A.   I would assume so.  Yes.

18   Q.   I don't want you to assume.  I mean, it's your

19   affidavit.  So you tell us.

20   A.   Yes.  The first time I saw him, he was already

21   sunburned.

22   Q.   Did you talk about in this affidavit any other times you

23   saw Mr. Purbeck while the agents were still there?

24   A.   Yes, I did.  I can see here I talked about it.  Oh, that

25   was the one that you were talking about.  I'm so sorry.

1    Okay.  You were talking about on the second page, 1.3?

2    Q.  Yeah.  Well, take your time.  So the affidavit is three

3    pages, and please take your time and refer to it.  In the

4    affidavit, you talked about seeing Mr. Purbeck one time when

5    the agents were there when he was in the back yard.  And

6    then you talk later in the affidavit about how Mr. Purbeck

7    appeared after the agents left.  What I want to know is, did

8    you -- let me ask you, isn't it true that you just talked

9    about the one time you saw Mr. Purbeck in the back yard in

10   this affidavit?

11   A.  Well, when I was writing it, I was going in a

12   chronological order for myself.  I -- at the time I don't

13   think -- I didn't know I needed to list each and every time.

14   I have never written one of these before so --

15   Q.  I appreciate that.  So the answer is true, that just --

16   you mentioned just the one time?

17   A.  I mentioned the one time in here.  Yes.  But I did see

18   him four times total.

19   Q.  And that's the first time we're hearing about that is

20   here today that you saw him these other three times?

21   A.  Okay.

22   Q.  That's true; right?

23   A.  Yes.

24   Q.  How close were you to Mr. Purbeck when you saw him those

25   approximately four times in the back yard?

1    A.  20 -- 20 feet.  It would have been at least from me to
2    your associates.
3    Q.  So that's about -- you're estimating about 20 feet?
4    A.  I'm not great at estimating --
5    Q.  It's okay.
6    A.  -- those type of things.  But I would say from me to
7    your associates.
8    Q.  Were the curtains drawn at all?
9    A.  All the curtains were drawn.  When I saw him the first
10   time, I opened them myself.  When I saw him the subsequent
11   times, it was because agents were moving in and out of the
12   house.
13   Q.  So it would just be for a brief glimpse on those times,
14   right, when the agents were coming in and out?
15   A.  The second time when I saw them moving him, they
16   actually had them opened because they were moving in and out
17   several times.  I also saw an agent standing at the outside
18   of the door.  He was kind of keeping the curtain open and
19   the door open for everybody to move in and out of.
20   Q.  You weren't in the back yard at any time that day?
21   A.  No.
22   Q.  Correct?
23   A.  Correct.
24   Q.  And you never -- did you ever see an agent put their
25   hands on Mr. Purbeck?

```
1    A.   When they were walking, they were close.  I don't know
2    if they touched.
3    Q.   You didn't see them touch Mr. Purbeck?
4    A.   I did not see them touch.
5    Q.   And you never saw anyone yell at Mr. Purbeck, did you?
6    A.   I only ever saw them talking.  I could hear their voices
7    from -- the first time before I saw them, I could hear their
8    voices.  I could not make out what they were saying.
9    Q.   Did you ever -- I'll ask you again, did you ever hear an
10   agent yell at Mr. Purbeck?
11   A.   No.
12   Q.   Now, in your affidavit, can you read the -- on the last
13   page of the first line of your affidavit on line 2.
14             MR. HALL:  I'm sorry, Mr. Herskowitz, where are
15   you?
16             MR. HERSKOWITZ:  Third page, last page of the
17   affidavit, first line.
18   A.   The first line?  "They left me stranded there with no
19   way to get help and no way to leave."
20   Q.   And who were you referring to?
21   A.   To the agents.
22   Q.   Is that true?
23   A.   Yes.
24   Q.   I think you just testified that you had a car and you
25   drove Mr. Purbeck to your parents' house.
```

1    A.   Yes.   They would not let me have it.

2    Q.   Okay.   Well, you weren't stranded there; right?

3    A.   No, I was.

4    Q.   You had a car.

5    A.   They told me I could not have access to my car.   They

6    told me anything at the house was considered his and I could

7    not have my phone, I could not have my car.   I could not go

8    into my car until they were done with everything.

9    Q.   They told you you could leave; correct?

10   A.   I asked them how I would leave and they said that was

11   not their problem.

12   Q.   That's not my question.   Agents told you that you could

13   leave.   Yes or no?

14   A.   Yes.   And when I asked them how I could leave, they said

15   that was not their problem.

16   Q.   So you were not stranded there?

17   A.   Yes, I was.   I am handicapped.

18   Q.   But in fact later you took your car?

19   A.   Yes.   After they had released my car, I did take my car.

20   Q.   And you took Mr. Purbeck to your parents' house?

21   A.   Yes.

22   Q.   And where is that in relation to --

23   A.   Mountain Home.   It's about 45 minutes away.

24   Q.   And just for -- so the court reporter can get everything

25   down we're saying, just let me finish my question if that's

1   okay.  On the way to your parents' house, did you stop to

2   get medical attention for Mr. Purbeck?

3   A.  No.

4   Q.  Did you stop to purchase any items from a grocery store

5   for pain relief for Mr. Purbeck?

6   A.  We already had the necessary items.

7   Q.  But you never stopped to get any medical attention?

8   A.  I have dealt with sunburns this badly.  They will tell

9   you the same thing.  Put aloe vera on them and rest.

10   Q.  You didn't think it was bad enough to take Mr. Purbeck

11   to see a doctor?

12   A.  He had lost his job that day, had no insurance because

13   of it, and I don't know if you know how much it costs to

14   visit a doctor.  But no.

15   Q.  You don't know if he lost his insurance that day, do

16   you, ma'am?

17   A.  Yes, I do.

18   Q.  But the fact of the matter is that you didn't go to any

19   type of urgent care, any type of doctor, seek any medical

20   attention for Mr. Purbeck?

21   A.  No.

22   Q.  And you wrote in your affidavit, and you testified

23   today, that he was the dealing with a third-degree sunburn?

24   A.  Yes.  That is my assumption at it.

25   Q.  Well, you wrote in your affidavit, and I believe you

1   testified before that everything in your affidavit is true;

2   correct?

3   A.  Yes.

4   Q.  So why did you choose to --

5   A.  True based to my knowledge.

6   Q.  So why did you decide to describe it as a third-degree

7   sunburn?

8   A.  Because I have witnessed what a third-degree sunburn is

9   with doctor visits with members of my family and his was, in

10  my opinion, exactly like that.

11  Q.  Are you aware a third-degree sunburn is -- it can burn

12  the outer layer of the skin, the epidermis, and the dermis?

13  A.  Yes.

14  Q.  It could damage bones, or a third-degree burn could

15  damage bones, muscles or tendons?

16  A.  A third-degree sunburn is slightly different from that

17  from what I have experienced.  It is normally a very, very

18  bad sunburn where it has burned deeper than the first layer

19  of skin, and sometimes there can be scarring from it.  But

20  normally it just takes a very long time to heal.

21  Q.  Do you have any medical training?

22  A.  No.

23  Q.  So how did you come up with that term, third-degree

24  sunburn?

25  A.  Because when I have seen it before on my sister

1   specifically, when we did go see a doctor, that is the term

2   that they used.

3   Q.  Now, you said for months he was dealing with -- you said

4   for months he was dealing with third-degree sunburn after

5   that?

6   A.  Uh-huh (affirmative).

7   Q.  Is that a yes?

8   A.  Yes.

9   Q.  So how many months was he dealing with this third-degree

10  sunburn?

11  A.  I would say the second peeling probably went four weeks.

12  And then the fifth week of that would have been him getting

13  back to fully normal.

14  Q.  And this search was August 21 of 2019.  Isn't that

15  correct?

16  A.  Yes.

17  Q.  Are you aware that Mr. Purbeck flew to Atlanta to meet

18  with the very agents that spoke with him in the back yard on

19  September 9th, 2019?

20  A.  Yes.

21  Q.  So 18 days after you are claiming he developed this

22  third-degree sunburn he is flying to Atlanta to meet with

23  these agents?

24  A.  Yes.

25  Q.  Do you know if he sought any medical attention between

```
1    August 21, 2019 and September 9, 2019 when he flew to
2    Atlanta?
3    A.  I do not believe so.
4             MR. HERSKOWITZ:  One second, please, Your Honor.
5             THE COURT:  Yes, sir.
6    BY MR. HERSKOWITZ:
7    Q.  Now, you testified before the agents were around
8    Mr. Purbeck, he was very sunburned and seemed disoriented?
9    A.  Yes.
10   Q.  You didn't know if he was disoriented or not from your
11   vantage point; isn't that right?
12   A.  Well, my statement about him being disoriented was to me
13   he did seem disoriented outside just because of the way he
14   was moving, but specifically when he came inside the last
15   time I saw him, he was shaking and looking around and his
16   eyes were glazed over.  Yes.  To me that is disoriented.
17   Q.  You testified on direct examination in this Court that
18   when you observed him in the back yard, agents were around
19   him, he was very sunburned, and he seemed disoriented.
20   A.  Yes.
21   Q.  My question to you is, how could you tell that he seemed
22   disoriented from your vantage point inside when Mr. Purbeck
23   was outside?
24   A.  When I saw him, he seemed to be shaking in his seat a
25   little bit, looking around kind of.  He just seemed
```

1   disoriented to me.

2   Q.  Isn't it true, ma'am, you could not tell if Mr. Purbeck

3   was disoriented from your vantage point?

4   A.  In my opinion, he was.  Yes.

5               MR. HERSKOWITZ:  Thank you, ma'am.

6               THE COURT:  Any redirect?

7               MR. HALL:  Briefly.  Yes.

8                       Redirect Examination

9   BY MR. HALL:

10  Q.  You were asked about, during the cross-examination just

11  a moment ago, about whether you ever saw any agents yelling

12  at Mr. Purbeck.  Do you remember that question?

13  A.  Yes.

14  Q.  Okay.  I understand you answered no.  You didn't see

15  that.  Right?  What I want to ask -- and I think you also

16  testified, and you correct me if I'm wrong, something to the

17  effect that you could hear voices, but you couldn't make out

18  what they were?

19  A.  Yes.

20  Q.  So here is my question.  Those voices that you --

21  throughout the day, did you hear any voices -- I understand

22  you couldn't hear what was being said, but any voices that

23  seemed louder or more elevated than what you otherwise were

24  hearing with the normal tone as you were sitting inside the

25  house?

1   A.   Yes.   I would say I heard raised tones.

2   Q.   All right.   And when you say raised tones, describe that

3   for me a little bit more.

4   A.   So specifically again when I was in the bedroom, and he

5   was in the back right corner, I -- the reason that I peeked

6   out was because it went from just like soft-spoken voices to

7   raised tones.   And that cued me in specifically to where

8   they were, and I was wondering if everything was okay.

9   Q.   Okay.   And was that the first occasion that you --

10  A.   Yes.   That was the first occasion.

11  Q.   That's what prompted you to pull back the curtain and

12  look?

13  A.   Yes.

14  Q.   Okay.   The Government was asking you about some

15  distances, so -- and I'm going to just -- again, you can

16  estimate it.   I'm going to start and walk.

17  A.   There.   Yes.   Right there.

18  Q.   All right.

19  A.   Specifically for the first time in the bedroom, it could

20  have even been slightly closer because our bedroom -- our

21  back yard is not that big.   There are a bunch of trees

22  around the outside of it so that shortens it even more.   So

23  I would say a step forward and he was maybe there.

24  Q.   Okay.   So that's here.   And then I move over here, is

25  this in general terms the distances from which you observed

1    Mr. Purbeck --

2    A.   Yes.

3    Q.   -- depending on the occasion that we're talking about?

4    A.   Yes.

5    Q.   Okay.  And so -- and by all means, correct me if I'm

6    wrong, but your testimony is, in your estimation, this is

7    approximately 20 feet?

8    A.   Yes.  But honestly, I do not know how to estimate feet.

9    I -- sorry.

10   Q.   I understand.  I'm just trying to demonstrate, you know,

11   in this manner.  I don't have a tape measure with me.  I'm

12   not going to dwell on this any longer.  Did you ever ask to

13   see Mr. Purbeck during the day?

14   A.   Yes, I did.

15   Q.   What were you told?

16   A.   No.

17   Q.   Do you remember approximately -- did you ask it one

18   occasion, more than one occasion?

19   A.   About -- every time I saw Clark, I asked if I could see

20   him.  I asked Sarah a couple times if I could see him.

21   Every time he said no.  When I asked what was going on, they

22   said they were not at liberty to discuss.

23   Q.   When you say Clark, to whom are you referring?

24   A.   Agent Clark.  He told me his -- he is the one who came

25   in with a gun drawn on me.  He is the one that I spent most

1    of my time with.

2    Q.   Did you see him here yesterday?

3    A.   Yes.  I did.

4    Q.   And then Sarah, to whom are you referring to when you

5    say Sarah?

6    A.   She was a very nice agent.  She is the one who helped me

7    take -- regulate my medicine as best she could.  I talked to

8    her as well.  I know she had just moved to Boise from a

9    southern state.

10   Q.   She is an FBI agent?

11   A.   Yes.

12   Q.   That's all I was trying to establish.  Okay.  Got it.

13   All right.  Now, the Government also asked you some

14   questions about how reliant you are on Mr. Purbeck for daily

15   assistance, how long you've been together, how much -- how

16   much you love him, all about your relationship with one

17   another.  You remember those questions?

18   A.   Yes.  Yes.

19   Q.   Okay.  So here is what I want to ask you.  Accepting all

20   of that as true as you have already testified, would you

21   come here into Court, under oath -- you understand what this

22   oath means that you took; right?

23   A.   Yes.

24   Q.   And would you lie to help Mr. Purbeck?

25   A.   No.

1  Q.  All right.  Assuming that for some reason Mr. Purbeck

2  was no longer able to provide you with the assistance that

3  you've described, with a roof over your head, with any of

4  these other support mechanisms that you and he have

5  together, what would you do?

6  A.  That wouldn't be a problem.  My family is well off.  I

7  would move back home with them.  Even now in my home shared

8  with Mr. Purbeck, another person lives there and she helps

9  take care of me as well.  So him not being there does not

10  factor into this or him going to jail does not factor into

11  this.  I have -- I can move home anytime I want.  I have

12  other people who care for me.  I just wanted to come here

13  and tell the truth.

14          MR. HALL:  No more questions.

15          MR. HERSKOWITZ:  I have two questions, if I may.

16          THE COURT:  Very limited.  Yes, sir.

17                    Recross-Examination

18  BY MR. HERSKOWITZ:

19  Q.  Ma'am, there is nothing in your affidavit about agents

20  raising their voices in front of Mr. Purbeck.  Isn't that

21  correct?

22  A.  Yes.

23  Q.  Yes, correct?

24  A.  Yes, correct.

25  Q.  And in the affidavit, you say, I do not know what I

1   would do without him.

2   A.  That is emotionally I would be very sad without him.

3   Physically I would be fine.  I have family, I have friends.

4   But emotionally, he is my partner.  I do love him.  So yes,

5   I do not know what I would do without him there.

6           MR. HERSKOWITZ:  Thank you.

7           THE COURT:  May she be excused?

8           MR. HALL:  Yes.

9           MR. HERSKOWITZ:  Yes.

10          THE COURT:  Ms. Ganger, you are excused.

11          THE WITNESS:  Thank you very much.

12          THE COURT:  Take your time, Ms. Ganger.

13          Ready for your next witness, Mr. Hall?

14          MR. HALL:  Yes, Judge.  May Ms. Ganger stay in the

15  courtroom, having now been -- now having testified and been

16  released?

17          THE COURT:  Any objection to that?

18          MR. HERSKOWITZ:  No, Your Honor.

19          THE COURT:  She may remain.  Yes.

20          MR. HALL:  Ms. Ganger, you are welcome to stay,

21  but you don't have to stay.  It's up to you.

22          I call Robert Purbeck.

23                    Robert Purbeck

24                        Sworn

25          THE CLERK:  Please be seated and state and spell

1  your name for the record.

2          THE WITNESS:  Robert Purbeck.  R-o-b-e-r-t.

3  P-u-r-b-e-c-k.

4                      Direct Examination

5  BY MR. HALL:

6  Q.  Mr. Purbeck, you understand the purpose obviously that

7  we are here for today.  Correct?

8  A.  I do.

9  Q.  All right.  So I would like you to -- let me ask you

10  this:  Where do you live?

11  A.  I live in 451 West Waterbury Drive, Meridian, Idaho.

12  Q.  How long you lived there, approximately?

13  A.  Since 2009.

14  Q.  All right.  Ms. Ganger, who just left, lived there with

15  you?

16  A.  Yeah.  I believe since 2013.

17  Q.  All right.  I want to draw your attention specifically

18  to the morning of August 21, 2019.  Do you recall that date?

19  A.  Yeah.  Absolutely.

20  Q.  Why don't you -- we will break it up as you go through.

21  Why don't you start off and tell the judge, when you first

22  left, when you first got up that morning and went outside

23  kind it from taking it from that point, describe for the

24  Court, what happened, what you saw.

25  A.  Okay.  So I left the front through the front door, went

1   to my car.  I was leaning in to grab a coffee mug.  I was

2   going to fill it up before I went to work.  It would have

3   been around 7:35.  7:35 was the time I had to leave by in

4   order to get to work on time, so I was going to be about a

5   minute or two late.  Or 8 o'clock.  Boise at the courthouse

6   is where I had to be.

7   Q.  Who did you work for?

8   A.  Ada County.

9   Q.  How long did you work there?

10  A.  At the courthouse itself, only for three months, I

11  think -- or, no.  For a little over a month.  And before

12  that, I worked at the Ada County Sheriff's Department,

13  although I think my employer itself was actually Ada County,

14  and not the Sheriff's Department.

15  Q.  What was your role at Ada County?

16  A.  Information Technology Specialist, I think.

17  Q.  All right.  Bringing you back to 7:35 a.m.

18  A.  So I leaned into my car.  I had no idea that there was

19  people around me.  But Rod Coffin put his hand on my

20  shoulder and said "Robert."  And then I turned around to

21  look around to see who, you know, who had touched me.

22  Q.  Did you know Rod Coffin on that morning of August 21st,

23  or is that someone's name you found out later?

24  A.  No.  He almost immediately, as soon as I turned around

25  said "Hi, Robert."  He might have said "Mr. Purbeck," you

1    know, could have been "Robert" or "Mr. Purbeck," one of the

2    two.  And then he told me, you know, his name.  And I

3    thought at first, he said Robert.  I thought he was another

4    Robert as well.  And then later on that day, we established

5    that he was Roderick.

6    Q.  So tell -- describe for the judge the manner in which

7    Agent Coffin laid his hand upon you.

8    A.  I mean, it was more like so if you were, you know, say

9    somebody was in your way, you might touch their shoulder an

10   say hey, you know.  Something like that.  It wasn't like

11   grab or something like that.  It was --

12   Q.  He didn't seize you with a steely grip.  You are saying

13   he just kind of got your attention by --

14   A.  He just rested his hand on me and then said "Robert" or

15   "Mr. Purbeck," one of the two.

16   Q.  When that happened, what did you do?

17   A.  So of course, I turned around.  I wasn't used to have

18   somebody approach me on my driveway or whatever.  And then

19   as I turned around, I saw people with guns drawn coming up

20   my driveway.  And at least one of them went off to the

21   doorway.  And started knocking.  Waited about a couple of

22   seconds and then just went inside.

23   Q.  Was the door locked or unlocked?

24   A.  It would have been unlocked because I still had to go in

25   and get my coffee.  So the door, it would have been -- which

1    we have like a screen door, a glass screen door.  And that

2    was closed.  But not locked.

3    Q.  Do you have a sense of how many people with guns you saw

4    coming up your driveway?

5    A.  I -- you know, so I don't know if it was how many people

6    were coming up.  I saw -- so everything was happening at

7    once.  So I had at least -- I want to say at least two

8    people had guns drawn that I could see.  And I don't know

9    which agents, so I have no idea.

10   Q.  How about Agent Coffin when he approached you, did he

11   have a gun drawn?

12   A.  He did not have a gun drawn.  He had a gun visible.  He

13   had body armor on.

14   Q.  When you say "body armor," describe what you mean.

15   A.  So a tactical bulletproof vest that said "FBI" on it.

16   Q.  What happened next?

17   A.  So he -- so I turned around to -- I don't exactly now

18   know what he said right then, but there was a lot of

19   different things happening hat once.  So somebody else asked

20   me for my keys to my car because they were going to search

21   it, they said.  And this could have all happened within a

22   few minutes of this.  I am not sure.  You know.  The

23   exact -- the exact sequence.  But somebody asked me for the

24   keys to my car.  Said that, you know, I asked, well, I have

25   to go to work.  Well, they said well, Ada County will know

1    you are not going to be there.  Whatever.

2    Q.  Let's pause for a moment.  Do you remember specifically

3    or to the best of your recollection specifically what was

4    said to you about Ada County?

5    A.  No.  Just that Ada County was not, you know, wasn't

6    expecting me that day.

7    Q.  Okay.

8    A.  So then somebody brought me over, I am pretty sure it

9    was Pinette, kind of grabbed my arm.  It wasn't like, you

10   know, vice grip kind of arm, but, you know, directing me to,

11   and somebody showed me a warrant.  I think it was Clark, you

12   know.  There is -- there is differing testimony.  Maybe

13   Ryan O'Neil was on there.  I didn't have a pat-down at that

14   point.

15   Q.  Pause for a moment.  You have a lot going on there.  So

16   let's talk first about, did someone show you a warrant?

17   A.  They showed me the cover page of the warrant, asked if I

18   wanted to read it and Pinette said there will be a time for

19   that later.

20   Q.  Okay.  Let's go to the pat-down.  You heard the

21   testimony from one of the agents yesterday that you were

22   subjected to some kind of either frisk or pat-down or, I

23   think another phrase was high-risk search, something like

24   that.  To the best of your recollection, did any agent

25   search you for any weapons?

1    A.   No.

2    Q.   Okay.  Now, we were also talking about, I believe, you

3    said Agent Pinette had reached over and put his hand on your

4    arm.  Where did he put his hand on your arm?

5    A.   It was my bicep.

6    Q.   Okay.  And describe for the Court, I understand you

7    already said it is not a steely vice-like grip, but describe

8    for the Court, in what manner was Agent Pinette's hand

9    placed on your bicep?

10   A.   So he just kind of reached out.  And it was, you know,

11   enough to basically directing me where I -- where I could go

12   and stuff.  This wasn't like I going to throw you to the

13   ground.  If I resisted, maybe.  I don't know.

14   Q.   Okay.  At that moment, did you feel like you had a

15   choice to say thanks, but no thanks, I will go somewhere

16   else?  Or did you have to kind of have to go and with

17   Agent Pinette?

18   A.   Absolutely not.

19   Q.   Absolutely not what?

20   A.   I absolutely did not feel free to leave.

21   Q.   How many agents were around you approximately, if you

22   recall at that time?

23   A.   So someone -- also, as part of all of this thing, so

24   when the one guy came in through the door, another one was

25   trying to get into the garage and trying to enter codes.

1    They were asking me what is the code to the garage.  And I

2    said, well, it is -- it is the year the Magna Carta was

3    signed.  And so then he asked for further clarification.  I

4    said it is 1215, and he couldn't figure it out.  So -- I

5    need a sip of water.

6                So anyway, I told him it was the year the Magna

7    Carta was signed in 1215.  He tried typing that in.  That

8    didn't work.  So I don't know if he or someone else decided

9    to go into the house and then come back around and open up

10   the garage.  I don't know if that is when the warrant was

11   officially presented to me or if it was during that period

12   of time.  But somewhere in that time frame, that was

13   happening.

14   Q.  Okay.  And then once the garage door opened, where

15   did -- what happened?  Where did you go?

16   A.  So Pinette and Coffin directed me into the kitchen.

17   Q.  All right.  So you -- take a step at a time.  You are

18   out in the driveway.  The garage door opens.  Do you go into

19   the garage?  Do you go through the front door?  How do you

20   get into the house?

21   A.  I went through the -- through the front door.  And we

22   walked through the living room, into the kitchen.

23   Q.  Who was with you?

24   A.  Coffin and Pinette.

25   Q.  All right.  Did either one of them have his hand on your

1    arm?

2    A.  Yes.  Pinette.  Yeah.  Pinette held me at least till we

3    got to the kitchen, and he might have let go of me for a

4    little bit because when Coffin was there, he had to go set

5    up the chairs.  So he went and set the chairs up outside.

6    But they had like a, I would describe as kind of a brief

7    argument where to have the interview.  I mean, there wasn't

8    a lot of time, so I don't know if this was preplanned or

9    what -- where they had.

10   Q.  Did they ask you -- did you -- did they express to you

11   in any form or fashion why you were going from the driveway

12   to the kitchen?

13   A.  I think they said they wanted to ask me questions.

14   Q.  What did you say?

15   A.  I just went with them.

16   Q.  And did you respond at all?

17   A.  No.

18   Q.  Okay.  And so you went into the kitchen.  Now, were you

19   successful in retrieving your coffee mug from the car?

20   A.  I had it in my hand.

21   Q.  Had you gotten it from the car?

22   A.  I had gotten it from the car and I had given the keys of

23   the car to the one agent who asked, whoever that was.

24   Q.  Once you got to the kitchen, were you able to get

25   coffee?

1   A.   No.

2   Q.   Okay.

3   A.   No.  That was different.  So when we went outside,

4   Pinette asked if -- so once he had set up this chair

5   arrangement, we went outside, just Pinette and I.  And I

6   tried to sit down.  So in that arrangement of chairs that I

7   just saw, there was the chair with Pinette and then the

8   curtain covered up one chair.  That is where I sat.  And

9   then over there, there was an empty chair and that is where

10  Coffin sat.  But I didn't -- and I tried to said sit in the

11  chair that Coffin wanted to -- that Coffin ultimately sat

12  in, and Pinette told me, no, that I needed to sit in that

13  chair.

14  Q.   Hold on a second.  I am going to try to show you this

15  exhibit.  I want to show you what has been introduced as

16  Exhibit 1.  And you can probably tap your screen.  Can you

17  show the Court where you first encountered Agent Coffin when

18  he said something to the effect "Mr. Purbeck," "Robert," you

19  know, Agent Coffin?

20  A.   So I was leaning into the car.

21  Q.   Okay.  And then I am going to show you --

22             THE COURT:  For the record, you want to specify

23  where he -- so he can see that.

24             MR. HALL:  You are so right, Judge.

25  BY MR. HALL:

1    Q.  So am I right to describe that, Mr. Purbeck, as the

2    driver side of the car?

3    A.  Yes.

4    Q.  And this is Government's Exhibit 1.  And the car that I

5    am referring to, what kind of car is that that I am

6    referring to?

7    A.  It's a Ford Mustang.

8    Q.  That is your car?

9    A.  It was.  I sold it.

10   Q.  And the -- if you could, leaving that mark there, that

11   is where you and Agent Coffin, is that also where they

12   showed you the warrant?

13   A.  No.  The warrant was shown to me here in front of the

14   car when the -- so I don't know if it was before or after

15   the garage door was opened.  But Harshbarger -- I believe

16   Harshbarger showed me that morning.

17   Q.  And describe it for the record.  That's from the

18   driver's side of the Mustang over to the front passenger

19   corner of the Mustang is where you saw the warrant?

20   A.  Yes.  It -- so it would have been in front of the car,

21   not obviously not on top.

22   Q.  And then when you first saw agents coming up with guns

23   drawn, can you mark that on Exhibit 1?  All right.

24       And so am I right in describing that as kind of the

25   edge of your driveway and what I will refer to you as the

1    public sidewalk, just near the black lamppost that is seen
2    in Government 1?
3    A.  Yes.  So I mean, that would have been facing that
4    direction as they were coming up so.
5    Q.  "That direction" doesn't translate very well.  Which
6    direction were you facing?
7    A.  I would have been --
8    Q.  Toward the car?
9    A.  Yeah.  Because I was leaning in.  And then I turned, you
10   know, to talk to Coffin for a second and the agents were
11   coming up at the same time with their guns drawn.
12   Q.  Okay.  And we are talking about an arrangement of
13   chairs.  I will show you what is Government's Exhibit 3 and
14   ask you from looking at this photograph, are you able to --
15   is this the photograph to which you were referring about the
16   arrangement of the chairs?
17   A.  Yes.
18   Q.  All right.  Can you show by circling or Xing, either one
19   is fine -- the only person that appears there, who is that?
20   A.  That is Agent James Pinette.
21   Q.  Okay.  You are referring to a chair that was empty.
22   Could you please put an "X" where that is.
23   Okay.  You are referring to -- you actually placed it on the
24   cardboard box.
25   A.  On the other side.  And you can see that.  You can see

1    it right here.

2    Q.  Okay.  You see the edge of it, you're saying, right

3    there where I put the blue mark?

4    A.  Yeah.  Exactly.

5    Q.  I am going to clear that out for a second.  Then if you

6    will please show the Court where you believe or you recall

7    that your chair was located on the outside?

8    A.  (Indicating.  Showing marks.)  You know, that chair was

9    a distance from me, from Pinette to me.

10   Q.  Okay.  And so you were outside obviously, even though we

11   are doing two-dimensional here.

12   A.  Yes.  Obviously.

13   Q.  And so for the purposes of describing this, the empty

14   chair then, in Government Exhibit 3, Agent Pinette is the

15   person that can be seen with his back to the photographer,

16   you've then described the empty chair for Agent Coffin to

17   be -- Agent Pinette's left; is that correct?

18   A.  Yes.

19   Q.  All right.  And then looking at that same Government's

20   Exhibit 3, you describe your location, although your

21   location, although we can't see it, to be by Agent Pinette's

22   right, but covered up by that curtain that is hanging down?

23   A.  And we were not on the concrete pad patio.  We were on

24   the grass itself.  So the overhang only covers the concrete.

25   Q.  Understood.  I guess my question was, the location of

1    the chair that we were talking about where you were located,

2    just in left/right orientation, is to the right of

3    Agent Pinette in Government's 3?

4    A.   Yes.

5    Q.   Okay.  And then if you will tell for the Court, please,

6    how you were oriented.  In other words, if we can see how

7    Agent Pinette is oriented from looking at the photograph.

8    If you could describe for the Court, please, how you were

9    oriented in relation to Agent Pinette.

10   A.   So if you could look through this wall right here, there

11   is a fence line.  And the sun was coming down over the fence

12   line right on to me.  So I mean, the sun was right in my

13   eyes.

14   Q.   All right.  So looking at the Government's 3 where the

15   sun seems to be casting upon Agent Pinette's back and kind

16   of to his left, how were you positioned in relation to the

17   sun?

18   A.   I was positioned dead on.

19   Q.   Dead on to what?

20   A.   To the sun.  So the fence line, the sun was, you know,

21   just coming -- it, you know, 7:35 in the morning, so it was

22   right above the fence line.  It was -- and straight into my

23   eyes.

24   Q.   All right.  We've gotten a little bit ahead of

25   ourselves.  From when you were in the kitchen, were you

1    given any coffee or able to get any coffee the first time

2    you came from the driveway to the kitchen?

3    A.   No.

4    Q.   So you had no coffee whatsoever?

5    A.   No.  It wasn't until we were outside sitting and Agent

6    Coffin came out.  Then Pinette said "Okay.  Now we can get

7    your coffee."  Because I had asked for it in the kitchen, I

8    think.  Because who doesn't enjoy their morning coffee;

9    right?  So, you know, that is part of my waking-up ritual.

10   And the -- so once we were --

11   Q.   Let me ask you this:  You were seated in the chair

12   facing the sun, Agent Pinette was seated as shown in

13   Government 3.  You say Agent Coffin came outside.

14   A.   Yeah.  When Agent Coffin eventually did come outside,

15   then Pinette said that he could get my coffee and he asked

16   if I wanted milk and sugar, and I thought that was very

17   southern.  I don't -- we say cream and sugar.  I don't know.

18   Q.   Did you get the coffee yourself or did he get it?

19   A.   He did.

20   Q.   And did he bring you back, in fact, coffee fixed the way

21   you preferred it?

22   A.   He did.

23   Q.   Now, go back and over here, the chairs outside.  When

24   you were in the backyard initially, did you just walk out

25   there on your own?  Did they say hey, let's go in the

1    backyard?  Did someone put their hand on you and direct you?

2    Describe to the Court the manner in how you were moved from

3    the kitchen to backyard.

4    A.  No.  Pinette directed me to go outside.  I believe he

5    still had his hand on me.  He may have released or -- he had

6    released it at one point in the kitchen, but I think he put

7    it back on me, just to direct me to where we were going.

8    Q.  Not a vicelike lock grip; right?

9    A.  No, no.

10   Q.  Just more of showing, here is the direction we are going

11   in?

12   A.  Yes.

13   Q.  Now, who arranged the chairs outside -- first of all,

14   were you outside when the chairs were arranged?

15   A.  No.

16   Q.  Did you see the arranging of the chairs that you

17   ultimately sat in?

18   A.  Yes.

19   Q.  Who arranged those chairs?

20   A.  Pinette did.  While Coffin was still in there.  There

21   was a brief period of time in the kitchen when both were

22   still there, and, then Coffin at some point after the chairs

23   were arranged and we were sitting outside, he left off into

24   another direction.

25   Q.  My question is a little different.  I'm sure I didn't

1    ask it very well.  So when you are in the kitchen; right?

2    And before you go out to the backyard for the first time,

3    did you see the arranging of the chairs?  Did that happen

4    once everyone moved outside?

5    A.   The arranging of the chairs happened before I went

6    outside.

7    Q.   Did you see who did that?

8    A.   Pinette did.

9    Q.   And where was Coffin at that time?

10   A.   Still in the kitchen with me.

11   Q.   Where did Pinette -- I mean, where did Pinette get the

12   chairs?  How did he arrange them?

13   A.   He just grabbed lawn chairs that were outside.

14   Q.   Were those plastic chairs?

15   A.   Plastic chairs.

16   Q.   Okay.

17   A.   And they had this, I say, disagreement.  I don't know if

18   maybe it was just the way they communicated.  But they had

19   decided not to be in the house for the interview.  Coffin

20   had suggested a bedroom after it was cleared.  And Pinette

21   wanted it outside.

22   Q.   Once you went outside, how did you determine what chair

23   to sit in?

24   A.   Well, I didn't want to sit in one in the sun.  So...

25   Q.   So what did you do?

1    A.   I tried to sit in the one that Coffin sat in.

2    Q.   And what happened?

3    A.   I was told to sit in the other seat.  The one that I

4    ultimately sat in.

5    Q.   Do you recall who sat down first?

6    A.   Pinette did.  Well, I don't know.  I mean, I don't know

7    which of us sat down.  But I was told to sit in the seat.

8    So...

9    Q.   So to be clear, looking at Government 3 again, please

10   circle the chair that you initially tried to sit in.

11   A.   Okay.

12   Q.   And who told you not to sit there and to sit in the

13   chair that you ultimately ended up sitting in?

14   A.   Ultimately James Pinette.

15   Q.   And at that time of day, were all the chairs in the sun

16   at that time?  Were they in the shade?  Were some of them in

17   the shade?  What was the situation with the chairs initially

18   when you went outside?

19   A.   Well, you know, I don't know precisely if this seat

20   wasn't in the sun, but the sun wouldn't have been in my

21   eyes.  So...

22   Q.   And was there shade available in your backyard at that

23   time?

24   A.   Absolutely.  I have a big tree that can provide shade.

25   And I don't know where in relation that would have been at

1    7:35 in the morning, but there were spots.  We could have

2    sat up against the fence line, and the fence would have

3    still covered it at that point until it was more overhead.

4    Q.  All right.  Tell me about your phones.  Did you have

5    phones on you in the morning?

6    A.  I did.  I had my work phone and personal phone in my

7    pocket.

8    Q.  At the time that you went outside, did you still have

9    those phones on you?

10   A.  I did.

11   Q.  And once you sat down, did anything happen with respect

12   to your phones?

13   A.  Not right away.  No.

14   Q.  How about your cat?  Did something happen with respect

15   to your cat once you guys went outside?

16   A.  When the three of us were sitting outside, then yes, my

17   cat went outside.  And --

18   Q.  When the cat went outside, what did you do?

19   A.  I tried to stand up to pick up the cat and put it

20   inside.

21   Q.  What happened?

22   A.  I was told to sit back down.

23   Q.  Who told you that?

24   A.  James Pinette.

25   Q.  What did he do?

1   A.   He -- ultimately, I told him that my cat had gotten out

2   before, and he got sick when he was out.  He is an indoor

3   only cat.  So he begrudgingly stood up, scooped it up and

4   threw it inside the house.  He was not excited about having

5   to touch a cat.  Some people aren't cat people.

6   Q.   At that point when the cat came out of the house, and

7   you sought to stand up and was told not to, did you still

8   have your phones on you at that point?

9   A.   As far as I know.  I don't know when exactly they came

10  out or when Coffin told me to hand over my phones.  But he

11  did at some point.

12  Q.   Do you remember whether it was early, kind of the

13  middle, late in the day?  Do you have a sense of where it

14  was in the process?

15  A.   It was fairly early in the day.  Because they bagged it

16  up, once he took it.

17  Q.   Hold on.  Before we get to that.  So it was early in the

18  day.  Tell us what happened.

19  A.   So when that happened, he told me to hand over my

20  phones.

21  Q.   Who is "he"?

22  A.   Agent Rod Coffin.

23  Q.   What did you do?

24  A.   I gave them to him.  I did ask if I could keep one.

25  Q.   What did he say?

1    A.   Because it was Ada County's.  And, you know.  I just
2    thought I should have my work phone; right?
3    Q.   What did he say?
4    A.   He said no.
5    Q.   Did you give him both phones?
6    A.   I did.
7    Q.   Did you see what he did with them?
8    A.   Harshbarger came in at some point and bagged them.
9    Harshbarger came in and out a few times to relay messages
10   and to go for these types of things.  I don't know.
11   Q.   All right.  Tell us then, having sat down with
12   Agent Pinette and was Agent Coffin there when they started
13   talking to you?
14   A.   Pinette had talked to me a little bit, but nothing
15   substantial, I don't think.  This business about being told
16   I was free to go at the beginning of the day, you know, on
17   the driveway, if they told me that, it was not something I
18   heard.
19   Q.   Let's jump back to that.  That is fine.  Do you remember
20   the testimony yesterday where Agent Pinette said -- and I am
21   paraphrasing -- but something to the effect of you are free
22   to leave, but you stay, but we are going to restrict your
23   movement, something to that effect?
24   A.   Absolutely not.
25   Q.   The question is, do you remember that testimony?

1   A.  I do remember the testimony.

2   Q.  To your recollection, were you ever told that?

3   A.  Absolutely not.

4   Q.  Okay.  If you were told that, you are testifying that

5   you did not hear that being said to you?

6   A.  If they told me, you know, I did not hear it.

7   Q.  Did you have a belief from any point from when you were

8   in the driveway to the kitchen to when you initially went

9   out in the backyard that you could tell them I am going to

10  leave and head off?

11  A.  No, I worked for the Sheriff's Department long enough to

12  know that you need to follow the directions of the officers.

13  Q.  When you were sitting out there talking with

14  Agent Pinette and Agent Coffin, was there any discussion

15  about any further mention of Ada County to you?

16  A.  Can you repeat the question?

17  Q.  My recollection of your testimony was that what you

18  initially said was when Agent Coffin approached and you made

19  some mention, I have to get to work, a comment was made

20  well, Ada County knows that you won't be coming in to work

21  today or you won't be there on time or something to that

22  effect?

23  A.  Yes.

24          MR. SISTLA:  Objection, Your Honor.  I think that

25  misstates the testimony.

1    BY MR. HALL:

2    Q.  Well, why don't you just tell us -- I was trying to

3    avoid that -- why don't you tell us what you recall?

4            THE COURT:  Objection sustained.

5    BY MR. HALL:

6    Q.  Tell us what they said -- tell us what was told to you

7    in the driveway about Ada County.

8    A.  They told me that Ada County would know that I was not

9    going to be there.

10   Q.  And that was in response to what had you said?

11   A.  That I am going to be late for work.

12   Q.  All right.  So moving past that mention of Ada County,

13   was there another mention of Ada County while you were in

14   the backyard?

15   A.  Yes.  And I'm not sure exactly when it was, but it was

16   relatively early on when they told me that Ada County would

17   be there to interview me.

18   Q.  Okay.  Now, you are employed by Ada County?

19   A.  I was.  Yes.

20   Q.  Well, excuse me.  On August 21, 2019, you were employed

21   by Ada County?

22   A.  I was.  Yes.

23   Q.  All right.  Do you have an understanding of the employee

24   policies that apply to Ada County employees?

25   A.  Yes, I do.

1  Q.  Is there one that in particular applies with respect to

2  any investigations that the County has to undertake?

3  A.  Yes.  There is.

4  Q.  And what is your understanding of that policy?

5  A.  That failure to -- failure to comply with an internal or

6  external investigation by the County could result in my

7  termination or other adverse disciplinary actions.

8  Q.  Okay.  And how did you know that to be a policy that

9  would apply to you?

10  A.  I read the handbook in its entirety.  But also about a

11  month after I was hired, they did like a new employee

12  orientation session, and we had to agree to various policies

13  and then sign them, sign saying that we had read them or

14  were aware of the policies.

15          MR. HALL:  My apologies, Judge. We have reached an

16  agreement among counsel for me to -- I have the entire

17  employee manual.  In discussion with counsel, that we are

18  going to do -- this morning, we are going to do an excerpt

19  only that is going to be introduced, the relevant portion

20  versus the whole thing.  So my apologies while we excerpt it

21  out.

22  BY MR. HALL:

23  Q.  I am going to show you what I have marked for

24  identification as Defense Exhibit 20.  Will you take a look

25  at that, please.  Do you recognize it?

```
1    A.   A document.

2    Q.   What is it?

3    A.   It's the employee handbook for Ada County.

4    Q.   All right.  And has it been -- the actual physical copy

5    that I have given you is Defense 20.  Is that not the whole

6    manual, but an excerpt I have prepared and given to you?

7    A.   Yeah.  The whole manual is about an inch thick.

8    Q.   And what is the thicker provision that I have put in

9    there?

10   A.   Maybe five -- well, ten pages, seven pages.  Something

11   like that.

12   Q.   All right.  Describe for the Court, what is the specific

13   provision that I put into the excerpt?  Just the number.

14   All I am looking for is the number.

15   A.   2.5.2.

16   Q.   Which pertains to what?

17   A.   It is discipline.  "Performance Management Discipline

18   and Conflict Resolution," specifically discipline.

19           MR. HALL:  All right.  We move for the admission

20   of Defense Exhibit 20.

21           MR. SISTLA:  No objection, Your Honor.

22           THE COURT:  Admitted.

23   BY MR. HALL:

24   Q.   All right.  So in turning to 2.5.2, can you look through

25   it and tell the Court; is there a portion of that that
```

1    corresponds with what you've just testified to as your

2    obligation to cooperate with County investigations?

3    A.   Yeah.  Specifically on page 46, impeding, interfering

4    with, or failing to cooperate in an official internal or

5    external investigation conducted by or at the request of the

6    County.

7    Q.   Okay.  And was it your understanding that that is one of

8    the policies that you were obligated to comply with?

9    A.   Absolutely.

10   Q.   Okay.   Now, I will point out something to you.  Defense

11   Exhibit 20 says August 20, '19; right?

12   A.   It does.

13   Q.   Okay.  Was the policy that you reviewed months earlier

14   and signed off on the same?

15   A.   No, it was -- it was the same handbook, but not the --

16   whatever -- changes they made on August 20th.

17   Q.   All right.  Was one of the changes had to do with the

18   cooperation provision to any County investigation, or is the

19   cooperation provision identical?

20   A.   It is identical.

21   Q.   After you were told that Ada County was on its way to

22   interview, what did you think?

23   A.   I thought I was being --

24           MR. SISTLA:  Objection, Your Honor.  I think that

25   misstates the testimony again.

```
1              THE COURT:  Sustained.
2              MR. HALL:  Okay.
3              THE COURT:  You can -- I think he is right.  That
4     did not characterize the testimony exactly.
5              MR. HALL:  That is my fault.  I misstated it.
6     Let's get it right.
7     BY MR. HALL:
8     Q.  When you were in the backyard and you were told about
9     Ada County the second time, what were you told?
10    A.  I was told that Ada County would be there to perform an
11    interview.
12    Q.  Okay.  And when you heard that, what did you believe
13    that to mean?
14    A.  It meant that I had to cooperate with Ada County and
15    perform, conduct an interview with them.
16    Q.  How about any cooperation with the FBI?
17    A.  Well, if Ada County was coming, it would lead me to
18    believe that the FBI was there because of Ada County's
19    investigation.
20    Q.  Did it lead -- not that -- but did -- did it, in fact,
21    lead you to believe that on that date or are you saying
22    generically that that is what you concluded?
23    A.  Absolutely.  I believed they were involved.
24    Q.  Did you believe that Ada County was involved?
25    A.  Yes.  I was told they wouldn't be expecting me at work
```

1    that day.

2    Q.   That is the first conversation you had about them?

3    A.   Yeah.

4    Q.   All right.  So let's talk now, so from the time -- from

5    the time that Agent Coffin first arrived and interacted with

6    you till when you made it outside and were seated in the sun

7    in the backyard, how much time do you think went by from the

8    first encounter to when you and Agent Pinette were in the

9    backyard in the lawn chairs?

10   A.   The time on the driveway wasn't very long.  I think we

11   were -- the entry team had to say "all clear" essentially

12   that we can enter the house.  Or -- and then I don't really

13   know how long that was.  There was so much stuff going on.

14   Q.   Okay.

15   A.   It was maybe -- maybe ten minutes or less.

16   Q.   When you were brought through the house, did you see

17   Sarah?

18   A.   No.  I could hear yelling at her.  But I didn't see her

19   at all.

20   Q.   When I refer to "Sarah," I am talking about Ms. Ganger.

21   A.   Yes.  Ms. Ganger.

22   Q.   I refer to Ms. Ganger.

23       Were you allowed to speak to Ms. Ganger at any point

24   during the day?

25   A.   No.

1   Q.  All right.  Were you allowed to see Ms. Ganger at any

2   point during the day?

3   A.  No.

4   Q.  Did you ask to see Ms. Ganger at any point during the

5   day?

6   A.  The first time I asked how she was doing with they --

7   had they talked to her about what was going on, and then

8   later on in the day, I asked specifically if I would be able

9   to see her during the day.

10  Q.  And when you asked specifically if you would be allowed

11  to see her, what were you told?

12  A.  I was told no.

13  Q.  Who told you that?

14  A.  I'm sorry.  I was told that it would depend on -- so

15  this was -- I don't know if I asked before or after I made

16  inculpatory statements.

17  Q.  Okay.

18  A.  But the time after I made inculpatory statements, they

19  said that Agent Coffin said that it would depend on my

20  cooperation with the investigation, what the prosecutor

21  believed would be.

22  Q.  Who told you that?

23  A.  Coffin.

24  Q.  And what did he tell you?

25  A.  Specifically I asked would I be able to see Sarah Ganger

1    before I go to jail.  And he said it would depend on the
2    AUSA or the prosecutor.  I didn't know the term "AUSA"
3    before that day.  So I substituted probably "prosecutor"
4    instead.
5    Q.  While you were sitting outside from where we originally
6    see the positioning of the chairs in Government's 3, did you
7    and Agent Pinette and Agent Coffin stay in roughly that same
8    location or did you move?
9    A.  They moved me periodically throughout the day.
10   Q.  Okay.  Do you remember the testimony from yesterday
11   about you being moved to the shade?  Did you -- were you
12   ever moved to the shade?
13   A.  There is a -- so I think I was moved to the shade when
14   Ada County was there.
15   Q.  Okay.  At what point in the kind of timeline of the day
16   did Ada County appear?
17   A.  So up -- so up until recently, I didn't have quite an
18   idea.  But I'd estimate it around four hours.
19   Q.  Okay.  What do you believe now?
20   A.  I think it was around four hours, three and a half to
21   four hours.
22   Q.  Is when Ada County appeared?
23   A.  Yeah.  Right around four hours.  I think it was actually
24   pretty accurate because the sun was almost overhead, so that
25   is how I kind of based it.

1    Q.  Okay.  And is that four hours from when Agent Coffin

2    first encountered you or four hours from when you were in

3    the backyard?

4    A.  Four hours from when Agent Coffin first encountered me.

5    Q.  Okay.  Prior to Ada County showing up and you being

6    moved to the shade, were moved -- were you in the sun?  Were

7    you in the shade?  How were you situated?

8    A.  So in this original position that we were at, I was in

9    the sun.  And the sun was in my eyes.  And it was pretty

10   uncomfortable.  And one of the agents asked me if the sun

11   was in my eyes.

12   Q.  Which agent asked you that?

13   A.  I think it was Coffin because I think Coffin was more

14   sensitive to the situation having sun in your eyes because

15   he also has blue eyes, I believe.

16   Q.  And what happened when you -- what did you say in

17   response to that question?

18   A.  I said "Yeah" and --

19   Q.  What happened?

20   A.  So they had us move to the more towards the back corner

21   of the -- of the backyard.

22   Q.  When you say "they" had you move, who are you referring

23   to?

24   A.  Agent Pinette and Agent Coffin.

25   Q.  Right.  And did you stand up all together and move

1    together?  Describe for the Court this manner of movement

2    from where we see the chairs situated in Government 3 to

3    what you are describing right now.

4    A.   Yeah.  The -- Coffin and Pinette stood up first, and

5    then directed me to where we were going to be sitting.

6    Q.   Did you carry your chair, or did someone else carry your

7    chair?

8    A.   I carried my chair.

9    Q.   And so all three of you carried your individual chairs?

10   A.   Yes.

11   Q.   And when you relocated after this conversation about the

12   sun in your eyes, tell the Court how you were oriented to

13   the sun.

14   A.   I was again oriented right in the sun with the sun in my

15   eyes.

16   Q.   Had you improved your circumstances with respect to the

17   sun at all?

18   A.   No.  So I took that as like almost an insult.  Like, I

19   had been moved -- I was in the sun.  They feigned some kind

20   of interest in moving me, and then moved me right to another

21   spot where the sun was right in my eyes.

22   Q.   At that point when you had now moved, were

23   Agents Pinette and Coffin also in the sun or not?

24   A.   Honestly, I wasn't that concerned about their condition.

25   Q.   Do you recall whether they were in the sun or not?

1    A.   I don't know.

2    Q.   Did there come a time -- the time frame, I want to

3    establish.  Did there come a time where the FBI agent other

4    than Agent Coffin or Pinette come out and addressed you

5    regarding the presence of a firearm in the house?

6    A.   Absolutely.

7    Q.   Describe for the Court in your own words what happened.

8    A.   So an agent came up from kind of behind me, and started

9    shouting at me.  There was two agents.  But one of them was

10   shouting at me.  His face was like red.  And from -- and I

11   could not understand this guy.  And he was shouting

12   something.  And Coffin interpreted it for me as being "Where

13   is the gun?"

14   Q.   All right.  And the agent -- at what point -- when did

15   this happen in the kind of timeline of events?

16   A.   I don't know.  A half an hour, 45 minutes into the

17   interrogation, I would say.

18   Q.   To your recollection, were you still in the same

19   location that you were in in Government's 3, or had you

20   moved to the other spot within the yard?

21   A.   I think we were still at this picture right here.  So

22   Government's Exhibit 3.

23   Q.   All right.  Is that also in Government's 3 where you

24   were seated when the cat ran out?

25   A.   Yes.

1   Q.  When you say the agent was yelling at you, I don't want

2   you to actually yell here in the courtroom, but can you

3   describe kind of the volume and the tone for the Court?

4   A.  It was loud.  Incomprehensible.  Just anger.  Like

5   angry.  The guy had his hand on his gun.  And I had no idea

6   what he was saying.  And the other agent wasn't being very

7   helpful, so I didn't know.

8   Q.  Did he point a gun at you?

9   A.  He didn't point a gun at me, but he had his hand on his

10   gun.  He was very, very angry.

11   Q.  Throughout the day, did any agent point guns at you?

12   A.  Not specifically, I don't believe.  The -- when they

13   were coming up the driveway, they had their guns drawn.  I

14   didn't know if one of them had one pointed at me at one

15   point or not.  But, you know.  Everything was happening

16   very, very quickly at that point.

17   Q.  I understand.  My question to you is slightly different.

18   Did you ever see any agent point a gun at you at any point

19   during the day?

20   A.  No.  I mean, not -- not that I could definitively say

21   that.

22   Q.  All right.  What did you respond when the agent came out

23   and was yelling at you about where a gun might be?

24   A.  Well, once it was determined what he was trying to say

25   to me, I told him that I did own a gun, but it was in

1    Mountain Home because I had a schizophrenic brother living
2    with me for a while off and on, and he had weird fantasies
3    about guns and it wasn't good to have in the house.
4    Q.  The gun was no longer present in the home?
5    A.  Yeah.  Exactly.
6    Q.  So let me ask you this.  From the events we've been
7    describing now, from driveway to the backyard, as shown in
8    Government's 3, to when the interview was then moved to the
9    later, farther in the yard, at any point along that way, did
10   you feel like you could just stand up and say thanks, I am
11   out of here, and leave?
12   A.  No.
13   Q.  All right.  Why not?
14   A.  Well, I mean, for one, you know, they controlled my
15   position.  Agent Pinette was blocking my pathway to the
16   door.  I mean, you can see in Government's Exhibit 3, he is
17   there in my way.  The -- when the cat came out, I wasn't
18   allowed to even pick up my animal, give her comfort or
19   anything.  So no, I didn't feel free to leave.
20   Q.  And did you ever ask -- did you ever say hey, I want to
21   leave?
22   A.  I did not.  Because I didn't feel I had control over the
23   situation at all.
24   Q.  Other than the one time you stood up to try to grab the
25   cat and was told to sit down, did you try to kind of

1  unilaterally make any other movements during this time?

2  A.   The only time I made any kind of movement that wasn't --

3  was when Ada County came.  I stood up and took my -- the --

4  I had some work supply equipment in my pocket, a hard drive

5  and a flash drive, and I gave those to Steven O'Meara.

6  Q.   That is later in the morning?

7  A.   Yeah.

8  Q.   All right.  Let me ask you this.  During this interview,

9  did there come a time when the FBI started asking you about

10  a darknet market vendor name or something to that effect?

11  A.   Yeah.  So I mean, they started off with biographical

12  questions for quite some time.  Then they worked their way

13  into asking if I had any monikers of any kind on darknet

14  markets.  And then ultimately, they asked me if I was --

15  well, I don't know if they asked me specifically if I was a

16  specific darknet market -- no, in fact, I don't think they

17  did.  I think they said, "What is your darknet vendor name?"

18  Q.   So before we get to that, did there come an occasion

19  where you asked to speak to a lawyer?

20  A.   Yes.

21  Q.   Okay.  Now, in relation to this point in time where we

22  are talking about the darknet market vendor name, did you

23  ask for the attorney before or after that conversation

24  occurred?  Or how in relation to it did you ask for it?

25           MR. SISTLA:  Your Honor, I object.  This assumes

1    facts not in evidence.  The witness hasn't testified yet

2    that he actually asked for an attorney.

3            MR. HALL:  He just testified to that.

4            THE COURT:  He did.  Go ahead.

5    BY MR. HALL:

6    Q.  All right.  In relation to talking about the darknet

7    market vendor name, when did you ask for an attorney?

8    A.  So I didn't ask for an attorney until specifically when

9    they asked, "What is your darknet vendor name?"

10   Q.  What did you -- explain to the Court specifically, when

11   you say I asked for an attorney, tell the Court, what did

12   you say?

13   A.  So I was equivocal at first.  I asked, "Do I need a

14   lawyer?"  And I was told that I do not --

15   Q.  Hold on.  So you said, "Do I need a lawyer?"

16   A.  Yes.

17   Q.  What was the response?

18   A.  "We can't give you legal advice, but we don't" --

19   Q.  Who told you that?

20   A.  Coffin.

21   Q.  Then what did you say?

22   A.  So then I said -- but he said something to the effect of

23   if you're going to call a lawyer, you know, you should do it

24   expeditiously.  So I then said, "I would like to use a phone

25   to call a lawyer, my phone specifically."

1   Q.  At that point, did you have your phones, your work phone

2   and your personal phone in your possession?

3   A.  No, they had been seized.

4   Q.  All right.  So when we discussed earlier at some point,

5   Agent Coffin had taken possession of both your work phone

6   and your personal phone, please tell us whether that

7   occurred before you asked for this lawyer?

8   A.  It happened before.  Probably an hour at least before.

9   Q.  Okay.  And to your recollection, how far into the

10  interview timeline were we when you asked for a lawyer?

11  A.  I would say approximately two hours.  One-and-a-half to

12  two hours, somewhere in there.

13  Q.  It's when you -- you had this conversation about the

14  dark -- or you and the agents had this conversation about

15  the darknet market vendor name and asked for a lawyer?

16  A.  It may have been longer.  I -- you know, it's hard to

17  tell exactly.  You kind of lose sense of time after that.

18  Q.  I understand it is an estimate, but you are estimating

19  an hour and a half to two hours?

20  A.  Yeah.

21  Q.  All right.  So specifically what did you ask about using

22  your phone?

23  A.  I asked specifically if I could use my phone to call a

24  lawyer.

25  Q.  What were you told?

1    A.   I was told no, because you can destroy evidence.

2    Q.   Who told you that?

3    A.   Coffin.

4    Q.   What did you say in response to that?

5    A.   I said then, can I use your phone to call a lawyer.

6    Q.   Who was present when you were saying -- when you were

7    asking these questions?

8    A.   So for most of this -- this period of the beginning part

9    of the interview was Pinette and Coffin.

10   Q.   During this exchange we are having right now about using

11   a phone to call a lawyer, who was present?

12   A.   Pinette and Coffin.

13   Q.   All right.  And when you asked could you use one of the

14   agents' phones to call a lawyer, what was the response?

15   A.   The response was the same.  You could destroy evidence.

16   They were worried all throughout the day that I had some

17   ability to destroy evidence remotely.  So I don't know.  So

18   then I specifically asked, "Can you call a lawyer for me?"

19   Q.   What were you told?

20   A.   No.

21   Q.   Who told you that?

22   A.   Coffin.

23   Q.   All right.  And who told you when you asked to use the

24   agent's phone, who told you no, you can't use the phone, you

25   might destroy evidence?

1    A.    Coffin.

2    Q.    All right.  Did you make any other requests or questions

3    about using a phone?

4    A.    No.

5    Q.    All right.  What happened after you had gone through,

6    can I use my phone, can I use your phone, can you call for

7    me, what was the next -- next exchange between you and the

8    agents?

9    A.    So Coffin made a comment that there's apparently some

10   operation going on on that, you know, they were doing

11   simultaneous raids around the country and that only the

12   first person to answer would get a deal.

13   Q.    All right.  And what did you say to that?

14   A.    So at that point, I kind of hesitated and I've been told

15   I couldn't call a lawyer.  I was pretty miserable at this

16   point.

17   Q.    When you say you were "pretty miserable," describe what

18   you mean by that.

19   A.    So, you know, so I -- the northwest is not very hot

20   typically.  This was one of the hotter days of the year.

21   And so, you know, I leave my air conditioning in my house at

22   68 degrees, and I get in my car, I use air conditioning, and

23   when I am work, I use air conditioning.  Almost immediately

24   when I went outside, it was kind of humid that morning, and

25   it was hot.  I know you guys are used to humidity here, but

1    it's not humid there.

2            And I just felt stifling heat.  And so then

3    throughout the morning, throughout this period of time, you

4    know, I started to get the, you know, get the irritation

5    along the hairline from sweating.  I was sweating throughout

6    the whole day.  But, you know.

7    Q.  What color shirt did you have on?

8    A.  A dark blue polo.

9    Q.  Is that a work polo?

10   A.  Yes.  It was Ada County assigned.

11   Q.  All right.  Were you told anything further on -- were

12   you told anything further beyond the conversation about the

13   phones, and then you were told about the simultaneous raids,

14   were you told anything else by the agents or did you say

15   anything else to the agents with respect to getting an

16   attorney or seeking an attorney other than what you've

17   already described?

18   A.  I didn't say anything after I asked for the attorney.

19   Asked to use the phone.  Coffin is the one that told me

20   there are these simultaneous raids going on.

21   Q.  And what did he say in relation -- did he say anything

22   in relation to an attorney with request to that comment?

23   A.  No.  Well, so you know, prior to this, he had said you

24   might want to call a lawyer expeditiously, that type of

25   thing.

1   Q.  Did he explain why he believed that you should call a

2   lawyer expeditiously?

3   A.  Well, because -- I because I was going to get a deal.

4          MR. SISTLA:  This is asked and answered.

5          THE COURT:  I don't think so.

6          MR. SISTLA:  I won't argue the point.

7          THE COURT:  Ask your question again.

8   BY MR. HALL:

9   Q.  Specific to the -- when you were told if you are going

10   to call a lawyer, you better do it expeditiously, was any

11   explanation given to you why you should call a lawyer

12   expeditiously?

13   A.  I was only going to get the best deal if I talked before

14   someone else did presumably.  I didn't know who that someone

15   else was, but, you know.  I had no idea.

16   Q.  Okay.  After -- any other -- other than what we've

17   already described, and we already talked about the attorney,

18   but any other conversations with respect to asking for an

19   attorney or trying to call an attorney, anything along those

20   lines?

21   A.  Those are the only times I asked for a lawyer.

22   Q.  Okay.  So after that conversation, tell us what happened

23   next.

24   A.  So I mean, I was uncomfortable.  I had -- you know, I

25   started to develop heat cramps in my torso area, which is

1    something --

2    Q.  When you state "heat cramps," describe what you mean.

3    A.  So I was prone to getting a lot of leg cramps.  Well,

4    still do, periodically.  But they are pretty painful, things

5    that can actually make you like, get out of bed, you know.

6    They are so painful.  And in my abdomen, it wasn't quite the

7    same.  It was painful, like restriction, but it wasn't like

8    you have to get up or whatever; right?  Like a leg cramp is.

9    It is kind of different, but it was still cramps were

10   developing in my torso.  It was very uncomfortable.

11   Q.  Up to this point, were you -- we're at the point where

12   we just got through talking about the lawyer.  Had you had

13   any water up to that point?

14   A.  No.

15   Q.  Had you been offered any water?

16   A.  No.

17   Q.  Remember yesterday, the testimony about how

18   Agent Pinette said we offered Mr. Purbeck water multiple

19   times?

20   A.  That did not happen.  There was one instance where he

21   said, you should switch to water.  But there was no option

22   to get it.  I couldn't ask for water.

23   Q.  Why did you not ask for water?

24   A.  Well, I felt I didn't have any -- so when they moved me

25   into the sun the second time, that was a -- directly in the

1    sun, that indicated to me that I wasn't going to get any

2    grace from them that day.  So I had felt it was better just

3    to not ask for anything.

4    Q.  All right.  Did you see either the agents drinking

5    water?

6    A.  Yes.

7    Q.  All right.  While they were outside with you?

8    A.  Yes.

9    Q.  All right.  And were they drinking out of cups?  Out of

10   bottles?  What was the container that they are drinking the

11   water from?

12   A.  Something similar to this.  A plastic bottle.

13   Q.  Okay.  Were they ever offer you any of the bottled

14   water, whether it was orally saying it, or sometimes, you

15   know, you can do a gesture, by kind of gesturing it towards

16   you, or anything along those lines?

17   A.  Absolutely not.

18   Q.  Had you, in fact, had any water at that point?

19   A.  No.  In fact, I -- I hadn't had any water since the

20   night before.

21   Q.  I want to show you what has been introduced into

22   evidence as Government's 6.  Do you recognize

23   Government's 6?

24   A.  I do.

25   Q.  And is that your signature there?

1  A.  It is.

2  Q.  Here is my question:  Did you sign this form before or

3  after you had that conversation about asking to call a

4  lawyer using the various different phones?

5  A.  After.

6  Q.  And tell us if you would kind of how -- describe for the

7  Court how -- where you were and how you came to sign this

8  form that is marked as Government's 6.

9  A.  So after the request for the lawyer and the denial of

10  it, I figured I didn't really have any choice but to

11  cooperate if I was going to get water.  So and -- any grace,

12  you know, maybe potentially be put inside the house or

13  whatever.  So I ended up just agreeing to say that I was the

14  vendor Lifelock.  And then after I said that, Coffin -- was

15  it Coffin or Pinette?  One of the two of them opened up like

16  a binder and they had a form to -- this form here, and they

17  started writing down and asking me user names and passwords.

18  Q.  Okay.  After you signed this form, tell the Court what

19  happened next.

20  A.  I believe Pinette went inside and tried these passwords.

21  Q.  What leads you to believe that?

22  A.  Well, he left and then he came back about ten minutes

23  later and said that it didn't work.  He was specifically

24  looking for an encryption password for a hard drive.  The

25  Veracrypt hard drive HP EliteBook.

1    Q.  And is that one of the passwords on this Government's 6?

2    A.  Yes.  The second one down under "password."

3    Q.  Okay.  Did you hear Agent Coffin's testimony yesterday

4    about how they didn't even need your consent to get the

5    password; they could have figured it out because of it was a

6    dictionary term?

7    A.  Yes, I did.

8    Q.  Do you agree with that?

9    A.  No.

10   Q.  Why not?

11   A.  Because they would still have to know the word, you

12   know.  He is saying a dictionary attack would be easy if

13   they know the word.  But I don't find his explanation that

14   that password thing that they found from password from the

15   1990's was credible.

16   Q.  Okay.  Setting that aside, when you made some reference

17   to finding a password in your house, what did you understand

18   that to refer to?

19   A.  The password was for veracrypt for the HP EliteBook.

20   Q.  Okay.  Is that the one here on Government's 6?

21   A.  Yes.

22   Q.  All right.  He also testified that there was some

23   documents or some paper they found with other passwords on

24   that.  Do you know what he is referring to?

25   A.  Yeah.  A really old password list that I had from the

1    1990's.

2    Q.  All right.  And how many passwords were on there?

3         MR. SISTLA:  Your Honor, I am not sure of the relevance

4    of this question here.

5              MR. HALL:  It all goes to their obtaining of this

6    password and how that impacts their ability to use it to

7    search any of the items that they ceased.

8              THE COURT:  It goes beyond the scope of the

9    hearing.

10             MR. HALL:  Okay.  I am not going to quibble with

11   the Court, and I'm really not -- I think it doesn't -- at

12   least the way I am looking at it in analyzing it and we have

13   tried to show is that, but for their obtaining this

14   password, they wouldn't be able to, you know, access any of

15   these computers.  That is why I thought that that was a

16   relevant point to address in this hearing here, not just in

17   the abstract.

18             THE COURT:  And you asked him about that.

19             MR. HALL:  Just now.

20             MR. SISTLA:  I think that is outside of the -- I

21   believe it's outside the scope.  The question is whether the

22   defendant was in custody at the time that he provided this

23   information.  To the extent that it goes to, did the --

24   could the government have an alternatively gotten into these

25   devices, it's outside the scope of this hearing.

1            THE COURT:  We've had some testimony about that.

2    I do recall Agent Coffin testified about it.  I will allow

3    you a little bit of leeway on it.

4            MR. HALL:  Yes, sir.  Thank you.

5    BY MR. HALL:

6    Q.  Tell us about the passwords that you were just

7    describing.  You said that they -- you found -- there was a

8    list of passwords.  Approximately, to your recollection, how

9    many passwords were on that list?

10   A.  Probably about 50.

11   Q.  And how old were they?

12   A.  I mean, it was internet service providers that had gone

13   out of business when the dot com crash happened in 2001.  So

14   early to mid 90's.

15   Q.  So 18, 19, 20 years old?

16   A.  Yes.

17   Q.  How long have you been in IT?

18   A.  I've been in IT since 2003.

19   Q.  All right.  Working in different capacities?

20   A.  Yeah.  I worked as a database administrator, senior

21   database administrator for the State of Idaho.  I worked as

22   an agent tech back in 2003.  Worked as an IT systems

23   technician specialist or something like that at Ada County.

24   I don't remember my exact title.

25   Q.  So you have a pretty good background in IT, it sounds

1  like?

2  A.  Yeah.  Exactly.

3  Q.  Turning to this, then, after you -- he came back

4  outside, "he," being Agent Pinette, I believe, if I get them

5  switched, you correct me.  Agent Pinette, the password

6  doesn't work, what did you do?

7  A.  He had me confirm that it was the correct password.

8  Q.  Was it the correct password?

9  A.  I believed it.  Yeah.  I said yes.

10 Q.  And then what happened?

11 A.  He disappeared again for a little while.  It is possible

12 I mixed this up.  It could have been Coffin.  I don't know.

13 Q.  Are you comfortable, whether Pinette or Coffin, as one

14 of the two of them?

15 A.  One of the two of them left, yeah.  And then ultimately

16 came back and continued the interrogations.

17 Q.  All right.  Tell us what happened when they came back

18 after you had signed this form.

19 A.  Well, while they were gone, I mean, they still kept

20 talking to me, asking me for more passwords.  So whichever

21 one was gone, they asked me for other passwords, and then

22 they asked me more about darknet market activities.

23 Q.  Okay.  I am going to show you what is marked for

24 identification as Defendant's Exhibit 21.  Do you recognize

25 that form?

1    A.  Oh, yes.

2    Q.  All right.  So what do you recognize that form to be?

3    A.  So this is the FD-395 and Advice of Rights form.

4    Q.  And did you see a form that was either that form or

5    similar to that form on August 21, 2019?

6    A.  Yes.

7    Q.  Okay.  You are not saying that is the exact form; right?

8    A.  No.  I think the -- the words were bigger.  You know,

9    before we ask you any questions, you must understand your

10   rights.  All of these words that are on here were bigger.

11   Q.  Okay.  But was it substantially the same as what I am

12   showing you as Defense 21?

13   A.  Yes, absolutely.

14            MR. HALL:  Move the admission of Defense 21.

15            MR. SISTLA:  No objection, Your Honor.

16            THE COURT:  It's admitted.

17   BY MR. HALL:

18   Q.  What -- tell the Court about what happened, why you

19   saw -- how you saw that form and what happened in relation

20   to when you were shown that form.

21   A.  So when the agent came back the second time, he came

22   back with this form --

23   Q.  The second time of what?

24   A.  You know, I actually, honestly -- wait.  I think that

25   the advice of right form and the account forms actually came

1    out at the same time.  So I must have given the password to

2    the laptop before the form was filled out because both of

3    them were presented at the same time.

4    Q.  So let's back up.  So this -- Government's 6, explain to

5    the Court what you are saying.

6    A.  So this form that is on the screen right now,

7    Government's 6, was presented to me immediately preceding

8    this advice of rights form.

9    Q.  Did you sign Government's 6 first?

10   A.  I did.

11   Q.  Let me show you Defense 21.  All right.  I am showing

12   you what has been introduced as Defense 21.  And tell the

13   Court -- describe for the Court, what happened when you saw

14   a form substantially similar to what has been introduced as

15   Defense Exhibit 21.

16   A.  I found it humiliating because I had asked -- just asked

17   for a lawyer within the previous 15 to 20 minutes, and

18   the -- my request wasn't honored.  And then I am presented

19   with this form, you know, and I have already given them the

20   password that was the most inculpatory thing that I could

21   possibly say was the password.  And so this form was, you

22   know, just an insult.  And --

23   Q.  I understand that.  What I am asking you, Mr. Purbeck,

24   is tell the Court what happened when you were shown this

25   form.  Let me ask you this way:  Who showed you the form?

1    A.   It was Pinette.

2    Q.   All right.  Did you have a chance to read it?

3    A.   I did.  Yeah.  And they asked me to agree to it.

4    Verbally.  They didn't read them out loud.

5    Q.   Did you read each of the different lines on -- did

6    you -- you understand this -- this to be kind of a Miranda

7    rights form?  Are you familiar with that term?

8    A.   Yes.

9    Q.   Did you have an opportunity to read each of these?

10   A.   Yes.

11   Q.   And in reading each of those, tell the Court what

12   happened.

13   A.   I did ultimately sign it because I had already given the

14   most inculpatory thing I could.

15   Q.   Okay.

16   A.   And so it just -- it was real, relatively insulting,

17   real -- really insulting because I had just asked for the

18   lawyer.  I didn't feel I could ask for a lawyer still.

19   Because it hadn't been honored before, so why would it be

20   honored after.  And Agent Coffin was kind of gleeful at this

21   point.  As I said, I agreed and Agent Pinette put a recorder

22   in my face, and recorded me saying that I agreed to this

23   form, to the conditions of this form.

24   Q.   Did Agents Coffin or Agent Pinette say anything specific

25   to you when they showed you this form?

1    A.   Yeah.   They asked me to sign it.   And they asked me to

2    agree to the -- do you agree to these statements here.

3    Q.   And then you are saying who put the recorder in front of

4    you?

5    A.   Pinette.

6    Q.   All right.   Describe the recorder.

7    A.   It was a long, silver digital recorder.

8    Q.   Are you familiar with recorders of that kind?

9    A.   Yeah.   I used to -- when I worked for Vocational

10   Rehabilitation, a state agency, our counselors each had

11   digital recorders that they used.   And they would keep case

12   notes with them.   I believed this to either be an Olympus or

13   a Sony digital audio recorder.

14   Q.   Roughly how big was it?   The recorders come in all

15   sizes.   You have those full cassettes, you have one sizes of

16   pin, you have them in all sizes.   Describe for the Court the

17   size.

18   A.   Maybe eight to ten inches.

19   Q.   Okay.

20   A.   Something in that range.

21   Q.   All right.   And when the recorder is placed in front of

22   you, what did you say?

23   A.   I agreed.   I mean --

24   Q.   My question is, what did you say?   When the recorder is

25   placed in front of your face, what did you say?

1   A.  I said I agreed to the Miranda terms.

2   Q.  That is what you said, I agree to the Miranda terms?

3   A.  Oh, no.  I just said "Yes."

4   Q.  That is what I am asking.  What did you say?

5   A.  Yes.

6   Q.  Let's back up and get some clarity for the record here.

7   When Agent Pinette put the recorder in front of you, okay,

8   in front of your face, and asked you -- what did he ask you?

9   A.  He asked me to say yes to the -- each of the -- to agree

10  to the -- you agree to the Miranda rights, essentially.

11  Q.  What did you say?

12  A.  "Yes," after I read it.

13  Q.  Okay.  And what did you see -- or did you see what he

14  did with the recorder?

15  A.  He had it out now.  After that -- so before that, I

16  don't know if he had it under his binder or not.

17  Q.  Did you see the recorder before this?

18  A.  Not really.  No.

19  Q.  Well, "not really" means kind of.  So did you see the

20  recorder before this or did you not see the recorder before

21  this?

22  A.  No.

23  Q.  Is this the first time you saw the recorder?

24  A.  Yes.

25  Q.  All right.  Now, after this happened, did you see the

1    recorder again?

2    A.   Throughout the day.  Yeah.

3    Q.   All right.  Was it out and about?

4    A.   Yeah.  He had it out after that.  They were recording

5    the conversation from that point forward.

6    Q.   All right.  After you signed this form or one

7    substantially similar to this, did you see anyone else do

8    anything else with this form as far as writing on it?

9    A.   They made -- oh, to this form?  No.

10   Q.   We are talking about the Miranda rights form right here.

11   A.   Yeah.

12   Q.   Okay.  Am I right that you signed it?

13   A.   I did.

14   Q.   Okay.  And who had it in their hand -- I understand that

15   Pinette had the recorder in his hand.  Who had it -- who had

16   the form in the hand, Pinette or Coffin?  Or you?  Were you

17   holding it?

18   A.   Well, yeah, I was holding it when I signed it.

19   Q.   Okay.  Once you signed it, what did you do with the

20   form?

21   A.   I handed it back to them.

22   Q.   Who?  To both of them together or one or the other?

23   A.   I think I handed it back to Coffin first because he

24   signed it, and then Pinette countersigned it and then he

25   looked at his watch and wrote down the time.

1    Q.   Okay.  Did you see Agent Pinette look at his watch and

2    then write the time on this form as Defense 21?

3    A.   Absolutely.

4    Q.   Did you see Agent Pinette sign it?

5    A.   Yes.  Absolutely.

6    Q.   Did you see Agent Coffin sign this same form?

7    A.   Absolutely.

8    Q.   And did that happen before or after you had signed the

9    form?

10   A.   It happened after I signed the form.

11   Q.   And part of your testimony is it was put on there from

12   your observation was the time that this took place; correct?

13   A.   Yeah.  That was -- so all along, I wanted to know that

14   time that was on there.

15   Q.   My question is:  From what you observed, Agent Pinette

16   put the time that you signed it and he and Agent -- he and

17   Agent Coffin signed it on this form; correct?

18   A.   Yes, they did.

19   Q.   Were you ever taken to the bathroom during the day?

20   A.   I was.

21   Q.   Do you recall on how many occasions?

22   A.   One time.

23   Q.   By whom?

24   A.   Agent Pinette.  Agent Coffin had left at that point.

25   And Coffin decided it was break time.  I mean, I'm sorry.

1    Pinette decided it was break time.

2    Q.  In relation to using Ada County as kind of a sign post

3    or we can use this, did that happen before, going to the

4    bathroom, did that happen before or after you signed the

5    document as Government's 6, just to remind you, is this one,

6    and the document that is Defense 21.

7    A.  It happened after.

8    Q.  Did you have any sense of how long after?

9    A.  So the rest of the interrogation probably occurred, took

10   an hour, an hour and a half, somewhere in that range.

11   Q.  Okay.

12   A.  And then I don't know if I can reference the document

13   from the Intermountain text, but --

14   Q.  Let me ask you this:  To your recollection, did you go

15   to the bathroom before or after Ada County showed up?

16   A.  I've always been confused about that, but I believe it

17   was before.

18   Q.  But you are not sure?

19   A.  I am not sure.

20   Q.  Tell the judge how you went to the bathroom -- not tell

21   the judge -- how you got from the backyard to the bathroom.

22   Who went with you?

23   A.  This was pretty deep into the day.  It was already very

24   hot at this point.  The cramps had gotten worse.  And when

25   we went to the bathroom, I wasn't able to walk for the first

1 few steps.  So Pinette assisted me.  And he --

2 Q.  He assisted you.  Did he put his hands on you?

3 A.  Yes.

4 Q.  Okay.

5 A.  And at this point, too, there was another point where

6 Pinette had picked me up when my chair fell and collapsed.

7 Q.  I will ask you about that in a minute.  So let's keep

8 going to the bathroom.

9 A.  So he assisted me into the house, directed me.  I

10 couldn't interact with anyone on the way.  And --

11 Q.  Did he tell you that?

12 A.  No.  But I wasn't allowed to deviate from the path that

13 he had, you know, planned for me.

14 Q.  Why do you say that?

15 A.  I just felt that way.

16 Q.  Did you ask to be able to walk to the bathroom by

17 yourself?

18 A.  No.

19 Q.  When he walked you -- describe for the Court where his

20 hands were on your person as you walked with Agent Pinette

21 to the bathroom.

22 A.  I mean, it was an assist kind of position, so he was

23 helping me.

24 Q.  Using one hand or two hands?  Or do you remember?

25 A.  I don't recall that level of detail.

1    Q.   When you got to the bathroom, what happened?

2    A.   So I tried to close the door.  He made me keep it open.

3    And I peed very -- it took a while to urinate.  But when I

4    urinated, it was dark brown, like the color of cola.  And it

5    hurt like -- kind of like razor blades almost.  It was

6    really painful to pee.

7    Q.   Up to the point you had gone to the bathroom, had you

8    had any water?

9    A.   I had had no water.

10   Q.   Had you drunk anything?

11   A.   Only that coffee.

12   Q.   Is that the initial coffee you had during the day?

13   A.   Yes.

14   Q.   Okay.  When you were in the bathroom, urinating, did any

15   agents question you?

16   A.   Clark Harshbarger came up and started demanding a

17   password to protonmail.

18   Q.   Describe for the Court what he said and what you said.

19   A.   He demanded this password.  So this form had one of the

20   passwords on it.  But protonmail has two passwords that you

21   need in order to access it.  And as I am urinating, he is

22   asking me for passwords.  And once I finished, he continued

23   to ask me.  He handed me his phone and told me to log in,

24   and I tried numerous times, but I was pretty confused.  I

25   had just entered this password the day before on my own

1    phone.  And I could not remember it in that moment.

2    Q.  So up to the point that you were escorted or assisted by

3    Agent Pinette from the backyard to the bathroom, did you

4    feel like you were free to leave at any time?

5    A.  No.

6    Q.  Did you feel like you were free to decline their

7    questions or just go on about your business?

8    A.  No, I didn't even get a real break.  I was being

9    bothered the whole time I was inside for a password.

10   Q.  When you say "bothered," are you referring to Agent

11   Harshbarger questioning you while you were urinating?

12   A.  Yeah.  And all the way up until we got to the door

13   again, of the house, and when I got to the threshold of the

14   screen doors, I don't know.  Maybe you can just change it

15   with the provider.  And, you know, that will get you in.

16            THE COURT:  About how much longer do you have on

17   your direct?

18            MR. HALL:  About 20 to 30 minutes.

19            THE COURT:  We are taking a break at this point,

20   then.  We will take a few minutes.

21            (Break from 11:33 a.m. until 11:43 a.m.)

22            MR. HERSKOWITZ:  Judge, before we proceed, I just

23   want to put something on the record.  During the break,

24   Mr. Purbeck asked me if he could resume the position on the

25   witness stand.  I just directed him to the security officer.

1    I just wanted to make sure that I put that interaction on

2    the record, and that is all that occurred.

3              THE COURT:  Thank you.

4    BY MR. HALL:

5    Q.  Let me show you what is marked for identification as

6    Defense Exhibit 22.  Do you recognize that document?

7    A.  I do.

8    Q.  What is it?

9    A.  It is a picture of my backyard in December of 2019.  And

10   it shows the chair that I was sitting on that collapsed

11   during the interrogation on August 21, 2019.

12   Q.  All right.  Although the photograph itself was taken in

13   September of 2019, does it fairly and accurately represent

14   the state of the broken chair in its position in your

15   backyard on August 21, 2019?

16   A.  Yes, sir.

17             MR. HALL:  Move for the admission of Defense 22.

18             MR. SISTLA:  No objection.  No objection.

19             THE COURT:  It's admitted.

20             MR. HALL:  May I publish it, Your Honor?

21             THE COURT:  Yes, you may.

22   BY MR. HALL:

23   Q.  The animal we see in the picture, who is that?

24   A.  That is Stewie.  He does not -- he was not there on

25   August 21 of 2019.

1   Q.  Let's talk about the chair.  Tell the judge about how
2   that chair came to be broken.
3   A.  I was sitting in it during the session, and the sun
4   presumably got so warm on it that it gave out structurally.
5   I am a big guy, but these chairs are pretty highly rated.
6   Q.  So what happened when it gave out?
7   A.  I fell onto my knee.
8   Q.  Were you by yourself or with other people at the time?
9   A.  I was with Agent Pinette and Agent Coffin.
10  Q.  Was this before the Government's 6 and Defense Exhibit
11  21 was signed or afterwards?
12  A.  I couldn't tell you.
13  Q.  All right.  What happened once you fell out of the chair
14  when it broke?
15  A.  I fell and hit my knee, and I struggled to get up and
16  Agent Pinette grabbed my hand and picked me up.  And I don't
17  know if Coffin went back inside or how it was acquired, but
18  a kitchen wooden chair was put in its place.
19  Q.  And the kitchen wooden chair that you just described,
20  was that put in the shade or the sun?
21  A.  It was in the exact same position or relatively close to
22  the same position as the one that collapsed.
23  Q.  The one that's depicted in Defense 22?
24  A.  Yes.  The agents didn't change their seating.
25  Q.  Okay.  At the time the chair collapsed, was it in the

1    shade or the sun?

2    A.   It was in the sun.

3    Q.   And the kitchen chair then that was put in place of it,

4    was it in the shade or the sun?

5    A.   The sun.

6    Q.   All right.  With respect to -- and did that happen to

7    your recollection before or after you were taken to the

8    bathroom?

9    A.   This happened before I went to the bathroom.

10   Q.   And did it happen before or after Ada County came out to

11   interview you?

12   A.   It happened before Ada County came.

13   Q.   Okay.  With respect to the time -- point in time where

14   you signed Government's 6 and Defense 21, describe for the

15   Court your physical state with respect to -- not just

16   emotionally how you felt, but physically, how did you feel?

17   A.   This one is 21?

18   Q.   No, sir.  I'm sorry.  So the point in time I want to

19   direct your attention to is the point that you signed

20   Government's 6, which is this document here, and then the

21   point in time right after that that you signed Defense 21,

22   which again, is, you know, either the same or essentially

23   the same as the document you signed.

24          What I am asking you is:  At that point in time,

25   right before you signed those documents, I want you to

1    describe for the Court how you felt from being outside up to

2    that point.

3    A.  Well, I mean, I am a big guy, so I sweat.  I think

4    everyone sweats, but bigger guys, they sweat more.  So I had

5    sweat quite a bit, and I -- if it wasn't visible to other

6    people, my shirt had gotten very wet.  My undershirt.

7    And --

8    Q.  Let me ask you this:  You described earlier a dark blue

9    polo that you wear.  You also wear an undershirt underneath

10   that?

11   A.  Yes, I do.

12   Q.  Keep going.

13   A.  Then I was wearing jeans that day because at Ada County,

14   I was allowed to wear jeans in the courthouse when I was

15   working under desks and stuff doing installs of computers,

16   and so I was wearing jeans that day as well.  The -- you

17   know, the sweat may not have been visible, but I was

18   sweating.  Because I mean, I am used to 68 degrees in my

19   house, and it was 85 or something like that at this point in

20   the day.  I am not used to that kind of heat, being there

21   for prolonged periods of time.

22   Q.  Up to that point, had you had any water?

23   A.  No.

24   Q.  How did you feel?

25   A.  So I was getting a little bit out of it.  Not as bad as

1    when Ada County showed up.  When Ada County showed up, it

2    was much worse.  But I had -- I had cramps.  The -- I mean,

3    the feeling of just being itchy, you know, in the spots

4    where sweat would normally collect, like on your hairline.

5    Q.  Were you able to look at your face?

6    A.  No.

7    Q.  Were you able to look at your arms?

8    A.  I could look at my arms.  Yeah.

9    Q.  Was this a short-sleeve polo?

10   A.  It was a short-sleeve polo.

11   Q.  All right.  And what was the state on -- when you looked

12   at your arms, how did they appear?

13   A.  I felt like I was getting red.

14   Q.  Okay.

15   A.  I don't -- I -- I can't give you a shade of red, you

16   know, from the Crayola box.  I could't be like is it this

17   particular red.

18   Q.  All right.  Did you have a sensation that you had been

19   in the sun for too long?

20   A.  Yes.

21   Q.  With respect to -- all right.  So moving then from that

22   point forward to when Ada County appeared, do you --

23   describe for the Court how you felt at that point.

24   A.  When Ada County showed up, I was pretty bad at that

25   point.  So...

1    Q.  When you say "pretty bad," what do you mean?

2    A.  So at one point during that, you know, interview,

3    interrogation, whatever, I felt like this feeling that I

4    could no longer sweat.  So sweat was no longer forming on my

5    body.  My skin felt dry.  Thin, if that is a -- I don't know

6    exactly, but it felt weird.  It was not normal.  And of

7    course, the cramps were still there.  And I started to be

8    confused.  So there was a -- so when Pacheco was talking to

9    me, Detective Pacheco, I started directing questions back to

10   Pinette because -- I don't know why, but I assumed that

11   Pinette could answer some of the questions for me.

12   Q.  Let me ask you this:  When Mr. O'Meara and Detective

13   Pacheco came to interview you, where was the interview?

14   A.  The interview at that point was in the -- over by the

15   large tree.

16   Q.  Was it in the shade or the sun?

17   A.  I think I was in the shade at that point.

18   Q.  All right.  With respect to Defective Pacheco and

19   O'Meara, were they in the shade or the sun or do you recall?

20   A.  You know, if it's the way I think it was laid out, I

21   think I was facing my back against the tree and they were

22   kind of in that same arrangement on the FBI arrangement of

23   the chairs were -- they were behind, you know -- sort of

24   blocking my exit.  And then Pinette, if I know, they

25   testified that Pinette was behind them, but I thought he was

1    right next to Pacheco.  So maybe -- he might have been right

2    behind Pacheco.

3    Q.  From your perspective, could you see in addition to

4    O'Meara and Pacheco, who was there in kind of the

5    conversation area?

6    A.  I didn't notice anyone else other than that.  It is very

7    possible there were other people.

8    Q.  I'm not trying -- listen to --

9    A.  Oh, oh.  I'm sorry.

10   Q.  Listen to my question.  Who was in the group -- when

11   Ada County came up to talk to you, who was in that group

12   talking to you and whom you were talking to?

13   A.  It would have been IT Director Stephen -- I think his

14   title is IT Director.  IT Director Stephen O'Meara,

15   Ada County Detective Pacheco, and James Pinette.

16   Q.  Was Agent Pinette part of the interview with Ada County?

17   A.  Yes.

18   Q.  Did he ask any questions during that time?

19   A.  He did not.

20   Q.  Describe what you just -- you mentioned it earlier.  I

21   told you to hold off and we're getting to it now.  Describe

22   for the Court the moment -- or how you came to get stand up

23   and hand something out of your pocket to Mr. O'Meara.

24   A.  So when the interview was going on, I stood up and just

25   decided that they should have this work equipment back.  I

1    assumed I was fired at that point.

2    Q.   What did you give him?

3    A.   I gave them a thumbdrive.  So we were doing imaging on

4    computers at the time.  We were doing Windows 10 roll-outs.

5    And so as part of that, we had an image that we used and

6    then we had a hard drive that I kept that would keep copies

7    of the individual users' data, so I can migrate it over to

8    the new machines.

9    Q.   After you gave that to Mr. O'Meara, did Detective

10   Pinette search you -- Agent Pinette, I'm sorry.

11   A.   To my knowledge, he did not at that point.  He did

12   search me later in the day.

13   Q.   Okay.  How long to your recollection did the Ada County

14   interview last?

15   A.   A half an hour to 45 minutes.

16   Q.   From the questions that Ada County asked you, did they

17   seem to be the same and similar type of questions that

18   you've been asked for by the FBI or a different subject

19   matter?

20   A.   No.  These were human resource type questions.  They

21   asked me about my job duties.  I think Pacheco said

22   something about the Sheriff's Office exposure.  But the

23   questions they were asking was about how I did my imaging of

24   these computers.  And I told them that I kept all of the

25   users' data, and it was per policy.  And O'Meara agreed that

1    that was the right thing to do.  And then he asked

2    inculpatory-type questions.  I don't know that it was

3    against the law, but I --

4    Q.  When you say inculpatory-type questions, what do you

5    mean?

6    A.  He was asking questions designed to elicit a

7    potentially, a criminal response.

8    Q.  From whom?

9    A.  Me.

10   Q.  Regarding what?

11   A.  Whatever I possibly had done to Ada County.

12   Q.  Okay.

13   A.  He did advise me of my Miranda rights.

14   Q.  You're talking about Detective Pacheco?

15   A.  Detective Pacheco.

16   Q.  And when he advised you of your Miranda rights, tell the

17   Court, in what fashion did he do that?

18   A.  He pulled a card out of his pocket and read it off of

19   there, and at the end he did something weird.  It's like

20   when he said do you want a lawyer, he said only guilty

21   people ask for lawyers.

22   Q.  All right.  Anything other than that?

23   A.  No.

24   Q.  And then what did you do?

25   A.  I agreed.  I said "Yes."

1    Q.   You agreed to do what?

2    A.   I agreed to that.  I waived Miranda.

3    Q.   And did he give you Miranda rights at the beginning, the

4    end, in the middle?  When did he advise you of your

5    Miranda?  "He" being detective Pacheco, when did he advise

6    you of your Miranda rights?

7    A.   He advised me at the beginning.

8    Q.   All right.  Let's move forward and ask you about this

9    search that you had just described that Agent Pinette

10   conducted on you.  When did that occur?

11   A.   It was almost very nearly the end of the day.  So Heap,

12   I know he testified that he came between when Ada County and

13   the FBI interview was done.  But I believe it happened after

14   Ada County because there was this long break period between

15   when Agent Pinette came back out, and I think he even said

16   that the -- everything was almost done by the time he did.

17   And so when he went back inside, Pinette -- well, Pinette

18   came out first, and then relieved Heap of his duty.

19             And then Agent Pinette said, "Let's get this over

20   with."  And there was a plastic lawn chair there, and I bent

21   over that, and he did a search of me, a very thorough search

22   of my groin area, like he was feeling for something I might

23   have taped up on, you know, me or something.  I don't know.

24   I don't know why.  Very weird.  And he --

25   Q.   Did he take anything from your person?

1   A.  Yes.  He took my wallet.

2   Q.  And what did he do?

3   A.  And he then sat down with me and started searching

4   through it.  And he found a BitPay card and the card for my

5   storage locker.

6   Q.  Were you in the sun or the shade at this time?

7   A.  I was back in the sun.  So he moved me when he came out.

8   Q.  When Ada County left, you had testified that you were

9   over near a large tree.

10  A.  Yeah.

11  Q.  After that, did you stay near that large tree till

12  Pinette came out, or did you move somewhere else?

13  A.  I asked Agent Heap if I could move, and he moved me to a

14  shaded area at my request.  So I felt that I had some --

15  Q.  I'm sorry.  Go ahead.

16  A.  I felt that I had some rapport with him.

17  Q.  And then when Agent Pinette came out and conducted the

18  search you were just talking about, was that done in the

19  shade where you were with Agent Heap or was it done

20  somewhere else?

21  A.  This would have been at the very end of the day, so it

22  was over by the shed on the property, and so it was the far

23  corner of the backyard.  And I believe it was in the sun.

24  Q.  How tall are you?

25  A.  5'8".

1    Q.  How much do you weigh?

2    A.  At the time, I weighed 280 pounds.

3    Q.  And when you say "at the time," is that on August 21,

4    2019?

5    A.  Yes.  I weigh a little more from the pandemic.

6    Q.  And when you -- once the -- after Pinette had searched

7    you and gotten the wallet, how much longer was the FBI still

8    there, approximately?

9    A.  Not very long.  He searched me.  I felt at that point, I

10   was under arrest.

11   Q.  Why did you feel you were under arrest at that point?

12   A.  He said, "Let's get it over with."

13   Q.  Who said "Let's get it over with"?

14   A.  Agent Pinette did.

15   Q.  Did he say that before or after he searched you?

16   A.  He said that before.

17   Q.  Okay.

18   A.  So then he searched me, presumably incident to arrest.

19   And then at some point, he got a phone call, and -- oh, and

20   Harshbarger also came out about this point.  I think he was

21   claiming that they were done or something like that.  But

22   they both looked at this BitPay card, and kind of

23   congratulated each other for finding this.  And then Pinette

24   got some kind of phone call.  And everything -- the demeanor

25   completely changed.

1    Q.  In what way did the demeanor change?

2    A.  He decided basically that we were going to leave, and I

3    was going to be let go.

4    Q.  Did he say something to you?

5    A.  Yeah, he said, "You are going to stay home.  You're

6    going to stay here tonight."

7    Q.  Prior to him saying "You are going to stay here

8    tonight," had there been any conversation about you going to

9    jail?

10   A.  Yes.  I'd asked if I was going to see Sarah before I

11   went to jail.

12   Q.  And in relation to him searching you, when did that

13   conversation take place?

14   A.  Hours later.

15   Q.  I don't think I asked a good question.  The conversation

16   about, can I see Sarah before I go to jail, that

17   conversation.  My question is, did that happen -- where in

18   relation did that happen?  Where did that occur in relation

19   to when Agent Pinette searched you and found your wallet

20   toward the end?

21   A.  It was sort of -- it was before Ada County showed up.

22   Q.  Okay.  Got it.  Back on August 21, 2019, were you taking

23   any prescribed medication?

24   A.  I was.

25   Q.  What?

1    A.  I was taking Campral, which is a drug for alcohol

2    cessation.

3    Q.  Okay.  What else?

4    A.  I was taking Lisinopril, Hydrochlorothiazide.  I was

5    taking --

6    Q.  What was that for?

7    A.  High blood pressure.  And it is a diuretic.

8    Q.  And what else?

9    A.  And then I was taking Duloxetine.

10   Q.  What was that for?

11   A.  It is an SSRI, so a crazy med.

12   Q.  How long had you taken that?

13   A.  I had taken it for a fairly decent amount of time, but I

14   actually ran out of part of my prescription, so instead of

15   having 40-milligram tablets the night before, I went to 30.

16   So my dosage was off.

17   Q.  When the agents -- tell me, so the phone call occurred

18   with Agent Pinette, he said you are staying here tonight.

19   What happened then?

20   A.  So then he walked me in, and everything from there was

21   Harshbarger.  Somebody -- so Harshbarger had me fill out --

22   or had me sign an inventory form of the things that they

23   seized.  And he said that something to the effect that they

24   had seized six SUV loads, I think, of stuff.  I -- it was

25   kind of confusing at that point.

1    Q.   Do you know what time that the FBI finally left?

2    A.   Well, the photographic evidence shows around 2:00.  At

3    the time, I thought it was 3:45.

4    Q.   Why did you think -- on August 21, 2019, why did you

5    think it was 3:45?

6    A.   Because the only clock that they left me with in the

7    house was the stove.  And the stove must have been unplugged

8    at some point and it was wrong.

9    Q.   During the time that the agents were there, from when

10   they first encountered you in the driveway until they

11   finally left, how many -- with the exception of the time

12   that you were brought in to use the bathroom, were there any

13   other occasions that you were not in the backyard?

14   A.   Well, in the front yard or the front driveway at the

15   very beginning of the day?

16   Q.   Fair enough.  Once again, I don't ask a good question.

17   So moving from the time that you first encountered Agent

18   Coffin fin and made it through the house and to the

19   backyard, that is our starting point.  From that point until

20   the agents finally left, once the agents finally left, you

21   came back inside your house?  Is that correct?

22   A.   Yes.

23   Q.   Those are two signposts.  In between those two periods,

24   how many times did you come inside the house?

25   A.   Just that one time for the bathroom.

1    Q.  And the rest of the time, where were you?

2    A.  Outside in the backyard.

3    Q.  Do you hear this testimony yesterday about you were in

4    the shade, they moved you to the shade, and all of that kind

5    of stuff like that?  The only time I can remember being in

6    the shade --

7            MR. SISTLA:  Your Honor, can I -- if I can ask

8    Counsel to identify what specific testimony he is referring

9    to?  It is sort of all about.

10           MR. HALL:  That is fair.  I withdraw the question.

11   BY MR. HALL:

12   Q.  Do you remember the testimony of Agents Coffin and

13   Pinette?

14   A.  I do.

15   Q.  You recollect testimony being given that you were moved

16   into the shade at various points when being interviewed by

17   Agents Coffin and Pinette?

18   A.  No.  Not while being interviewed with the two of them

19   together.  No.

20   Q.  Do you remember them ever saying that you were being put

21   in the shade?

22   A.  No.

23   Q.  Okay.  And during the time that you were outside in the

24   backyard, at any time during that time, were you given any

25   water?

1    A.   I was not.

2    Q.   Did you get any water any other way?

3    A.   No.

4    Q.   Were you able to get another cup of coffee at some

5    point?

6    A.   When we went into the -- when I went to the restroom, on

7    the way out, as Harshbarger was asking me this password

8    questions, Pinette told me to get another cup of coffee.

9    Q.   Once the FBI left and you came back outside, what was

10   your physical condition?

11   A.   Pretty poor.

12   Q.   Describe what you mean by "pretty poor."

13   A.   I was disoriented.  Dazed.  I have some memory problems

14   associated with that day and that night.  The -- like Sarah

15   just testified that we went to Mountain Home that night.  I

16   don't recall that.  I didn't know that we went there that

17   night.  So yeah, I was -- I drank a lot of water when they

18   left because I was very dehydrated.

19   Q.   What was your -- did you have a chance to look at

20   yourself in the mirror?

21   A.   Yes.

22   Q.   How did you look?

23   A.   I was burned.  I was looking for aloe vera gel so I

24   could put it on my skin.

25   Q.   Did you have some?

1    A.   I believe I did.   Yes.

2    Q.   How about water?   How much water were you drinking?

3    A.   Well, I know that I am not allowed to drink too much

4    water, you know, because it can cause a shock as well.   So I

5    drank probably at least a 32-ounce cup's worth, and I took a

6    potassium and magnesium, so it would help counteract any

7    electrical problems that I was having.   And my sunburn --

8    when I had that second cup of coffee, too, I had nausea when

9    I tried to drink it, so I couldn't actually drink that

10   second cup of coffee.   It was just terrible acid reflux,

11   just trying to think about stomaching that.

12   Q.   How much sleep -- that 21 and moving into the other

13   nights, did the sunburn or other sun exposure impact your

14   sleeping at all?

15   A.   Absolutely.

16   Q.   In what way?

17   A.   So I had difficulty sleeping.   I had a fever for, I want

18   to say, two days after that.

19   Q.   Is that a fever that you just felt like you had a fever

20   or did you actually take your temperature?

21   A.   A fever as in my whole face felt red and everything was

22   hot.   And just weird feeling.   And yes, I wasn't fully

23   functional for at least a couple of days.   I did some minor

24   phone calls.   Like, I called the Public Defender's Office in

25   Boise immediately as soon as I could get a phone connected,

1    again.  But that was later on in the day.

2    Q.  How about your skin?  Did it peel?

3    A.  It did, absolutely.  I don't know how long that went

4    for, other than what Sarah said.

5    Q.  Do you remember flying to Atlanta on or about September

6    the 9th?

7    A.  I do.  Yeah.

8    Q.  And at that point, how would you describe your physical

9    condition?

10   A.  I would say I was back to normal by then.  It was, you

11   know, the fever and everything was the first couple of days.

12   That was the part that made it kind of debilitating.  The

13   sunburning hurt.  It is uncomfortable, and you pee a lot

14   during that, but it's something you can work around other

15   than your skin is tender.  I mean, that's -- three months

16   later, I did go to see a psychiatrist for sleeping problems

17   associated with it all.  I was having, you know, night

18   terrors, type of thing, so they gave me Klonopin for that

19   from my psychiatrist.

20   Q.  Did you ever seek medical attention for any of the

21   sunburn or the abdominal cramps that you described or any of

22   the other heat exposure that you experienced on August 21,

23   2019?

24   A.  No, I did not.

25   Q.  Why not?

1    A.   Well, I mean, I was fired, so the cost of going to -- I

2    mean, cost of health care in Boise is pretty high anyway

3    because of the limited doctors and stuff that are there, and

4    I didn't feel like I could afford that at that point.  There

5    was too many other financial burdens at the time.  So...

6    Q.   Having heard the testimony from yesterday, do you

7    believe that Assistant U.S. Attorney Nathan Kitchens was at

8    your home at any point on August 21, 2019?

9    A.   After hearing the testimony, I believe not.  I

10   believe -- I asked on August 24th of this year to amend my

11   complaint in front of Judge Winmill so I could make any

12   modifications because I thought that might be a possibility

13   that he was not.

14   Q.   Let me ask you this:  The phone call that was played

15   yesterday, in which you -- the recording that was played

16   yesterday in which you made a phone call to Agent Pinette,

17   do you recollect that?

18   A.   Yes, I do.

19   Q.   Why did you make that call?

20   A.   So I had multiple reasons for it.  For one, I was trying

21   to be honest with the FBI.  I didn't want to steal

22   government property.  So they had flown me to Atlanta.  So I

23   felt that if I received any kind of benefit from that, I

24   owed the government that benefit back; right?  Because they

25   had already reimbursed me for it.  So I asked Pinette if I

1    needed to return a travel voucher for the inconvenience of

2    flying.  All three of my flights on the way to Atlanta were

3    delayed.  So it was something that happened.  The other

4    reason for calling was -- I had that -- well, there are two

5    other reasons.  So I had the other -- I had that box of

6    thumbdrives that I looked through and there was nothing, you

7    know, illegal on them.  But I felt I should give them to the

8    government to dispose.  It was all stuff from working at

9    various employers like thumbdrives and stuff that had, you

10   know, work materials and some of it was P.I.  So it I

11   thought it was just time to get rid of it.  And the third

12   reason was because -- and this was not the characteristic

13   reason.  I didn't want Agent Pinette, who I saw was the more

14   vicious of the two agents, to question Harshbarger about the

15   theft of items.

16   Q.  What items were you worried that had been stolen?

17   A.  A number of silver coins with some various -- some

18   various magazines that were fairly high-valued.

19   Q.  At the time you made the phone call, were you

20   represented by legal counsel?

21   A.  I was.

22   Q.  And who was that legal counsel?

23   A.  Sanford Wallack.

24   Q.  How did you come to be represented by Mr. Wallack at --

25   back at the time that you made the phone call in December of

1    2019?

2    A.  So I -- so after --

3    Q.  I don't need the entire -- just how did you come to be

4    rented by Mr. Wallack?

5    A.  I asked the Court here in the Northern District of

6    Georgia after the Public Defender in Boise told me that I

7    need to do that.

8    Q.  So you had a court-appointed lawyer by this Court?

9    A.  Yes.

10   Q.  Mr. Wallack?

11   A.  Yes.

12   Q.  And do you recall whether that court-appointed lawyer

13   that was representing you on or before -- or before you flew

14   to Atlanta in September 9th of 2019?

15   A.  I was represented by him.

16   Q.  And did that representation continue to and through the

17   time of the phone call that we heard played yesterday in

18   December of 2019?

19   A.  Yeah.  That phone call occurred one day before a

20   polygraph -- I mean, one day after a polygraph that I went

21   to where the AUSAs --

22   Q.  We are not going to that one.  That is not my question.

23   A.  Yeah.  But I was represented at that time.

24   Q.  That was my question.  All right.  Thank you very much,

25   Mr. Purbeck.

1          THE COURT:  Mr. Sistla, how long do you expect

2    your cross-examination to take?

3          MR. SISTLA:  It is not going to be like 20

4    minutes, but I am hoping it won't be -- what is -- what

5    would the Court like to do?

6          THE COURT:  If you are prepared to go forward, we

7    just had a break.  I would like to get started and maybe

8    find out where we are at the conclusion.

9          MR. SISTLA:  I will get started and if the Court

10   wants to take a break, half-an-hour or so for lunch, I will

11   try not to go too long, Your Honor.

12         THE COURT:  That is fine.  Let me know when you

13   get to a breaking point, if you have a longer period to go.

14         MR. SISTLA:  Sure, Your Honor.  May I get started?

15         THE COURT:  Please.

16                    Cross-Examination

17   BY MR. SISTLA:

18   Q.  Good afternoon, Mr. Purbeck.

19       I am going to start with your background.  You have a

20   Bachelor's Degree in information technology.  Is that

21   correct?

22   A.  I do.

23   Q.  And you have a Master's Degree as well?

24   A.  I do not.  I am short of the -- I need more courses.

25   Q.  Have you taken Masters's level classes?

1   A.   I have.

2   Q.   And your Bachelor's Degree is from the University of

3   Phoenix?

4   A.   Yeah.

5   Q.   And what was your master's or what were studying for

6   your Master's?

7   A.   American public university system.

8   Q.   What is -- what are you studying?  Is that what you're

9   getting it or is that what you were studying?

10  A.   Oh, I'm sorry.  Yeah.  It was information technology

11  project management, I believe.

12  Q.   Are you familiar with what an A-plus certification is?

13  A.   Yes.

14  Q.   And what is that?

15  A.   It is a basic computer technician exam.

16  Q.   Do you have that certification?

17  A.   I do.

18  Q.   Is it fair to say that most of your professional career

19  has been in IT?

20  A.   Yes.

21  Q.   And then going back to at least since 2003?

22  A.   Yes.

23  Q.   And at the time of the search warrant that was executed

24  at your residence, you were working in the IT field?

25  A.   I was.

1   Q.  For Ada County; correct?

2   A.  Yes.

3   Q.  And part of your work was involving with the Sheriff's

4   Department?  Did I understand that correctly?

5   A.  Yeah.  And so when I first started there --

6   Q.  It's just a "yes" or "no." Is it with the Sheriff's

7   Department at the time?

8   A.  No, it was at the courthouse.

9   Q.  At the courthouse.  At some point, were you working with

10  the Sheriff's Department?

11  A.  Yes.

12  Q.  Okay.  In an IT capacity?

13  A.  Yes.

14  Q.  All right.

15  A.  Well, but -- they have two different IT departments.  I

16  was the County division, not the Sheriff's division.

17  Q.  Fair enough.  Thank you for the clarification.  All

18  right.  You are also a hacker; correct?

19  A.  Yes.

20  Q.  That is what this criminal investigation involves;

21  correct?  You are hacking -- your alleged hacking

22  activities?

23  A.  Yes.

24  Q.  And that is why the FBI was at your house on August 21,

25  2019; correct?

1    A.  Yes.

2    Q.  And the information, whether it is ultimately admissible

3    or not, the information you provided to the FBI agents on

4    August 21, 2019, was all entirely true; correct?

5              MR. HALL:  Objection; relevance as to the scope.

6    The scope of the hearing matters, I don't understand the

7    relevance, and I think it is outside the scope of the

8    hearing.

9              MR. SISTLA:  Your Honor, one of the defendant's

10   contentions is that he was suffering from cognizant -- I'm

11   sorry -- neurological or he doesn't understand or he was

12   confused, the heat had overwhelmed him.  And if he told the

13   truth and understood the question, that is goes to whether

14   or not that is a credible claim or not.

15             THE COURT:  Overruled.

16   BY MR. SISTLA:

17   Q.  The information you provided to the agents was true;

18   correct?

19   A.  I believe.  There may have been one or two, you know --

20   Q.  You are Lifelock; correct?

21             MR. HALL:  Excuse me.  Objection.  I would like

22   the witness to be able to answer the question that was

23   asked.

24             MR. SISTLA:  Apologies, Your Honor.

25             THE COURT:  Please answer.

A.   I think right around the time that I made the

inculpatory statements, I may have equivocated around the

edges of their question.

Q.   So the inculpatory statements that you made, those were

all true; correct?

A.   To my knowledge.  Correct.

Q.   About your hacking activities; correct?

A.   Yeah.

Q.   And one of the things in order to be a successful hacker

is to be able to obfuscate or hide your identity; correct?

A.   I agree.  Yeah.

Q.   And, in fact, it is helpful if you can lie or mislead

the individuals that you are dealing with; is that correct?

A.   Well, yeah.  I mean, there is rapport-building that

would require being truthful.  Yes.

Q.   But also being dishonest and deceitful is helpful when

you are a hacker; correct?

A.   You know, not necessarily.  I mean, the obfuscation

itself perhaps is, you know.  But I don't think that that

is -- I don't think that is necessarily dishonest in and of

itself being -- I mean, using Tor is not dishonest, if that

is what you are trying to get at.

Q.   No.  No, not necessarily.  I appreciate that.  So let's

start with the interaction.  Your first encounter on August

21, 2019, you were outside of your house; correct?

1    A.   Yes.

2    Q.   You were -- you have a -- you had a Mustang at the time?

3    A.   I did.

4    Q.   And you were on the driver's side of the car.  Is that

5    correct?

6    A.   I was.

7    Q.   And to the best of your recollection, on direct

8    testimony, you believe that Agent Coffin was the first

9    person you interacted with?

10   A.   Yeah.  I don't know who that Ryan O'Neil is.

11   Q.   And I am not just -- just to understand, I am not

12   accusing you of lying or anything.  I am just making sure.

13   That was your best recollection; correct?

14   A.   To the best of my recollection.  Yes.

15   Q.   And I just want to make sure that I understood correctly

16   on direct.  Was it when Agent Coffin touched you or came up

17   to you, is that the first time you sort of became aware that

18   there were people at your house?

19   A.   Yeah.  That's the first time I was aware.

20   Q.   And so just to walk through this, you are at your car,

21   you are leaning in to get a coffee cup.  Agent Coffin, did

22   he come up on the like, from the rear of the car, or had he

23   like, walked around from the garage side of the car?

24   A.   I am guessing he came up from behind.  So because I

25   didn't see him when I was leaning in, I just all of a

1    sudden, I was touched.  You know.  And so I thought that was

2    weird; right?

3    Q.  Okay.

4    A.  And so I turned around to look and see.

5    Q.  And you saw him?

6    A.  I saw him.  And then I saw those other agents coming up

7    with the guns too.

8    Q.  Okay.  And that's sort of -- I believe it's -- are all

9    of the exhibits here, gentlemen?

10            MR. HALL:  They should be, unless some of them

11   wandered off.

12            MR. SISTLA:  Sorry, Your Honor.  I am looking for

13   Government's Exhibit 3.

14   BY MR. SISTLA:

15   Q.  Here is Government's 1.  And so just, sir, you -- you

16   are roughly here; correct?

17   A.  Yes.

18   Q.  And your recollection is that who you think was

19   Agent Coffin came this way and sort of tapped you on the

20   back?

21   A.  Yes.

22   Q.  And there were agents over here; correct?

23   A.  Yes.

24   Q.  And so you look up and at that point is when you sort of

25   see these agents on over here?

1  A.  Yes.

2  Q.  And just to be clear, I think this was your testimony,

3  they are not like, pointing a gun at you; correct?

4  A.  No, I don't believe they were pointing it at me.

5  Q.  And Agent Coffin, who you believe came up to you, he

6  doesn't have a gun out pointing a gun at you when he

7  approached you; correct?

8  A.  He just had his visible sidearm.

9  Q.  And so you filed --

10            THE COURT:  Mr. Sistla, when you say "here,"

11  "there," I --

12            MR. SISTLA:  Very good, Your Honor.  Let me make

13  the record clearer on that.  I apologize.  Too many jury

14  trials recent

15  BY MR. SISTLA:

16  Q.  When I said "here," I mean to the left side of the

17  Mustang, the driver's side of the Mustang; correct?

18  A.  Yes.

19  Q.  And when Agent Coffin approached you, I understand you

20  didn't see him approach you on the driver's side of the

21  Mustang, he did not have a firearm pulled out; correct?

22  A.  He did not.

23  Q.  And the time period for the record we are talking about

24  is the first approach when you first were encountered by the

25  FBI; correct?

1    A.  Yes.

2    Q.  And when Agent Coffin approaches you, based on your

3    testimony, it is clear to you he is FBI?  He's got an FBI

4    vest on or something?

5    A.  He had the body armor on, but it took me a few seconds

6    to realize what was going on.  So, yeah.

7    Q.  Within a few --

8    A.  Within a few seconds, I did realize.  I do believe he

9    told me that he was with the FBI.

10   BY MR. SISTLA:

11   Q.  All right.  So from the start, you understood that the

12   FBI was there; correct?

13   A.  True.  Yeah.

14   Q.  All right.  Did any of those individuals, when they

15   first approached your house, they identified themselves as

16   being with Ada County?

17   A.  They did not.

18   Q.  But --

19   A.  But I didn't know who the other people were.

20   Q.  The question is:  Did anyone identify themselves as

21   being with Ada County?

22   A.  I don't know why they would.

23   Q.  Okay.  So is that no, they did not?

24   A.  No.

25   Q.  All right.  So you prepared a declaration in this case;

1    correct?

2    A.   I did.

3    Q.   All right.  And just to be clear, your recollection

4    today is that your first encounter with the FBI was when

5    Agent Coffin comes and touches your -- touches you at your

6    car?

7    A.   That is my best recollection.

8    Q.   The sworn declaration that was filed in this case, did

9    you prepare it yourself?

10   A.   I did, yeah.

11   Q.   And you reviewed it before it was filed?

12   A.   Yes.

13   Q.   And everything in that sworn declaration, to the best of

14   your knowledge, was true and accurate?

15   A.   Yes.  I mean, there is probably potentially things I --

16   I just don't completely remember.  But yes.

17   Q.   Your declaration was filed on December 12 of 2021.  This

18   hearing is September 1, and September 2 of 2022.  Have you

19   had an opportunity to review the declaration prior to your

20   testimony today?

21   A.   Oh, yeah.  Absolutely.

22   Q.   So are you -- is your testimony that some of the

23   information contained in your declaration may no longer be

24   accurate?

25   A.   I think it was accurate, to the best of my memory.

1    Q.  So is it still accurate today?

2    A.  Yes.  Yes.

3    Q.  When was the last time you reviewed your declaration?

4    A.  Last night.

5    Q.  So you're then pretty familiar with it?

6    A.  I think so.

7    Q.  In paragraph 3 of your declaration, and --

8    A.  I don't have a copy of it.

9            MR. HALL:  Can I show him a copy?

10            MR. SISTLA:  May I approach?

11            THE COURT:  You may.

12            MR. SISTLA:  Our printer is not working

13    downstairs.  Does the Court have a copy?

14            THE COURT:  Is it Document 28-1?

15            MR. SISTLA:  My version is undocumented, but it

16    has 23 pages, Your Honor.

17            THE COURT:  Paragraph 44 is the last paragraph

18    number.

19            MR. SISTLA:  Yes, Your Honor.  With a couple of

20    photos above it.

21            THE COURT:  Yes.

22    BY MR. SISTLA:

23    Q.  So in paragraph 3, you stated that you saw multiple cars

24    swing around at high speed and block my driveway.

25    A.  That's correct.

1   Q.  You didn't testify to that, though.

2   A.  No.  I saw the agents coming up after they jumped out of

3   the car with the guns drawn.

4   Q.  So now, there -- you didn't -- so when Agent Coffin came

5   up, you didn't actually first see the agents on the

6   sidewalk.  You saw cars pull up, and then they jumped out of

7   the car?

8   A.  Yeah.  I mean, all of this stuff happened within a few

9   seconds.

10  Q.  Well, your testimony on direct examination was

11  Agent Coffin came up and touched you on your shoulder, you

12  looked up and you saw agents on the street.  Your testimony

13  is now that actually, there were -- the cars pulled up at

14  that time and they popped out of their cars?

15  A.  Yeah.  I mean, there's both.  You know.  There was

16  agents coming from different areas too.

17  Q.  So all of this was happening?

18  A.  Yeah.  I mean, this -- a lot of stuff happening all at

19  once.

20  Q.  Okay.  So your testimony on direct was partially

21  accurate?  Or incomplete?

22  A.  I suppose -- I guess, incomplete in that I didn't

23  mention that the cars swung around.  But, yeah.

24  Q.  All right.

25  A.  But there was also other agents.

1    Q.  There is no question pending.  All right.  So you were

2    with Agents Coffin and Pinette all day.  Is that correct?

3    A.  I was.

4    Q.  All right.  And they were the only ones from the FBI who

5    interviewed you?

6    A.  Harshbarger asked me questions as well.  And --

7    Q.  In the backyard?

8    A.  No.  In -- no.  In, just in the house.

9    Q.  In -- you mean, when you say Harshbarger asked you

10    questions, you are referring to when he asked you about the

11    password for the protonmail?

12    A.  Yes.  When he repeatedly asked me.

13    Q.  But aside from that one instance when you were in the

14    backyard, was it just Agents Coffin and Pinette who

15    interviewed you?

16    A.  And then the guy that yelled at me, asking me where the

17    gun was.

18    Q.  So -- but when they were interviewing you, was it --

19    when they were doing the interview, were there other people

20    present sitting with them, or was it just Agents Coffin and

21    Pinette?

22    A.  That is more clear.  Yes, just them.

23    Q.  Just them.  So -- and the interview was in the backyard;

24    correct?

25    A.  It was.

1  Q.  Okay.  And there were other agents there clearly;
2  correct?
3  A.  Tremendous number.  Yeah.
4  Q.  Like between ten -- I believe the other agents testified
5  a total of 14 people; correct?
6  A.  There was 16 agents.
7  Q.  You believe there were 16 agents?
8  A.  I think that is what the 302 said.
9  Q.  But those agents were not in the backyard with Agents
10  Pinette and Coffin during the testimony -- during the
11  interview aside from the couple instances where agents would
12  came out; correct?
13  A.  Yeah.  They might have been milling about as far as I
14  know, but I didn't see them.
15  Q.  There weren't agents, for example, in the backyard with
16  firearms drawn while Pinette and Coffin were conducting
17  their interview; correct?
18  A.  No.
19  Q.  And Agents Pinette and Coffin, they did not have their
20  firearms drawn when they were interviewing you; correct?
21  A.  No.  They were displayed, but they weren't --
22  Q.  By "display," you mean they were on their shield?
23  A.  They were on their side.
24  Q.  In fact, they were taking notes during the interview.
25  Isn't that correct?

1    A.   Yes.

2    Q.   They had taken out notepads or something to write on?

3    A.   Exactly.

4    Q.   And both Agents Pinette and Coffin were taking notes

5    during the interview; correct?

6    A.   I believe so.  Yeah.

7    Q.   In fact, you received copies of their handwritten notes

8    in discovery that they took during the interview; correct?

9    A.   Yeah.

10   Q.   All right.  Now, you -- you testified -- there has been

11   a lot of testimony from several individuals about what you

12   were sitting in.  You were sitting in plastic chairs.  Is

13   that correct?

14   A.   I sat in plastic chairs for -- until that one broke.

15   Then I sat in a wooden chair.

16   Q.   But you are absolutely certain that when the interview

17   began, sometime around 8 o'clock, there were -- the three of

18   you sat in plastic chairs.  Is that correct?

19   A.   All three of us were in those lawn chairs.  Yeah.

20   Q.   That is your memory, 100 percent sure?

21   A.   Yes.

22   Q.   Now, you have filed many pleadings in other courts

23   related to this investigation; correct?

24   A.   I have.

25   Q.   You have filed a civil complaint in the District of

1   Idaho?

2   A.   I have.

3   Q.   You have filed a Rule 21(g) motion in the --

4           MR. HALL:   Objection; relevance.

5           MR. SISTLA:   Your Honor, the -- these filings in

6   those courts were pro se and therefore they are admissions

7   or party opponent statements of the defendant.   I believe

8   that the -- I don't -- the Government intends to elicit

9   contradictions between earlier filings and statements made

10  in this proceeding.

11          MR. HALL:   If they are a prior inconsistent

12  statement that meets that criteria, then I would agree they

13  can certainly do that, but that is not the question that I

14  object to.   Whether it is a litany of have you filed this or

15  have you filed that or have you filed this, if there is some

16  prior inconsistent statement, then they can certainly

17  impeach him with that.

18          THE COURT:   I assume you are laying a

19  foundation --

20          MR. SISTLA:   I was laying a foundation that he has

21  done these --

22          THE COURT:   -- that he's filed these single-digit

23  documents.

24          MR. SISTLA:   And, Your Honor, just to be clear,

25  the government, because they are prior -- prior -- they're

1    party admissions.  They aren't -- first of all, Rule 211

2    doesn't apply during a suppression hearing as an initial

3    matter, but they are -- they could be admissible or the

4    government could be using them for other reasons.  The

5    specific one I believe will elicit a contradiction or at

6    least go to the defendant's credibility.

7              THE COURT:  All right.  You may proceed.

8    BY MR. SISTLA:

9    Q.  So sir, I think I had said the District of Idaho, you

10   agreed that you filed a civil complaint there?

11   A.  I have, yes.

12   Q.  And you've made many supplemental filings in the

13   District of Idaho; correct?

14   A.  I have.

15   Q.  And you are representing yourself in that proceeding;

16   correct?

17   A.  I am.

18   Q.  You are the one who is drafting and making those

19   filings; correct?

20   A.  Yes.

21   Q.  All right.  And now, I mentioned a filing in the

22   Northern District of California.  Have you -- did you make a

23   filing in the Northern District of California?

24   A.  I did.

25   Q.  Was that a Rule 21(g) motion?

1   A.   As far as I know, there is no such thing as a Rule 21(g)

2   motion.

3   Q.   Was it -- was it -- what were you trying to recover,

4   property or a file, something in the Northern District of

5   California?

6   A.   Yeah.   Under Rule 41 of the Federal Criminal Code.

7   Q.   Okay.   And then based on adverse rulings in those

8   courts, you have taken appeals to the 9th Circuit or

9   attempted to take appeals to the Ninth Circuit.   Is that

10  correct?

11  A.   I have.

12  Q.   Do you recall when you filed your complaint in the

13  District of Idaho?

14  A.   It was January 31, 2021.

15  Q.   So I am going to -- (pause.)

16           THE COURT:   Have you marked it with a number?

17  Just so the record is clear.

18           MR. SISTLA:   That will be Government's Exhibit 9

19  for identification purposes, Your Honor.

20           THE COURT:   Thank you.

21  BY MR. SISTLA:

22  Q.   Just to be quick, do you recognize the document, sir?

23  A.   I do.

24  Q.   I understand it's long. Does it look like a fair and

25  accurate complaint that you filed in the District of Idaho?

1    A.  I think so.

2    Q.  Do you want a second to confirm that we gave you the

3    right thing?

4    A.  I think it is accurate.

5    Q.  If you can turn to the 21st page.  You see those page

6    numbers at that very top?

7    A.  Or at the bottom?  Oh, the top.  The ECF?

8    Q.  ECF.  I think that actually corresponds in this case.

9    A.  Yes.  I see page 21.

10   Q.  And if you direct -- if you look at lines 10 and 11, I

11   am going to look at them while I read it out loud.

12           MR. HALL:  What are you doing, introducing it?

13   Tell me what you are doing.

14           MR. SISTLA:  May I proceed?

15           THE COURT:  You may.

16   BY MR. SISTLA:

17   Q.  Do you see where I am, sir?

18   A.  I do.

19   Q.  The line that starts "Agent Pinette"?

20   A.  Yes.

21   Q.  So you allege "Agent Pinette placed two wooden kitchen

22   chairs in the shade from a fence.  He placed one" -- "he

23   placed one plastic lawn chair opposite the other two chairs

24   but placed it in direct morning sunlight."  He then ordered

25   you to give up phones and so forth.  You see that?

1    A.   Yes.

2    Q.   So your -- in January of 2001 you allege the way the

3    chairs were set up is two wooden chairs were taken from the

4    kitchen; correct?

5    A.   Okay.

6    Q.   And one plastic chair?

7    A.   Yes.

8    Q.   But now, you are saying that, in fact, it was -- that is

9    not what happened.

10   A.   So I told you that we had some memory problems from that

11   day.  So as evidenced from when the government came in, I've

12   been able to jog my memory with those items.  I did my

13   absolute best from memory.  The government had provided

14   almost no evidence to me at that point.

15   Q.   Okay.  But just to be clear, you filed this complaint,

16   you know.  You are supposed to verify all of the allegations

17   are true and accurate in this complaint; correct?  You never

18   amended this complaint to correct that allegation, for

19   example?

20            MR. HALL:  Objection.  I think we've got three

21   questions in one.  So I understood where he's is going, but

22   I would ask one question at a time.

23            THE COURT:  Sustained.

24   BY MR. SISTLA:

25   Q.   You had verified the allegations in this complaint;

1   correct?  They were accurate?

2   A.  To the best of my -- my recollection at the time.

3   Q.  And you had not subsequently amended this until very

4   recently; correct?  Or attempted to amend it?

5   A.  That is actually not true.  It was amended because Judge

6   Winmill did an initial screening, and told me the charges

7   that I could proceed on.  And then gave me the chance to

8   amend for those charges.

9   Q.  So is it your testimony today that you don't know if --

10  how the chair arrangements was, whether it was three plastic

11  chairs or it could be this allegation, or is it -- which is

12  it?

13  A.  I believe it was three plastic chairs at this point, and

14  then at one point during the day, I had sat on a wooden

15  chair.

16  Q.  But is it going to be your testimony that there are

17  things that you've previously alleged that might be

18  inaccurate because of memory issues?

19  A.  I have done my absolute best and have changed things as

20  evidence comes in to make sure that they --

21  Q.  So your story has changed over --

22          THE COURT:  Mr. Sistla, you are interrupting.

23          MR. SISTLA:  I'm sorry.  I thought he was done.

24          THE COURT:  He is clearly talking.  Just pause

25  just a little bit before so that the court reporter's sake

1    to allow the witness to complete his answer, please.

2    A.   No.   I mean, I do have some memory problems from the

3    day.   I did my best to recall from memory, and as evidence

4    came to light from the government, that I considered

5    reliable, then I was able to jog my memory and make changes

6    as necessary.   And I have made change.

7              MR. SISTLA:   And I apologize, Your Honor.   I

8    didn't mean to cut him off.   I'll be very careful about it.

9              THE COURT:   Just slow down a little bit.   I know

10   we've been here for a day and half now, but take your time

11   to get it done.   You don't have to rush.   Okay?

12             MR. SISTLA:   I appreciate that, Your Honor.

13   BY MR. SISTLA:

14   Q.   Now, the three of you went into the backyard together;

15   right?

16   A.   Yes.

17   Q.   And you weren't in like handcuffs or anything; correct?

18   A.   I have never said I was.

19   Q.   That wasn't the question.

20   A.   Yeah.

21   Q.   You were able to walk on your own free will to the

22   backyard; correct?

23   A.   I did have Agent Pinette was holding my arm.   Yes.

24   Q.   You -- but you don't need a cane or a crutch or any type

25   of a wheelchair or anything like that; correct?

1   A.   No.

2   Q.   And let's just walk all the way through.  When agents

3   first approached you, you were not handcuffed or otherwise

4   physically restrained; correct?

5   A.   I was restrained, in that Agent Pinette put his hand on

6   myself.  I was -- it wasn't a vice grip, like I said, but it

7   was, you know, it was a showing of authority.

8   Q.   Were you handcuffed?

9   A.   No.

10  Q.   And at no point during the interview were you handcuffed

11  or held in a specific position by the agents; correct?

12  A.   No.

13  Q.   The chair you sat on, we have established it is a

14  plastic chair.  You weren't like handcuffed to the chair in

15  any fashion; correct?

16  A.   I was not.

17  Q.   And after the interview was done, the interview went on

18  for several hours.  The agents never handcuffed you or

19  physically restrained you.  Is that correct?

20  A.   Well, I would say when I was being patted down by

21  Agent Pinette, I was restrained at that point.

22  Q.   Okay.  But that was momentarily -- that was just

23  briefly; correct?

24  A.   He felt my testicles for quite a bit.

25  Q.   We will get to that.  When you were sitting in the

1   chair, your legs were not shackled; correct?

2   A.   No.

3   Q.   And your chair was not otherwise like bolted or fixed to

4   the ground in some fashion; right?

5   A.   No.

6   Q.   So during the interview, your arms were free to move?

7   A.   I would say yeah.

8   Q.   Is that -- were they?

9   A.   Yeah.

10  Q.   Your legs were free to move?

11  A.   Yes.

12  Q.   And the chair was free to move?

13  A.   Yes.

14  Q.   So the two agents are sitting there with their -- go

15  ahead.   And so the two agents are sitting there.   They have

16  notebooks in their hand and they are interviewing you;

17  correct?

18  A.   Yes.

19  Q.   And is it your testimony that if you had taken the chair

20  and like moved it slightly, you weren't allowed to do that?

21  A.   I don't know.   I don't believe that I was free to move.

22  Q.   Did you actually ever try moving the chair yourself?

23  A.   I tried to stand up to pick up my cat and was told I

24  couldn't.

25  Q.   So again, the question is, did you ever try to move the

1    chair from the sun to the shade or to a more, in your view,

2    more comfortable position?

3    A.   I did not feel that I had the -- no.

4    Q.   Is the answer no?

5              THE COURT:  You can answer yes or no and then

6    explain.

7              THE WITNESS:  No, I did not feel that I was free

8    to move.

9    BY MR. SISTLA:

10   Q.   But the question is:  Did you try to move the chair from

11   the sun to the shade?

12   A.   No.

13   Q.   And I may have asked this.  I apologize, Your Honor.  I

14   don't mean to be --

15             MR. HALL:  I won't have an objection.  Ask away.

16   BY MR. SISTLA:

17   Q.   When you were in the interview with Agents Coffin and

18   Pinette, there wasn't an agent standing over you with a gun

19   pointed; correct?

20   A.   No.

21   Q.   Now, there has been a lot of talk about access to

22   liquids this morning; correct?

23   A.   Yes.

24   Q.   All right.  So I think we can agree you had a cup of

25   coffee at the start of the interview.  Is that correct?

1    A.  I did.

2    Q.  Your recommendation is that everyone went outside and

3    then Agent Pinette went and got -- got the cup of coffee for

4    you; correct?

5    A.  Yes.

6    Q.  And he offered you milk and -- milk and sugar.  Is that

7    right?

8    A.  Yes.

9    Q.  And you were here yesterday when Agent Pinette

10   testified; correct?

11   A.  Yes.

12   Q.  And his recollection is he thought you got a coffee

13   before you went outside; correct?

14   A.  He did.

15   Q.  But either way, can everyone agree that you had

16   something to drink at the start of the interview?

17   A.  Yes.

18   Q.  And was it in the mug that you were getting out of the

19   car?

20   A.  It was.

21   Q.  Did -- however way it worked, did you get the cup of

22   coffee the way you wanted it?

23   A.  Yes.

24   Q.  And did the agents in any way keep you from drinking

25   that cup of coffee?

1    A.  No, I drank that coffee.

2    Q.  Okay.  It's also your contention as I understand that

3    you believe the agents purposefully kept you in the sun?

4    A.  Yes, I do.

5    Q.  And by "agents," let's make it clear.  You believe that

6    was Agent Pinette and Agent Coffin; right?

7    A.  Yes.

8    Q.  There were other FBI agents or at least an agent, who

9    allowed you to sit in the shade.  Is that correct?

10   A.  That is correct.

11   Q.  And Ada County, when they came, whenever they came, is

12   it your contention that they forced you to remain in the

13   sun?

14   A.  No.  I am ambiguous as to whether or not I was in the

15   shade, but I do think that I was in the shade at that point.

16   Q.  So I just want to be real clear then.  The only two

17   individuals who you believe were forcing you to remain in

18   the sun were Agents Pinette and Agent Coffin?

19   A.  Yes.

20   Q.  All right.  And they never said, though, to you, sir,

21   you need to remain in the sun the entire time?

22   A.  No.  But --

23   Q.  Is that right?

24   A.  I wasn't allowed to move chair positions.  So...

25   Q.  Well, you never tried.  Isn't that correct?

1    MR. HALL:  Objection again.  I mean, I understand

2    the desire to have a strict "yes" and "no," but I think he

3    is always allowed to explain his answers.  The last one, I

4    believe, was a responsive answer.

5    THE COURT:  He is allowed to answer "yes" or "no"

6    as we explained and give him the time to explain.  Don't cut

7    him off.  Okay?  Make sure he is finished.  If we have to go

8    to a point where he says I am finished, we will do that.

9    But we haven't gotten to that point.  Ask your question.

10   Ask your question again.

11   BY MR. SISTLA:

12   Q.  So when -- when you refer to the agents not allowing you

13   to be in the sun, you are referring to only Pinette and

14   Coffin.  Is that correct?  I mean to be in the sun, rather.

15   A.  Yes.  I believe they did place me in the sun.

16   Q.  And is it your belief that they intentionally did so?

17   A.  I tend to think so.  Yes.

18   Q.  They did not say that, though; correct?

19   A.  No.

20   Q.  They also did not prohibit you from moving your chair.

21   That is your belief; correct?

22   A.  I wasn't allowed -- so yes, but I don't believe I was

23   allowed to pick up my cat.  So I don't think I could pick up

24   my chair either.

25   Q.  Again, Your Honor, I don't mean to be repetitive, but

1   just to be clear, you never actually tried to move the chair

2   into the shade; correct?

3   A.  That is correct.

4   Q.  And during the interview, neither agents Pinette nor

5   Coffin hit you in any fashion; correct?

6   A.  No.

7   Q.  They did not verbally threaten you; correct?

8   A.  Well, if I didn't cooperate, then I suppose that is sort

9   of a threat.

10  Q.  So that they didn't threaten you; correct?

11  A.  Physically threaten me?  No.

12  Q.  Now, you mention you have a number of medications that

13  you are on; correct?

14  A.  Yes.

15  Q.  And one of those medications may make you more

16  susceptible to sunburn.  Is that correct?

17  A.  I believe Hydrochlorothiazide does.  Yes.

18  Q.  Have you ever consulted with your physician about that?

19  A.  No.

20  Q.  How long have you been on that medication?

21  A.  Since 2013, I believe.

22  Q.  And have you ever had an -- experienced some

23  relationship between taking that medication and experiencing

24  more severe sunburn?

25  A.  I don't frequently sit outside in the sun for

1    six-and-a-half hours.

2    Q.  So is that "no"?

3    A.  No.

4    Q.  Did you request a hat?

5    A.  I did not.

6    Q.  Did you request sunglasses?

7    A.  I did not.

8    Q.  You mention you were in a polo shirt, I believe.

9    A.  I was.

10   Q.  Did you request like a long-sleeve shirt or jacket to

11   put on to cover your arms?

12   A.  No.

13   Q.  Did you request sunscreen?

14   A.  I did not.

15   Q.  Did you indicate to the agents that you suffer -- that

16   you were taking any medication that might make you more

17   susceptible to sunburn?

18   A.  They asked me all the medications that I took.

19   Q.  Did you -- I'm sorry.  Go ahead.

20   A.  They asked me all the medications that I took, and I

21   gave them a listing of everything that I took.

22   Q.  Did you know at that time that you took medications that

23   might make you susceptible to sunburn?

24   A.  No.  I had never had the occasion of being sunburned

25   because of taking the medication.

1   Q.  Okay.  So you had no reason to tell them that?

2   A.  I wouldn't have known.

3   Q.  Did you -- you mentioned that your recollection was when

4   the agents first got there and they are walking through the

5   house, there was some -- I think you used the term

6   disagreement between Agents Pinette and Coffin about the

7   location of the interview.  Do you recall that?

8   A.  Yes.

9   Q.  And I take it on direct examination you didn't want to

10  over state that it was like a big disagreement.  Is that

11  fair?

12  A.  Yes.  I mean, it was enough that it wasn't a normal

13  like, conversation.  But I wouldn't say that Coffin was

14  yelling at Pinette.  No, we are going to do this.

15  Q.  All right.  And that -- that interaction was very brief?

16  A.  Yes.

17  Q.  And after that, you went outside, all three of you went

18  outside eventually to where the interview was conducted;

19  correct?

20  A.  Yes.

21  Q.  So when you are outside, you mentioned now a couple of

22  times that you don't like to be in the sun.  You tend to not

23  be outside for long periods of time.  Is that fair?

24  A.  Yeah.  Absolutely.

25  Q.  Did you ask the agents to conduct the interview in the

```
1    garage?
2    A.  I did not.
3    Q.  Did you ask the agents to conduct the interview
4    somewhere in the house?
5    A.  I did not.
6    Q.  Did you ask the agents to conduct the interview in an
7    air-conditioned vehicle?
8    A.  I did not.
9    Q.  The agents both testified, Agent Coffin and Pinette,
10   that the tone and demeanor, and interaction between you and
11   them was pretty calm and not aggressive, very even-keel.  Is
12   that your recollection?
13   A.  For the majority of it, yes.  There were times when they
14   told me I was being evasive or lying to them.
15   Q.  But generally, would you say that you and the agents had
16   a good rapport during the interview?
17   A.  Reasonably so.  I didn't -- yeah, I would say that the
18   conversation was okay.
19   Q.  It was okay?
20   A.  Yeah.
21   Q.  Now, despite being outdoors, and you don't like being
22   outdoors, you understood what they were asking you about;
23   correct?
24   A.  Yes.
25   Q.  You -- the interview initially began with biographical
```

1    information?

2    A.   Yeah.  Quite a long period of time for a biographical

3    information.

4    Q.   And at any point when you -- were there points when you

5    did not understand the agent's question?

6    A.   Well, I didn't understand that one agent running out and

7    screaming at me.

8    Q.   I'm sorry.  It was a poor question.  Agents Pinette and

9    Coffin, when they were interviewing you, were there any

10   instances where you didn't understand the question they were

11   asking?

12   A.   No.  There was a period of time when like, with

13   Ada County, I referred to the other agents to say, well, you

14   know, one or the other that was asking the question, well,

15   you probably already know the answer to that.  So because I

16   couldn't either remember or didn't, you know, didn't know

17   the answer to.

18   Q.   So I just want to make sure I understood your answer.  I

19   apologize.  So there were instances where either

20   Agent Pinette or Coffin asked a question, and so my question

21   is, if they asked a question and you didn't understand it,

22   were you able to ask them to clarify or explain what they

23   were trying to get at?

24   A.   I probably could have.  I did sometimes on occasion

25   refer them to each other to answer the question.  Or didn't

1  understand why they were asking or what they were asking.

2  Q.  But as a general matter, whether you knew the answer or

3  didn't know the answer, or wasn't quite sure what they were

4  getting at, you were able to intelligently respond to the

5  question?

6  A.  I would say for the most part.  Yeah.

7  Q.  And that was for the entire time that Agents -- the

8  Agents Pinette and Coffin were questioning you?

9  A.  Well, I mean, I was getting pretty uncomfortable by the

10  time they asked me to come up with my vendor name.  So I

11  would still say yes, I was able to intelligently answer the

12  question, but I was very uncomfortable.  So that definitely

13  made it more difficult for me to make decisions about

14  things.

15  Q.  Okay.  So when you say "vendor name," are you referring

16  to Lifelock?

17  A.  Yes.

18  Q.  But when they asked you about that, you understood what

19  the question was about; correct?

20  A.  Yes.

21  Q.  And when they asked you about the darknet market or

22  whatever the topic was, you understood the question;

23  correct?

24  A.  Yeah.  For most of the day.

25  Q.  And when they asked you the biographical information,

1  you understood the question; correct?

2  A.  Yes.

3  Q.  So the focus of the FBI's questions, let's break it

4  down.  You are outside.  You said for a while, it was

5  biographical?

6  A.  It was.

7  Q.  And biographical, is sort of what kind of job you had?

8  A.  Yeah.  I would say nonbooking questions.  So yeah, what

9  kind of job do you have, where have you lived, the number of

10  years of education, things like that.

11  Q.  And then at some point, the conversation shifted to

12  their hacking investigation?

13  A.  No.  Sort of, but not really.  They were -- they asked

14  about my brother.  They asked about the darknet markets, you

15  know, purchasing.  So that wasn't necessarily a giveaway

16  that they were talking about hacking at that point.

17  Q.  All right.  So let me ask it better because I obviously

18  wasn't there for the interview.  So biographical, then

19  brother, then stuff about darkweb markets, and then

20  eventually they get to your activities?  It is sort of a

21  progression?

22  A.  It was.  Yeah.

23  Q.  And those questions, though, they had nothing to do with

24  your employment at Ada County aside from being the

25  biographical part?

1    A.   Eventually they did ask about Ada County.

2    Q.   So sir, I am trying to focus my questions pretty

3    precise.   So in this first series of questions where it is

4    biographical, and then your brother, and then dark web

5    activities and your hacking activities, none of that is

6    about Ada County aside from where you worked, that was where

7    you were presently working; correct?

8    A.   Yeah.   Up until that point.

9    Q.   And they didn't ask in that series of questions, let's

10   go all the way up to the point where you disclose that you

11   are Lifelock.   They -- I am referring to Agents Coffin and

12   Pinette, they are not asking about any potential wrongdoing

13   or problems at Ada County; correct?

14   A.   That is correct.

15   Q.   And then they get the password and they go and try --

16   they try the password and there is all of that back and

17   forth; correct?

18   A.   Yeah.

19   Q.   And all of that discussion is still focused on their --

20   what is called hacking investigation; correct?

21   A.   Yes.

22   Q.   Nothing about Ada County; correct?

23   A.   They did ask about Ada County.   Because they said they

24   found something on the computer and they asked about that.

25   Q.   So the question about Ada County was something that they

1    discovered; correct?

2    A.  Yeah.  On the computer that was unlocked in the office.

3    Q.  Now, at this point -- I'm sorry.  During the interview,

4    do you recall, were the agents drinking water?

5    A.  Yes.  Agent Coffin and Pinette, I believe had water at

6    different points.  And I remember when Pinette was drinking

7    water, he was sweating.  And so -- and that is when he, I

8    believe, it was him that said, you know, you should switch

9    to water.  But there was no option to actually get water.

10   Q.  So Agent Pinette recommended that you should switch to

11   water?

12   A.  He did.

13   Q.  But did you say that is a good idea, I should get some

14   water?

15   A.  No.  Because at that point, I felt that I didn't have

16   any grace with them and I couldn't actually ask for

17   anything.

18   Q.  So the point at where Agent Pinette suggested that you

19   should have some water, was that before the Lifelock

20   discussion?

21   A.  No.  This was after.

22   Q.  This is after the Lifelock discussion?

23   A.  Yeah.  Absolutely.

24   Q.  And when you say "absolutely," how do you know it is

25   absolutely, considering you've admitted that you have

1    perhaps memory issues about the day?

2    A.  I am -- okay.  Well.  I am pretty confident that it was

3    after.

4    Q.  So not absolutely.

5    A.  Okay.  Not absolutely.  Sure.

6    Q.  Okay.  So I just want to understand this.  The agent

7    says you should have water and you didn't take him up on the

8    offer?

9    A.  I didn't think I could ask him for water.  Because he

10   had already placed me in the sun again right after, you

11   know, we had already -- we moved because of that reason.

12   Q.  Did the agent ever -- did Agent Pinette ever taunt you

13   with water or taunt you about water?

14   A.  That was my impression, that that was taunting.

15   Q.  I'm sorry.  What exactly did the agent do to taunt you?

16   A.  He was drinking water in front of me, and I was

17   miserable and sweating.

18   Q.  But just to be clear, you never asked for water?

19   A.  I did not.  I did not believe I could.

20   Q.  Did the agents tell you not to ask for water?

21   A.  No.

22   Q.  And the agents allowed you to have a cup of coffee?

23   A.  They did.

24   Q.  Out of your own mug?

25   A.  Yes.

1    Q.   And when you went back in the house, you were able to
2    get another cup of coffee?
3    A.   They told me to get coffee.
4    Q.   Okay.  But they weren't denying you liquid; right?
5    A.   I believe they were.
6    Q.   But as a matter of fact, you were not denied liquid;
7    right?
8    A.   I was denied -- well, okay.  Maybe not.  Maybe it was
9    just my impression that I could not ask for water.
10   Q.   And coffee is basically water; right?
11   A.   It is a diuretic.  But, yeah.
12   Q.   Basically water?  I mean, I didn't mean to speak over
13   you.
14   A.   And that second cup of coffee, I couldn't drink because
15   it caused acid reflux like immediately.
16   Q.   Did you tell the agents that?
17   A.   No.  I didn't feel I had any grace, that they were going
18   to offer me anything.  Tucker Heap was the only agent that I
19   was kind, that was kind of kind to me.
20   Q.   Just to be clear, it is your testimony that the agent
21   who spoke to you in a calm manner, who in your backyard, who
22   didn't threaten you with a firearm, who didn't physically
23   restrain you in any fashion, who let you have your morning
24   cup of coffee, were going to deny you water?  Is that your
25   testimony?

1           MR. HALL:  Objection.

2           THE COURT:  What is your objection?

3           MR. HALL:  At least a portion of that misstates

4    the prior testimony.

5           THE COURT:  Which portion?

6           MR. HALL:  The calm business.  I don't believe he

7    has ever used the word "calm."  That is a word that was

8    introduced by the government.

9           THE COURT:  We confirmed that a few minutes ago on

10   cross.  He confirmed it was calm for the most part.  Are you

11   at a breaking point?

12          MR. SISTLA:  This is as good a breaking point as

13   any.

14          THE COURT:  It is a after 1 o'clock.  Another hour

15   and a half, so we will take a recess.  One moment.  We will

16   recess until 2 o'clock.

17             (Break from 1:04 p.m. until 2:00 p.m.)

18          THE COURT:  Mr. Sistla, you may resume your

19   cross-examination.

20   BY MR. SISTLA:

21   Q.  Good afternoon.  You mentioned, where we left off was

22   about the water.  Do you recall that?  And the questions

23   were just to orientate ourselves.  I had asked you about

24   Agent Pinette allegedly taunting you.  And what did you mean

25   by that?  And I don't want to put words in your mouth, but

1   my understanding is him simply drinking the water

2   constituted taunting in your view.  Is that -- do I

3   understand you correctly before lunch?

4   A.  And telling me that you should switch to water.

5   Q.  The two things, that was the taunting?

6   A.  When there was no real option in my opinion.

7   Q.  I just want to make sure that we got that complete, that

8   that is what you thought it was, taunting?

9   A.  Yes, sir.

10  Q.  He didn't throw water at you or wave the bottle in your

11  face or anything like that?  And I am glad the cap is on.

12  He didn't do anything like that; right?

13  A.  No.

14  Q.  And, you know, the agents didn't like, high-five each

15  other and like say like, we have water and he doesn't.

16  Anything ridiculous like that; right?

17  A.  No.

18  Q.  I just wanted to understand what you meant by the word

19  "taunting."  Do you recall alleging that the agent from

20  Boise, I believe it was Agent Heap, is that who let you sit

21  in the shade?  Was that your testimony?

22  A.  Yes.

23  Q.  That him letting you sit in the shade saved you from

24  organ failure?  Do you recall that allegation?

25  A.  Yes.  I think that is correct.

1   Q.  So you believe that as a result of the interview with

2   Agents Pinette and Coffin, you were on the verge of organ

3   failure?

4   A.  I believe I was close to heat stroke, if not in heat

5   stroke.  Yes.

6   Q.  And your attorney, though, established on direct

7   examination, you did not immediately go to urgent care or

8   the emergency room.  Is that correct?

9   A.  Yes.  That is correct.

10  Q.  Not on the 19th, the day the search warrant was

11  executed.

12  A.  The 21st.

13  Q.  Sorry.  Not on the 21st, the day the search warrant was

14  executed; correct?

15  A.  No, I did not.

16  Q.  Not the next day?  Not ever; correct?

17  A.  No.

18  Q.  And you have subsequently been to see a physician;

19  correct?

20  A.  Several times.  Yes.

21  Q.  Have you been diagnosed with organ failure, or are you

22  in any sort of acute medical condition?

23  A.  No.

24  Q.  Can you tell the judge why you believe you were on the

25  verge of organ failure?

1    A.   I believe that I was close to heat stroke, if not in

2    heat stroke, at the time that they left.  And I don't know

3    completely, you know, what -- because I wasn't seen by a

4    doctor right away, I don't think we can diagnose necessarily

5    heat stroke, but I think there was very severe possibilities

6    of that from sitting in the sun for a substantial period of

7    time without water.

8    Q.   Is it fair to say that prior -- your prior experiences,

9    you don't like to be outside?  Is that correct?

10   A.   I would say yes, not for an extended period of time.

11   Q.   I don't want to judge or -- you like to do athletic

12   stuff?

13   A.   I am not very athletic.

14   Q.   So you don't go running or hiking or really exert

15   yourself when outside?

16   A.   I did maybe about ten years ago.  I used to go for some

17   training on half marathon, and I did participate in one.

18   Not very athletic.  It took me nearly the entire four hours

19   that was allowed to do a half marathon.  So I -- but that's

20   been a decade ago or something.

21   Q.   And that was outdoors?

22   A.   That was.

23   Q.   And you didn't suffer from heat stroke from that event;

24   correct?

25   A.   No, but I always had water, and I did weight training in

1   the afternoon.  I didn't run.  I just walked.

2   Q.  Now, the day of the interview, you were seated.  And

3   when I say "interview," with the agents in the backyard, you

4   were seated the entire time except for when you went up to

5   go to the house?

6   A.  Other than when I stood up to give the agent or the

7   Ada County their hard drives and when we walked between the

8   different locations of the yard.

9   Q.  So you didn't -- is it fair to say you didn't physically

10  exert yourself during the interview?

11  A.  There's a fair amount of mental exertion going on.

12  Yeah.

13  Q.  But you weren't doing --

14  A.  I wasn't doing athletics or anything like that.

15  Q.  You had to concentrate trait during your interview?

16  A.  Yes.

17  Q.  Is that the mental exertion you were referring to?

18  A.  I would say.

19  Q.  And you needed to concentrate during the interview to

20  make sure you understood the agents' questions; correct?

21  A.  Yes.

22  Q.  And you were also trying to answer the agents' questions

23  truthfully; right?

24  A.  Yeah.  I wouldn't want to lie to an FBI agent.

25  Q.  And you were trying to be cooperative with them?

1    A.   I wouldn't say I was trying to be cooperative.

2    Especially when I was asking for a lawyer.  That's not, you

3    know, when you ask for a lawyer, you are trying to get

4    consultation to determine if you should move forward in that

5    path.  And of course, I wasn't afforded that.  So I would

6    say no, I wasn't necessarily fully cooperative with them.

7    Q.   All right.

8    A.   Once they breached that period, then I would say yes, I

9    was cooperative.

10   Q.   And I understand, in your version of events, the lawyer

11   discussion came up right around the time -- the Lifelock

12   discussion came up; correct?

13   A.   Yes.

14   Q.   But let's break those two periods.  Prior to that, to

15   them getting to Lifelock, you were cooperative with the

16   agents; correct?

17   A.   Yeah.  Answering non-eliciting questions.  Yes.

18   Q.   Okay.  And then I understand your views on the attorney

19   thing, but then afterwards you are saying that you also

20   remained cooperative and truthful with the agents?

21   A.   Yeah.  I mean, if I made equivocations of any kind, I --

22   they weren't, I don't believe, intentional.

23   Q.   You were doing your best?

24   A.   I was doing my best.  Yeah.  They were asking me a host

25   of questions that I couldn't possibly know the answer to.

1    And so I was doing my best.

2    Q.   Okay.  Those questions were like the dark overlord, that

3    kind of stuff?

4    A.   Yeah.  And all kinds of things that they imagined me,

5    you know, fantasies that they had.

6    Q.   But to use your word, their fantasies or things that you

7    believed, you were -- you were, that entire time, starting

8    at 8 o'clock and going through, it sounds like, you believe

9    Ada County came about four hours after they started their

10   interview?

11   A.   Yeah.  Somewhere around there.

12   Q.   So that would put us around 11:30, noon-ish?

13   A.   Yeah, I would agree.

14   Q.   So that entire time, that four hours in the morning, you

15   were able to follow everything Agents Pinette and Coffin

16   were asking you.  I mean, everybody characterizing them as

17   fantasies when there were questions that you didn't think --

18   there were questions about which you did not know?

19   A.   Yes.

20   Q.   At any point did you tell Agents Pinette and Coffin, I

21   am confused?

22   A.   No.

23   Q.   At any point, did you tell them that you were having

24   trouble -- sorry, you were suffering from muscle cramps?

25   A.   Again, I didn't feel like I had any grace with them.

1    And so I would say no, I did not ask that.  But I didn't

2    feel like I had the ability to.  Or, in my opinion, I didn't

3    have that ability to ask that.

4    Q.  So I understand that you are probably going to probably

5    caveat a lot of your questions with you didn't feel like you

6    had the grace or not to.  You didn't tell them; correct?

7    The question was:  Did you tell the agents you were

8    suffering from muscle cramps?

9    A.  No, I did not.

10   Q.  Did the agents tell you that they were medical doctors

11   or had medical training or anything like that?

12   A.  No.

13   Q.  In fact, there was one time where something physical

14   happened to you during the interview; correct?

15   A.  Yeah.  It fell onto my knee.

16   Q.  And at that point, the one time that something visibly

17   happened to you, did Agent Pinette help you up?

18   A.  He wanted to continue the interrogation, so yes.

19   Q.  Did he help you up?

20   A.  He did.

21   Q.  He didn't look at you and wait for you to stand up on

22   your own accord, did he?

23   A.  Yeah.  He waited a few seconds.  He wanted to see if I

24   could stand up myself.

25   Q.  He didn't make fun of you?

1    A.   No.

2    Q.   He didn't laugh at you?

3    A.   No.

4    Q.   He didn't kick you?

5    A.   No.  Of course not.

6    Q.   Well, you have accused the agents of torturing in other

7    filings.  Isn't that true?

8    A.   I have.

9    Q.   Okay.  So you have this accident.  The chair breaks.

10   You didn't say oh, just sit on the ground.  I will continue

11   the interview there.  Did he?

12   A.   No.

13   Q.   He helped you?

14   A.   Yes.

15   Q.   And you accepted his help?

16   A.   I did.

17   Q.   Now, the agent from Boise, the kind agent, I think it is

18   Agent Heap.  Do I have that right?

19   A.   Yes, sir.

20   Q.   You described him as kind?

21   A.   I did.

22   Q.   Did you ask him for water?

23   A.   I did not.

24   Q.   Why?

25   A.   I don't know.  I was -- that was after the Ada County

1   situation.  I don't think I was completely there.  So...

2   Q.  But after the agents all left, you then realized you

3   needed water in your house?

4   A.  Yes.

5   Q.  But at that point before the agents left, when you were

6   finally in the shade, you decided not to ask the agent for

7   water?

8   A.  So when I went into the air conditioning, that is when

9   everything markedly changed.  That was the first time

10  that -- it took me a few minutes, but I started to feel

11  better again.

12  Q.  So you were coherent enough to follow the questioning of

13  FBI agents and then Ada County detectives, but you are

14  claiming you also didn't realize you needed water?

15  A.  I don't know.  I don't know why I didn't ask.  I just

16  didn't feel at the time when I was being questioned, I

17  didn't feel like I could.

18  Q.  That is not -- that is what you said about Agents

19  Pinette and Coffin.  I am talking about the kind agent, in

20  your own words, who let you sit in the shade?

21  A.  That is true, but he was also by himself.  So how would

22  he have gotten water?  Because I had to be watched.

23  Q.  So your testimony is that if you had asked, asked him,

24  this kind agent to go in the house to get water with him, he

25  would have declined?

```
1     A.  Oh, I don't know that.  I can't --
2              MR. HALL:  Objection, speculation.
3              THE COURT:  Sustained.
4     BY MR. SISTLA:
5     Q.  The bottom line is you didn't ask; correct?
6     A.  I did not.
7     Q.  So when you are testifying that this would have been
8     denied for me or I assume that they lack grace or this one,
9     that is you speculating as to what would have happened;
10    correct?
11    A.  Yes, it was speculation.
12    Q.  So one of the important issues or an issue that is at
13    least relatively important has been the timing of events.
14    Do you agree?
15    A.  I agree.
16    Q.  And I think both -- I think your attorney has
17    established with his examination and to the agents that you
18    provided, which I think you may have said or at least
19    someone has said in this hearing, the critical information
20    was about you being Lifelock and the passwords; is that
21    correct?
22    A.  That is correct.
23    Q.  And you would agree -- in your view, those are the two
24    sort of critical pieces of information that you provided the
25    FBI agents?
```

1    A.  Well, yeah.  The inculpatory.  As far as the inculpatory

2    statements.  Yes, that is correct.

3    Q.  And -- and the timing of when you gave those events is

4    exactly the same time when -- and you say that you initially

5    equivocal about a lawyer, and then asked for a lawyer.  Is

6    that right?

7    A.  Well, when they asked for my darknet vendor name, then

8    yes, I did ask for that lawyer.  And so, yes.

9    Q.  And that was around 11 o'clock in the morning?

10   A.  Give or take, somewhere in that range.  Or they could

11   have been, if they broke the interview up into two stages,

12   it could have been before that slightly.  I don't know.

13   Q.  So I understand you have your -- have talked about you

14   may have had memory issues about the day; correct?

15   A.  That is correct.

16   Q.  But you sat and you heard the agents's testimony and

17   your own recollection, would you agree that you provided

18   that information before noon, sometime around 11 o'clock,

19   and I might be hard to know exactly whether it was a little

20   bit before 11:00 or a little after 11:00, but sometime in

21   the mid morning?

22   A.  Yeah.  I believe it was pretty well along in the day

23   before -- well, at least before the interview ended for

24   sure.  The period of time between when I gave the

25   inculpatory statement and when the interview ended is up in

1    the air.

2    Q.  Okay.  But we are focusing on the Lifelock and the

3    passwords.  That was around 11 o'clock in the morning;

4    correct?

5    A.  Yeah.  If those time stamps and everything are correct.

6    Then, yes.

7    Q.  And, in fact, you made that allegation in prior filings.

8    Would you agree?

9    A.  Yes, sir.  Because of the --

10   Q.  Relying on the photographs; correct?

11   A.  I am heavily reliant on those.

12   Q.  And one of those photographs that was time-stamped

13   around 11:09.  Do you recall that?

14   A.  Yes.

15   Q.  And assuming that, you know, people can't instantly go

16   from getting information from you to go to the computer, is

17   it fair to say they must have gone the password and relevant

18   information slightly before the time stamp on the photo?

19   A.  I wouldn't say hours, but yeah, minutes.

20   Q.  Okay.  And you were there for, agree it is pretty

21   obvious, you provided it was before noon that you provided

22   this information?

23   A.  I think it's reasonable because when Ada County came

24   pretty much, the sun was overhead.  So...

25   Q.  Well, based on your own filings, you -- you figured it

1    out that you must have given it before 11:09 a.m.?

2    A.  Yes.  Exactly it.

3    Q.  And before 11:09 a.m. --

4              MR. HALL:  Sorry.  Objection.  That is one of

5    those pauses again.

6              THE COURT:  Please pause until the witness answers

7    the question.

8    BY MR. SISTLA:

9    Q.  Oh, I'm sorry.  I didn't mean to cut you off, sir.

10   A.  What was the question again, sir?

11             THE COURT:  I think he tends to pause a little bit

12   so just give him a few seconds.

13             THE WITNESS:  I apologize.

14             MR. SISTLA:  No, no, no.  That is on me.  That is

15   on me.  I apologize.

16             THE COURT:  Did you have anything else you wanted

17   to say about the last question?

18             THE WITNESS:  I don't.  What was the question

19   again?

20   BY MR. SISTLA:

21   Q.  It was just confirming it was 11:09.  We were just

22   confirming it was a little bit before that that you must

23   have given that information?

24   A.  I believe that is correct.

25   Q.  And you have noted in your filings, and correct me if

1   I'm wrong, that the temperature that day reached 97 degrees

2   or something like that.  Is that correct?

3   A.  That is correct.

4   Q.  And how -- how did you get -- how did you come by that

5   information?

6   A.  So there are several -- there is several weather

7   stations that are available in the area, and NOAA provides

8   daily summaries of all the weather conditions.  The National

9   Oceanographic, whatever it is, agency.  It is a government

10  agency.

11  Q.  So you went and looked up the -- looked up the weather

12  for that day, basically?

13  A.  Yeah, absolutely.  And it was UV 8 on that day.

14  Q.  And you agree though that it wasn't 97 degrees; correct?

15  A.  And I think that I even mentioned that in the filings,

16  that trying to follow, in my initial filing, I thought that

17  the thing happened until 3:45.  Since I've gotten

18  photographic evidence and Clark's 302, I have made the

19  determination that it was 2 o'clock.  That is more accurate.

20  Q.  Sorry.  What was 2 o'clock?

21  A.  Is when everything ended.

22  Q.  But whether it ended at 2 o'clock or 3 o'clock, the

23  information is sort of critical information was provided

24  even hours before that; correct?

25  A.  Yeah.  And so the weather station data that you can get

1    online, especially for historical information, tend to be

2    just the daily highs, daily lows.  But I was able to find a

3    source from like AccuWeather or something like that, or the

4    historical trend, and I was able to find the hourly rates

5    and I think I put that into the filing.  And, in fact, if I

6    could, and I still believed that -- until I got the photos,

7    which wasn't until several months or a month after the

8    indictment, that I couldn't have known how long that the

9    interrogation and everything, you know, went.  So I was

10   making guesses based on sun positioning.

11   Q.   Okay.  I am going to pull Government's 5.

12        MR. SISTLA:  Government's Exhibit 5 is referring

13   to -- third page of Government's 5.

14   BY MR. SISTLA:

15   Q.   Can you see that, sir?  It is a little small.

16   A.   Yes.

17   Q.   You agree these are the hourly observations at a weather

18   station near your residence.  This is Boise; correct?

19   A.   The Boise is the better of the two.

20   Q.   Does that have something to do with the elevation it is

21   at?

22   A.   I don't know why there is a difference, but I work in

23   Nampa, and it is always hotter in Meridian where I live than

24   Nampa, and that was the previous weather station.

25   Q.   And the -- just so we can go through, the interview

1    started sometime around 8 o'clock, and so that's this line

2    here.  And it was 75 degrees Farenheit; correct?

3    A.  Yes.

4    Q.  All right.  And you had mentioned on direct examination

5    that it was an unusually humid day.  Do you recall that

6    testimony?

7    A.  Yes.  I felt it was extra humid that day.

8    Q.  What was the relative humidity though, actually?

9    A.  It was reasonably low, it was 31 percent.

10   Q.  And the dew point was relatively low as well, isn't it?

11   A.  Dew point, 42.  I don't know what that actually means.

12   Q.  Okay.  But you -- you, I know you are not a weatherman

13   or a meteorologist, but you know from watching the forecast

14   on the nightly news or whatever, that a relative humidity in

15   the 30's or 40's or even 20's is really low; correct?

16   A.  It tends to be pretty dry in high desert where I live.

17   Q.  And this is consistent with it being pretty dry that

18   day; correct?

19   A.  It did feel a little more humid than normal.

20   Q.  And the interview, we agreed sometime around 11 o'clock

21   is when you provided this information, give or take, plus or

22   minus 15 minutes or whatever.  What was the temperature at

23   11 o'clock?

24   A.  At 11:00, it was 84 degrees.

25   Q.  During the morning, between when it started and 11

1    o'clock, the temperature was in basically the 70's or low

2    80's.  Is that correct?

3    A.   That is correct.

4    Q.   Nowhere near 97 degrees; correct?

5    A.   That is correct.

6    Q.   And, in fact, if you look at the official reports for

7    Boise, the temperature didn't actually reach 97 degrees that

8    day, at least at the Boise Airport?

9    A.   I -- the NOAA site said 97.

10   Q.   You don't disagree with what the document says; correct?

11   A.   No, no.  I don't.

12   Q.   Okay.  So just to be clear, allegations -- the various

13   allegations that you've made against the agents, that they

14   had, you know, to use your words, "torture" you.  Right?

15   A.   Yeah.

16   Q.   And kept you in excessive heat, is it your testimony

17   that mid high 70's, low 80's is excessive heat?

18   A.   I didn't make the determination that it was torture.

19   That was -- I provided information about the situation to an

20   actual torture expert, Mr. Manford Nowak.  He was a former

21   UN -- former -- he was a former UN Special Rapporteur on

22   torture, and he said that if I had pain, then in those

23   conditions it could objectively be determined to be torture.

24   Q.   Using your words as you used the word "torture" to

25   describe it; correct?

1    A.   Yeah.  But that was only after Manfred Nowak made that,

2    you know, told me that.

3    Q.   Okay.  And -- and just to be clear, it is your testimony

4    today that sitting in a chair, not handcuffed, not tied

5    down, having a cup of coffee, talking in a calm manner, with

6    two agents who aren't pointing a weapon at you or

7    threatening you in any fashion, and in low humidity, high

8    70's, low 80's weather, that is torture?

9    A.   Six-and-a-half hours in direct sunlight is, yes,

10   torture.

11   Q.   Let's just be clear.  This interview period that we're

12   looking at where you then provided the inculpatory statement

13   was not after six and a half hours, was it, sir?

14   A.   It was not.

15   Q.   Up to two and a half hours; correct?

16   A.   Three and a half hours.

17   Q.   Well, we know it's not three-and-a-half hours because we

18   know they took the picture of the computer at 11:09; right?

19   A.   Yeah.

20   Q.   Okay.  So it's -- it's up to, let's say, three hours and

21   nine minutes, I will even give you.  Okay?  So it is your

22   testimony that what happened to you was torture?

23   A.   I would say yes.  Because I was placed in the direct

24   sunlight for hours on end.  Yes.

25   Q.   You mentioned that you called the federal public

1    defender in Boise, Idaho?

2    A.  I did.

3    Q.  And you called them on what day?

4    A.  I don't -- I can't remember that night very well.  I

5    don't know if I called them that day or the next day.  But I

6    believe it was within a day.

7    Q.  Okay.  So do you recall -- we know from the timeline

8    that you contacted Agent Coffin on August 23, 2019 to

9    discuss the proffer; correct?

10   A.  That's inaccurate.

11   Q.  So when Agent Coffin testified that he had a

12   conversation with you on August 23rd, that is inaccurate?

13   A.  I did have a conversation with him because the public

14   defender said I needed to get a target letter so that I

15   could get representation because he couldn't represent me.

16   Q.  Okay.

17   A.  So the purpose of the call was to get the target letter

18   and I didn't have any idea who the AUSA was.  So the only

19   way was to contact them, the agents.

20   Q.  Okay.  So you contacted -- you did have a call, that

21   part is accurate; right?

22   A.  Yes.

23   Q.  When you called the public defender, did you tell them

24   that you had been tortured?

25   A.  I did not.  The guy basically said, "Holy crap, you need

1    to get a lawyer," and after explaining that I made

2    inculpatory statements, and it was - agents from Atlanta, he

3    was concerned.  So he told me to contact the agents and get

4    a -- find out how to get a target letter.

5    Q.  So the answer to my question is no, you did not tell the

6    public defender in Boise that you were tortured?

7    A.  No, I did not.

8    Q.  So the call with Agent Coffin is on August 23rd, which

9    is two days after the search warrant was executed; correct?

10   A.  Wait.  I'm sorry.  What was the question again?

11   Q.  August 23rd, if the call was on August 23rd, it was two

12   days after the day of the search warrant; correct?

13   A.  That is correct.

14   Q.  So do you believe -- best recollection, do you believe

15   you called the public defender the same day that you called

16   Agent Coffin, or was it the day before?

17   A.  There was two calls that I made because I also made a

18   call to the district court to see if they would unseal

19   the -- or how I would go about unsealing the filings and

20   they told me to, you know, call the -- I still had to find

21   the -- I -- I still had to contact the agent or the Court in

22   the Northern District of Georgia to find out how -- how to

23   get that target letter.

24   Q.  I don't think you answered my question.  I'm sorry, sir.

25   A.  I'm sorry.

1    Q.  So the question was:  Do you think that the call to the

2    public defender and Agent Coffin was on the same day, or did

3    you call the public defender the day before?

4    A.  I couldn't tell you which day it was.  It was similar

5    days.  But it was either the one or the two.  Yeah.

6    Q.  So you -- just to be clear, you believe that you had

7    suffered potential -- or may have suffered potential organ

8    failure, but from being put in the shade by the agent and

9    that you thought you were on the verge of heat stroke or may

10   have even suffered heat stroke?

11   A.  I did believe.  Yes.

12   Q.  And your -- but you didn't call the hospital, you didn't

13   call an E.R., did not go to urgent care.  Your first call,

14   or one of your first calls, was to a federal public defender

15   and one of the agents who allegedly tortured you?

16   A.  Well, that was the only way to find out what the AUSA

17   was looking at this case, so I didn't really have much

18   choice.  I could have called him, Clark, or Pinette.  I had

19   the business cards for all three of them, all three of them

20   are listed defendants in the case.

21   Q.  So that is a yes?  You didn't call -- you are saying

22   that you are suffering, or you believe you were suffering

23   from these very serious life-threatening injuries, or

24   situations, and your first call is not to a hospital, you

25   call the public defender and an FBI agent.

1  A.  My first thing I did was drink lots of water after that.

2  So yes.  I was still suffering from the effects of fever

3  when I called the public defender and the agent.

4  Q.  Okay.  Do you recall at some point, once Ada County

5  arrived, that Agent Pinette searched your person?  Did he

6  search you?

7  A.  Did Agent Pinette search me?

8  Q.  Yes.

9  A.  I do not believe that he searched me at that time.

10  Q.  When Ada County came, you don't recall you stood up and

11  he did -- he searched you, physically searched you?

12  A.  I don't believe that happened at that point.  He

13  searched me at the end of the day.

14  Q.  Sorry.  Poor question.  After Ada County was done.

15  A.  After Ada County was done, he searched me.

16  Q.  And is it your contention still that he spent a, quote,

17  "Solid minute feeling your genitals to humiliate" you?

18          MR. HALL:  Objection, relevance.

19          MR. SISTLA:  Goes to credibility, Your Honor

20          THE COURT:  Overruled.

21          THE WITNESS:  Yes.  He absolutely did that.

22  BY MR. SISTLA:

23  Q.  And did you report him to another FBI agent?

24  A.  Why would I?  I didn't feel I had any grace with them.

25  So no.

```
1    Q.  So even the kind FBI agent who helped you in the shade,
2    you didn't think you should go tell that agent, oh my god,
3    your colleague just sexually assaulted me?
4    A.  I didn't see Agent Heap again that day.
5    Q.  What about the Ada County detectives that are there?
6    A.  They already left.
7    Q.  You worked at Ada County.  You know the Sheriff's
8    Department.  You know law enforcement.
9    A.  Yes.
10   Q.  You didn't call them and say oh, my God, an FBI sexually
11   assaulted me?
12   A.  When I put that into the allegation, I wasn't asking for
13   a charge of sexual assault.  Judge Winmill described it as a
14   sexual assault.
15   Q.  That's -- that's in your civil complaint.  Let me direct
16   you.  That is in the original complaint you filed.  Can you
17   take a look at Government's 9, page 36, line 13.
18   A.  Page what?
19   Q.  Page 36, line 13.
20   A.  Yeah.  I agree.  It is a sexual assault, but I wasn't
21   asking for a charge of sexual assault at that time.  It was
22   Judge Winmill who put in the screening review that that was
23   a sexual assault.
24   Q.  So sir, this is the original complaint that you filed.
25   A.  Yes.
```

1    Q.   Whether or not you wanted sexual assault, you have a

2    federal agent who sexually assaulted you and you told nobody

3    about it?

4    A.   Yes.

5    Q.   For over a year and a half.

6    A.   I believe that is common when people are sexually

7    assaulted.

8    Q.   Now, Agent Pinette who -- who you said sexually

9    assaulted you in that manner?

10   A.   Yes.

11   Q.   When he testified yesterday, that was not the first time

12   you had seen him since the search warrant; correct?

13   A.   It is not.

14   Q.   You saw him in Atlanta in September of 2019; correct?

15   A.   I did.

16   Q.   Agent Pinette and Agent Coffin were the two agents who

17   participated in the proffer session; correct?

18   A.   Yes.

19   Q.   So you are now at Agent Pinette, you understood -- I'm

20   sorry.  You understood that Agent Pinette is an FBI agent

21   based in Atlanta; correct?

22   A.   Yes.

23   Q.   Did you say to your lawyer -- you are now represented by

24   counsel; correct?  Did you tell your lawyer that you've been

25   sexually assaulted?

```
 1              MR. HALL:  I object.  That is attorney/client
 2    privilege.
 3              MR. SISTLA:  I'll withdraw the question.  I heard
 4    it in my head.
 5              THE COURT:  How much longer do you have on
 6    cross-examination, Mr. Sistla?
 7              MR. SISTLA:  I can wrap up in 30 minutes at most.
 8    I don't want to overuse the Court's time, but I will try to
 9    do it rapidly.
10              THE WITNESS:  May I answer the question?
11              MR. SISTLA:  No.
12              MR. HALL:  No, you may not answer the question.  I
13    objected on privilege.
14              MR. SISTLA:  I was going to withdraw the question,
15    Your Honor.
16              THE COURT:  All right.
17    BY MR. SISTLA:
18    Q.  Just to be clear, you are not represented by counsel --
19    you are represented by counsel at this point; correct?
20    A.  I am.
21    Q.  All right.  And you're due to proffer at Agent Pinette's
22    headquarters at the FBI; correct?
23    A.  Yes.
24    Q.  Did you seek out either Agent Pinette or Agent Coffin's
25    supervisors to report that they had tortured you in your
```

1    backyard?

2    A.   No.

3    Q.   Did you seek out their supervisors to report that, in

4    your view, they had -- they had ignored your request for

5    counsel?

6    A.   So I mean, without going into attorney/client

7    privilege --

8    Q.   I don't want you to get into privilege.

9    A.   Yeah.  So no.

10   Q.   Now, you mentioned that you had invoked or you claim you

11   have invoked the -- the right to counsel; right?

12   A.   I did.

13          MR. HALL:  Objection.  Let him finish the answer.

14          MR. SISTLA:  Oh, I'm sorry.  I really thought he

15   was done.  Go ahead.

16          THE WITNESS:  I absolutely did invoke privilege.

17   BY MR. SISTLA:

18   Q.   Did you ever invoke the right to remain silent?

19   A.   I was silent until Agent Pinette reinitiated the

20   conversation.  Yes.

21   Q.   No.  I mean, once they asked you about Lifelock and your

22   hacking activities, did you tell them you no longer wish to

23   answer their questions?

24   A.   What is the point?  At the point that I gave them the

25   inculpatory password, what difference does -- did it make?

1    Q.   I am asking before that point, they are asking about

2    your hacking activities.  They are asking about Lifelock.

3    They are asking about the password.  Did you invoke your

4    right to remain silent?

5    A.   No.  I only invoked the right to an attorney.

6    Q.   All right.  Now, you mentioned in one -- do you

7    recall -- do you recall alleging that you were unable to

8    document the quote/unquote, "torture" that you suffered

9    because you didn't have a camera or other electronic

10   devices?

11   A.   That is correct.

12   Q.   But your partner testified that you went -- the two of

13   you went to her parents' house that night; correct?

14   A.   I am confused at the timing of that.  I don't recall

15   when we went to Mountain Home, but I would believe that she

16   was correct.

17   Q.   Do you dispute going there?

18   A.   No.  I do remember going.  I just don't know the timing

19   of it.

20   Q.   And you agree that the alleged injuries that you

21   suffered, in your view, persisted for several days; is that

22   correct?

23   A.   Yeah.  The fever, for sure.  What I felt is a fever,

24   and, you know, the dryness of skin, and the headaches and

25   everything else associated with that.  Yes.

1   Q.  What about this alleged third-degree sunburn?

2   A.  So I did have sunburn.  I -- I couldn't recall how bad

3   it was.  I just remember it peeling and peeling.  So

4   that's -- I don't remember how sunburned I was.  I just

5   remember it being red and my face was extremely red after

6   the fact.

7   Q.  So one way you could have documented it was by going to

8   a hospital emergency room, whatever, and we have established

9   that you did not take any of those steps; correct?

10  A.  I did not.  No.

11  Q.  And you also, it appears have access to a car, and

12  access to money, you could have gone and purchased something

13  to document in that fashion as well; correct?

14  A.  What money?

15  Q.  Are you saying you had no money to purchase a camera or

16  to use your friends' cameras or some -- or your in-laws --

17  your partner's parents' cameras or something to take

18  pictures?

19  A.  No.  After that, so before the FBI raid of my house, I

20  just filed for bankruptcy.  And I was rebuilding.  So it --

21  I had only worked for Ada County for six or seven months at

22  that point, and I was making all the repairs to the house

23  that needed to be done, like the air conditioning and stuff.

24  So no, I didn't have any money.  The only incoming money I

25  had left was the one check that I got for the partial pay

1    period.  So no, I didn't have a lot of extra money.

2    Q.  So your testimony is that you could not have asked

3    someone, either your partner or your partner's parents or

4    friends to lend you some money to get a camera or something

5    to document all of these alleged injuries?

6    A.  The -- well, I am more self-supporting than that.  I

7    don't like to ask for hand-outs.  But the -- my partner was

8    also stripped of all of her electronics as well.  They took

9    her phone, which she needed for the ability to call doctors

10   because she is clearly handicapped and the agents took it

11   anyway.

12          MR. SISTLA:  Your Honor, I am going to ask that be

13   stricken.  That is unresponsive to the question.  And I know

14   I have overstepped at times and I apologize.  But I'm trying

15   to find a polite way to get the witness to be responsive to

16   the question so we can -- I apologize, Your Honor.  I am

17   trying to think of the best way.  I don't know how to get

18   there without overstepping his answers.

19          THE COURT:  As I've said a couple of times

20   already, if you will first answer "yes" or "no."  His

21   questions should be calling for a "yes" or "no," and then if

22   you need to explain, then you can explain.  I will strike

23   the answer as unresponsive.  Put your question to him,

24   listen, and answer "yes" or "no," and then if you need to

25   explain, you can explain.  I will allow him to complete his

1    answer and then ask your next question.

2            MR. SISTLA:  Absolutely, Your Honor.

3    BY MR. SISTLA:

4    Q.  So the question was, basically, can -- could you have

5    asked a friend or your partner's parents, you know, to

6    borrow some money or to use their phones or cameras to

7    document all of these alleged injuries?

8            THE COURT:  "Yes" or "no," Mr. Purbeck.  "Yes" or

9    "no."

10           THE WITNESS:  Yes, I could have, I suppose.

11   BY MR. SISTLA:

12   Q.  And then as His Honor said, if you want to explain, I'm

13   sorry.  I'm not trying to cut you off, but if there is an

14   explanation.

15   A.  Yes, I could have.  I didn't think about it at the time.

16           MR. SISTLA:  Thank you, Judge.

17           THE WITNESS:  I apologize.

18   BY MR. SISTLA:

19   Q.  All right.  Aside from the proffer, you also spoke with

20   Agent Pinette in December of 2019; correct?

21   A.  I did.

22   Q.  And that's the voice mail that we heard yesterday;

23   correct?

24   A.  Yes.

25   Q.  You reported that you had additional devices to provide;

1    correct?  That you had found these thumbdrives tucked away

2    in the garage?

3    A.   Yes.

4    Q.   And you, in fact, went to the Boise office and turned

5    them in; correct?

6    A.   There is conversation in between, so yes.  And there was

7    conversation in between that, though, including a phone call

8    that is missing, because I had misgivings about doing that.

9    I didn't want to meet with Clark Harshbarger because I

10   thought that he was involved in stealing items or someone

11   from his team had stolen items from my house.  But Pinette,

12   I don't know if I could say he was alluding to, but he was

13   going to get those devices.  So I was afraid of another

14   search warrant incident where I was going to be left in a

15   bad position all day.  And in December, it could have been

16   the opposite of, you know, August.  It could have been a

17   hypothermic situation instead of a hyperthermic.

18   Q.   Okay.  I'm sorry.  The question was very simply, you

19   called Agent Pinette in December of 2019; correct?

20   A.   Yes.

21   Q.   And very simply, it was about some thumbdrives that were

22   found in the garage; correct?

23   A.   Yes.

24   Q.   And you asked him what to do with them; correct?

25   A.   I did.

1    Q.   And you ultimately provided them to the FBI office in

2    Boise; correct?

3    A.   I did.

4    Q.   And you also had that other interaction you mentioned on

5    that same day where you went and took a polygraph at FBI

6    Boise; correct?

7    A.   Yes.

8    Q.   And then, so you -- you have a call two days after the

9    search warrant with Agent Coffin.  You have a proffer on

10   September 9, 2019 with the same two agents you accused of

11   torture.  You have a conversation in December 2019 with one

12   of your alleged torturers; correct?

13   A.   Yes.

14   Q.   And then you also go and provide devices; correct?

15   A.   To Clark Harshbarger.  Yes.

16   Q.   So you have all of these interactions with FBI.  Just a

17   very simple question, is it fair to say at no point did you

18   report to either FBI Boise or FBI Atlanta that you had been

19   the victim of some sort of alleged torture or harassment or

20   whatever you claim happened during the search warrant on

21   August 21, 2019; is that correct?

22   A.   That is correct.  Can I clarify a little bit on that,

23   though?

24   Q.   Sure.

25             THE COURT:  You may clarify.

1          THE WITNESS:  There was much conversation with my

2     attorney about that, though.

3          MR. SISTLA:  I really am not trying to elicit

4     attorney/client privilege.

5          THE COURT:  You need to avoid conversations with

6     attorneys.

7          MR. HALL:  Any conversations with Mr. Wallack who

8     is your attorney and certainly with me, since I've -- I've

9     been your attorney, these are privileged, and you can't

10    even -- don't even volunteer.  All right?

11         THE WITNESS:  All right.

12         MR. SISTLA:  Your Honor, I don't think you really

13    believe that I am trying to elicit attorney/client

14    privilege.

15         THE COURT:  No.

16         MR. HALL:  And he is not, just to make it clear.

17    BY MR. SISTLA:

18    Q.  Do you recall, have you been making filings in your

19    civil cases as recently as July and August of this year?

20    A.  Yeah.  The last filing was to amend my complaint on

21    August 24th.  So anything prior to that will be amended.

22    If --

23    Q.  I didn't mean to cut you off.

24    A.  -- if the Court allows me leave.

25         MR. SISTLA:  Let's mark for identification only

1    Government's Exhibit 10. May I approach, Your Honor?

2              THE COURT:  You may.

3    BY MR. SISTLA:

4    Q.  Okay.  Did you file the document that I just handed to

5    you?

6    A.  Yes.

7    Q.  All right.  And what is it?

8    A.  So this is my motion in opposition to dismiss for

9    insufficient service of process, lack of subject matter

10   jurisdiction, and failure to state a claim for which relief

11   could be granted.

12   Q.  This is District Case No. 1:21-CV-47.  Is that correct?

13   A.  Yes.

14   Q.  That is the same case in which you filed that civil

15   complaint that we have talked about a little earlier;

16   correct?

17   A.  Yes.

18   Q.  And just so the record is clear, you wrote this entire

19   document; correct?

20   A.  Yes.

21   Q.  And you believe that what you wrote in here was true and

22   accurate?

23   A.  Since the hearing, I have determined that Nathan

24   Kitchens was probably not in the house.

25   Q.  Let's look at what you said about Mr. Kitchens.  If we

1    could turn to page --

2              MR. HALL:  Objection, relevance.

3              MR. SISTLA:  Your Honor, again, I think this goes

4    to his credibility.  He is making some very specific

5    allegations of people who were at the house during the

6    search warrant, directing the agents to do certain things.

7    So I think it goes to his credibility today on the Court's

8    evaluation of his credibility, which is at the central to

9    the Court's determination.

10             MR. HALL:  But I want to respond this time.  So

11   unlike the other ones where I just took it on the ruling, on

12   this one, so at no point was any allegation regarding any

13   AUSA being present in Mr. Purbeck's house raised in this

14   criminal litigation, either before I started representing

15   Mr. Purbeck or since I've been representing Mr. Purbeck.

16   This doesn't exist in this case, number one.  Number two,

17   there is no allegation of any kind of prosecutorial

18   misconduct or interference or anything else along those

19   lines that have been raised in this criminal litigation

20   either by myself or by my predecessor, Mr. Wallack.  The

21   scope of the hearing today that we've heard plenty of times

22   that have strayed too far afield and gotten reined back in

23   appropriately, is what happened that day, that time.  We

24   know what I mean by that shorthand.  So what I think what

25   the government wants to do, and I understand the advocacy

1  point behind it is that certain inflammatory statements were

2  made in civil filings, which neither me nor Mr. Wallack had

3  any involvement in whatsoever, out in another district and

4  circuit, and they now want to introduce this under the guise

5  goes -- somehow goes to the credibility.  And I respectfully

6  submit that I object and ask you to sustain my objection and

7  exclude the statements.

8          THE COURT:  Well, if the statements are

9  allegations that Mr. Purbeck has made in whatever form,

10  whether here or in Idaho, and they pertain to what he

11  asserts happened, seems to me that is relevant to the

12  inquiry because his credibility is very much at stake in the

13  assessing your allegations for a motion in this case.  So if

14  he has made a statement under oath that certain conduct

15  happened, and the government is going to demonstrate it

16  didn't or he can concede that it didn't, why is that not

17  relevant to his credibility?

18          MR. HALL:  Yes, sir.  I think, unless I'm

19  mistaken, it is not under oath.  So I mean, take it out of

20  that category.  I think manner they are proceeding is it's

21  it is A pro se filing and since it's a pro se filing, he has

22  made a --

23          THE COURT:  Subject to Rule 11.

24          MR. HALL:  Certainly.  I am not saying this is not

25  all subject to all kinds of --

1            THE COURT:  For truthfulness.

2            MR. HALL:  For the Civil Practice Act for sure.  I

3   totally agree with those aspects of things.  It is an

4   allegation that was raised in a civil filing.  And while we

5   go generally things involving other issues that have been

6   raised in this case about what all happened in the house for

7   the scope of the search, none of which are part of this

8   hearing obviously, I don't see why him making some statement

9   about something that happened somewhere else just generally

10  goes to the truthfulness as to the issues that are here

11  today.

12           THE COURT:  He has testified he has memory

13  problems about that day.  And I think the government is

14  going to explore how accurate his memory is about those

15  circumstances.  Isn't that right, Mr. Sistla?

16           MR. SISTLA:  He is.  And, Your Honor, this filing

17  makes specific allegations regarding Mr. Kitchens and

18  specific location during the search warrant, during specific

19  things, and it was just filed on July 6th, 2022.  And one of

20  Mr. Purbeck's points as to why things that were earlier

21  filed might not have -- might not be entirely accurate or he

22  was operating under, you know, best information, is that the

23  indictment had not been filed and he had not received

24  discovery yet.  July 6, 2002 is long after the indictment

25  was filed.  Mr. Herskowitz is lead counsel.  He can correct

1     me if I am wrong.

2             But the discovery -- they've had discovery for a

3     long time.  I believe the discovery was filed in March of

4     2022, obviously -- and so the sort of  argument that

5     Mr. Purbeck has been advancing, which is well, I didn't have

6     complete information, that doesn't hold water for something

7     that was filed July 6 of 2022, making very specific

8     allegations about who was present during a search warrant.

9             THE WITNESS:  May I make an objection?

10            THE COURT:  No, sir.

11            MR. HALL:  If this hearing had been scheduled by

12    that point, I am not suggesting that.  I guess the point I

13    am trying to make is that the -- first of all, I didn't see

14    these filings last night.  State that in my place; right?

15    And Mr. Sistla gave them to me yesterday, and I read them

16    last evening.  Those statements in that civil filing don't

17    in any way, unless I just misread them, have claimed that

18    Mr. Kitchens was involved in anything in the backyard or any

19    of the events or testimony we've been talking about with

20    respect to the status or custodial status of Mr. Purbeck.

21            Now, if I have misspoke because I read it too

22    quick last night, so be it, and I'll be corrected and I'll

23    be glad to be corrected.  But I am pretty sure based on my

24    reading of it, that it has to do with alleged events on

25    August 21, and it has to do with events not involving Agents

1    Coffin or Pinette and Mr. Purbeck in the backyard.  It does

2    not have to do with the allegations related to the rights

3    waiver form or any of the business that we are talking about

4    right there.  And specifically having read it last night, I

5    added in to my direct today that Mr. Purbeck specifically

6    has said that whatever he heretofore may have thought

7    regarding Mr. Kitchens, he no longer believes as of today.

8    So for those reasons, I would raise my objection.

9              THE COURT:  Overruled.

10   BY MR. SISTLA:

11   Q.  So Mr. Purbeck, if we can turn to page 5, lines 21

12   through 23.  We are going to start there.  I am going to

13   read there.  Tell me when you are there, sir.

14   A.  I am there.

15   Q.  It says you alleged on July 6, 2022, "Nathan Kitchens

16   alleges they were not present in the home during the search

17   of the home and even includes they did never visit Idaho."

18   You used the pronoun "they."  Is that referring to

19   Mr. Kitchens?

20   A.  Yes.

21   Q.  This prevents no evidence to support that claim.  Now,

22   if we can turn to -- now, my understanding now is that

23   suddenly six weeks later, you now are withdrawing this

24   allegation?

25   A.  Yes.  And there was additional evidence provided by the

1    government on July 20th.  And that is the basis for my

2    asking for a motion to leave on August 24th.

3    Q.  Let's turn to page 10 of this document.  I'm sorry.  I

4    am sorry, Your Honor.  Page 8.  We will start at page 8,

5    line 6.

6    A.  Okay.

7    Q.  You allege that Ze -- that is Mr. Kitchens; correct?

8    A.  Uh-huh (affirmative).

9    Q.  -- did not stop them -- "Them" being Agents Coffin and

10   Pinette -- from leaving Mr. Purbeck, you, in continuous UVA

11   sunlight and 97 degree temperatures.  Do you see that?

12   A.  Yes.

13   Q.  And we have established that certainly by July 6 of

14   2022, we know that you were not in 97 degree temperatures.

15   Is that right?

16   A.  Yeah.  I think maybe I made a mistake on -- by saying

17   continuous 97.  That was probably not the correct thing to

18   say.

19   Q.  And it said "conspired to destroy evidence of the Fifth

20   Amendment violation."  You see that; correct?

21   A.  Yes.

22   Q.  Now if we turn to page 10, lines 5 through 16, you

23   further wrote, "This is to say that Nathan Kitchens lacks

24   credibility to make an unevidenced declaration that he has

25   never been to Idaho and was not present during the search

1    execution.  Mr. Purbeck," that is you, "saw a moderately

2    obese, double-chinned, curly-haired effeminate with no

3    discernable Adams apple and an unhealthy pallor and a face

4    exactly matching the image of Kitchens as seen on the video

5    of the indictment hearing, both sitting on Mr. Purbeck's

6    chair in his office and as the last person to leave the

7    house on the day of the search warrant execution."

8         You say "later since" -- and you also said "they,"

9    being Mr. Kitchens, "were also present at the proffer

10   session weeks after the search.  Since it is still

11   relatively rare in Idaho to see transitioning individuals,"

12   whatever that refers to, "Mr. Purbeck has great confidence

13   that Mr. Kitchens is, in fact, the same person that was in

14   his home on the day of the search, the facial features are

15   too similar.  Ze --" and let me stop there.  So six weeks

16   ago you alleged that AUSA Nathan Kitchens was not just at

17   the search warrant, but in your house?

18   A.  I believed he was.

19   Q.  This was more than a year after the indictment?

20   A.  Yes.

21   Q.  After you have received discovery?

22   A.  Yes.

23   Q.  And you believe that Nathan Kitchens was sitting there

24   orchestrating, directing the agents what to do?

25   A.  I -- yes.

1    Q.  Do you still believe that today?

2    A.  No.  After the discovery that was -- that the government

3    provided on July 20th, I believe that is no longer the case.

4    I believe the person that I saw was one of the technicians

5    from Intermountain West, and I was confusing two

6    curly-haired people that were short with each other, and I

7    had a very brief view of him.  So when I saw the indictment,

8    I believed that I had seen -- I think -- it made me -- like,

9    I recognize this person, so I started wracking my brain

10   trying to think of who was this person, and where did I see

11   them, and I think I confused those.

12   Q.  But let's just be clear, sir.  You didn't just say

13   someone was present at your -- at the house.  You alleged

14   Nathan Kitchens as orchestrating and directing the agents

15   what to do.

16   A.  Well, I think it's reasonable that -- so, Mike

17   Herzkowitz I knew was in Boise at the time.  I don't know

18   anything about how these federal investigations go.  So I

19   was under the impression that, yes, he was.

20   Q.  You remember talking about the recording?

21   A.  Yes.

22   Q.  And you say that -- you say that Agent Pinette had a

23   recorder?

24   A.  Yes.

25   Q.  And the first time you saw the recorder, as you

1    explained on direct testimony, is when you signed the two

2    consent forms?

3    A.   Yeah.  So I have a little bit of lack of clarity on

4    that.  I believe the first time I saw it was when the forms

5    were brought out to sign.  But then it was -- I saw it

6    later, you know, continued throughout.

7    Q.   Let's just start real narrow.  The first -- very first

8    time, your direct testimony was the first time you allege

9    that you saw Agent Pinette with an eight-inch-long recorder

10   is when you signed two FBI forms.  Is that correct?

11   A.   Yes.

12   Q.   And you signed those two forms basically contemporaneous

13   with one another?

14   A.   Yes.

15   Q.   All right.  And the two forms were the FD-395 consent to

16   take over your accounts?

17   A.   Yes.

18   Q.   And then a Miranda waiver form?

19   A.   Yes.

20   Q.   So just to be clear, that -- so exactly what happened

21   then?  They pulled out the forms and then Agent Pinette

22   appeared with the recorder?

23   A.   So after the -- so during that period -- so Pinette, I

24   believe, had gone inside.  I don't know if it was Pinette or

25   Coffin, but one of them had gone inside to get forms, and

1    also do that password -- enter the password, and then when

2    they came back, they came back with the forms.  And the

3    recorder may have come in at that time, or it may have been

4    there the whole time.  I don't know.  Under, you know, his

5    binder that he had.

6    Q.  Did you see the recorder under his binder?

7    A.  No.  I am not looking at it like that.  So...

8    Q.  So you are just speculating?

9    A.  Yeah.  I don't know -- if he got it when the forms came

10   out or if he got it before that.

11   Q.  So to the best of your knowledge, they started recording

12   the conversation after you signed the two consent forms?

13   A.  Yes.  I believe that was the case.

14   Q.  Okay.  So it is your testimony that the FBI agents got

15   inculpatory statements from you?

16   A.  Yes.

17   Q.  Got inculpatory information about your passwords?

18   A.  Yes.

19   Q.  And then decided to record the interview?

20   A.  Yes.  Because they had gotten their Miranda warning and

21   then, I think when they -- Coffin was gleeful basically when

22   he put this thing in my face and got me to agree to it.  And

23   then they held it there while they asked questions, and

24   then, you know, periodically, you know, it was raised again

25   to not -- not right into my face like the first time, but

1   throughout the rest of the interview.

2           MR. SISTLA:  If I could have one moment, Your

3   Honor.  I am just trying to find a reference.

4           THE COURT:  Yes, sir.

5   BY MR. SISTLA:

6   Q.  Sir, Mr. Purbeck, you could pull out Government's 9,

7   which is your complaint.

8   A.  Okay.

9   Q.  We were -- we were here earlier, so turn to page 21.

10  A.  Okay.

11  Q.  And do you recall line 10?  This is where we talked

12  about the wooden chairs.

13  A.  Yes.

14  Q.  And some explanation as to why that was wrong.  Okay.

15          MR. HALL:  Where are you?

16          MR. SISTLA:  Oh, I'm sorry.  Page 21 on the

17  complaint.

18  BY MR. SISTLA:

19  Q.  Let's turn to page 17, line 18.  Do you see that?

20  A.  Yes.

21  Q.  You allege that Pinette had a digital audio recorder to

22  record the interview with him per DOJ policy.  This

23  allegation makes it seem like you saw the recorder much

24  earlier in the interview and that he was recording it the

25  entire time.

```
 1    A.   I wasn't sure when the recorder came out.
 2    Q.   So your testimony is he was recording the interview, or
 3    he was not recording the interview the whole time?
 4    A.   I believe he was recording the interview.
 5    Q.   Based on?
 6    A.   Well, I don't know for sure.  Before the recorder came
 7    out, but I don't know.
 8    Q.   If -- if the agent hadn't wanted to disclose the fact
 9    they were recording the interview to you, why would they
10    pull it out and wave it in your face?
11    A.   They had already gotten the password that they needed.
12    Q.   But there is no point in showing you the recorder.  That
13    doesn't make sense.
14    A.   I think they wanted to get a clear recording of my
15    voice, saying that I had waived Miranda.
16    Q.   You are guessing.  Is that right?
17    A.   Yes.
18              MR. HALL:  Objection.  I think that is what the
19    question calls for.  I don't mind.  I didn't object to that
20    ground, but now you can't fuss for getting the answer.
21              MR. SISTLA:  I wasn't mean to be fussing.  I
22    didn't mean it to be to be pejorative.
23    BY MR. SISTLA:
24    Q.   That was a guess on your part.  Is that better?
25              MR. HALL:  Yes.  Yes.
```

1            THE WITNESS:  Yes.  The entire basis of this

2    lawsuit was because I wanted to get that audio recording,

3    and Miranda form because after the 302, it was -- they

4    indicated that they were not going to provide that

5    essentially.

6            MR. SISTLA:  Can I have one moment, Your Honor?

7            THE COURT:  Yes, sir.

8    BY MR. SISTLA:

9    Q.  So sir, you mentioned filing something on August 24th?

10   A.  Yes.

11   Q.  What was filed on August 24?

12   A.  I asked motion for leave to amend my complaints.  And

13   that is because the government provided evidence on July

14   20th that allowed me to establish the timeline.  And also

15   described who was present in the house with better clarity.

16           MR. SISTLA:  Can I just have one more second?  I

17   haven't seen that filing.

18   BY MR. SISTLA:

19   Q.  What was the amended complaint for exactly?

20   A.  I haven't filed an amended complaint.  I asked for leave

21   to file an amended complaint.

22   Q.  I mean, also you proposed to add an amended complaint

23   when you file a motion to leave; correct?

24   A.  That wasn't the way it happened when the initial

25   screening review happened.  So I was asking the Court to

1  allow 30 days to file an amended complaint.

2  Q.  And what is going to be your amended complaint?  Does it

3  relate to this search warrant?

4  A.  Yes.

5           MR. HALL:  Objection.

6           THE COURT:  Sustained.

7           THE WITNESS:  Yeah.

8           THE COURT:  You don't have to answer.

9           THE WITNESS:  I'm sorry.

10          MR. SISTLA:  I'm sorry, Your Honor.  We haven't

11  seen that -- that specific filing.  Just a couple more

12  things, Your Honor, and I will wrap up here.

13          THE WITNESS:  Can I make one clarification on the

14  wooden chairs?

15          THE COURT:  That's not a question now.  Your

16  attorney will have a chance to redirect and he can go there

17  with yo

18  BY MR. SISTLA:

19  Q.  Mr. Purbeck, unfortunately, your medical records do not

20  have page numbers on them.

21  A.  No.

22  Q.  And they are in reverse chronological order.  Have you

23  reviewed these before?  Have you seen these?

24  A.  Yes.  They go all the way back to 2013.

25  Q.  Okay.  I am just going to hand just for identification

1    as Government's Exhibit 11, Your Honor.

2           Mr. Purbeck, because there is no page number, I am

3    going to tell you what I am referring to, but if you want me

4    to ultimately show you what I am referring to, I will walk

5    up with the document; okay?

6    A.   That is fine.

7    Q.   So we all agree that in 2019, you didn't see a doctor or

8    anyone about this incident about the alleged physical

9    injuries; correct?

10   A.   That is correct.

11   Q.   And based on the medical records, and these are the only

12   medical records we have received -- your next examination

13   after the search warrant was on June 2nd of 2020.  Does that

14   sound right?

15   A.   I did see a psychiatrist, but yes.  This was the

16   first -- unless I went to a doctor in the box, I think this

17   was a -- the first visit to my primary care physician.

18   Q.   And I believe his name is Eric Hall.  Is that right,

19   Dr. Hall?

20   A.   Yes.

21   Q.   Dr. Hall?  And that is at St. Luke's?

22   A.   Yes.

23   Q.   Was this just a regular sort of annual checkup?

24   A.   Yeah.  This was the annual physical.

25   Q.   Now, you will agree that you were taking blood pressure

1    medicine and your blood pressure was under control on this

2    visit?

3    A.   Yes.

4    Q.   Your doctor examined your neurological situation?

5    A.   Yes.

6    Q.   And the conclusion was normal; correct?

7    A.   Yes.

8    Q.   You have general anxiety disorder, but that is

9    long-standing.  Is that correct?

10   A.   Very much so.  Yeah.

11   Q.   You did not record suffering from heat stroke or any

12   heat event in this June 2020 checkup, did you?

13   A.   I don't believe so.  No.

14   Q.   And you did not report suffering from severe sunburn or

15   days or perhaps months or days at least of like severe

16   fevers or anything like that, did you?

17   A.   No.  By that time, the symptoms had subsided, so...

18   Q.   So in short, on June 2nd of 2020 at your annual checkup,

19   you did not tell your doctor about anything that had

20   occurred during the search warrant in August of 2019;

21   correct?

22   A.   That is correct.

23   Q.   You then have another checkup on June 18 of 2021.  And I

24   think you have one more in 2022; correct?

25   A.   Yes.

1    Q.   Sot your June '21 checkup, the doctor reports, and if
2    you want, I can find the page or I can show you.
3    A.   That -- this is fine.
4    Q.   That you reported having a heat stroke in 2019, and feel
5    like you have heat intolerance.  Is that -- let me finish my
6    question.  I know I've been interrupting, and I apologize.
7    That is the first time in June of 2021 that you reported you
8    to a medical professional about any alleged heat stroke.  Is
9    that right?
10   A.   Yes.  And to clarify that, since 2020, I've been working
11   in a warehouse.  It's hot.  And this was -- my belief is
12   that after you've had heat stroke, you are more susceptible
13   to it.  And So my doctor gave me advice on how to mitigate
14   that in the future, working in a hot warehouse without air
15   conditioning.
16   Q.   Just to be clear, you have never been diagnosed as
17   having suffered heat stroke; correct?
18   A.   No.
19   Q.   And you were working in the warehouse, you have never
20   been diagnosed suffering from heat stroke; correct?
21   A.   No.
22   Q.   I'm sorry.  You have never been diagnosed with heat
23   stroke; is that correct?
24   A.   My belief is -- no.  And my belief is that you have to
25   be diagnosed at the time that it occurs in order for it to

1   be called heat stroke.  Or die, one of the two.

2   Q.  I think there is a confusion on the double negative.

3   You've never received a heat stroke diagnosis?

4   A.  No.

5   Q.  And even after reporting this work with your -- at the

6   warehouse to your doctor and in June of 2001, you have never

7   received a heat stroke diagnosis subsequent; correct?

8   A.  No.  Again, I believe you have to -- to get a heat

9   stroke diagnosis, you have to be examined right away.

10  Q.  Did your doctor find any evidence that you suffered any

11  aftereffects that you suffered a heat stroke?

12  A.  No.  I don't believe there are any biomarkers that can

13  be identified after the fact.

14  Q.  Did, you a TSH test?

15  A.  Did I have what?

16  Q.  A TSH test.  Did your doctor test for TSH?

17  A.  I don't know what that is.

18  Q.  Thyroid stimulating hormone?

19  A.  Yes, I -- I believe I think so.

20  Q.  And do you recall -- what was the purpose of that test?

21  A.  I couldn't -- I would be speculating.

22  Q.  Do you recall if you actually got your THS levels

23  tested?

24  A.  I do believe -- yes.  I do believe that is one of the

25  annual physical markers that they check for.

1    Q.   Did your doctor advise that -- you test that for -- to

2    evaluate if you have possible heat intolerance?

3    A.   He did not.  Well, if he did, I don't recall that.

4    Q.   So you have never had that discussion with your

5    physician?

6    A.   No.  We did briefly discuss heat intolerance and what I

7    can do to mitigate future incidents.

8    Q.   So just to be clear, your testimony is the reason you

9    brought up the 2019, the alleged heat stroke from 2019, in

10   2021 was because you had started working at a factory.  Is

11   that your testimony?  I'm sorry.  It is a factory; is that

12   right?

13   A.   Yeah, it's a window manufacturing factory.  It's hot in

14   there.  And, you know, as a potential way of maybe asking

15   for a reasonable accommodation at work.

16            MR. SISTLA:  YOUR Honor, if I may have one second.

17            THE COURT:  You may.

18   BY MR. SISTLA:

19   Q.   Just a real quick, sir.  The factory you worked in, how

20   long have you worked there?

21   A.   I've worked there since February of 2020, I believe.

22   Q.   And is that a sedentary job or are you actually moving

23   around for that job?

24   A.   I do move around for that job.

25   Q.   What are your responsibilities?

1   A.   They call me a laborer.   Glazier.   Working with glass.

2   I put glass in either a washer or put screws in, window

3   panels, and it's a pretty hot factory.   So, you know, I have

4   a fan nearby to keep me cool.

5   Q.   When you say "pretty hot," do you know how hot it is in

6   there?

7   A.   Well, the ambient temperature in Boise the last couple

8   of years has been fairly high.   So without that fan, I think

9   I would be in a pretty bad place.

10   Q.   How long are the shifts?

11   A.   It depends on the -- so it is never -- almost never

12   shorter than eight hours back in 2020.   After -- during the

13   pandemic, it went quite bit shorter, but it goes until we

14   finish the allotment for the day.

15   Q.   You get a break every so often?

16   A.   Yeah.

17   Q.   On the hour?

18   A.   We get breaks 8 o'clock, 11:30, 1:30.   So...

19   Q.   Okay.   Have you ever passed out from that job?

20   A.   No.   My boss became concerned when I first started

21   because of my weight, and I was very red when I was working.

22   And he wanted to put me in a different area with a better

23   fan.   So yeah.

24   Q.   But so this is a job where you exert yourself for at

25   least eight hours.   I understand with breaks.

1    A.   Yeah.

2    Q.   But you have never had a situation where you have passed

3    out for -- from heat exhaustion or anything like that?

4    A.   No.   Because they also provide water very readily,

5    provide water.   And if it gets into the types of

6    temperatures that I experienced on August 21, they give

7    electrolytes as well.   So they'll give you popsicles,

8    electrolyte popsicles, or stuff added to your water.

9    Q.   So in the factory when it gets into the high 70's to low

10   80's, is that what you are saying?

11   A.   When I -- when I refer to the interrogation, I -- maybe

12   I meant the entire detention.   So when it was 95 outside, or

13   93, whatever the weather data said for then, yes, they would

14   definitely provide that.

15   Q.   And when you say 95 or 93, you mean long after Agents

16   Coffin and Pinette were done with their interview?

17   A.   That would be the way that the weather data shows.

18   Yeah.   It was 93 when the search wrapped up.

19   Q.   Long after they were done with their interview; correct?

20   A.   Yes.   I would agree with that.

21                MR. SISTLA:   No further questions.

22                THE COURT:   Mr. Hall, you may redirect.

23                         Redirect Examination

24   BY MR. HALL:

25   Q.   What clarification do you want to make regarding the

1    wooden chairs?

2    A.  So on the wooden chairs, when Ada County came, I just

3    mixed up the plastic and the wooden chairs.  There was only

4    three of the plastic chairs.  And so there was four people

5    during the Ada County interview, so they needed the extra

6    wooden chair.  So my confusion was because I saw the two

7    wooden chairs the next day or whatever.

8    Q.  And just to be clear, count us through the chairs.  So

9    when Ada County came out, how many chairs were in the

10   backyard?

11   A.  There were three, plus the broken one.

12   Q.  Two were plastic and one wood?

13   A.  Yes.

14   Q.  And what you are testifying to is a second wooden chair

15   came out to make it a total of four chairs because who all

16   needed a chair?

17   A.  Myself, Steven O'Meara, Pinette, and Detective Pacheco.

18   Q.  And where was Agent Pinette?  Did he sit in the chair or

19   stand by the chair?

20   A.  No.  There was enough chairs then for everyone to sit.

21   Q.  And did Agent Pinette sit?

22   A.  Yes.

23   Q.  The government asked you a question on cross-examination

24   about physical threats and verbal threats, and where things

25   are getting a little confusing.  And so I believe you

1   answered the one about physical threats.  I don't believe

2   you answered the question about verbal threats.  Were there

3   any verbal threats made by Agent Coffin or Pinette to you on

4   August 21, 2019?

5   A.  Well, verbal threats as in an assault, no.  But there

6   was verbal threats in that I got the best cooperation if

7   I -- or I would get the best deal essentially if I gave

8   inculpatory statements at that point rather than seeking a

9   lawyer.

10  Q.  So when you are referring to verbal threats, you are

11  referring to your testimony in sum and substance that you

12  were told if you cooperated, that is the time to get the

13  best deal?

14  A.  Yeah.

15  Q.  Okay.  And not to pursue legal consultation?

16  A.  Yes.  I mean --

17  Q.  You had also discussed during your cross-examination --

18  let me ask you this:  Forget the cross-examination.  You

19  made some reference, I guess, in your cross-examination,

20  about or maybe the government made the reference, to Agents

21  Coffin and/or Pinette saying that you were being evasive.

22  Do you recall that?

23  A.  Yes.

24  Q.  Here is my question:  At that moment when the agents

25  asked you or said to you something to the effect that you

1    were being evasive or not fully truth or cooperative or

2    however it was phrased, what was the tone of their voice?

3    A.  It was more stern with me.  It was not any kind of

4    casual conversation.  It was they were trying to elicit a

5    response.  And it was one of their fantasies.  It wasn't --

6    Q.  One pause on the fantasies.  All right.  Listen to my

7    question.  Let me ask a different question.  Were they, when

8    you say "stern," were they just becoming a little more

9    forceful in their tone?

10   A.  It was very much, much more forceful.  Yeah.

11   Q.  Were they yelling?

12   A.  No.

13   Q.  All right.  After everything that has happened

14   yesterday, everything that has happened today, let me ask

15   you this:  Do you have any doubt in your mind that on August

16   21, 2019, that you asked to use your phones to call an

17   attorney?

18   A.  I do not.

19   Q.  And are you confident that that request came before you

20   signed the online identity assumption waiver form, which is

21   Government's 6, and the form that is either the same or

22   substantially the same, the Miranda rights form, that is

23   Defense 21?

24   A.  Absolutely.

25   Q.  And are you likewise sure that when you were told you

1    could not use your phone, you further asked to use one of

2    the agents' phones?

3    A.  Yes.

4    Q.  Did you make further inquiry when you could not do that.

5    To use anyone's phone to call an attorney?

6    A.  Yes.

7    Q.  With respect to the Defense 21, are you confident that

8    you actually were shown that form?

9    A.  Is that the Miranda advice of rights form?

10   Q.  Fair point.  I am too quick at tossing my numbers

11   around.  Let me get it and show it to you.  All right.  It

12   escapes me at the moment, but it is the Miranda rights form.

13   So Defense Exhibit 21 is the Miranda rights form.  And for

14   some reason, my memory has failed me.  It is the form that

15   we discussed earlier and it was introduced into evidence.

16   Are you -- how confident are you that you were actually

17   shown that form?

18   A.  100 percent.  I turned down a plea deal because I wanted

19   to get that form.

20   Q.  Any doubt in your mind if everything that has happened

21   the last two days, that you were shown that form?

22   A.  I have no doubts that I was shown that form, and that I

23   signed it and that it was countersigned.

24   Q.  Do you have any doubts that at the time, contemporaneous

25   the same time that you were signing that form, that you were

1   asked to orally agree that you were waiving your Miranda

2   rights an that oral agreement was recorded by Agent Pinette

3   using a hand recorder?

4   A.  I do not have any doubts that that occurred.

5              MR. HALL:  All right.  No more questions.

6              THE COURT:  Mr. Purbeck, you may step down.  Call

7   your next witness.

8              MR. HALL:  Dr. John Allen.

9                      Dr. Jonathon Allen

10                          Sworn

11             THE CLERK:  Please be seated and state and spell

12   your name for the record.

13             THE WITNESS:  My name is Jonathon Allen.

14   J-o-n-a-t-h-o-n A-l-l-e-n.

15                   Direct Examination

16   BY MR. HALL:

17   Q.  Let me show you what's been marked for identification as

18   Defense Exhibit 23.  Do you recognize that document, sir?

19   A.  Yes, sir.  I do.

20   Q.  What is it?

21   A.  That's my curriculum vitae.

22   Q.  All right.  Move for the -- is it a true and accurate

23   copy of your curriculum vitae?

24   A.  There is one change.  I had an address change.  Since I

25   submitted this, I have since moved.  The address at the top

1  of the document on each page is no longer accurate.

2  Q.  All right.  But for the -- is that your professional

3  address?

4  A.  No.  That was my prior home address.

5  Q.  Okay.  Other than changing your home address, is the

6  other information on this CV true and correct?

7  A.  Yes, sir.  It is.

8          MR. HALL:  Move for the admission of Defense 23.

9          THE COURT:  Any objection?

10          MR. SISTLA:  None, Your Honor.

11          THE COURT:  It's admitted.

12  BY MR. HALL:

13  Q.  All right.  Tell us, what's your profession?

14  A.  I'm an emergency physician.

15  Q.  All right.  Tell us about your education?

16  A.  I got my undergraduate degree at Wabash College in

17  Crawfordsville, Indiana, followed by my Doctor of Medicine

18  at Indiana University School of Medicine.  And then I

19  completed an emergency medicine residency at the Medical

20  College of Georgia in Augusta, Georgia.

21  Q.  All right.  When were you first licensed in Georgia?

22  A.  I had a residency training permit in 2004, which is when

23  I began my residency.  My first unrestricted license was in

24  2005.

25  Q.  And are you licensed -- is that in Georgia?

1    A.  Yes, sir.  It is.

2    Q.  Licensed in any other states?

3    A.  I'm also licensed in Tennessee and Alabama.

4    Q.  All right.  And are those licenses still current and in

5    good standing?

6    A.  Yes, sir.  They are.

7    Q.  Do you have any board certifications?

8    A.  I do.  I have a board certification in emergency

9    medicine.

10   Q.  And how long have you had that board certification?

11   A.  I was first board certified in December of 2009, and I

12   recertified in April of 2019.

13   Q.  Does that mean that board certification is still good

14   and valid?

15   A.  It is.  It's valid through the end of 2029.

16              MR. SISTLA:  Your Honor, to speed this up, we

17   will -- the Government stipulates to Dr. Allen's

18   credentials.  There's no need to -- not taking away from Mr.

19   Rack, but no need to walk through all this.

20              THE COURT:  Mr. Hall?

21              MR. HALL:  I'll accept that, and just get to --

22   BY MR. HALL:

23   Q.  All right.  Jump forward.  I want to talk specifically

24   about your expertise as it relates to heat-related

25   illnesses.

1    A.   Yes, sir.

2    Q.   All right.  Tell us about that.

3    A.   So heat-related illnesses are one of the common

4    conditions that we encounter during an emergency medicine

5    residency.  So obviously working in Augusta, Georgia, it's a

6    very hot and humid environment, so we would frequently see

7    patients during residency where I'm seeing those patients

8    with an attending physician who is even more experienced

9    than I at the time in the evaluation, management, and

10   diagnosis of those patients.

11   Q.   Okay.  And what kind of training have you received or --

12   with respect to heat-related illnesses?

13   A.   So in addition to the emergency medicine residency

14   training that I had, I'm also -- I was a flight surgeon in

15   the Tennessee Air National Guard and I underwent Aerospace

16   Medicine Primary which is -- it's basically an aerospace

17   medicine course which is based off of occupational medicine.

18   So we get training in various extreme physiology

19   environments.  Cold, heat, low oxygen, low atmospheric

20   pressure, those types of environments.

21   Q.   All right.  And how about in your -- what do you do kind

22   of day in, day out these days as an emergency room

23   physician?

24   A.   So, I have two primary job functions right now.  I work

25   as an emergency physician with the Northside Health System

1   in -- Northside Hospital System, primarily in Cherokee

2   County in Canton, Georgia.  My other job function, I'm the

3   contract medical director for Department of State diplomatic

4   protective security contract.  So I supervise paramedics

5   that are deployed to our consul general in Kurdistan.

6   Q.  All right.  And in either or both of those roles, are

7   you involved in diagnosing and treating heat-related

8   illnesses?

9   A.  Primarily in my role as an emergency physician, that's

10  where I do the diagnosis and treatment of those conditions.

11  With the Department of State, that job is primarily

12  mitigating the potential for heat-related illnesses with our

13  contractors that are deployed to a desert environment.

14  Q.  Okay.  And let me ask you this, then.  Have you had an

15  opportunity to sit here throughout the last day and a half

16  to listen to the testimony of all the witnesses?

17  A.  Yes, I have.

18  Q.  All right.  Were you there every moment that we were in

19  court?

20  A.  I believe I stepped out for one brief moment during Mr.

21  Purbeck's testimony today.  But it wasn't more than a few

22  minutes.

23  Q.  Okay.

24  A.  But otherwise, I was here for the duration.

25  Q.  All right.  And you had occasion to -- well, first of

1    all, let me start with this.  Let me back up a little bit.

2    Tell us, please, doctor, when we talk about heat-related

3    illnesses, what is that?

4    A.   So heat-related illness is really a spectrum of

5    conditions that we see ranging from mild heat exposure all

6    the way up to and including heat stroke which is sort of the

7    terminal event.  So it's basically figuring out where on

8    that spectrum the illness is after being exposed to a

9    hyperthermal environment, you get various metabolic and

10   physiologic derangements.

11   Q.   And what are those -- tell us about those situations?

12   A.   So they can -- they range anywhere from excessive

13   sweating to the lack of sweating.  As you progress along in

14   that spectrum, you can have end organ damage such as kidney

15   failure, nausea and vomiting, neurologic disorders,

16   confusion, all the way up to at the level of heat stroke

17   involving coma and ultimately death.

18   Q.   What causes, in your experience, heat-related illnesses?

19   A.   Typically, it's prolonged exposure to a hyperthermal or

20   a hot environment.  And it's basically your body's lack of

21   the ability to thermoregulate or regulate your core

22   temperature back down.  As your core temperature increases,

23   the typical physiologic responses that your body is able to

24   regulate break down.

25   Q.   Are some people more prone or predisposed to suffering

1    from heat-related illnesses than others, or is everyone more

2    or less on the same level?

3    A.   Yes.   There are certain individuals that can be more or

4    less tolerant to a hyperthermal or hot environment.

5    Q.   Give us an example, if you would, doctor, of what kind

6    of things make a human being more susceptible to a

7    heat-related illness?

8    A.   Genetics is one of them.   That's obviously something you

9    can't control.   But certain medications, certain pathologic

10   conditions, prior treatments, those kinds of things can also

11   impact your ability to withstand a hot environment.

12   Q.   All right.   And how about someone's weight?

13   A.   Weight can certainly play a role.   As you increase your

14   weight, you are obviously more insulated with a layer of

15   fat, so it decreases your body's ability to thermoregulate

16   or to be able to shed that excess heat.

17   Q.   Is BMI the right term?   Is that the --

18   A.   Yeah.   BMI is one of the calculations that we use to

19   determine somebody's level of obesity, for lack of a better

20   word.

21   Q.   What does BMI stand for?

22   A.   Body mass index.

23   Q.   And is that something that's accepted in the medical

24   profession as a measure to determine obesity?

25   A.   Yes, it is.

1   Q.  Okay.  And tell the Court, please, someone -- tell him

2   in kind of -- we don't have to go into all the details, but

3   the different levels of one's BMI where it might somehow be

4   impacted by heat-related illness?

5   A.  Right.  So below 20 is considered to be a normal BMI.

6   30 is considered obese, and over 40 is considered to be

7   morbidly obese.  As you get to -- obviously, the higher your

8   BMI, the more likely you are to not be able to withstand the

9   hot environment as well.  So it's -- I wouldn't call it a

10  linear progression, but there is a correlation, a direct

11  correlation between an increased BMI and your likelihood to

12  not be able to withstand a hot environment.

13  Q.  Medications, do some medications make you more prone to

14  a heat-related illness?

15  A.  Yes, sir.

16  Q.  All right.  How about, are there medications that make

17  you more prone to being sunburned?

18  A.  Yes, there are.

19  Q.  Okay.  When we talk about a hypothermal -- I don't even

20  remember the word you used -- a hypothermal environment,

21  give us some common examples of what that would be.

22  A.  Sure.  Just to -- not meaning to quibble, but to correct

23  you, it's hyperthermal.  Hypothermal --

24  Q.  No.  I want you to quibble with me if I misspeak.  So

25  hyperthermal?

1    A.   Hyperthermal is a hot environment.  Yes, sir.

2    Q.   All right.  Let's go with hyperthermal.  Tell us about

3    some of those environments.

4    A.   So some of the ones that we would encounter would be

5    obviously working out in the hot sun or a humid environment,

6    working in a factory, sort of an indoor environment with no

7    air conditioning, lack of circulation, being in an enclosed

8    car with the windows closed and the air conditioning not

9    running, endurance athletes, prolonged exercise in an

10   outdoor -- a hot environment.

11   Q.   How about simply just being put outside in the sun for

12   an extended period with no water?

13   A.   Sure.  So you're going to absorb thermal solar radiation

14   from the sun, so prolonged sun exposure can certainly

15   predispose you to a heat-related illness.

16   Q.   All right.  Let me turn you now to the specifics of

17   Mr. Purbeck.  Have you had an occasion to -- well, first of

18   all, let's be clear.  Have you ever personally examined Mr.

19   Purbeck?

20   A.   No, sir.

21   Q.   Okay.  And let me further be clear.  Have you ever --

22   are you aware of any medical records or anything else that

23   you have reviewed as part of your involvement in this case

24   showing or regarding -- I guess regarding is a better

25   word -- regarding Mr. Purbeck being diagnosed, treated, or

1   anything else related to any kind of heat-related illness on

2   August 21, 2019?

3   A.  No.

4   Q.  Okay.  So is it -- now, turning to Mr. Purbeck, have you

5   had an opportunity to review his medical records?

6   A.  I have.

7   Q.  Please tell the Court based on what you have reviewed,

8   what you understand his BMI to be?

9   A.  I don't recall the exact number.  But I believe it was

10  around 42, if I recall correctly.

11  Q.  Okay.  And tell the Court, a BMI of 42, where is that

12  considered on the spectrum of normal, obese, morbidly obese?

13  A.  That would be considered morbidly obese.

14  Q.  And how would someone with a BMI of 42, being morbidly

15  obese, how would that condition predispose someone, if it

16  does at all, to a heat-related illness?

17  A.  I would expect with all other things being equal,

18  somebody who is morbidly obese would be more susceptible to

19  a heat-related illness.

20  Q.  Okay.  Have you had an opportunity to review the

21  medications that Mr. Purbeck was taking in August 21, 2019?

22  A.  Yes, I have.

23  Q.  Okay.  And what are those medications?

24  A.  He was taking Cymbalta, Duloxetine which is a

25  psychiatric medication, and he was also taking a combination

1  blood pressure medication Lisinopril and

2  Hydrochlorothiazide.

3  Q.  Do any of those predispose or have some other side

4  effects of being exposed to sunlight or heat?

5  A.  Yes, they both do.  And let me correct that.  He was

6  also taking a medication, I believe it was called Campral,

7  which is a medication for alcohol abuse or alcoholism.

8  Q.  Does that have any impact?

9  A.  That medication, I don't believe it does.  I'm not

10  familiar -- 100 percent familiar with that medication.  But

11  I don't believe it has any impact on potential heat-related

12  illness.

13  Q.  With the other two medications that you are familiar

14  with, tell the Court about what -- how -- what their side

15  effects or how they impact your susceptibility to

16  heat-related illness?

17  A.  Sure.  So we'll start with the Lisinopril

18  Hydrochlorothiazide.  The Hydrochlorothiazide is a -- it's a

19  combination medication.  It's an ACE inhibitor, the

20  Lisinopril.  And the Hydrochlorothiazide is a mild diuretic.

21  The diuretic obviously causes you to excrete excess water

22  which will lead to a state of potentially increased

23  dehydration at baseline.  So that by itself would increase

24  your risk to potentially suffer from a heat-related illness.

25  On top of that, Hydrochlorothiazide also predisposes you to

1   photosensitivity.  So it makes your skin more susceptible to
2   direct sunlight radiation.
3   Q.  How about the medication in combination with the BMI,
4   does that -- is it just kind of -- they don't -- is it all
5   equal, or does the combination make one more or less
6   susceptible?
7   A.  I don't know for certain.  I wouldn't think that there
8   would be a compound effect or -- not sure what the word I'm
9   looking for is.  But I don't believe they interact with each
10  other.  I think it's an additive, not multiplicative, I
11  guess.
12  Q.  Okay.  Is that the medicine you're talking about, or the
13  medicine as it relates to the BMI?
14  A.  The medicine and the BMI together.  I don't believe that
15  those two are -- I don't think it's a compound effect.  I
16  think it's each individual component has its own effect.
17  Q.  In your review of Mr. Purbeck's medical records, other
18  than the medications we've already discussed and his BMI, is
19  there anything else in the medical records that you reviewed
20  in your medical opinion would make him more or less prone to
21  any kind of heat-related illness?
22  A.  So the Duloxetine which I didn't mention, the Cymbalta,
23  is a psychiatric medication, and one of the known side
24  effects from that medication is decreased ability to
25  tolerate heat.  So it can cause flushing, and it can also

1    cause decreased ability to regulate your body's core

2    temperature and your ability to tolerate a hot environment.

3    Q.  As we asked -- when I asked you the question about

4    the -- I don't even remember the word you used -- multiplier

5    of the BMI and the medication, does this additional medicine

6    added in, does that change your answer with respect to how

7    it compounds?

8    A.  Again, I don't think it's a cumulative effect -- it's a

9    cumulative effect, but I think the cumulative effects are

10   independent of each other.  I don't think they -- I don't

11   think one contributes to the other's effect.  Independently

12   they have an effect and obviously together -- the more of

13   those you have with each other, the more effect it has, but

14   I don't think they add on top of each other, if that makes

15   sense.

16   Q.  Yes.  Did you have an opportunity as part of your

17   involvement in this case to review the weather records --

18   and I can find them and show them to you again to refresh

19   your recollection -- from Boise Air Terminal in Boise,

20   Idaho?

21   A.  Yes, I did.

22   Q.  Okay.  And were you also here during the testimony when

23   that document was shown to one or more witnesses and

24   discussed, the different times and different temperatures?

25   A.  Yes, I was.

1  Q.  When you saw that document, was that one that you were

2  already familiar with and you had seen?

3  A.  Yes, sir.

4  Q.  All right.  With respect to -- have you reviewed

5  anything else in this case other than -- I want to get to

6  the testimony you witnessed in just a second.  But anything

7  else outside of the testimony that you reviewed in this

8  case?

9  A.  I did review three research articles that I pulled as

10  part of my search.  And I think those were provided to you

11  and to the prosecution.

12  Q.  Did you also review the sworn declaration of Mr.

13  Purbeck?

14  A.  I did.

15  Q.  Okay.  Now, turning to the testimony, did you have

16  opportunity to hear from Agent Coffin and his description of

17  the events and interactions with the FBI and Mr. Purbeck on

18  August 21, 2019?

19  A.  Yes, I did.

20  Q.  Is that the same for Agent Pinette?

21  A.  Yes.

22  Q.  And the same for Agent Harshbarger?

23  A.  Yes.

24  Q.  The same for Agent Heap?

25  A.  Yes.

1    Q.  And the same for Detective Pacheco?

2    A.  Yes.

3    Q.  And did you also hear the testimony of Ms. Sarah Ganger

4    and of Robert -- let me do one at a time -- Ms. Sarah Ganger

5    with respect to what she described happened on August 21,

6    specifically as it related to Mr. Purbeck's location outside

7    and how he seemed -- or how he appeared afterwards?

8    A.  Yes, sir.

9    Q.  Okay.  And then did you also have an opportunity to

10   listen to Mr. Purbeck's description just a short time ago

11   about what happened on August 21, 2019?

12   A.  I did.

13   Q.  Including his location outside, and what he is reporting

14   as occurred with him and his reactions and symptoms to that?

15   A.  Yes, sir.

16   Q.  Okay.  Is there anything else that you reviewed in the

17   medical records with respect to Mr. Purbeck that you believe

18   to have some bearing on your opinions in this case?

19   A.  No.  Nothing else I can think of.

20   Q.  All right.  Am I right in saying -- this is one of these

21   everyone knows, let me state it questions.  You were not

22   present on August 21, 2019?

23   A.  I was not.

24   Q.  So your, lack of a better word here is, what we're doing

25   here is having you offer some expert medical testimony

1   depending on what the Court were to find, how that may

2   impact other -- or the medical condition of Mr. Purbeck; is

3   that right?

4   A.   That's correct.

5   Q.   I'm going to ask you kind of two sides of it.

6   A.   Okay.

7   Q.   First side, if the Court were to find that the

8   conditions described by Ms. Sarah Ganger and Mr. Robert

9   Purbeck were what happened with respect to Mr. Purbeck being

10  outside and his reactions and conditions and symptoms, and

11  if given what you know about the medications he took, about

12  the objective weather data from the Boise Air Terminal,

13  about his BMI, and any other information you gained from the

14  medical records, do you have an opinion to a reasonable

15  degree of medical certainty as to whether Mr. Purbeck was

16  suffering from a heat-related illness on August 21, 2019?

17  A.   Yes.  If you take --

18  Q.   Hold on.  We're going to do one at a time.  Yes, you do?

19  A.   Yes.  Sorry.

20  Q.   Okay.  That's all right.  What is it?

21  A.   Yes.  So if I take those facts to be assumed, then I

22  would -- my medical opinion would be that he was suffering

23  from a heat-related illness on that particular day.

24  Q.   Earlier we were talking about a spectrum.  Where on the

25  spectrum would you place that?

1    A.   I would place him at the level of heat exhaustion.  So

2    heat-related illness, you kind of start with heat cramps

3    where you start to get some muscle cramps, but you don't

4    have really any additional end organ damage or failure.  As

5    you progress, you get things like nausea and vomiting,

6    confusion, difficulty walking, being off balance.  So from

7    the description of his symptoms, I would place him in the

8    category of heat exhaustion based on that description.

9    Q.   Okay.  So based on the symptoms as you've heard them

10   testified to and based on the testimony about placement in

11   the sun and all the other factors you're taking into

12   account, you would place him at heat exhaustion?

13   A.   Yes.

14   Q.   And if this is not the right way to do it, just tell me,

15   but on a spectrum, is it the kind of thing you move the

16   scale up and down, like this is in the middle, this is at

17   the top, this is at the bottom, or is that not the way to do

18   it?

19   A.   Yeah.  That would be an accurate description.

20   Q.   Where is this along that spectrum if you think about it

21   visually?

22   A.   I would say it's in the middle.

23   Q.   All right.  And what kind of -- in your medical opinion,

24   what kind of effects does suffering from heat exhaustion in

25   the manner that we've just discussed with respect to Mr.

1   Purbeck likely to have on an individual?

2   A.  So they would have the symptoms that I described

3   previously.  They can have all sorts of different symptoms.

4   Nausea, vomiting, increased sweating.  They could get to the

5   point of not sweating as much.  Confusion.  Difficulty

6   walking.  Diarrhea.  All sorts of different potential

7   symptoms.

8   Q.  Would they be more or less likely to be able to make

9   intelligent cognitive decisions while suffering from heat

10  exhaustion?

11  A.  I think they would be much less likely to be able to

12  make informed decisions or complete complex tasks.

13  Q.  Would you feel comfortable with someone suffering from

14  heat exhaustion in the manner that Mr. Purbeck described and

15  Ms. Ganger described with coming in and making informed

16  decisions in that state regarding medical care?

17  A.  In terms of if they were to try to leave against medical

18  advice or not allow some treatment of a minor, some critical

19  decision, no, I don't think I would be able to comfortably

20  say that they were able to make an informed decision in that

21  particular situation.

22  Q.  Okay.  Now, I told you we were going to do the yin and

23  the yang, so let's do the other side of that.  So if the

24  Court were to find that the facts, as described by

25  Ms. Ganger and Mr. Purbeck -- I mean, I guess the way I'm

1    viewing this, kind of two -- from what you saw, would you
2    see kind of two versions of events here?
3    A.  Yes.
4    Q.  Okay.  So the other side I want to ask you about is, if
5    the Court were to decide that the events as described by
6    Agent Coffin and Agent Pinette more accurately describe --
7    describe what occurred on August 21, 2019, do you have an
8    opinion to a medical -- to a reasonable degree of medical
9    certainty as to whether Mr. Purbeck was suffering from a
10   heat-related illness?
11   A.  Yes.
12   Q.  And what's that opinion?
13   A.  I would say if we assume those facts to be true, then he
14   would not be suffering from a heat-related illness.
15   Q.  Okay.  Based on what you have observed, what you have
16   read, what you have seen here today, what is the -- well,
17   let me ask you this.  Under both scenarios, the
18   Coffin/Pinette scenario and the Ganger/Purbeck scenario,
19   under both scenarios, Mr. Purbeck has a BMI of 42; right?
20   A.  Correct.
21   Q.  Under both scenarios, he's already -- he's taking these
22   medications that you have discussed; correct?
23   A.  Correct.
24   Q.  All right.  What is, in your medical opinion, the
25   distinguishing point between in what situation you say not

1    heat exhaustion, other one you say, yes, heat-related
2    illness, heat exhaustion, what's the distinguishing fact?
3    A.   The distinguishing factor is the presentation of
4    symptoms.  So if somebody has those predisposing conditions,
5    but they have no signs or symptoms of a heat-related
6    illness, then it would be difficult for me to diagnose them
7    with a heat-related illness.  So it would be how they would
8    physically or visually present.
9    Q.   Okay.  And so -- and tell us what those -- what the
10   physical -- if they did, tell me -- what are the symptoms
11   that you're referring to when you make that statement?
12   A.   So you would look for being drenched with sweat,
13   being -- having difficulty walking, being confused, having
14   nausea, vomiting, diarrhea, sort of physical symptoms that
15   they would exhibit.
16   Q.   How about abdominal or stomach cramps?
17   A.   Definitely, yes, that would be included in that.
18   Q.   So if those symptoms existed under the facts as you
19   understand them to be, that would be the distinction --
20   distinguishing factor as to whether Mr. Purbeck was
21   suffering from heat-related illness?
22   A.   That's correct.
23   Q.   And specifically heat exhaustion?
24   A.   That's correct.
25   Q.   And if those symptoms were not present, then if I

1    understand correctly, your opinion would be he would not be

2    suffering from a heat-related illness?

3    A.   That's correct.  He would still have the predisposing

4    factors that would put him at a higher risk, but he doesn't

5    have the signs or symptoms that would lead me to a diagnosis

6    of a heat-related illness.

7    Q.   Is it all those symptoms have to be present, or just

8    some of those symptoms, or how does that work?

9    A.   No.  It's a spectrum again.  So the more symptoms you

10   have and the more severe, the farther on that spectrum --

11   the farther up or to the right, I guess, toward the more

12   severe side of that scale you would get.

13   Q.   Okay.  Were the weather conditions as described that day

14   sufficient to put Mr. Purbeck into a heat-related illness?

15   A.   If he were --

16          MR. SISTLA:  Your Honor, I'm sorry.  Could counsel

17   just repeat the question?  Just missed it.

18          MR. HALL:  I probably mumbled.  Sorry.

19          THE COURT:  Could you specify the time period too?

20          MR. HALL:  Yes.  For sure.  Okay.

21   BY MR. HALL:

22   Q.   With respect to the -- if you need to refer to those --

23   you want me to show you the --

24   A.   Yeah.  If I could take a look just to refresh my memory.

25   Q.   Of course.  I think the easiest way to do this is to

1   turn over to page 3, it's not numbered, so it's the physical

2   page 3.

3   A.   Okay.

4   Q.   And you see where it has hourly times for the date of

5   August 21, 2019?

6   A.   Yes.

7   Q.   All right.  So what I would like to draw your attention

8   to is the time period starting at 7:53.  See where that is?

9   A.   Yes.

10  Q.   And taking it down to -- I want to stop at a couple

11  spots.  One, 11 o'clock, and then the next spot is a pretty

12  big jump from 11 o'clock to 11:53.  That's kind of the range

13  I want to ask you about, is that 7:53 range up through

14  11:53; right?  With a stop at 11 along the way.

15  A.   Okay.

16  Q.   All right.

17  A.   So if I read the data correctly, at 7:53, the ambient

18  air temperature was 75 degrees.  At 11, it was 84 degrees.

19  At 11:53, it was 89 degrees ambient dry bulb temperature.

20  Q.   I guess what we don't know is how quickly it went from

21  84 degrees to 89 degrees from 11 to 11:53?

22  A.   Correct.

23  Q.   Okay.  We don't know if it increased at the same rate,

24  whether it was a sudden jump, or we just don't know;

25  correct?

1    A.   That's correct.

2    Q.   Okay.  So asking my question again, were those weather

3    conditions sufficient to cause Mr. Purbeck to have a

4    heat-related illness on August 21, 2019?  And in answering

5    that question, feel free to distinguish between the

6    different time entries and be specific when you are so that

7    we can all understand what's what.

8    A.   Sure.  So the number that's accepted in the literature

9    that I reviewed as having a significant effect on the mental

10   and physical performance is 85 degrees ambient.  So

11   according to these data, through 11:00 a.m., it's 84 degrees

12   ambient.  So I mean, I would say based on the literature

13   that I reviewed, those temperatures would not be sufficient

14   to subject him to the potential for a heat-related illness.

15   At 11:53, it is 89 degrees outside.  So it also has to do

16   with, in this particular situation, it is a clear sky so

17   there's no cloud cover.  So you would have to take into

18   account the absorption of the solar radiation from being in

19   the sun.  If he is in the shade with a relative ambient --

20   relatively low ambient humidity, then I think your risk

21   would be even lower because of the low dew point, the lower

22   wet bulb temperature.

23   Q.   How about if you're in the sun for either the entire or

24   most of the time from 7:53 to 11 o'clock, would you please

25   tell us your view on whether that would be sufficient for

1    that duration to cause a heat-related illness?

2    A.   I think it would increase your susceptibility with the

3    absorption of the solar radiation which is going to further

4    increase your -- the amount of heat that your body is

5    absorbing.  And if we add in the potential factors of

6    obesity, the medications that he's on, and those kinds of

7    things, I think it would increase your risk of a

8    heat-related illness.  Yes, sir.

9    Q.   Okay.  So having double-checked all this data that we've

10   looked at, does that change anything about either of your

11   medical opinions with respect to Mr. Purbeck, whether it's

12   the Ms. Ganger and Mr. Purbeck, if the Court were to find

13   that those are the facts that occurred versus the Agent

14   Coffin/Agent Pinette version, or is your answer still the

15   same?

16   A.   I think it's still the same because it would be based on

17   the symptoms that he presents with.  Certain people are more

18   or less susceptible to a varying range of temperatures.  So

19   you can have somebody who is exposed to a lower ambient

20   temperature or relative humidity that has more -- worse or

21   less severe symptoms than somebody else just based on their

22   ability to tolerate the heat.  So again, my answer would be

23   based on the presentation of the visual and physical signs

24   and symptoms.

25   Q.   Okay.  And again, to be super clear, you've never

1    examined Mr. Purbeck and you are unaware of any medical

2    records providing you information about his state on August

3    21, 2019; correct?

4    A.   That's correct.  I have never examined him and the only

5    medical records I reviewed were the ones that were mentioned

6    previously.

7    Q.   Is it fair to say that your purpose here then really is

8    to provide the Court with some medical information for the

9    Court to consider, given the fact that the Court is going to

10   be making various different decisions about facts that

11   occurred on that date?

12   A.   Yes, I think that's a fair statement.

13   Q.   Okay.

14           MR. HALL:  If I could have one second, Judge.

15   That's all.  Your witness.

16           THE COURT:  All right.  You may cross-examine.

17           MR. SISTLA:  Thank you, Judge.

18           THE COURT:  How long do you think you need?

19           MR. SISTLA:  I'm hoping no more than 15 to 20

20   minutes.

21           THE COURT:  We'll take a break.

22                     (Break is taken)

23           THE COURT:  Please be seated.  For planning

24   purposes, Counsel, I just want to find out, will this be

25   your last witness, Mr. Hall?

```
 1                    MR. HALL:  Yes.
 2                    THE COURT:  Does the Government expect to call any
 3      rebuttal witnesses?
 4                    MR. SISTLA:  No, Your Honor.
 5                    THE COURT:  Do y'all anticipate we can complete
 6      the proceedings by 5 o'clock?  The reason I'm asking is the
 7      CSOs need to know whether they need to make arrangements to
 8      stay here beyond 5 o'clock.
 9                    MR. SISTLA:  Your Honor, I apologize.  I intend
10      cross to be, like I said, 15 or 20 minutes.
11                    MR. HALL:  Yes.
12                    THE COURT:  All right.  Very good.
13                    MR. SISTLA:  May I proceed?
14                    THE COURT:  You may.
15                            Cross-Examination
16      BY MR. SISTLA:
17      Q.  I will be very conscientious to speak slowly even though
18      it's the end of the day.  Good afternoon, Dr. Allen.  How
19      are you?
20      A.  I'm doing well.  Thanks.  Good afternoon.
21      Q.  So just real briefly on your background, you are an
22      emergency room physician?
23      A.  That's correct.
24      Q.  But you don't specialize in heat-related illnesses;
25      correct?
```

1    A.  I do not.

2    Q.  It's sort of whatever comes in, comes into the ER;

3    correct?

4    A.  That's correct.

5    Q.  Have you ever done any fellowships or received any

6    specialized training in heat-related illnesses?

7    A.  I have not.

8    Q.  And I know this is a hard question, but in a -- let's

9    say in a given week, and I know it depends on the season and

10   so forth, in the summer, let's say in August, what

11   percentage of cases might be heat-related illnesses?

12   A.  I'd be estimating, but two -- two percent.

13   Q.  Okay.  A relatively small percentage of your --

14   A.  A small percentage.

15   Q.  In the sense enough that it triggers a visit to the

16   emergency room?

17   A.  Correct.  Relative to the broad spectrum of chief

18   complaints that we see, yes, it would be a small percentage.

19   Q.  And you've been a physician for close to 20 years if I

20   got my numbers right?  I don't want to -- no.  Just under --

21   about 18 years, I guess?

22   A.  Yeah.  I graduated from medical school in 2004.  So yes,

23   18 years.

24   Q.  So 18 years.  And so it would be fair to say that you've

25   probably treated hundreds, if not thousands of heat-related

1    illnesses?

2    A.  I think that's a fair statement.  Yes.

3    Q.  If I'm undercounting, please --

4    A.  No.  I think hundreds would be probably more accurate.

5    Q.  Hundreds would be more accurate?  Okay.  In those

6    hundreds of cases you've seen, is it fair to say that the

7    patient -- you've identified -- excuse me.  You've

8    identified some factors on direct examination that may make

9    someone more susceptible to heat-related illnesses; correct?

10   A.  That's correct.

11   Q.  And one of them was obesity; right?

12   A.  Yes.

13   Q.  And another one was some kind -- perhaps the medications

14   they're on; correct?

15   A.  That's correct.

16   Q.  Is it fair to say that one of the most important

17   factors, though, is age, and if you're very old or very

18   young, that makes you more susceptible to heat-related

19   illnesses?

20   A.  I would say it's a contributing factor.  I wouldn't say

21   it's the most important factor.

22   Q.  Okay.  Relative to obesity or medication, is it a more

23   significant factor?

24   A.  I think the extremes of age are probably more -- less

25   likely to be able to tolerate a hot or cold environment.

1    Q.  And so when we have these like heat warnings or heat --
2    isn't it -- it's typical that it focuses on the very young
3    and like the elderly.  Is that a fair statement?
4    A.  That's a fair statement.  Yes.
5    Q.  And the hundreds or so of cases that you've seen, do
6    those cases tend to fall into those patient populations,
7    either very, very young or much older populations?
8    A.  No.  I wouldn't say so.  I think it's a -- I wouldn't
9    say a bell curve, but I think it's a relatively even
10   distribution across the age ranges.
11   Q.  Okay.  When a patient presents with a heat-related
12   illness -- when I'm using that term, you understand that to
13   include a whole broad range of heat-related illnesses; is
14   that correct?
15   A.  Yes.
16   Q.  So that could be the extreme end being heat stroke?
17   A.  Yes.
18   Q.  And then I believe based on my Google -- being a Google
19   doctor, the low end is something called heat rash; is that
20   right?
21   A.  That's correct.
22   Q.  And heat exhaustion is sort of to the middle to the
23   higher end in that spectrum?
24   A.  That's correct.
25   Q.  All right.  And when you said the hundreds of cases,

1    that encompasses all of that; is that correct?
2    A.  Yes, it does.
3    Q.  It would be my guess that because you're an emergency
4    room doctor, you're more likely to see the heat exhaustion,
5    heat stroke type cases rather than a heat rash case?
6    A.  That's correct.
7    Q.  And if you are able to do so, with respect to those more
8    severe cases, and we'll call them the heat exhaustion, heat
9    stroke cases, are they -- are you able to sort of generalize
10   whether or not the individuals who you are examining were
11   sedentary versus like engaged in some sort of physical
12   activity?
13   A.  I don't recall specifically.  I think we see both types.
14   Frequently, it's people that are working outdoors or they're
15   endurance athletes, but also people that are sedentary and
16   stuck in a hot environment.  So I think it's a mix of all of
17   the above.
18   Q.  And when you say sedentary stuck environment, when I
19   heard you say that on direct, I was imagining like kids in a
20   hot car or something like that, or an older person stuck
21   without air conditioning on a really hot day.  Is that the
22   kind of case you're talking about?
23   A.  Yes.  That's correct.
24   Q.  And that's where the sedentary person, because either
25   they're really young or they're really old, they have an

1    inability to really deal with the situation; is that

2    correct?

3    A.  Correct.

4    Q.  If you can recall, have you had, you know, even dozens

5    of cases that presented under these sort of circumstances

6    where a person is sitting in their backyard on a relatively

7    low humid day that develops heat exhaustion?

8    A.  I can't think of a specific case with that specific fact

9    pattern.

10   Q.  I mean, that's the fact pattern we have here.  Wouldn't

11   you agree?

12   A.  Correct.

13   Q.  So -- and you've seen hundreds and hundreds of cases.

14   So that -- it might stick out and you can't think of one

15   like that?  I'm not saying it never happened, but it doesn't

16   come to mind?

17   A.  That's -- yes.  That's correct.  One does not come to

18   mind with that specific fact pattern.

19   Q.  Okay.  Now, in terms of testimony, jumping back, have

20   you ever testified before in court?

21   A.  I have.  Yes.

22   Q.  In what kind of cases?

23   A.  It was a civil malpractice trial.

24   Q.  Just a single case?

25   A.  I have testified at one trial.  Yes.

1    Q.  You've been retained as an expert in other cases?

2    A.  I have.

3    Q.  Could you ballpark?

4    A.  Retained in any capacity?

5    Q.  As an expert?

6    A.  As an expert?  Yes.  I would say probably in the order

7    of 25 cases.

8    Q.  And then the sole malpractice case you testified in, was

9    it a heat-related case?

10   A.  No, it was not.

11   Q.  Okay.  Was it related to like ER, whether -- performance

12   in the ER then?

13   A.  Yes.  It was.

14   Q.  Plaintiffs or defense?

15   A.  I was a plaintiff expert.

16   Q.  How much are you being paid to be retained in this case?

17   A.  I am being paid 200 an hour.

18           MR. HALL:  Fine question.  I just want to be

19   clear, this is a CJA case for which everything is being paid

20   not by Mr. Purbeck.  So --

21           MR. SISTLA:  I just wanted to establish if he was

22   being paid or this was pro bono.

23           MR. HALL:  I just wanted some clarity.

24           THE COURT:  Yes, sir.

25   BY MR. SISTLA:

1   Q.  And this is the first criminal case you've been involved

2   in?

3   A.  That's correct.

4   Q.  You've been rendered -- you've been asked to basically

5   render a historic opinion based on different fact patterns.

6   Is that fair to say?

7   A.  I think that's fair to say.  Yes.

8   Q.  And I just want to make sure I didn't miss anything that

9   you reviewed.  You reviewed Mr. Purbeck's declarations filed

10  in this case?

11  A.  Yes.

12  Q.  You reviewed the three academic articles?

13  A.  Yes.

14  Q.  You reviewed the medical records and now you've heard

15  some testimony about the medical records; correct?

16  A.  Yes.

17  Q.  And you reviewed the weather data for Boise, Idaho,

18  there's a couple different ones, but for the Boise area on

19  that day; is that correct?

20  A.  Yes.

21  Q.  Is there any information that you reviewed aside from

22  the testimony you've heard over the last couple days that

23  informed your opinion?

24  A.  No.  There's no additional documentation that I

25  reviewed.

1    Q.  So prior to today, were you aware that Mr. Purbeck had

2    filed many, many other pro se filings related to the events

3    on August 21 --

4    A.  No, I was not.  Oh, I'm sorry.

5    Q.  No.  I'm most guilty of it.  August 21, 2019?

6    A.  No, I was not.

7    Q.  And I am assuming you haven't had a chance to go and

8    like review those filings since you first -- since you've

9    heard about them in court today; right?

10   A.  That's correct.

11   Q.  Okay.  As a physician, as an ER physician, have you

12   encountered circumstances where the patient is not a

13   particularly -- does not -- is not a particularly good

14   narrator?

15   A.  Yes.

16           MR. HALL:  Objection.  Relevance.  He's not being

17   offered in any single fact in this case.  He's only being

18   offered for purposes of his medical opinion depending on the

19   facts decided by this Court.

20           MR. SISTLA:  May I be heard, Your Honor?

21           THE COURT:  Yes, Mr. Sistla.

22           MR. SISTLA:  Your Honor, he's evaluating -- his

23   opinion is based on evaluating in part the credibility of

24   representations that were being made.  The defendant is, in

25   the Government's view, analogous to a person presenting to

1   an ER physician making representations about their

2   conditions.  And so he's being -- he's an expert as an

3   emergency room physician, and so his experience as to

4   patients being unreliable narrators because they want

5   something I think is relevant to the Court's evaluation of

6   his testimony.

7            THE COURT:  Mr. Hall?

8            MR. HALL:  Yeah.  We've gone out of our way to be

9   clear to the Court and clear to the Government going in that

10  he's not a fact witness.  He didn't -- there is nothing for

11  him to evaluate on facts.  He's just saying recognizing the

12  fact finder in this case is Your Honor, he is providing the

13  medical information that depending on where Your Honor comes

14  down ultimately, this is how those factual findings would

15  be -- impact a medical diagnosis or medical conditions.

16  That has been the narrow focus of his engagement with me

17  from the beginning as well as his presentation to the Court

18  today.

19            In other words, if I can just add.  This is not a

20  situation in my humble opinion, I respectfully submit, where

21  questioning him about whether you believe him, do you not

22  believe him, what do you think, those are not the

23  appropriate questions for this particular witness because

24  that's not what he's doing.  He's just providing the Court

25  with the medical information depending on what the fact

1    finder in this Court, Your Honor, ultimately decides.

2            THE COURT:  I think what Mr. Sistla is getting at

3    is you want to ask when he's making diagnoses, what sort of

4    information does he rely upon and the credibility of the

5    person making the claim.  Not Mr. Purbeck, you're not asking

6    about Mr. Purbeck.  You're just asking in general.

7            MR. SISTLA:  Uh-huh.

8            THE COURT:  I will overrule the objection.  It's

9    not pertaining to Mr. Purbeck.  He's just asking in general.

10           MR. SISTLA:  Yes, sir.

11   BY MR. SISTLA:

12   Q.  Do you understand the question, doctor?

13   A.  Could you repeat it, please?

14   Q.  Sure.  So are there instances where patients, as a

15   doctor, an ER doctor, are not reliable narrators?

16   A.  Yes.

17   Q.  And is it because they may be motivated to obtain

18   something and may therefore exaggerate their symptoms or the

19   situation?

20           MR. HALL:  Same objection as before.  That's not

21   part of anything that he's discussed or opined upon.  So

22   while I don't have any doubt that he's competent to talk

23   about these things, that's not one of the issues that he's

24   either testified about, he's been presented for, or that's

25   before the Court insofar as this witness is concerned.

1    Objection to relevance.

2              THE COURT:  Overruled.

3    BY MR. SISTLA:

4    Q.  You may answer.

5              MR. SISTLA:  You said overruled, right, Your

6    Honor?

7              THE COURT:  Overruled.

8    BY MR. SISTLA:

9    Q.  You may answer it.

10   A.  That's one specific instance of that particular

11   situation.  Yes.

12   Q.  I mean, when you say one specific, you've experienced

13   that only one time in your career?

14   A.  No.  I'm saying that's one example of that type of

15   situation where they're exaggerating symptoms for ulterior

16   motives.

17   Q.  Sometimes to get drugs or something like that; correct?

18   A.  Correct.

19   Q.  What are other -- what would be another instance of

20   that?

21   A.  Munchausen Syndrome where they exaggerate their symptoms

22   to get sympathy from others would be one, or to get specific

23   treatment would be another.

24   Q.  Would it be fair to say that in the absence of actually

25   evaluating a patient, evaluating a person specifically, it's

1   hard to make that determination in terms of reliability?

2   A.   Yes.  I would say that's a fair statement.

3   Q.   And it's -- and if you're only looking at a case from a

4   historic standpoint, it's hard to make that evaluation from

5   your perspective?

6   A.   Yes.  That's correct.

7   Q.   Okay.  Stopping there.  That's where I was going.  All

8   right.  So -- and you mentioned on direct you've never

9   physically examined Mr. Purbeck; correct?

10  A.   That's correct.

11  Q.   Have you actually ever had a conversation with Mr.

12  Purbeck about the events on August 21, 2019 outside from

13  reading his declaration?

14  A.   I have not.

15  Q.   No personal conversations whatsoever?

16  A.   Not directly related to the case.  I think we may have

17  had some trivial conversations in passing over the past two

18  days, but nothing related directly to the case.

19  Q.   So the only additional information you've learned over

20  the last couple days relating to those events were from his

21  testimony as well as the other testimony; is that correct?

22  A.   That's correct.

23  Q.   You -- I just want to make sure we went through -- make

24  sure I got this right.  But when you say heat-related

25  illnesses, there was this sort of sliding scale, heat rash,

1    then heat cramps, then heat syncope.  Is that how you

2    pronounce that?

3    A.   Syncope.

4    Q.   Syncope.  That's the fainting?

5    A.   Correct.

6    Q.   Heat exhaustion, and then heat stroke; right?

7    A.   That's correct.

8    Q.   And based on either version of events, you can

9    definitively rule out he did not suffer from a heat stroke

10   event; is that correct?

11   A.   I would say that it's much less likely that he suffered

12   from heat stroke.  Although, diagnosing somebody with heat

13   stroke requires the specific diagnosis of what would be

14   described as end organ damage.  So a failure of one or more

15   body systems.  So, for example, renal failure, coma, altered

16   mental status.  Something that would constitute an end organ

17   system being in failure.

18   Q.   Well, you reviewed his medical records that were

19   subsequent to those to the event in question; correct?

20   A.   Correct.

21   Q.   Was there anything in those medical records that was

22   indicative of an end organ failure that you --

23   A.   Not that I saw in the medical records.  No.

24   Q.   And if someone had suffered from a heat stroke event,

25   would you expect to see such information in the records?

1   A.   Perhaps if it was persistent.   If they had a transient

2   elevation of some particular lab marker that subsequently

3   normalized, perhaps not.   But I would expect that you would

4   probably see something that would be residual.

5   Q.   Now, you heard Mr. Purbeck testify for several hours

6   today; correct?

7   A.   Correct.

8   Q.   And if my recollection is wrong, just correct me.   But

9   would it be fair to say that throughout his testimony on

10  both direct and cross-examination, Mr. Purbeck represented

11  that at least in the morning, from 8:00 a.m. till 11:00 or

12  noon while the FBI agents were interviewing him, he was

13  cognitively together, he understood the questions, he was

14  able to answer the questions.   Is that a fair representation

15  of his testimony?

16           MR. HALL:   Objection.   Relevance.   And it's also

17  asking -- this witness has nothing to do with that.   I'm

18  trying to remember what the testimony was.   I don't have

19  memory if he did that.

20           THE COURT:   Sustained.

21           MR. SISTLA:   Well, Your Honor, I guess his

22  testimony says it's based on what he heard.   So I guess I'm

23  trying to confirm the information --

24           THE COURT:   You asked based on what he heard.   You

25  are asking him to confirm the testimony.   You can pose the

1    question based on the testimony that's been presented.  But

2    not asking him about whether he recalls it accurately or

3    not.  I know he has been very attentive, I can see him

4    sitting down here, but he is not the person that has to

5    recall that.  You can pose the question to him based on the

6    testimony that's been presented and ask him questions based

7    on that.

8           MR. SISTLA:  Let me see if I can do it this way if

9    it's okay with the Court.

10   BY MR. SISTLA:

11   Q.  Do you agree with me that Mr. Purbeck testified that he

12   understood the FBI agents' questions?

13          MR. HALL:  Same objection.  We are getting into

14   what was said and having it repeated.  Objection.

15          THE COURT:  Sustained.

16          MR. SISTLA:  Give me a second.  I'm just trying to

17   think of how I want to phrase it.

18          THE COURT:  Yes, sir.

19   BY MR. SISTLA:

20   Q.  Did you learn anything today that would suggest to you

21   that Mr. Purbeck did not understand the FBI agents'

22   questions?

23          MR. HALL:  Same objection.

24          MR. SISTLA:  Well, I'm not asking if he -- I'm

25   asking what he learned, if he was present.

1          MR. HALL:  Objection.  That's not what this

2     witness is for.  Relevance.

3          MR. SISTLA:  Well, Your Honor, he's saying that he

4     based his opinion on the testimony here.  So you can't have

5     it both ways, I guess.  His direct examination was premised

6     on him recalling the testimony.

7          MR. HALL:  Well, we're asking about particularly

8     do you recall if this was said, do you recall if that was

9     said, and start going after that.  If you want to say based

10    on what you heard does it change anything, I think that's

11    fine.  But he's asking about specific -- he's basically

12    asking the question, here is what I am proposing to you,

13    Mr. Witness, that was said.  Do you adopt that and agree

14    with that.  And that's my basis for my objection.  I don't

15    believe he can do that for this witness.

16         THE COURT:  I think -- Mr. Sistla, I think I know

17    where you're trying to get there, and you're getting close,

18    but I don't know how many more times you want to try, you

19    know.  What you're trying to get to is, is there evidence of

20    the kind of condition that Mr. Purbeck has alleged.

21         MR. SISTLA:  Right.

22         THE COURT:  Something like that.  And I think

23    that's a fair question.  But not to ask a summary of the

24    evidence.  You can presume -- ask him to presume facts that

25    he's heard and pose it in that way.

BY MR. SISTLA:

Q.  Assuming it's true as -- assuming it's true that Mr.
Purbeck -- I'll avoid the word -- assuming it's true that
Mr. Purbeck understood the FBI's questions -- do you
understand the premise of the question?

A.  Yes.

Q.  Okay.  I just want to make sure we're on the same --
okay.  Assuming that Mr. Purbeck understood and was able to
intelligently answer the FBI's questions while he was
interviewed, is that evidence, based on your training, that
he was suffering from a heat-related illness?

A.  I don't think independently that fact alone I could make
a determination as to whether he was or was not suffering
from a heat-related illness.

Q.  So then it's possible that someone could be suffering
from a heat-related illness, even heat exhaustion, and still
be completely there cognitively?

A.  Yes.

Q.  Because -- the reason I'm asking is you had -- there
were some questions on direct examination about making
informed medical choices.  And it sounded like your answer
was more in the context of actually being in like a medical
setting and whether you could provide informed consent in a
medical setting.  Did I understand that correctly?

A.  Yes.

1    Q.   Okay.  So the mere fact that based on the one set of --

2    assuming one set of facts is true, that Mr. Purbeck was

3    suffering from heat exhaustion, does not eliminate or

4    exclude the possibility that he could perfectly comprehend

5    and answer the agents' questions?

6    A.   That's correct.

7    Q.   Okay.  Do you understand the question?  I saw you

8    hesitate, because I want to make sure --

9    A.   Yeah.  Just let me -- I want to make sure that I have it

10   right in my own mind.  So you can have a heat-related

11   illness and be cognitively intact.  You can have no

12   neurologic symptoms, but have other signs and symptoms of a

13   heat-related illness.  You can also be not neurologically

14   intact and not suffering from a heat-related illness.

15   Q.   Of course.  There can be other instances where --

16   A.   Right.

17   Q.   Right.  All I'm getting at is, the mere fact that

18   someone has a heat-related illness does not mean suddenly

19   they don't understand what's going on?

20   A.   No.  I mean, you can have a heat-related illness and

21   still be cognitive -- 100 percent cognitively intact.

22   Q.   All right.  So, for example, like tennis players at the

23   US Open can be suffering from heat exhaustion, right, and

24   understand everything that's going on around them?

25   A.   Correct.

1    Q.   And keep playing their match which is a very demanding

2    complex thing; correct?

3    A.   Correct.

4    Q.   I have one question -- real quick question.  You said

5    that the literature talked about an 85 degree Fahrenheit

6    ambient temperature.  Do you remember which article that was

7    in?

8    A.   I believe --

9    Q.   Let me -- and I may have assumed, but you took that from

10   one of the articles that you read?

11   A.   I did.  I did.  I'd have to look and see which one.

12   Bear with me for just a moment.

13   Q.   And I'm not trying to be difficult.  I couldn't find it,

14   so that's why I was wondering which article.

15   A.   Yeah.  I remember seeing it.  I just don't remember

16   specifically which article it's in.

17   Q.   Okay.  And I don't want to take up too much of the

18   Court's time.  So why don't we just jump to the article.

19   It's the Hancock and Vasmatzidis article.

20   A.   Okay.

21   Q.   Effects of Heat Stress on Cognitive Performance: The

22   Current State of Knowledge.  That's one of the three

23   articles you relied upon; correct?

24   A.   That's correct.

25   Q.   And just real quick, how did you pick these three

1     articles out of the thousands and thousands of articles out

2     there?

3     A.   It was a PubMed search that I did.

4     Q.   What were the search criteria that you used?

5     A.   Heat-related illness, hyperthermia.

6     Q.   Hypo or hyper?

7     A.   Hyperthermia.   I think those were the search terms that

8     I used.

9     Q.   And have you relied on this prior in your prior practice

10    or --

11    A.   These specific articles, no.

12    Q.   Okay.   So if you look at the Hancock article, there is

13    discussion -- do you recall the article pretty well?

14    A.   Yes.

15    Q.   Okay.   There was discussion as to what temperature scale

16    we should look at.   Do you recall that discussion?

17    A.   Yes.   I do.

18    Q.   And one of the criticisms they made, you would agree is

19    that oftentimes the literature refers to effective

20    temperature, but what we should really look at is the wet

21    bulb temperature; correct?

22    A.   That's correct.

23    Q.   And can you explain to the Court the difference between

24    wet bulb versus ambient temperature, or dry bulb as you

25    understand it?

1    A.   Right.   So dry bulb is the ambient temperature that's

2    taken with a thermometer that is, as described, is a dry

3    thermometer.   The wet bulb globe temperature takes into

4    account the -- not only the relative humidity, but also what

5    they describe as the solar radiance.   So it's a black --

6    basically a black sphere that is -- has a thermometer

7    incorporated in it.   So it not only encompasses the amount

8    of solar radiation that body absorbs, but also the ambient

9    temperature and the relative humidity.

10   Q.   And you would agree that the authors of this study

11   recommend or argue that the focus should be on the wet bulb

12   temperature; correct?

13   A.   That's correct.

14   Q.   And in this study, they are looking at wet bulb

15   temperatures in the range of, you know, 30 degrees Celsius

16   or higher in most cases.   Is that an accurate

17   representation?

18   A.   Yes.   I think that's an accurate representation.

19   Q.   Okay.   And I believe I found your 85 degrees.   It's on

20   page 358 just for your reference.   But that's ambient air;

21   correct?

22   A.   Correct.

23   Q.   But what the authors are criticizing is you should

24   really look at the wet bulb temperature; right?

25   A.   I think that's a fair assessment of the authors'

 1    position.

 2    Q.  And if you look at the meteorological data, the

 3    Government -- as you see the exhibit to your -- should be on

 4    the monitor to your right, I think.

 5              THE COURT:  We may have a copy.

 6              MR. SISTLA:  Oh.

 7              THE WITNESS:  It's actually easier to see here if

 8    that's okay.

 9              THE COURT:  Is it?  Yes, sir.

10    BY MR. SISTLA:

11    Q.  Government's Exhibit 6, there are wet bulb temperature

12    readings for the day in question.  Do you see that?

13    A.  Yes.

14    Q.  And for the time period that we've been looking at, the

15    morning between 7:53 and let's go up to 11:53, those

16    temperatures don't exceed 62 degrees; is that correct?

17    A.  I'm sorry.  Can you slide it to the right just a little?

18    There we go.

19    Q.  Is that better?

20    A.  Yeah.

21    Q.  So I'm starting at -- if you look in the area from 7:53

22    to 11:53.

23    A.  Yes.

24    Q.  What is the range of wet bulb temperatures in that time?

25    A.  So 13.9 C to 16.7 degrees C.

1   Q.  Would you agree that that's well below the wet bulb

2   temperatures that this article identifies as where there are

3   concerns about the effects of heat on cognitive performance?

4   A.  Yes.

5   Q.  About half of -- half what they're looking at; correct?

6   A.  Correct.

7   Q.  And you would also agree that the conditions in Boise on

8   that day were relatively dry based on the relative humidity;

9   correct?

10  A.  Yes.

11  Q.  In your experience as an ER physician, does the concern

12  with heat-related illness, especially serious heat-related

13  illness, diminish or become lower in lower humidity

14  situations?

15  A.  A lower humidity situation would decrease the risk of

16  serious heat-related illness.

17  Q.  Understanding that it's not a linear relationship?

18  A.  Correct.

19  Q.  Okay.  Based on this sort of additional focus on the wet

20  bulb temperature, does that have any effect on sort of your

21  conclusions with respect to those two fact patterns, or does

22  it ultimately depend on the reported symptoms of the

23  individual?

24  A.  I think it still -- it still depends on the reported

25  symptoms.  You can have somebody that even in a relatively

1    dry environment, depending on the circumstances that they're

2    involved in, they can still have a significant heat-related

3    illness even in a low humidity environment.

4    Q.   But putting together all these factors, sedentary

5    individual, the low wet bulb temperatures, the low humidity,

6    and given even the ambient air temperature, in your

7    experience, I think you have already said this, that would

8    be a very unusual instance of a person developing a heat --

9    a serious heat-related event?  Illness rather?

10   A.   I'm sorry.

11   Q.   I'm sorry.  I misspoke.  It would be unusual that an

12   individual developed a serious heat-related illness under

13   these -- in these circumstances?

14   A.   I would say those climatological conditions would

15   decrease the risk for serious heat-related illness, all

16   other things being equal.

17   Q.   In fact, you can't even recall sort of a situation where

18   you treated a patient in sort of similar circumstances?

19   A.   Not a sedentary individual in those particular

20   circumstances.  No.  I can't recall that particular fact

21   pattern.

22                MR. SISTLA:  No further questions, Your Honor.

23                THE COURT:  Redirect, Mr. Hall?

24                MR. HALL:  Yes.

25                         Redirect Examination

1     BY MR. HALL:

2     Q.  Having treated patients over the 18 years, past 18

3     years, is it true that it's not uncommon for nonmedical

4     patients, in other words -- I guess they're medical

5     patients, but people who aren't doctors or otherwise medical

6     profession, let's call -- like me, us lay people, to

7     describe medical conditions that they're undergoing in ways

8     that are not medically accurate?

9     A.  Yes.

10    Q.  All right.  So, for instance, someone -- example I'm

11    going to ask you about is if someone is saying they are

12    suffering from heat stroke, that may or may not be a

13    medically accurate use of that term.  Would you agree with

14    that?

15    A.  I would agree with that.  Yes.

16    Q.  All right.  And then what is your -- we had this little

17    discussion about the wet bulb versus the ambient

18    temperature.  In your experience as an emergency room

19    physician, what is your opinion about those authors' view

20    that wet bulb is a better climatological reference point

21    versus the dry bulb ambient temperature?

22    A.  I think the wet bulb temperature takes into account much

23    more data to give you a bigger picture of what the actual

24    affect of the environment that you're in has on the body.

25    So not only is it ambient temperature, but it's relevant

1   humidity as well as the amount of solar radiation that you

2   are absorbing from the sun.  So I mean, I think it is a

3   better representation of the actual effects of the

4   environment.

5   Q.  Does it measure what it's like being in the sun versus

6   being in the shade or is it just kind of a general overview?

7   A.  So that's what the wet bulb takes into account.  Being a

8   black body, it would be a different wet bulb temperature if

9   it's in the shade versus the sun.

10  Q.  It would be lower?

11  A.  It would be lower in the shade versus in the sun.

12  Correct.

13  Q.  Anything that we've just discussed just now that causes

14  you to change your original opinions that you provided to

15  the Court about depending on what the Court ultimately finds

16  as to whether Mr. Purbeck was suffering from heat exhaustion

17  on August 21, 2019?

18  A.  Nothing has changed.  I mean, it still depends on the

19  signs and symptoms that he exhibits would be the principal

20  factor behind my diagnosis for that specific case.

21          MR. HALL:  No more questions, unless the Court has

22  questions.

23          THE COURT:  May Dr. Allen be excused?

24          MR. HALL:  Yes.  Unless -- I guess you -- okay.

25          THE COURT:  Thank you, sir.  You are excused.

1          THE WITNESS:  Thank you, sir

2          THE COURT:  Any other evidence you want to

3     present, Mr. Hall?

4          MR. HALL:  No.  We rest.

5          THE COURT:  Any rebuttal evidence from the

6     Government?

7          MR. HERSKOWITZ:  No, Your Honor.

8          THE COURT:  All right.  We need to discuss

9     briefing on this matter.  I'm sure it will take a more

10    significant period of time than usual for the transcript to

11    be prepared in this matter.  My study of the docket, but I

12    stand to be corrected by counsel, is y'all have completed

13    briefing on all other motions, that all we need to brief is

14    the document number 25.  Mr. Herskowitz, you're going to be

15    briefing that; is that right?

16         MR. HERSKOWITZ:  Yes.

17         THE COURT:  Mr. Hall?

18         MR. HALL:  Yes, sir

19         THE COURT:  Okay.  All right.  Ms. Burgess was

20    pushed into service, you recall.  She was not the court

21    reporter scheduled.  She's been very kind to assist us

22    yesterday on short notice and to be here today.  She said

23    she needs about three weeks to prepare the transcript, which

24    is certainly understandable.  So let's look at the calendar

25    together, if you have your calendars available, to let me

1    know what you have going on.  I think, Mr. Hall, it might be

2    helpful for you to go first.  You can delineate what the

3    issues are --

4              MR. HALL:  Yes, sir.

5              THE COURT:  -- which you are still contending

6    after the hearing.  So let's say the transcript is going to

7    be prepared essentially toward the end of September.  So,

8    Mr. Hall, I'm looking to you for your October schedule and

9    how much time you need.

10             MR. HALL:  Yes, sir.  So let me just say as a

11   point of personal preference, request of the Court is I am

12   celebrating my 25th wedding anniversary this year.

13             THE COURT:  Congratulations.

14             MR. HALL:  Hard to believe I made it.

15             THE COURT:  That's significant.

16             MR. HALL:  But we're disappearing for four or five

17   days right at the end of September, early October.

18             THE COURT:  Good.

19             MR. HALL:  So I respectfully ask if we can just

20   set it in a way that I have sufficient time once I return

21   from that.  I understand the transcript may exist, but I

22   hope not to exist.  So --

23             THE COURT:  You tell me what works for your

24   schedule in the month of October.

25             MR. HALL:  I guess, all things considered, I would

1    like to have 30 days from when I start, and I'm supposed to

2    be back on the 4th.  I may, depending on whether we come

3    back a day early or not, I'll come back October 3rd or 4th.

4    So if I could get until sometime --

5            THE COURT:  November?

6            MR. HALL:  Yeah.  Sometime -- I love to file on

7    Mondays.  It doesn't have to be that.  But I think November

8    the 7th would be the date I would be looking for.

9            THE COURT:  That's fine -- is that okay with the

10   Government?

11           MR. HERSKOWITZ:  Yes, Your Honor.

12           THE COURT:  November 7th then for the post-hearing

13   brief of the defendant.  Mr. Herskowitz, or if you're going

14   to have Mr. Sistla write it, whoever's schedule needs to be

15   accommodated.

16           MR. SISTLA:  Your Honor, I feel like Mr. Mund and

17   I may end up doing this.  The Thanksgiving holiday is just

18   in the middle there.  Could we have until the 5th of

19   December to file or the 6th of December?

20           THE COURT:  Any objection to that, Mr. Hall?

21           MR. HALL:  No.  I'm fine.  Whatever the Court

22   wants as far as a date, I have no problem with however they

23   want to do it.  Do you want longer, Mr. Sistla?

24           MR. SISTLA:  No.  No.  I think that will be fine.

25           THE COURT:  December 6th?

1        MR. SISTLA:  If that's okay with the Court, Your

2   Honor.

3        THE COURT:  Okay.  December 6th.  And then a reply

4   puts us in, getting back to your court, Mr. Hall, with the

5   holidays, around there.  What do you need for your reply

6   date?

7        MR. HALL:  Normally I ask for two weeks and where

8   two weeks puts me.  Two weeks puts me right pre-Christmas.

9   I think better to get it done than not.  How about the 21st

10  of December?

11        THE COURT:  Yes, sir.  December 21st.  And that

12  will complete the briefing.  Y'all have already done the

13  briefing -- Document 40, it's a motion that is under seal,

14  but I understand it's moot?

15        MR. HERSKOWITZ:  That's right.

16        MR. HALL:  Yes.  That's correct.  I'm sorry.

17  Yeah.  I had to think of what it was.  I don't think it was

18  numbered.  Yes.  I know what it is.  And yes, that's

19  correct.

20        THE COURT:  Go ahead, Mr. Herskowitz.

21        MR. HERSKOWITZ:  Just to put on the record, we did

22  provide at the beginning of the hearing yesterday a couple

23  pages from the Grand Jury transcript from Agent Coffin as

24  Jencks, provided that to Mr. Hall, so I want to put that on

25  the record.  And I assume it's not going to be an issue, but

1    that's not to go to Mr. Purbeck.  That's to remain with

2    Mr. Hall, in the Government's view.  Unfortunately, some

3    things have appeared in the civil case, but we are hopeful

4    that remains with Mr. Hall.  And I don't think that's going

5    to be a problem, but I just wanted to raise that.  Probably

6    should have talked to you beforehand.

7              MR. HALL:  Fine.  No problem.

8              THE COURT:  Okay.

9              MR. HALL:  Not an issue.

10             THE COURT:  All right.  Very good.  Is there

11   anything else, Mr. Hall, you want to discuss this afternoon?

12             MR. HALL:  No, sir.

13             THE COURT:  Mr. Herskowitz?

14             MR. HERSKOWITZ:  No, Your Honor.  Thank you.

15             THE COURT:  All right.  You all have a good

16   holiday weekend.  Take care.

17                  (End of hearing at 4:39 p.m.)

18                   REPORTER'S CERTIFICATION

19        I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21

22                         *s/Lori Burgess*
                           Lori Burgess
23                         Official Court Reporter
                           United States District Court
24                         Northern District of Georgia

25                         Date:  January 3, 2023