IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No. |
| | : | 3:21-CR-0004-TCB-RGV |
| ROBERT PURBECK | : | |

## DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS, PASSWORD DISCLOSURES, ETC.

Defendant Robert Purbeck hereby submits his post-hearing brief in support of, not in lieu of, his Motion to Suppress Statements, Password Disclosures, and Matters Arising Therefrom [Doc. 25]. He also incorporates by reference the legal and factual arguments previously set forth in that motion.

## I.   The Interrogation of Mr. Purbeck.[1]

Between 7:30 a.m. and 7:35 a.m. on August 21, 2019, multiple FBI agents, wearing body armor, approached Mr. Purbeck while he was in the driveway of his home, standing on the driver's side of his car, retrieving a coffee mug from inside the vehicle. (Doc. 77 at 38:20-39:6, 46:14-48:11; Doc. 76 at 85:19-25).[2] Mr. Purbeck knew what time it was because he had to leave by 7:35 a.m. each morning

---

[1] Unless noted otherwise, Mr. Purbeck is setting forth the facts as he understands them to exist, recognizing of course that the Court will have to resolve the factual disputes that exist between what he says occurred and what the FBI says occurred.
[2] Mr. Purbeck's citations to the motions hearing transcripts will be to page and line numbers, as follows: "Doc. 77 at 38:20-39:6" is a citation to page 38 line 20 through page 39 line 6 of Vol. II of the motions hearing transcript.

so that he would arrive at work on time. (Doc. 77 at 39:2-6). Mr. Purbeck first became aware of the presence of the agents when one of the agents touched him on the shoulder and spoke his name. (Id. at 39:18-40:15). At that same time, Mr. Purbeck saw vehicles pulling up and additional law enforcement officers, wearing body armor, with their guns drawn approaching his house. (Id. at 40:16-41:9, 129:23-130:25; Doc. 76 at 85:19-25).[3] They knocked on the front door, waited only a few seconds, and then entered Mr. Purbeck's home. (Doc. 77 at 40:17-25). His physically disabled girlfriend (Sarah Ganger) was inside, still in bed, when she was awakened by an FBI agent yelling and pointing a gun at her. (Doc. 77 at 5:1-24). There were at least 14 FBI employees (9 agents and 5 other FBI personnel) involved in the law enforcement activities at Mr. Purbeck's home on August 21, 2019. (Doc. 76 at 9:24-25).

The FBI have claimed that they conducted what would be an obviously illegal pat-down of Mr. Purbeck for weapons. (Doc. 76 at 12:16-24, 44:3-5). Mr. Purbeck testified that no such pat-down occurred. (Doc. 77 at 42:20-43:1). Agent

---

[3] Agents Coffin and Pinette's testimony that no weapons were drawn when the FBI approached Mr. Purbeck and his home is demonstrably incorrect. Not only did Mr. Purbeck see FBI agents with drawn weapons, (Doc. 77 at 40:17-22), and an FBI agent pointed a gun at Ms. Ganger, (id. at 5:13-20), but FBI witnesses themselves corroborated they had guns drawn. Agent Heap testified that, at a minimum, he and the other 5-6 agents on the entry team had their weapons drawn, (Doc. 76 at 205:6-25). Lead agent Clark Harshbarger testified that it was the FBI's standard operating procedure to have their weapons drawn when entering a location. (Id. at 189:1-10).

Coffin claimed that he told Mr. Purbeck he was not under arrest, (Doc. 76 at 13:20-25), but he also admitted that he did not tell Mr. Purbeck that he was free to leave. (Id. at 15:21-25). Agent Pinette went even further, stating that he told Mr. Purbeck that he did not have to stay, but if he did stay, they would restrict his movements. (Id. at 147:8-9). However, nothing in the case report prepared jointly by both case agents reflects that either one of them ever told Mr. Purbeck that he did not have to stay or that he was free to leave, even though, as Agent Pinette admitted, telling Mr. Purbeck he is free to leave is far more significant than the passage about no law enforcement weapons being observed, which the agents did include in their report. (Id. at 148:9-149:18). Mr. Purbeck heard nothing about his being free to leave or anything similar. (Doc. 77 at 57:14-58:6).

Instead, after identifying themselves as the FBI, they took Mr. Purbeck's car keys from him and advised him that his employer (Ada County) knew he would not be coming to work that morning. (Doc. 77 at 41:19-42:6, 45:2-23). Because his vehicle was included within the scope of the search warrant, the FBI would have stopped him from leaving in his vehicle even if they had not taken his keys.  (Doc. 76 at 150:4-11). Mr. Purbeck did not feel free to leave from his encounter with the FBI agents. (Doc. 77 at 43:10-20, 58:7-12, 59:6-14).

With at least one of the agents holding onto Mr. Purbeck's arm, they guided Mr. Purbeck back inside his house and out into the backyard. (Doc. 77 at 44:14-

45:17). The FBI agents had arranged three chairs outside, (id at 46:3-13), in the sun, not in the shade, even though there was shade available. (Doc. 76 at 92:15-25; Doc. 77 at 54:22-55:3). Mr. Purbeck tried to sit in one of the chairs so that he was not facing the sun, (Doc. 77 at 54:1-21), but Agent Pinette directed him to a different chair where the sun would shine directly into Mr. Purbeck's eyes. (Doc. 77 at 46:5-13, 50:10-23; see also Doc. 76 at 92:14-25, 53:22-54:21). The FBI filled Mr. Purbeck's coffee mug and brought it outside to Mr. Purbeck. (Doc. 77 at 51:4-22).  And then the FBI's interrogation began.

For the next few hours, FBI agents interrogated Mr. Purbeck in his backyard. Soon after the interrogation started, Mr. Purbeck's cat ran out of the back door. (Id. at 55:14-56:5). When Mr. Purbeck stood to grab his cat, Agent Pinette ordered him to sit back down, and Agent Pinette instead scooped up Mr. Purbeck's cat and tossed him back into the house. (Id.). Around this same time, another agent came outside and began angrily screaming questions at him regarding the whereabouts of a gun. (Id. at 69:1-22). The screaming agent had his hand on his holstered gun. (Id. at 70:1-10). Agents Coffin and Pinette also used stern and much more forceful tones when addressing Mr. Purbeck when they believed that he was not being fully cooperative with them. (Id. at 215:17-216:12).

Initially when the FBI took Mr. Purbeck to the backyard, he still had his phones on him: both his personal cellphone and his work cellphone. (Doc. 77 at

55:4-13). Relatively early in the interview process, however, Agent Coffin told Mr. Purbeck to hand over his phones. (Id. at 56:6-57:6). When Mr. Purbeck asked to keep his work cellphone, Agent Coffin denied that request and took both phones. (Id. at 56:9-57:8).

As Agent Pinette testified, being in the sun that day would be hot, (Doc. 76 at 129:17-19), which is further corroborated by Mr. Purbeck's testimony. (Doc. 77 at 76:19-77:6). And it is undisputed that the three chairs the FBI arranged initially to question Mr. Purbeck were in the sun. (Doc. 76 at 92:15-25).

There, however, is a factual dispute as to whether the FBI intentionally kept Mr. Purbeck in the sun: Agents Coffin and Pinette say that they did not intentionally keep him in the sun; whereas, Mr. Purbeck explains in detail how the FBI repeatedly ensured that they questioned him while keeping him in the direct sunlight. As Mr. Purbeck testified, one of the agents asked Mr. Purbeck whether the sun was in his eyes, and Mr. Purbeck responded yes. (Doc. 77 at 67:5-21). Agents Pinette and Coffin then stood up and directed Mr. Purbeck to a different place in the yard, where the sun was again in Mr. Purbeck's eyes, which Mr. Purbeck interpreted as another showing of the FBI's dominance over him. (Doc. 77 at 68:4-21). Furthermore, other witnesses confirm that Mr. Purbeck was in the sun during his time in the backyard with the FBI.  Agent Heap testified that when he came outside, prior to Ada County arriving, he found Mr. Purbeck sitting in the sun

in one of three chairs arranged in a semi-circle, U-shape formation. (Doc. 76 at 213:20-214:14). Det. Pacheco with the Ada County Sheriff's Office testified that, when he arrived, Mr. Purbeck was still sitting in the sun. (Doc. 76 at 229:9-11). Sarah Ganger testified that, when she was able to look through a window and see Mr. Purbeck, he was in the sun. (Doc. 77 at 7:9-13:18). The testimony of these witnesses is all consistent with, not only Mr. Purbeck's testimony about being placed in the sun, but also the photographs of the arrangement of chairs that the FBI put together. (Doc. 76 at 92:15-25; see also Gov't Exh. 6).

After multiple hours of interrogation, Mr. Purbeck asked the FBI agents whether he needed an attorney. (Doc. 77 at 73:8-20). Agent Coffin's response was that he could not provide legal advice, but that if Mr. Purbeck was going to call an attorney, he should do so expeditiously because the only way he would get the best deal is by talking to the FBI before someone else did, (id. at 73:17-24, 76:9-12, 78:9-15), that the FBI needed Mr. Purbeck "to cooperate quick because it's to [Purbeck's] advantage to cooperate quickly," (Doc. 76 at 101:2-6), and that it was preferable for Mr. Purbeck to cooperate that day without seeking legal counsel. (Doc. 77 at 215:5-16). Mr. Purbeck then told Agents Coffin and Pinette that he wanted to call an attorney and could he have his phone to do so. (Doc. 77 at 73:21-75:3, 78:1-15). Agent Coffin told Mr. Purbeck that he could not have his phone back for fear he would destroy evidence. (Id. at 75:1-3). Mr. Purbeck then asked

whether he could use one of the agents' phones to call an attorney. (Id. at 75:4-18).

Again, Agent Coffin denied Mr. Purbeck's request. (Id.).  Mr. Purbeck then asked

whether one of the agents would call an attorney for him. (Id. at 75:18-22). Again,

Agent Coffin denied Mr. Purbeck's request. (Id.).

By this time, Mr. Purbeck had developed painful heat cramps in his torso

area. (Doc. 77 at 78:24-79:10). Mr. Purbeck had not consumed any water since the

previous evening. (Id. at 79:11-80:19). The FBI agents drank bottled water

throughout the day, but they never offered Mr. Purbeck any water. (Doc. 76 at

94:21-95:24; Doc. 77 at 79:11-80:20). Mr. Purbeck believed he would not receive

any water even if he asked, given his earlier experiences having been moved from

direct sunlight to direct sunlight and his repeated requests to call an attorney

having been denied. (Doc. 77 at 79:11-80:20).  Throughout his interactions with

the FBI (from the driveway, through his own house, and out into the backyard),

Mr. Purbeck did not feel free to leave. (Id. at 71:6-23).

The only way Mr. Purbeck believed that he would receive any grace from

Agents Pinette and Coffin, not to mention water, air-conditioning or shade, or

otherwise be relieved from his presently intolerable situation was to make certain

inculpatory statements about his on-line identities and activities, to disclose his

passwords, and to sign the FBI's consent to assume on-line identities form. (Id. at

81:6-19). It is the disclosure of those identities and passwords that enabled the FBI

to access Mr. Purbeck's computers that contained the inculpatory information that is being used to prosecute this case against Mr. Purbeck.

For the first time that day, the FBI agents provided Mr. Purbeck with his Miranda rights, giving him an FBI FD-395 Advice of Rights form, on which his Miranda rights were spelled out. (Doc. 77 at 86:3-89:4). Using a hand-held audio recorder, the FBI agents recorded themselves asking Mr. Purbeck whether he understood his Miranda rights and Mr. Purbeck responding affirmatively. (Id. at 88:16-90:12). This is the first that Mr. Purbeck had seen the recorder, (id. at 90:15-24), and the remainder of the interrogation was recorded using this same silver recorder. (Id. at 90:25-91:5). No recording has been produced by the government and, in fact, the government has denied that any recordings were ever made. (See, e.g., Doc. 76 at 102:1-105:9).[4]

After acknowledging orally that he understood his Miranda rights, Mr. Purbeck signed the FD-395 form acknowledging in writing that he understood his Miranda rights. (Doc. 77 at 91:6-18). FBI Agent Coffin then signed the form, and handed the form to Agent Pinette, who signed the form and, after looking at his watch, put the time on the form. (Id. at 91:19-92:18). No Miranda form has been

---

[4] Det. Pacheco with the Ada County Sheriff's Office audio-recorded his questioning of Mr. Purbeck, which would provide further independent corroboration of Mr. Purbeck's inability to communicate effectively.  Mr. Purbeck has requested for that recording to be produced; however, Ada County has advised that it was deleted during a transfer of data. (Doc. 76 at 233:5-234:5).

8

produced by the government and, in fact, the government has denied that any such Miranda form ever existed. (See, e.g., Doc. 76 at 102:1-105:9)

When Mr. Purbeck was presented with the Miranda rights and on-line identity forms, he was a "little bit out of it," he had consumed no water since the previous evening, his undershirt was wet with sweat, his arms felt like they were getting red, and he had the sensation that he had been in the sun for too long. (Doc. 77 at 99:24-101:20). Although Agent Pinette testified that he believed he had obtained the passwords from Mr. Purbeck prior to 11am, (Doc. 76:73:19-23), the photographs taken by the FBI during the search show that it likely occurred only minutes prior to 11:09 a.m. (Doc. 77 at 170:2-171:24).

After Mr. Purbeck signed the two FBI forms, the FBI took him to the bathroom inside his home for the first and only time that day. (Doc. 77 at 92:19-22, 93:2-7). The day had continued getting hotter and hotter, and Mr. Purbeck's heat cramps had gotten worse. (Id. at 93:20-24). He had trouble walking to the bathroom at first, and Agent Pinette had to assist him walking. (Id. 93:25-94:25). Once at the bathroom, Mr. Purbeck experienced a lot of pain when he urinated and his urine was a dark brown color, similar to cola. (Id. at 95:1-6).[5]

---

[5] At some point during the FBI's interrogation, the chair in which Mr. Purbeck was sitting collapsed. (Doc. 77 at 97:5-98:5). It had been in the direct sun and appeared to collapse from a combination of the heat to which it was subjected and Mr. Purbeck's weight. (Id. at 98:1-5). The FBI retrieved a wooden chair to replace the broken plastic chair and put it in the sun, too. (Id. at 98:13-99:5).

At some point thereafter, approximately in the 11:30am to 1pm time period,[6] Mr. Purbeck's employer (IT Director Steven O'Meara) and Sheriff's Deputy Ryan Pacheco showed up at Mr. Purbeck's home. By the time Ada County appeared, Mr. Purbeck was in even worse physical condition. (Id. at 101:21-102:17). Mr. Purbeck recalls having trouble even answering the questions being posed to him by Det. Pacheco. (Id.). Det. Pacheco first read Mr. Purbeck his Miranda rights, but not his Garrity rights, and then questioned Mr. Purbeck about various items related to his employment at Ada County, while Agent Pinette listened. (Doc. 76 at 230:4-13).

From his first encounter with the FBI agents around 7:35 a.m. until the FBI agents left his home around 2 p.m., the FBI kept Mr. Purbeck separate from his girlfriend Sarah Ganger. (Doc. 77 at 64:16-66:4). Ms. Ganger was kept inside the house, and law enforcement had closed the curtains for the windows facing the backyard, preventing her from being able to see easily into the backyard.  (Id. at 7:9-22). When she asked where Mr. Purbeck was, the agents advised her that they could not tell her. (Id.). Nonetheless, on a couple of occasions she was able to look into the backyard and see him, either by moving the curtains when left alone or

---

[6] Mr. Purbeck estimated that Ada County showed up approximately four hours after the FBI first arrived because the sun was almost directly overhead. A strict four hours would be 11:30am.  However, solar noon on August 21, 2019 in Boise, Idaho was 1:47 p.m., which would mean that the time was much closer to 1pm. See https://www.timeanddate.com/sun/usa/boise?month=8&year=2019 (last visited 2/12/2023). Det. Pacheco believed he arrived late morning and before lunch. (Doc. 76:231:17-20).

when an agent opened a door into the backyard. (Id. at 7:23-13:18).  Each time,

Ms. Ganger saw him, he was in the sun. (Id.). Likewise, the FBI kept Mr. Purbeck

from seeing Ms. Ganger, (id. at 65:1-23), and the FBI told Mr. Purbeck that seeing

Ms. Ganger would depend on his cooperation and what the prosecutor decided.

(Id. at 65:24-66:4).  Throughout the entire time the FBI was present, they kept Mr.

Purbeck outside in the backyard, except for bringing him inside one time to use the

bathroom, while keeping Ms. Ganger inside. (Doc. 76 at 93:21-94:14; Doc. 77 at

7:10-25, 24:12-22, 65:6-12, 111:16-25).

    After the FBI left, Mr. Purbeck was in bad condition. (Doc. 77 at 113:9-

115:19). He was disoriented and dazed. (Id.). He was very dehydrated, and he

drank a lot of water. (Id.). He was sunburned and used aloe vera gel to help soothe

the burn. (Id.). He had trouble sleeping because of his burned skin and felt as

though he had a fever for a couple of days following the FBI's interrogation

because his face and body felt hot. (Id.). His skin peeled from the sunburn. (Id.).

He has some memory problems from what he experienced. For example, he does

not recall going with Ms. Ganger to her parents' home that evening. (Id.). After at

least two weeks, his skin returned to a more normal condition, and by September 9,

2019, he was back to normal. (Id. at 115:5-10).

    In August, 2019, Mr. Purbeck was 5'8" tall and weighed 280 pounds, which

made him morbidly obese, and which also made him more susceptible to heat-

induced illness. (Doc. 77 at 227:7-19). Furthermore, Mr. Purbeck took a

combination blood pressure medication (Lisinopril Hydrochlorothiazide) which

increased his susceptibility to heat-related illnesses by increasing his risk of

dehydration and making him more photosensitive. (Doc. 77 at 228:3-229:2). He

also took a psychiatric medication (Duloxetine), which has a known side effect of

decreasing a person's ability to tolerate heat by decreasing the ability to regulate

the body's core temperature and to tolerate a hot environment. (Doc. 77 at 229:17-

230:2).

  As testified to by Dr. Jon Allen, if the Court were to find that Mr. Purbeck's

recitation of events was accurate, then it would be Dr. Allen's opinion that Mr.

Purbeck was suffering from heat exhaustion and, as such, he would not be in a

position to make informed decisions regarding medical care or other critical

decisions in which informed consent is needed. (Id. at 233:7-235:21). However, if

the Court were to find that Agents Coffin and Pinette's recitation of Mr. Purbeck's

condition was accurate, then Dr. Allen's opinion would be that Mr. Purbeck was

not suffering from a heat-related illness. (Id. at 235:22-236:14).

II.  <u>Ninth Circuit Law Applies Here.</u>

  Because the search of Mr. Purbeck's home and his custodial interrogation

took place in Idaho, which falls within the boundaries of the United States Court of

Appeals for the Ninth Circuit, the law of the Ninth Circuit governs the legality of

law enforcement's conduct here. <u>See, e.g.</u>, <u>United States v. Ozuna</u>, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001) (adopting lex loci approach and applying Fourth Circuit law to analyze legality of police-citizen encounter that occurred in Maryland); <u>United States v. Gerena</u>, 667 F. Supp. 911, 927 (D. Conn. 1987) (evidence gathered in violation of the law of the Circuit where the evidence was obtained should also be inadmissible in the Circuit where the conduct is being prosecuted); <u>see also</u> Deft's Motion to Suppress (Doc. 25, p. 6).  This is particularly true in a case such as Mr. Purbeck's where Eleventh Circuit courts "are much less likely" to find an in-home interrogation custodial whereas Ninth Circuit precedent treats in-home interrogations during the execution of a search warrant as much <u>more</u> likely to be custodial in nature, particularly when there are a large number of law enforcement personnel present.[7] Because the government should not be able to engage in conduct in one Circuit that would violate the law of that

---

[7] <u>Compare</u> <u>United States v. Kight</u>, Case No.: 18-cr-00169-TWT-RGV, 2019 WL 1781356 (N.D. Ga.) (noting that "courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar . . . surroundings, such as a suspect's house.") <u>with</u> <u>United States v. Craighead</u>, 539 F.3d 1073, 1083 (9th Cir. 2008) (holding that in-home interrogations **are unique** in that "a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free to 'terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search.") <u>and</u> <u>United States v. Herran</u>, No. 20-10157, 2021 WL 5027488, at *1 (9th Cir. Oct. 29, 2021) (holding that in-home interrogation was custodial because of police-dominated atmosphere based on the four factors (<u>infra</u>) of <u>Craighead</u>, 539 F.3d at 1083-1084, and the five factors (<u>infra</u>) of <u>United States v. Kim</u>, 292 F.3d 969, 973 (9th Cir. 2002)).

13

Circuit and later rely on the law of another Circuit to justify its conduct -- here, the

Eleventh Circuit, this Court should apply Ninth Circuit law to this case.

III.    Mr. Purbeck's Statements Must Be Suppressed Because the Government
        Custodially Interrogated Him Without Miranda Warnings.

As set forth in more detail in his motion to suppress, (Doc. 25, p. 7), "to

reduce the risk of a coerced confession and to implement the Self-Incrimination

Clause . . . the accused must be adequately and effectively apprised of his rights

and the exercise of those rights must be fully honored." Missouri v. Seibert, 542

U.S. 600, 608 (2004). "[F]ailure to give the prescribed warnings and obtain a

waiver of rights before custodial questioning generally requires exclusion of any

statements obtained." Id.; see also Dickerson v. United States, 530 U.S. 428, 433-

444 (2000) ("unwarned statements may not be used as evidence in [] prosecution's

case in chief"). Because the FBI extracted Mr. Purbeck's computer passwords and

other incriminating statements during a custodial interrogation without first

advising him of his Miranda rights, those statements must be suppressed.

Controlling Ninth Circuit precedent establishes that Mr. Purbeck's

interrogation was custodial. In United States v. Craighead, 539 F.3d 1073 (9th Cir.

2008), the Ninth Circuit reversed the district court's denial of the defendant's

motion to suppress. Recognizing that a suspect is "in custody" if he has been

deprived of his freedom in a significant way, the Ninth Circuit noted that in-home

interrogations are unique in that "a reasonable person interrogated inside his own

14

home may have a different understanding of whether he is truly free to 'terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." Id. at 1083. The court identified four factors relevant to determining whether an in-home interrogation "effected a police-dominated atmosphere" and was thus custodial: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." Id. at 1084.

In addition to the four Craighead factors, the Ninth Circuit has also identified several other factors that should be considered in determining whether an interrogation was custodial: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the interrogation; and (5) the degree of pressure applied to detain the individual." United States v. Herran, No. 20-10157, 2021 WL 5027488 (9th Cir. Oct. 24, 2021) at *1 (quoting United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002)).

Considering all these factors here, Mr. Purbeck's interrogation was plainly custodial. Multiple armed law enforcement agents wearing body armor with drawn

guns swarmed his driveway early in the morning and entered his home. They told him that his work was not expecting him that day, which obviously could not be true if he was truly free to leave. They sat him in a chair outside in direct August sunlight without water or food. He was isolated from, and unable to communicate with, his disabled girlfriend inside. The agents grilled him for hours without giving Miranda warnings or telling him that he was free to leave or that his statements were optional. He was not allowed to use his vehicle because it was part of the search warrant; indeed, they took his car keys. They took both of his cell phones (his personal cell phone and his work cellphone, which plainly was not within the scope of the warrant), which deprived him of being able to communicate with the outside world. They directed him to the backyard of his home, told him to sit in a particular chair, which was different from the chair he had attempted to sit in, and kept him there until 2pm under police guard. At no point was he left without a guard. He was not allowed to go into his own home unaccompanied, and he even had to leave the bathroom door open and have an agent watch him on the one occasion he was allowed to use the bathroom. The one time he stood up to retrieve his cat that had run out of the house into the backyard, he was ordered to sit back down, thereby dispensing with any possible doubt that he was under police control. In all respects, Mr. Purbeck's home was dominated by police activity, and no

reasonable person in his situation would have believed he could end the interrogation and leave.

The FBI also ignored his requests for counsel. They refused to allow Mr. Purbeck to use either of his two phones (including his work phone for which they had no authority to seize) to call an attorney. The agents refused to allow Mr. Purbeck to use their phones to call an attorney, and they refused to call an attorney for him.

Under these circumstances, the agents' failure to Mirandize Mr. Purbeck requires suppression of his statements. See Craighead, 539 F. 3d at 1089; Herran, 2021 WL 5027488 at *2 (reversing denial of motion to suppress because non-Mirandized defendant was in custody throughout in-home interrogation given "the length of the interrogation, the number of armed agents, and the way in which the agents directed and escorted Herran around his own property," along with their use of pressure and confrontation of Herran with evidence of his guilt); see also United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007) (affirming the suppression of Mittel-Carey's confession where eight officers arrived at his house to execute a search warrant, ordered him out of bed, separated him from his girlfriend, told him where to sit in the living room, discouraged him from getting a lawyer, monitored him while he used the bathroom, and interviewed him for nearly two hours without Mirandizing him).

17

IV.   <u>Law Enforcement's Belated Miranda Warnings Would Not Save Mr.
      Purbeck's Post-Warning Statements.</u>

The government has taken the position that no <u>Miranda</u> warnings were ever

given to Mr. Purbeck by the FBI.  Mr. Purbeck, however, specifically testified that

he and Agents Coffin and Pinette reviewed and signed a written <u>Miranda</u> form.

And it is undisputed that Det. Pacheco with the Ada County Sheriff's Office later

read him his <u>Miranda</u> rights. But both these warnings were given **<u>after</u>** the agents

had already extracted incriminatory statements, including the computer passwords,

from Mr. Purbeck. "[T]his midstream recitation of warnings after interrogation and

unwarned confession could not effectively comply with *Miranda's* constitutional

requirement[.]" <u>Siebert</u>, 542 U.S. at 604. Accordingly, any statements that Mr.

Purbeck gave after being <u>Mirandized</u> are not admissible. <u>Id.</u>

As set forth in more detail in Mr. Purbeck's motion to suppress, (Doc. 25, pp

11-14), the Ninth Circuit has held that "a trial court must suppress post-warning

confessions obtained during a deliberate two-step interrogation where the

midstream *Miranda* warning -- in light of the objective facts and circumstances --

did not effectively apprise the suspect of his rights." <u>United States v. Williams</u>, 435

F. 3d 1148, 1157 (9th Cir. 2006) (listing six factors for the courts to consider).

Applying the <u>Williams</u> factors here, Mr. Purbeck's pre-warning interrogation

lasted for hours and included comprehensive questions about a range of topics,

including his computer passwords. The interrogation was one continuous event,

involving the same law enforcement personnel (with the addition of Det. Pacheco) pursuing the same lines of questioning, in the same setting, with no temporal break. No curative measures were taken. Because all six <u>Williams</u> factors weigh in favor of suppression, Mr. Purbeck's post-<u>Miranda</u> statements are inadmissible. <u>See</u> <u>Reyes</u>, 833 F.3d at 1031-1034; <u>see also</u> (Doc. 25, pp. 16-18).

V.   <u>The Fruits of the Government's Coercion Are Also Inadmissible.</u>

During their custodial interrogation of Mr. Purbeck, the agents coerced him into divulging his computer encryption passwords, which they then used to access information on the computer. They also bullied Mr. Purbeck into signing a consent form purporting to allow the government to assume his online identities and take over his accounts. The fruits of these illegal acts -- the contents of Mr. Purbeck's computers and the results of the government's misappropriation of his online identities -- must be suppressed.

A.   <u>The contents of Mr. Purbeck's computer must be suppressed because his disclosure of the passwords was involuntary.</u>

The production of electronic passwords "constitutes incriminatory testimony protected by the Fifth Amendment." <u>United States v. Sanchez</u>, 334 F. Supp. 3d 1284, 1295 (N.D. Ga. 2018) (suppressing contents of defendant's iPhone because his admission concerning the phone password was not voluntary). In <u>United States v. Patane</u>, 542 U.S. 630 (2004), the Supreme Court held that physical evidence obtained as a result of a statement elicited during a non-<u>Mirandized</u> custodial

interrogation is admissible, but only if the statement was voluntarily made. Id. at 633-634 (plurality), 644-645 (Kennedy, J., and O'Connor, J., concurring). If the statement was not voluntary, however, then the physical evidence must be suppressed. United States v. Mora-Alcaraz, 986 F.3d 1151, 1157 (9th Cir. 2021) (remanding case to district court to consider whether defendant's consent to search truck, which was given during an un-Mirandized custodial interrogation and which led to the discovery of a gun, was involuntary -- in which case the gun would need to be suppressed.). In this case, Mr. Purbeck's disclosure of his passwords was involuntary, so any information obtained through use of the passwords must be suppressed as fruit of the poisonous tree.

In evaluating the voluntariness of a statement, a court considers the totality of the circumstances of the interrogation, including "the duration and conditions of the detention . . ., the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control." United States v. Preston, 751 F.3d 1008, 1016 (9th Cir. 2014) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). The prosecution has the burden to show that the statements were voluntary. United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

Here, the totality of the circumstances show that Mr. Purbeck's statements to police were not freely given. He was subjected to inhumane physical conditions by

20

being forced to sit for hours in direct sunlight in the August heat without water or

food, even though he took diuretic medications that required him to hydrate

frequently. He was worried about his disabled girlfriend, who was trapped

incommunicado inside their home with multiple armed agents. He was told his

boss would be arriving and participating, causing him to fear for his job. Both his

work phone and personal phone were taken from him. Over the course of hours,

the agents hounded him for his computer passwords, ignoring his requests for

counsel, and telling him that he had to hurry up and cooperate without the benefit

of counsel. Finally, suffering symptoms of heat exhaustion, Mr. Purbeck divulged

the passwords. Because this revelation was "not the product of a rational intellect

and a free will," Brown v. Horell, 644 F.3d 969, 979 (9th Cir. 2011) (punctuation

omitted), but was instead the result of extreme physical and psychological

pressure, the fruits of that password must be suppressed. See Sanchez, 334 F.

Supp. 3d at 1295.

> B. Mr. Purbeck's password revelation also was involuntary because he was
> forced to choose between disclosure or losing his job.

"If an individual's refusal to answer incriminating questions subjects him to

a penalty, then the Fifth Amendment is self-executing and any statements made

under threat of such penalty are inadmissible." United States v. Saechao, 418 F.3d

1073, 1077 (9th Cir. 2005). In Garrity v. New Jersey, 385 U.S. 493 (1967), the

Supreme Court held that confessions given by police officers who were forced

either to incriminate themselves, or to lose their jobs, were involuntary and inadmissible.

Mr. Purbeck worked for Ada County and was required, as a condition of his employment, to cooperate with any county-initiated investigations. As set forth in the Ada County Employee Manual, which Mr. Purbeck was subject to, he was required to cooperate with official internal and external investigation conducted by or at the request of Ada County, and he could be terminated if he did not. (Doc. 77 at 59:6-64:3; see also Def. Exh. 20 ("Impeding, interfering with, or failing to cooperate in an official internal or external investigation conducted by or at the request of the County.")).

Mr. Purbeck reasonably feared that failure to answer the agents' questions would result in the loss of his job.  They took his work phone.  They told him his employer knew he would not be coming into work that day. Under these circumstances, "there is a reasonable basis for concluding that [Ada County] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." United States v. Goodpaster, 65 F. Supp. 3d 1016, 1029 (D. Or. 2014) (punctuation omitted). Accordingly, Mr. Purbeck's statements must be suppressed because he was placed in "a penalty situation." Id. at 1030.

C. <u>Mr. Purbeck's signing of the consent form was not voluntary.</u>

Finally, Mr. Purbeck's signing of the form purporting to give the government consent to appropriate his online accounts was not voluntary. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." <u>United States v. Yeary</u>, 740 F.3d 569, 581 (11th Cir. 2014); <u>see also</u> <u>United States v. Chan-Jimenez</u>, 125 F.3d 1324, 1327 (9th Cir. 1997). "Where there is coercion, there cannot be consent." <u>Bumper v. North Carolina</u>, 391 U. S. 543, 550 (1968). Mr. Purbeck signed the form only because of the physical and psychological coercion described above. Accordingly, all evidence or information gained through that "consent form" must be suppressed.[8]

---

[8] To the extent that the government may argue that it would have inevitably discovered the contents of Mr. Purbeck's computers without Mr. Purbeck revealing the passwords, that argument is directly contradicted by expert witness Jim Persinger's analysis that it would have taken 4 billion years to brute force their way into Mr. Purbeck's secured computers. (<u>See</u> Exh. C to Defendant's 12/13/22 Notice of Filing Exhibits). Agent Coffin opined that the password was not as difficult to break as stated by Mr. Persinger, but Agent Coffin also admitted that he had not independently tested his hypothesis in any fashion, something Mr. Persinger has done, because he (Coffin) already had the password from Mr. Purbeck and any test would not be valid, and (2) he had not considered how he would have determined whether to use upper case or lower case in determining whether the password was more or less breakable than Mr. Persinger's analysis shows. (Doc. 76 at 78:18-81:20, 83:5-17).

VI.   Mr. Purbeck's Statements, and the Fruits Thereof, Must Be Suppressed Because Law Enforcement Agents Ignored His Requests for Counsel.

A person who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication . . . with the police." Arizona v. Roberson, 486 U.S. 675, 678 (1988) (citing Edwards v. Arizona, 451 U.S. 477, 484-485 (1981)). Although "[a] request for counsel need not be stated as a model of eloquence and clarity," Alvarez v. Gomez, 185 F.3d 995, 997 (9th Cir. 1999), the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). If police continue the interrogation after the accused has asked for a lawyer, then the accused's statements must be suppressed. Alvarez, 185 F.3d at 998.

Mr. Purbeck said he wanted a lawyer when the agents badgered him about his computer passwords. He then asked for his phones so he could call a lawyer. When the agents denied that request, Mr. Purbeck asked to use one of their phones to call a lawyer. Finally, when the agents made it clear that Mr. Purbeck was allowed no access to any phone, he asked if they would call a lawyer for him. In the face of Mr. Purbeck's multiple unambiguous requests for counsel, the agents should have ceased the interrogation until a lawyer could be made available to him.

Id. Instead, they tried to discourage him from getting a lawyer, saying he had to move expeditiously and cooperate with the government before someone else cooperated. This was a clear violation of Mr. Purbeck's rights. See Sessoms v. Grounds, 776 F.3d 615, 629 (9th Cir. 2015) (officers violated clearly established law when they responded to suspect's request for counsel by telling him a lawyer would only hurt him, then continuing their questioning). Mr. Purbeck's uncounseled statements, and the fruits thereof, must be suppressed.

WHEREFORE, Mr. Purbeck respectfully requests that the Court grant this motion and suppress and exclude from evidence all information and evidence gathered from the illegal detentions, searches, seizures and interrogations detailed in this motion.

Respectfully submitted, this 13th day of February, 2023.

/s/ Andrew C. Hall_____
Andrew C. Hall
Georgia Bar No. 318025
Hall Hirsh Hughes, LLC
150 E. Ponce de Leon Ave., Suite 450
Decatur, Georgia  30030
404/638-5880 (tel.)
404/638-5879 (fax)
andrew@h3-law.com
Counsel for Defendant Robert Purbeck

<u>CERTIFICATE OF COMPLIANCE WITH TYPE AND FONT</u>
<u>AND CERTIFICATE OF SERVICE</u>

I hereby certify that this motion has been prepared in Times New Roman font (14 pt.) and consistent with the Local Rules of this Court.

I further hereby certify that I have this date caused a true and correct copy of the foregoing DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS, PASSWORD DISCLOSURES, ETC. to be served by filing it with the Clerk of Court using the ECF System that will send notification of such filing to:

Assistant United States Attorney Michael Herskowitz and Nathan Kitchens

This the 13th day of February, 2023.

/s/ Andrew C. Hall
Andrew C. Hall