IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

ROBERT PURBECK
 A.K.A. "LIFELOCK"
 A.K.A. "STUDMASTER"
 A.K.A. "STUDMASTER1"

Criminal Action No.

3:21-cr-004-TCB-RGV

## GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by Ryan K. Buchanan, United States Attorney, Michael Herskowitz, Nathan P. Kitchens, and Alex R. Sistla, Assistant United States Attorneys for the Northern District of Georgia, files this post-hearing brief in opposition to Defendant Robert Purbeck's motion to suppress statements and password disclosures (Docs 25, 80).

The Court should deny Purbeck's motion because he was not in custody during his interview with agents, and therefore not entitled to any *Miranda* warnings, and the record establishes that his statements were made voluntarily.

### Procedural History

On March 2, 2021, a grand jury returned an indictment charging Purbeck with wire fraud, access device fraud, and computer fraud and abuse in connection with a series of computer intrusions against medical practices in Georgia, the City of Newnan government, and an orthodontist in Wellington, Florida. (Doc. 1.) On December 13, 2021, Purbeck filed the present motion to suppress. (Doc.

25.)  On September 1–2, 2022, the Court held an evidentiary hearing. (Doc. 64). At the hearing, the government called FBI Special Agents Roderick Coffin and James Pinette; Purbeck called former FBI Special Agent Clark Harshbarger, Ada County Detective Ryan Pacheco, Sarah Ganger, Dr. Jonathon Allen; and Purbeck testified on his own behalf. On February 13, 2023, Purbeck filed his post-hearing brief. (Doc. 80.)

### Statement of Facts

In approximately June 2019, FBI Atlanta identified Purbeck, an IT professional employed by Ada County, Idaho, as likely responsible for a series of computer intrusion attacks.  (Doc. 76 at 7:18–19; 16:11–13.)

On August 19, 2019, nine FBI Special Agents, including Atlanta-based agents Roderick Coffin and James Pinette, and five other FBI personnel executed a search warrant at Purbeck's residence in Meridian, Idaho. (*Id*. at 7:6–10:8). The agents were armed and wearing "undercover-type" protective armor. (*Id*. at 187:14-15.)

Shortly before 8:00 a.m., agents observed Purbeck—who was holding a cup of coffee—exit his residence and walk to a car parked in his driveway. (*Id*. at 12:11–14; 13:15–18; 14:13–16.) A couple of agents then approached Purbeck, one of whom did a brief safety search of Purbeck's waist area for weapons. Meanwhile, other agents "stacked outside" of Purbeck's residence,[1] before entering and

---

[1] It is standard operating procedure for agents planning to enter a residence to execute a warrant to line up outside with their firearms unholstered, lowered towards the ground. (*Id*. at 189:5–10; 222:25–223:5.)

completing a standard safety sweep. (*Id.* at 12:17–24; 44:11–13; 120:13-14; 204:20–22.)

Agents Coffin and Pinette then approached Purbeck, who was still by his vehicle, unrestrained. (*Id.* at 12:21–24; 14:1–7; 116:24-117:24.) The agents calmly informed Purbeck that the FBI was executing a search warrant but that he was not under arrest. (*Id.* at 13:20–22; 15:1–2; 117:7-15.) The agents asked Purbeck if he was willing to speak with them, because they "thought he could be of assistance in [the] investigation." (*Id.* at 13:24–25; *see also id.* at 117:16-20; 146:13-15.)

Purbeck asked the agents about getting to work on time, and Agent Coffin assured Purbeck that his employer, Ada County, did not expect him to arrive to work on time that day. (*Id.* at 16:4–9.) Purbeck agreed to speak with the agents, and together they entered his house. (*Id.* at 16:16–17:7.)

Upon entering Purbeck's residence, Agent Pinette informed Purbeck that "you don't have to stay, but if you do, we're going to limit your movements." (*Id.* at 148:3–5.) Because the house had an unpleasant odor and was "very cluttered," Agents Coffin and Pinette suggested they should speak in the backyard, to which Purbeck did not object. (*Id.* at 18:24–19:2; 121:3-7; 122:6-8.) Before going outside, Purbeck asked if he could refill his coffee, and he did so in the kitchen. (*Id.* at 18:16–21; 121:18–21.)

Purbeck's grass backyard was fenced-in but had a gate to the street that was not blocked. (*Id.* at 19:13–19; 38:7-10.) When the interview began around 8:00 a.m., the temperature was "cool" and "pleasant." (*Id.* at 19:7–8; 122:21.) The agents interviewed Purbeck in plastic lawn chairs placed in a triangular formation about two to five feet apart. (*Id.* at 20:7–11; 20:18–21; 123:2-14.) During

the interview, Purbeck appeared to be calm, articulate, and smart. (*Id*. at 21:23–22:2.) Purbeck was not handcuffed or restrained at any time; nor did the agents make any promises or threaten him. (*Id*. at 40:20–41:9; 121:22-122:2; 129:6-9.) The interview was not recorded but memorialized in an FD-302. (*Id*. at 22:5–20.)

Agents Coffin and Pinette began by asking Purbeck about his education and employment. (*Id*. at 24:23–25:9.) Early on, Purbeck offered to be of assistance and wanted to clarify that he was not part of a hacking organization. (*Id*. at 25:16–20.) The agents told Purbeck that they would discuss his assistance after finishing the background questions. (*Id*. at 25:20–23.) The agents inquired about Purbeck's involvement in online darknet markets, including one known as AlphaBay. (*Id*. at 126:14–17.)

The agents challenged Purbeck's recollection of his AlphaBay usernames and reminded Purbeck that law enforcement had seized user account information and associated messages. (*Id*. at 32:24–33:1.) Purbeck confirmed that he used "Studmaster" and "Studmaster1" on AlphaBay. (*Id*. at 41:22–25.) Purbeck offered that college friends nicknamed him Studmaster because "he wasn't good with girls," and Purbeck and the agents "chuckle[d] about that one." (*Id*. at 41:25–42:3.)

The agents then asked Purbeck if he had any other AlphaBay usernames, and Purbeck said he was nervous and asked if he should have an attorney. (*Id*. at 32:24–33:2; 127:13–17.) The agents advised they could not provide legal advice but that "he was entitled to an attorney and he did not have to talk to [them]." (*Id*. at 99:11–19; *see also id. at* 127:19-20.)

4

Purbeck then asked, "how much time was he looking at." (*Id*. at 33:8–9.) The agents responded that they "couldn't make any determination of whether he would have been charged or if he was charged what potential sentence he would be looking at." (*Id*. at 33:9–12; *see also id.* at 127:21-23.) The agents further advised that if Purbeck decided to speak with a lawyer, doing so quickly would be advantageous because he would be able to cooperate more effectively. (*Id*. at 100:7–101:6.)

Without any change in his demeanor, and without asking for an attorney, Purbeck continued to speak with the agents. Purbeck admitted to being Lifelock, which was "the identity of one of the hackers that [the FBI] were investigating." (*Id*. at 33:21-34:4–6.)[2]

The interview then turned to Purbeck's hacking victims and the computers inside the house. Purbeck identified which computer (along with an external hard drive) he had used for his hacking activities and explained they were password-protected by VeraCryrpt, a type of encryption software. (*Id*. at 34:12–18.) Sometime between 10:00 a.m. and 11:00 a.m., Purbeck agreed to provide the passwords for his encrypted devices and consented to the FBI assuming his online identities and gaining access to multiple email accounts. (*Id*. at 34:18-36:13; 37:5–11; 73:23.) Purbeck also signed a form giving consent to the FBI accessing and operating certain of Purbeck's online accounts. (*Id.* at 34:21-36:13; Doc. 70-6.)

Many of Purbeck's passwords, including the one he provided for VeraCrypt and those found on a handwritten list recovered by agents, used the dictionary

_____

[2] Agent Coffin estimated that Purbeck made this statement within the first 90 minutes of the interview. (Doc. 76 at 36:16-19; 71:2-8.)]

word, "leviathan." (Doc. 76 at 79:13–21.) Accordingly, Agent Coffin opined it would have been "trivially simple" to decrypt Purbeck's devices even if he had not provided the password, and observed that the FBI had in fact successfully decrypted one of Purbeck's computers using the word "leviathan" and password-cracking technology. (*Id.* at 79:22–25; 81:17–20.)

During the interview, Purbeck and the agents would at times move their chairs to remain in the shade because it was getting warmer. (Doc. 76 at 28:1–7.) At some point, however, Purbeck stopped moving his chair. (*Id.* at 28:16–18; 106:15–17.) Purbeck appeared calm throughout the interview, and at no point appeared to be dehydrated, sick, in pain, or in discomfort. (*Id.* at 24:9–14; 41:12–15.) He also did not ask for food, water, medication, or a hat or sunscreen, and declined multiple offers of water from the interviewing agents. (*Id.* at 40:2–6; 41:18–19; 131:13–18; 168:2–9.) Although he was escorted for agent safety, Purbeck also used the restroom in the house once or twice. (*Id.* at 167:20–23; 26:19–27:2.)

At some point during the interview, Purbeck's chair collapsed, and he fell to the ground. (*Id.* at 130:17–19.) The agents immediately helped Purbeck up and retrieved him another chair. (*Id.* at 130:22–23.)

The interview did not have "a hard end" time, because the interviewing agents went into the residence at various points while Purbeck elected to remain in his backyard for the duration of the search. (*Id.* at 36:22–23,37:2–3.) While Agents Coffin and Pinette were inside, another agent stayed with Purbeck. Even at that time, the temperature was not "overly hot." (*Id.* at 215:4–9.) The meteorological data showed the temperatures throughout the morning were between 75 and 84 degrees with low humidity. (*Id.* at 29:8–31:10.)

6

The FBI agents at the residence eventually learned that individuals from Ada County were coming to interview Purbeck. (*Id*. at 88:8–9.) Agent Coffin testified that before the search he did not know anyone from Ada County would be coming. (*Id*. at 89:14-16.) The Ada County personnel arrived before lunch in the "late morning." (*Id*. at 231:19–20.)

Agent Pinette observed the subsequent interview involving Purbeck, his immediate supervisor, and an Ada County detective. (*Id*. at 166:12–17.) During that interview, Agent Pinette learned that Purbeck had a hard drive in his pocket (which Purbeck handed to Pinette) and realized Purbeck had not been searched for evidence or weapons other than the initial high-risk search when the agents first arrived. (*Id*. at 133:10–16.) Agent Pinette then searched Purbeck for approximately five to ten seconds for any weapons or other evidence. (*Id*. at 133:17–18.)[3]

Purbeck remained in the backyard until approximately 2:00 p.m. when the search of his residence was concluded. (*Id*. at 37:19–20; 38:23–24.) At no point did the agents restrain Purbeck—who was in fact free to go if he chose—but did not leave him alone for officer safety. (*Id*. at 37:21–23; 38:3–14.)

After the search, Purbeck contacted Agent Coffin explaining that he had additional information to share with the FBI. (*Id*. at 42:9–16.) In early September 2019, Purbeck flew to Atlanta for a proffer session at the FBI's office. (*Id*. at 42:23–

---

[3] The government does not intend to introduce any statements Purbeck made during the Ada County interview. To the extent that Purbeck seeks to suppress information obtained from the Ada County interview, that part of Purbeck's motion should be denied as moot.

43:3.) In December 2019, Purbeck called Agent Pinette in a calm and friendly demeanor to discuss the investigation. (*Id*. at 134:15-20; 136:15-24.)

## Argument

### A. The Court need not reach the issue, but if it does, Eleventh Circuit law governs Purbeck's motion to suppress.

Purbeck argues that the Court should apply Ninth Circuit instead of Eleventh Circuit law because his interview occurred in Idaho. (Doc. 80 at 12-13.) The Court need not resolve this issue because, as detailed below, regardless of which circuit's law applies, the result is the same—his motion fails because the interview was non-custodial. *See, e.g.*, *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1352 (S.D. Fla. 2001) ("Because I find that there was no constitutional violation even under the apparently more demanding Eleventh Circuit precedent, it is unnecessary to engage in a choice-of-law determination at this stage of the analysis.").[4] But if the Court addresses the choice of law issue, it should reject Purbeck's argument and apply Eleventh Circuit law.

---

[4] Purbeck cites a Northern District of Georgia case for the proposition that "Eleventh Circuit courts 'are much less likely' to find an in-home interrogation custodial whereas Ninth Circuit precedent treats in-home interrogations during the execution of a search warrant as much more likely to be custodial in nature." (Doc. 80 at 13 & n.7.) But he overstates the purported conflict between the Eleventh and Ninth Circuit. Both circuits recognize that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature[]" and that "[t]he element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008). Separately, Purbeck fails to raise any purported conflicts of law other than with respect to the law governing custodial interviews. Accordingly, the Court should

As Purbeck correctly notes, the few federal cases to have considered the choice-of-law issue in the criminal context have mainly adopted the *lex loci* approach—that is applying the law of the forum in which the officer's conduct occurred. (Doc. 80 at 12-13.) But the cases on which Purbeck relies are distinguishable from the situation here because they involved law enforcement from that forum—the one in which the conduct occurred—rather than from the prosecuting jurisdiction.[5] For example, in *Ozuna*, the district court considered whether Eleventh Circuit or Fourth Circuit law should apply to conduct involving a Maryland State Trooper executing a warrantless search in Maryland. 129 F. Supp. 2d at 1348-49, 1354-55 (applying Fourth Circuit law to evaluate the trooper's conduct because "the primary purpose of the exclusionary rule is to deter future police misconduct"). In contrast, here, the agents who interviewed Purbeck were both based with FBI-Atlanta. And the one court to consider (albeit not resolve) the issue has suggested that in this context—where agents are based in the prosecuting forum—the law of that forum, rather than the forum in which conduct occurred, should apply.

In *United States v. Maley*, No. CR 13-3696, 2020 WL 1041545, at *6 (D.N.M. Mar. 3, 2020), *aff'd* 1 F.4th 816 (10th Cir. 2021), a District of New Mexico court considered whether officers had unconstitutionally executed an arrest warrant by making a warrantless entry into the defendant's residence in Arizona. The

---

consider the remainder of Purbeck's legal arguments under controlling Eleventh Circuit precedent regardless of how it resolves the conflict of law issue.

[5] They are also distinguishable because none address whether the *lex loci* approach should apply to the question of determining whether a suspect is "in custody" for purposes of *Miranda*.

case had been investigated and ultimately prosecuted in New Mexico, but officers from both New Mexico and Arizona helped to execute the warrant. *Id.* Because the arrest occurred in the Ninth Circuit, the defendant argued that Ninth Circuit rather than Tenth Circuit law applied. The district court was not convinced, observing that "[a]rguably, New Mexico officers trying to execute a New Mexico warrant arising out of a New Mexico investigation should have been able to rely on their understanding of the law as the Tenth Circuit has interpreted it." *Id. Maley* ultimately did not have to resolve the issue because execution of the warrant was valid under either circuit's law. *Maley's* reasoning, however, applies with full force here: this is a Georgia-based investigation and prosecution involving Georgia-based FBI agents, and there is no reason that their conduct should be evaluated by a different circuit's law. *See also United States v. Kennedy*, No. 13-cr-240, 2014 U.S. Dist. LEXIS 159802, at *18 (W.D. Pa. Nov. 13, 2014) ("In applying the *lex loci* approach, the Court reasoned that police officers are held to a good faith standard, and therefore, 'logic requires that their conduct be consistently held to the law as applied within their own circuits.'") (citations omitted).

### B.  Under controlling Eleventh Circuit law, Purbeck was not "in custody" while interviewed in his backyard.[6]

*Miranda* warnings are necessary "only where there has been such a restriction on a person's freedom as to render him in 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "A defendant is in custody for the purposes of *Miranda* when

---

[6] Purbeck does not dispute that he was in custody or argue that his statements should be suppressed under Eleventh Circuit law. (*E.g.*, Doc. 80 at 13-17).

there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted)).  However, the "coercive environment that exists in virtually every interview by a police officer" is not sufficient to establish a custodial interrogation. *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (citing *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000)). Determining whether a person was "in custody" "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (cleaned up) (citing *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Moya*, 74 F.3d at 1119. "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *Id*. Purbeck "bears the burden of showing that he was in custody when he made the contested statements." *United States v. Woodson*, 30 F.4th 1295, 1302 (11th Cir. 2022).

The Eleventh Circuit has identified several factors for courts to consider in determining whether a person is in custody, including "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (citation and quotation marks

omitted). Relatedly, "the duration of the questioning, the statements made during the interview, the presence of physical restraints during questioning, and 'the release of the interviewee at the end of questioning'" are relevant to the custodial analysis. *Matcovich*, 522 F. App'x at 851 (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).

But when a person is "[u]nambiguously advis[ed] . . . that he is free to leave and not in custody [that] is a powerful factor . . . and generally will lead to the conclusion that the [person] is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *Brown*, 441 F.3d at 1347 (quoting *Muegge*, 225 F.3d at 1271) (emphasis in original). The location of the interview is also a powerful factor: "although not dispositive, 'courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" *Matcovich*, 522 F. App'x at 851 (quoting *Brown*, 441 F.3d at 1348)).

Considering Purbeck's interview in light of these factors demonstrates that the interview was non-custodial, and therefore he was not entitled to any *Miranda* warnings. The totality of the circumstances shows that Purbeck's interview was non-custodial because: (1) he was told he was not under arrest; (2) he was not handcuffed or otherwise physically restrained during the interview; (3) the agents did not brandish weapons during the interview; (4) the agents questioned him in a calm, non-threatening manner; (5) he was interviewed in the familiar setting of his own backyard; and (6) the interview was not excessively long in duration.

12

*First*, the fact that the agents made plain to Purbeck that he was neither under arrest nor required to speak with them weighs in favor of finding that Purbeck was not in custody. (Doc. 76 at 13:20-22; 15:1-2; 117:7-118:13; *see also* 148:6-8 (Pinette recalling he told Purbeck "he didn't have to stay").) Agent Pinette immediately advised Purbeck that he was not under arrest, and that the agents were interested in speaking to Purbeck *if he was willing*. (*Id.* at 117:16-20; 146:2-19)

*Second*—as Purbeck conceded during the evidentiary hearing—he was never handcuffed or otherwise detained before, during, or after the interview, which weighs against a finding of custody. (Doc. 77 at 140:17-20, 141:2-16, 141:25-142:2). Indeed, even where an interviewee is initially handcuffed for "officer safety," that fact alone does not render the later questioning a custodial interrogation. *See, e.g.*, *Matcovich*, 522 F. App'x at 852.

While Purbeck was not permitted to roam freely within the house during the pendency of the search warrant due to officer agent safety, "[t]here certainly was no restraint on [Purbeck's] freedom of movement of a degree associated with formal arrest[.]" *United States v. Kight*, No. 1:18-CR-169-TWT-RGV, 2019 WL 1781356, at *10 (N.D. Ga. Mar. 11, 2019), *adopted by*, 2019 WL 1778048 (N.D. Ga. Apr. 23, 2019).

*Third*, that the agents did not brandish any guns during the interview—as Purbeck concedes—weighs in favor of finding that the interview was non-custodial. *See United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (noting that one factor in the analysis is whether officers brandished weapons); (Doc. 77 at 132:15-133:6). Courts have long recognized that brandishing firearms upon entry in a search warrant execution does not make subsequent questioning

13

custodial if the weapons are holstered during the interview. *See, e.g.*, *Matcovich*, 522 F. App'x at 852 (concluding that defendant was not in custody, in part, because the agents' weapons were holstered when speaking with the defendant); *Luna–Encinas*, 603 F.3d at 881–82 (concluding that defendant was "plainly not in custody" when officers first entered with weapons drawn but "pointed downward in a protective posture and . . . holstered shortly after the initial arrival"). The interviewing agents kept their firearms holstered throughout the interview, never once touching or gesturing toward them. Purbeck even admits when he first interacted with Agent Coffin in the driveway, Agent Coffin did not point a weapon at him. (Doc. 76. at 41:10-13; 126:19-22). And any display of weapons during the protective sweep—without more—does not create a physical restraint or coercion akin to custody. *Luna–Encinas*, 603 F.3d at 881.

*Fourth*, as Purbeck concedes, that the interview took place in his backyard weighs strongly against finding custody. (Doc. 80 at 13.) "[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *United States v. Graham*, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *6 (N.D. Ga. June 27, 2014); *see also United States v. Caswell*, 788 F. App'x 650, 653 (11th Cir. 2019) (reasonable person would be free to leave where interview occurred on defendant's back patio). Here, Purbeck, in the familiarity of his own home, voluntarily agreed to speak with and assist the agents, poured himself a cup of coffee, and pulled up a chair to speak with the agents in his backyard.[7]

---

[7] Purbeck claims that the agents deliberately positioned his chair such that he was always in the sun with the sun in his eyes. (Doc. 80 at 5.) The government respectfully submits that this testimony is not credible given Agents Coffin's and

*Fifth*, it is likewise uncontested that the interview was conducted in a calm and respectful manner. (Doc. 76 at 15:1-15, 21:23-22:2, 24:18-21, 43:4-7; 124:5-11; 128:23-129:5; 134:12-14 (agent testimony); Doc. 77 at 150:9-20 (Purbeck's testimony); *id.* at 26:1-11 (Ganger's testimony).) This coupled with the fact that the agents did not touch Purbeck during the interview or threaten him further evinces that the interview was non-custodial.[8] *See, e.g.*, *United States v. Young*, No. 3:16-CR-006-TCB-RGV, 2017 WL 653556, at *4 (N.D. Ga. Jan. 25, 2017), *adopted by*, 2017 WL 635120 (N.D. Ga. Feb. 16, 2017) (finding no custody when, among other things, officers questioned suspect in "a calm tone of voice"). Indeed, Purbeck remained at his residence and reached out to the FBI several times on his own volition, including calling Agent Coffin within a few days of the search and indicating that he was willing to provide more information. (Doc. 76 at 42:12-22.)

*Sixth*, the interview's duration—at most three hours—is also consistent with a finding that Purbeck was not in custody. While "there is no fixed limit to the length of questioning" before an interview becomes custodial, courts have

---

Pinette's testimony, and that Purbeck has made outrageous claims of being tortured and suffering from life threatening heat exposure yet never reported the agents nor sought any medical treatment.

[8] An agent touched Purbeck when conducting a safety search at the inception of the search warrant. But a person temporarily detained for the purpose of a protective sweep is not deemed to be "in custody" during the later interview. *See, e.g.*, *Woodson*, 30 F.4th at 1305-06 ("For this reason, neither the fact that Woodson was restrained before the interview nor the high number of officers involved in the search—yet uninvolved in questioning Woodson—rendered the interview custodial.") (citation omitted). Purbeck also maintains that he was briefly touched on the shoulder and held onto his arm when walking through his residence. (Doc. 80 at 3; *but see* Doc. at 41:4–7; 90:17-19.) But that too would not convert an otherwise non-custodial interview into a custodial one.

routinely found interviews of similar length to be non-custodial. *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) (four hours); *United States v. Caswell,* 788 F. App'x 650, 653 (11th Cir. 2019) (three hours).

### C. Even if the Court applies Ninth Circuit law, Purbeck was not entitled to *Miranda* warnings because it was not a custodial interrogation.

Although the Court should apply Eleventh Circuit law, even under Ninth Circuit law, Purbeck was not entitled to *Miranda* warnings because it was a non-custodial interview. Like the Eleventh Circuit, the Ninth Circuit directs courts to consider a number of factors in determining whether under the totality of the circumstances a reasonable person would have felt free to terminate the interview, including: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008); *see also United States v. Kim*, 969, 973 (9th Cir. 2002) (factors to consider are: (1) language used to summon individual; (2) extent defendant is confronted with evidence of guilt; (3) physical surroundings of the interrogation; and (4) degree of pressure applied to detain the individual).

Relying principally on *Craighead*, Purbeck argues that he was in custody and no reasonable person would believe they could end the interrogation because: (1) multiple armed law enforcements wearing body armor executed the warrant; (2) he was allegedly directed to sit in a chair in the direct sunlight without water and food; (3) he was allegedly isolated from his disabled girlfriend; (4) he was not

permitted to use his vehicle; (5) agents seized his cell phones and keys; and (6) he was not allowed to wander around the house unaccompanied. (Doc. 80 at 15-16).

As an initial matter, many of Purbeck's claims are unsupported by the record. There is no evidence that the agents directed Purbeck to sit anywhere or in the direct sunlight without water and food during the interview. (Doc. 76 at 20:11-12 (no thought for original placement of chairs); 28:10-14 (no instruction as to where Purbeck put his chair); 93:12-20 (no recollection of anyone ordering Purbeck to sit down); 33:13-20 (no request by Purbeck to speak to an attorney); 13:20-22 (immediately informed that he was not under arrest).) And Purbeck himself admitted that the agents permitted him to refill his coffee, offered him water, and even helped him when his chair broke. (*E.g.*, *id.* at 130:22–23; 193:18-24.) There is also no credible evidence that the agents "grilled him" or denied him from seeing his girlfriend or contacting an attorney if he so chose. (*Id.* at 89:20-22, 169:3-6.)[9]

Nor do the circumstances of Purbeck's interview resemble those in *Craighead*. In *Craighead*, the defendant was an active-duty member of the Air Force residing on base housing who was suspected of downloading child pornography. 539 F.3d at 1077-78. Three different law enforcement agencies—the FBI, a local sheriff's office, and Air Force-OSI—executed a federal search warrant at his residence, with the defendant's immediate supervisor present. *Id.* at 1085.

---

[9] Purbeck cites his own testimony that whether he could see his girlfriend depended on his cooperation and what the prosecutor decided. (Doc. 80 at 11.) But that testimony is in the context of Purbeck "[s]pecifically . . . ask[ing] [the agents] would I be able to see [her] before I go to jail." (Doc. 77 at 65:25-66:1-4.) The agents testified they did not recall Purbeck asking this, but regardless he did not request to see her but would have been allowed to do so if requested. (Doc. 76 at 89:17-90:3, 95:25-96:5, 152:1-23; 168:22-169:17.)

Although an FBI agent advised the defendant that he was not under arrest (and would not be arrested that day regardless of what he said), the same agent interviewed him in an unfurnished, cluttered storage room in the back of his home while an armed county detective, who did not participate in the interview, stood by the only exit—a closed door. *Id.* at 1078-79, 1086, 1088-89. The defendant's supervisor, who—unbeknownst to him—was there to provide "emotional support," was also prevented from joining the interview "in the dark recess of the back storage room." *Id.* at 1087. The court concluded that under these circumstances, the defendant would not have felt free to leave, especially where "the presence of agents from three different law enforcement agencies left [him] with doubt as to whether [the FBI agent] had the authority to pronounce him free to [do so]." *Id.* at 1088.[10]

Here, in contrast, the record plainly demonstrates that: (1) FBI agents—and only FBI agents—executed the search and conducted the interview (Doc 76 at 127:11-24, 131:18-22); (2) Purbeck was initially approached in his driveway and voluntarily agreed to be interviewed (*id.* at 16:16-17:7); (3) the interview was conducted in a calm, non-confrontational manner (*id.* at 15:1-15, 21:23-22:2, 24:18-21, 43:4-7; 124:5-11; 128:23-129:5; 134:12:14 (interviewing agents' testimony); Doc. 77 at 150:9-20 (Purbeck's testimony)); (4) the interview was conducted *outdoors* where Purbeck was neither isolated nor barricaded in any fashion (Doc. 76 at

_____

[10] Purbeck also cites *United States v. Herran*, 2022 NO. 20-10157, 2021 WL 502788 (9th Cir. Oct. 24, 2021), but the opinion does not detail the circumstances of the defendant's interview. Nonetheless, that the defendant "was . . . confronted with evidence of his guilt and pressured to confess" appears to have significantly impacted the court's resolution. *Id.* at 4. Such pressure tactics were absent from Purbeck's interview.

38:3-10); and (5) his girlfriend, Ms. Granger, was able to observe him from the house for extended periods. (Doc. 77 at 7:23-13:13.)

As to Purbeck's keys, Agents Pinette and Harshbarger could not recall if they were seized (Doc. 76 at 119:8-9; 200:13–21), but, even if they were, this seizure neither made the interview custodial nor prevented Purbeck from leaving the residence. *See United States v. Guadagni*, 583 F. App'x 778, 779 (9th Cir. 2014) (defendant not in custody when agents took his car keys where defendant voluntarily returned home to answer questions "and was interrogated in a cordial manner in a physically open setting") (citations omitted).

Purbeck also mistakenly asserts "that his work was not expecting him that day, which obviously could not be true if he was truly free to leave." (Doc. 80 at 16.) Agent Coffin in fact testified that Purbeck's employer was not *expecting him on time*, which is consistent with Purbeck's ability to choose to leave (and the fact that he was not under arrest). (Doc. 76 at 16:7-9.)

When considering similar residential interviews, the Ninth Circuit has routinely concluded that defendants were not in custody. For example, in *United States v. Quackenbush*, 728 F. App'x 777, 778-79 (9th Cir. 2018), the court concluded that the defendant was not in custody where he was not a "member of the military" being interviewed at base housing, the interview took place in the living room, the defendant was not blocked from leaving, the interactions with law enforcement were "low-intensity," and the defendant was told he was not under arrest, was free to leave, and did not have to answer questions. *See also United States v. Liddy*, No. 20-50238, 2022 U.S. App. LEXIS 27188, at *8 (9th Cir. Sept. 28, 2022) (distinguishing *Craighead* in part because defendant did not live

on a military base, "there was no display of 'unholstered firearms,'" and "his exit was not physically blocked"). Indeed, *Craighead* itself recognized that "an interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." 539 F.3d at 1088.[11]

The Ninth Circuit has also carefully noted that even if one of the *Craighead* factors weighs in favor of finding a defendant in custody, that is not dispositive. In *United States v. Young*, 622 F. App'x 694, 695 (9th Cir. 2015), for example, the court acknowledged that while "many officers forcefully enter[ing]" the defendant's residence at 6:00 a.m. "weighs in favor of finding custody, the totality of circumstances" did not because the defendant was neither interviewed in a closed room with a single blocked exit nor was "he isolated from those who could provide moral support." *Id.*; *see also United States v. Terragna*, 390 F. App'x 631, 636 (9th Cir. 2010) ("While the number of law enforcement personnel that were present weighs in favor of . . . custody, the remainder of the *Craighead* factors do not.").

---

[11] *See also United States v. Tobie*, 411 F. App'x 995, 996 (9th Cir. 2011) (defendant not in custody simply because defendant's girlfriend asked to stay out of room where interview was conducted where agents politely asked to enter home, did not show their weapons or raise their voices, they twice advised the defendant he was not under arrest, and the defendant was never physically restrained); *United States v. Dierking*, 359 F. App'x 823, 825 (9th Cir. 2009) (district court erred in finding the defendant was "in custody" where "agents ensured Dierking was dressed and [he] got himself a glass of water from his kitchen before the interview started" and he was "not isolated in a storage room with the door blocked by an agent").

Several district courts in the Ninth Circuit have also concluded that an interview conducted in a defendant's backyard favors finding that the interview is non-custodial. *See United States v. Ornelas*, No. 14-00183-CJC, 2016 WL 5422034, at *8 (C.D. Cal. Sept. 27, 2016) (finding that the interview "held in Defendant's familiar, open-aired, and verdant backyard" was "nothing like that in *Craighead*."); *United States v. Murray*, 696 F. Supp. 2d 1044, 1055-1056 (D. Ariz. 2010) (unlike in *Craighead* defendant was not "confined in a small storage room with an armed guard at the door"). And the agents did not interview Purbeck outside to isolate him, but rather because his house was cluttered and had a foul odor. *See Young*, 622 F. App'x at 695 (defendant's interview non-custodial when interviewed in his garage "because the house was too cluttered to arrange three chairs in one area"). That Purbeck was not permitted to enter the house unescorted while the search was ongoing is of no moment because it "is typical of interrogations conducted while a search warrant is being executed . . . and the *Craighead* factors account for this." *Ornelas*, 2016 WL 5422034, at *7.

### D. Purbeck's statements were made voluntarily.

Even if an interview is noncustodial, a defendant's statements are inadmissible unless made voluntarily. *See, e.g.*, *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). The government bears the burden to prove by a preponderance of the evidence that Purbeck's statements were voluntary. *Id.*

Whether a defendant's statements were voluntary turns not on whether he was subject to a custodial interrogation, but whether "the circumstances show that 'coercive police activity' overcame the defendant's free will" such to render his statement involuntary. *Arvelo v. Sec'y, Fla. Dep't of Corr.*, 687 F. App'x 901, 904

(11th Cir. 2017) (quoting *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986)). In determining whether a defendant's will was overborne, a court must assess the totality of the circumstances, including the defendant's education or intelligence, the length of the detention, and the use of physical punishment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "The presence or absence of a factor will not necessarily warrant a conclusion that the confession was involuntary." *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003).

The Eleventh Circuit has held that "the absence of official coercion is a *sine qua non* of effective consent." *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or making of a promise that induces a confession." *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988); [12] *see also United States v. Killen*, 729 F. App'x 703, 709 (11th Cir. 2008) ("A law-enforcement officer's promise not to prosecute or not to use a suspect's statement against him 'may be the most significant factor in assessing the voluntariness of an accused's confession.'") (quoting *Lall*, 607 F.3d 1286).

Here, every factor weighs in favor of finding that Purbeck's statements were voluntary. At the outset, the agents asked if Purbeck wished to answer their questions; they did not compel him to participate in the interview. The agents never handcuffed or otherwise restrained Purbeck (aside from the brief safety

---

[12] If the Court determines that Ninth Circuit law applies, that court has elucidated similar factors for courts to consider. *See, e.g.*, *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014).

check). Further, Purbeck agrees that the interviewing agents never threatened him, drew their weapons, exerted physical force, or yelled at him. Indeed, there were even points of levity during the interview like when they discussed Purbeck's usernames. (Doc. 76 at 41:25–42:3.) Moreover, Purbeck is highly educated, has been employed in a technically sophisticated job for nearly two decades, and admitted that he understood the agents' questions and could intelligently answer them. (Doc. 77 at 84:17-24; 119:19-121:19; 152:2-153:2.)

The length of the interview also suggests that Purbeck's statements were made voluntarily. He made his critical admissions within the first three hours of speaking with the agents in the backyard (and more likely within the first ninety minutes). *See, e.g.*, *Martin v. Wainwright*, 770 F.2d 918, 927 (11th Cir. 1985), *modified on other grounds*, 781 F.2d 185, (11th Cir. 1986) (no coercion in spite of five hours of interrogation); *United States v. Cobb*, No. 1:16-CR-281TCB-RGV, 2017 WL 9472899, at *14 (N.D. Ga. June 1, 2017) (six-and-a-half-hour interview without food or water did not render statements involuntary).

Purbeck's arguments to the contrary are unpersuasive and contradicted by the record. *First*, there is no evidence that Purbeck was subjected to inhumane conditions. He was interviewed by the agents for at most three hours while sitting in his backyard on a low humidity day while the temperatures were in the high 70s and low 80s. He had two cups of coffee, was permitted to go the bathroom, and was never deprived of anything if he asked. Indeed, when he fell to the ground the agents helped him up, and by his own admission they were calm and not aggressive. Purbeck's actions after the search warrant confirm that the agents did not mistreat him: Purbeck *voluntarily* contacted them on two

23

occasions, including once just a couple of days after the search, as well as traveling to Atlanta in September 2019 for a proffer with them.

*Second,* there is also no credible evidence that the agents hounded or deceived Purbeck into disclosing his passwords, yet alone pressured him to cooperate or not seek the assistance of counsel. Nor is there anything "in the record evidenc[ing] that anyone made promises to [Purbeck], direct or implied, in exchange for his statements." *United States v. Mercer*, 541 F.3d 1070, 1075 (11th Cir. 2008). And merely suggesting that expeditiously speaking with a lawyer might be advantageous for cooperation does not otherwise make his statements involuntary. *Cf. United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) ("An official who encourages cooperation with the government and who informs the defendant of realistically expected penalties for cooperation and/or non-cooperation does not offer an illegal inducement."); *United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993) (holding that it was not coercive for law enforcement to suggest that "the court might favorably consider [the defendant's] cooperation").

*Third*, there's no evidence, aside from Purbeck's self-serving testimony, that he was suffering from heat exhaustion—or any other physical condition—that impaired his ability to understand and answer the agents' questions.[13] Purbeck admitted to being able to understand and answer their questions throughout the

---

[13] Purbeck's expert testified that if the agents testified accurately about the circumstances of the interview, Purbeck was not suffering from a heat-related illness. (Doc. 77 at 236:4–14.) The expert in fact acknowledged that in his 18 years of practice as an ER physician he had never treated an individual for a serious heat-related illness who had been sedentary and experienced the "climatological conditions" that Purbeck did during his interview. (*Id.* at 267.)

interview (Doc. 77 at 150:21-24; 152:2-14.) Purbeck also admitted to never seeking medical treatment despite claiming he had suffered from heat stroke or worse. (*Id.* at 160:1-8.) But even if Purbeck suffered from some illness during the interview, courts have consistently held that illness standing alone is insufficient to render a suspect's statements involuntary. *See e.g.*, *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary."); *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993) ("[A] defendant can voluntarily waive his *Miranda* rights even when he is in the hospital, on medication, and in pain") (citations omitted).

*Fourth*, Purbeck cannot demonstrate he "reasonably feared that failure to answer the agents' questions would result in the loss of his job." (Doc. 80 at 21-22) (citing *Garrity v. New Jersey*, 385 U.S. 493 (1967).) To establish a *Garrity* violation, Purbeck must prove that he both subjectively believed that he was compelled to give a statement upon threat of loss of job and that his belief was objectively reasonable at the time the statement was made. *United States v. Vangates*, 287 F.3d 1315, 1322 (11th Cir. 2002). "[W]here there is no direct threat, the mere possibility of future discipline is not enough to trigger *Garrity* protection." *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016).[14] Agent Coffin's statement that Ada County did not expect Purbeck to arrive on time cannot be reasonably be interpreted as a threat to his job if Purbeck did not speak

---

[14] The Ninth Circuit has cited *Smith* approvingly. *See United States v. Wells*, 55 F.4th 784, 795-797 (9th Cir. 2022) ("We too conclude that in the absence of a direct threat of loss of employment, this framework is appropriate for assessing whether government employment policies violate the rule in *Garrity*.").

to the FBI—especially since Agent Coffin had just asked if Purbeck would be willing to speak with the agents. *See e.g.*, *United States v. Bazile*, No. 13-20173-CR, 2013 WL 3776271, at *14 (S.D. Fla. July 17, 2013) ("There is no evidence . . . that the agents ever explicitly threatened [defendant's] job or employment status in obtaining the statements from him. He was told his statements were voluntary; he was not coerced or compelled to give any statement."). Purbeck further admitted that aside from asking some biographical-related questions about his Ada County employment, Agents Coffin and Pinette never asked him about any problems or wrongdoing there. (Doc. 77 at 154:9-14.)

### E. Even if Purbeck's *Miranda* rights were violated, the contents of his electronic devices should not be suppressed.

In *United States v. Patane*, 542 U.S. 630 (2004), the Supreme Court held that the "fruit of the poisonous tree" doctrine does not apply to *Miranda* violations because the Fifth Amendment's guarantee against self-incrimination "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 643. Accordingly, "the exclusion of unwarned statements is [a] complete and sufficient remedy for any perceived *Miranda* violation," *id.* at 636, and the physical fruits of a voluntary unwarned statement are not subject to suppression. *Id.* at 634; *see also United States v. Robinson*, 760 F. App'x 762, 764 (11th Cir. 2019) (affirming admission of physical evidence found despite failure to comply with *Miranda* because defendant's unwarned statements were voluntary).

As this Court has previously recognized, *Patane* forecloses any argument that the contents of Purbeck's electronic devices should be suppressed. *See United States v. Mendez-Bernal*, No. 3:19-cr-10-TCB-RGV, 2020 U.S. Dist. LEXIS 166429, at

26

*61 n.25 (N.D. Ga. July 20, 2020) (observing that contents of defendant's cell phone were not suppressible despite passcode being obtained in violation of *Miranda* because he voluntarily provided the passcode) (citing *United States v. Orozco Ramirez*, No. 1:17-cr-185-LMM-AJB, 2019 U.S. Dist. LEXIS 83680 (N.D. Ga. Apr. 22, 2019), *adopted by*, 2019 U.S. Dist. LEXIS 83464 (N.D. Ga. May 17, 2019)); *see also, e.g.*, *United States v. Hernandez*, No. 18-cr-1888, 2018 U.S. Dist. LEXIS 137475, at **11-13 (S.D. Cal. 2018) (same). As detailed above, "[t]he record does not contain evidence of any repeated questioning, threats of violence, or promises of leniency"; therefore, Purbeck's statements—including the disclosure of his online identities and passwords—were made voluntarily, and the contents of his electronic devices should not be suppressed. *Robinson*, 760 F. App'x at 764.

### F. Purbeck knowingly, intelligently, and voluntarily consented to the FBI taking over his online accounts.

A consensual search is constitutional if it is voluntary; that is, it is the product of an "essentially free and unconstrained choice." *Schneckloth*, 412 U.S. at 225. "Relevant factors include the 'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017) (citation omitted).

For many of the same reasons that Purbeck's statements were made voluntarily, he knowingly, intelligently, and voluntarily consented to the FBI taking over his online and email accounts. But in addition to these reasons, the

record also shows that Purbeck signed a written consent form—after having already made incriminating admissions—that expressly advised him of the right to refuse to consent to the search and in which he attested to the free and voluntary nature of his consent. (Doc. 70-6; Doc. 76 at 34:21-36:13.) He did not execute the waiver under duress or coercion, but rather in his backyard—physically unrestrained—during a calm, non-confrontational interview with the agents. And he in fact offered to assist the agents on multiple occasions, even after the search was complete. (*Id.* at 25:16–20; 42:9–16.)

### G. The government would have inevitably discovered the contents of Purbeck's electronic devices.

Even if Purbeck had not voluntarily disclosed his passwords, and even if the contents of his password-protected electronic devices were not admissible under *Patane*, those contents are still admissible under the inevitable discovery doctrine. The "inevitable discovery" doctrine applies when the government can show by a preponderance of the evidence that it would have discovered the evidence by some other lawful means, even if the original source of the evidence was obtained in violation of the Fifth Amendment. *McKathan v. United States*, 969 F.3d 1213, 1232 (11th Cir. 2020); *United States v. Martinez-Gallegos*, 807 F.2d 868, 870 (9th Cir. 1987). For that doctrine to apply, "the government must also demonstrate that before the unlawful activity occurred, it was actively pursuing the lawful means that would have rendered discovery inevitable." *McNathan*, 969 F.3d at 1232 (citation omitted).

The government would have inevitably discovered the contents of Purbeck's electronic devices (and determined the passwords that Purbeck disclosed). The FBI found a list of Purbeck's handwritten passwords during the search of his

residence, including several with the word "leviathan," which Agent Coffin opined would have made it "trivially simple" to decrypt Purbeck's devices using a "brute force" method. Moreover, the FBI in fact successfully used that method to decrypt one of Purbeck's computers. (*Id*. at 79:6–81:20.) Thus, even if Purbeck had not voluntarily provided the password to the VeraCrypt program protecting the computer and external hard drive associated with his hacking activities, the FBI would have successfully decrypted that password and would have inevitably discovered the contents of those devices.

### H. Purbeck did not invoke his right to counsel.

Purbeck claims to have invoked counsel during his interview. (Docs. 25 at 19-20; 80 at 24.) This claim is not credible.

"[I]f a suspect requests counsel at any time during [a custodial] interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994). However, the request for counsel must be unambiguous. *Id*. at 459; *see also United States v. Dowd*, 451 F.3d 1244, 1250 (11th Cir. 2006) ("The government has no duty to cease interrogating a suspect where the suspect's invocation of [his *Miranda* rights] is equivocal.") (internal quotation omitted).

Purbeck never unambiguously asked for an attorney. He neither asked to consult with an attorney, nor asked to call an attorney. (Doc. 76 at 98:13–99:10.) Instead, Purbeck asked the agents "if he should have an attorney." (*Id.* at 33:1–2; 97:23–98:4). The agents both testified that they informed Purbeck in response "[they] could not give him legal advice" and that "he was entitled to an attorney and he did not have to talk to the agents." (*Id.* at 33:4–6; 99:11–19.) Agent Coffin

29

also testified that they told Purbeck to consult an attorney quickly because it would allow Purbeck to cooperate more effectively.  (*Id.* at 100:7–101:6.) Purbeck subsequently continued speaking with the agents. Moreover, Purbeck's claim that he unambiguously asked to speak to a lawyer is especially not credible given: (1) that he spoke with Ada County even after being read his *Miranda* rights; and (2) the numerous other baseless accusations he's lobbed at the agents, including that they tortured him, taunted him about drinking water, sexually assaulted him, and were indifferent as to his alleged medical needs.

In short, Purbeck's uncertainty about whether to seek a lawyer "conveyed only that [Purbeck] might invoke the right to counsel at some point and, thus, did not require the cessation of questioning." *United States v. Joseph*, No. 1:20-CR-114-WMR-CCB, 2022 WL 2802302, at *4 (N.D. Ga. July 18, 2022); *see also United States v. Edwards*, 834 F. App'x 559, 560 (11th Cir. 2020) (finding statement that "I have an attorney that, you know, uh, I — I should probably be talking to" to not constitute a clear request for counsel).

## Conclusion

For the foregoing reasons, the Court should deny Purbeck's motion.

Respectfully submitted,

RYAN K. BUCHANAN
    *United States Attorney*


/s/ ALEX R. SISTLA
    *Assistant United States Attorney*
Georgia Bar No. 845602
600 U.S. Courthouse
75 Ted Turner Dr. SW
Atlanta, GA 30303
404-581-6000
alex.sistla@usdoj.gov

/s/ MICHAEL HERSKOWITZ
Georgia Bar No. 349515
600 U.S. Courthouse
75 Ted Turner Dr. SW
Atlanta, GA 30303
404-581-6000
michael.herskowitz@usdoj.gov

/s/ NATHAN P. KITCHENS
Georgia Bar No. 263930
600 U.S. Courthouse
75 Ted Turner Dr. SW
Atlanta, GA 30303
404-581-6000
nathan.kitchens@usdoj.gov

**Certificate of Service**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

March 15, 2023

/s/ ALEX R. SISTLA

ALEX R. SISTLA

*Assistant United States Attorney*