IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No. |
| | : | 3:21-CR-0004-TCB-RGV |
| ROBERT PURBECK | : | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS, PASSWORD DISCLOSURES, ETC.**

Defendant Robert Purbeck hereby submits his Reply Brief in further support of his Motion to Suppress Statements. [Dkt. 25].

## I. Ninth Circuit Law Governs this Case

This Court should apply Ninth Circuit law to the issues presented in this motion to suppress because the conduct at issue occurred in the Ninth Circuit, involved a home in the Ninth Circuit, and impacted a citizen whose domicile is in the Ninth Circuit. And the Ninth Circuit offers greater protection to its citizens for in-home custodial interrogations than what is offered by case law in the Eleventh Circuit. The government should not be able to send its agents into a judicial circuit, act in a manner that is contrary to the laws of that judicial circuit, and then claim that, because it sent agents unfamiliar with the law of that circuit, its agents' conduct should be judged by the law of a circuit that is more forgiving of the illegal conduct. Here, Ninth Circuit law is different from the law in the Eleventh Circuit no matter how much the government may argue that it is the same.

1

Just a few years ago, this very Court denied a motion to suppress, ruling that, under Eleventh Circuit law, an interrogation inside a defendant's home was not custodial in nature. In arriving at its ruling, this Court held that,

> **In particular,** "[a]lthough not dispositive, 'courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" Matcovich, 522 F. App'x at 851 (quoting Brown, 441 F.3d at 1348). Courts should also consider whether a suspect was "unambiguously advis[ed] ... that he is free to leave and is not in custody." Id. (alterations in original) (citation and internal marks omitted). "**This is a 'powerful factor'** that '**generally will lead to the conclusion that the defendant is *not* in custody** absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" Id. (citation omitted).

United States v. Kight, No. 118CR00169TWTRGV, 2019 WL 1781356, at *10 (N.D. Ga. Mar. 11, 2019) (bolded emphasis added), report and recommendation adopted, No. 1:18-CR-169-TWT, 2019 WL 1778048 (N.D. Ga. Apr. 23, 2019).

In marked contrast to the law of the Eleventh Circuit as set forth above by this Court, the Ninth Circuit holds that in-home interrogations during the execution of a search warrant **are unique** in that "a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free to 'terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." United States v. Craighead,

2

539 F.3d 1073, 1082–83 (9th Cir. 2008). In the Ninth Circuit, "[t]he usual inquiry into whether the suspect reasonably believed he could 'leave' the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home. 'Home,' said Robert Frost, 'is the place where, when you go there, they have to take you in.' Robert Frost, The Death of the Hired Man, *in* THE POETRY OF ROBERT FROST 38 (Edward C. Latham ed., 1967). **If a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home**." Craighead, 539 F.3d at 1082–83 (emphasis added). Furthermore, unlike in the Eleventh Circuit, in the Ninth Circuit "the mere recitation of that [you are free to leave] statement does not render an interrogation non-custodial *per se* and must be assessed within the context of the scene as a whole." United States v. Herran, No. 20-10157, 2021 WL 5027488, at *2 (9th Cir. 2021); Craighead, 539 F.3d at 1088.

Unlike the case law in the Eleventh Circuit in which "courts are much less likely" to find in-home interrogations custodial and, indeed, interrogations in a defendant's home are a "powerful factor" that "generally will lead to the conclusion that the defendant is *not* in custody," see, e.g., Kight, supra, the Ninth Circuit recognizes that police conducting in-home interrogations create unique

3

situations that increase the likelihood of a custodial detention. Craighead, 539 F.3d at 1082–83. This is particularly true when an in-home interrogation occurs as part of law enforcement executing a search warrant: "when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will be necessary to preserve evidence and protect the safety of the agents. The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." Id. at 1086.

Because of the increased risk of an in-home interrogation during a search warrant being custodial, the Ninth Circuit, unlike the Eleventh Circuit, looks at the following factors: (1) the number of law enforcement personnel and whether they were armed, (2) whether the suspect was at any point restrained, either by physical force or by threats, (3) whether the suspect was isolated from others, (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. Herran, 2021 WL 5027488, at *1. The Ninth Circuit also looks at (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (3) the duration of the detention, and (5) the degree of pressure applied to detain the individual. Id.. The question ultimately is whether a defendant's home has become a police-dominated

atmosphere such that the comfort and familiarity with the surroundings of home no longer exist.

The facts underlying the Ninth Circuit case of Herran illustrate how to apply these factors. In Herran, whose facts are set forth in the Magistrate Court's Report and Recommendation, see, e.g., United States v. Herran, No. CR17-01026-TUC-RCC(JR), 2019 WL 3068435 (D. Ariz. 2019), between 8 and 11 federal agents executed a search warrant for Herran's residence. Herran, 2019 WL 3068435, at *1. Two agents, both dressed in civilian clothing and with concealed weapons, knocked at the front door. Id. Upon being allowed in, the agents went to the back and woke up Herran. Id. Herran was initially confused by the presence of law enforcement, said he had been up all night with a fever of 105 degrees, was groggy, "kind of out of it," and had taken prescribed codeine cough syrup. Id. Neither agent recalled Herran saying anything about a fever or cough syrup. Id.

The agents asked Herran if he wanted to smoke or get a cup of coffee, and they offered to get his shoes. Id. at *2. Although normally the agents would have conducted the interview inside, because of the disarray inside the home, they moved outside to speak. Id. The two agents and Herran began talking on the front porch. Id. Then, because of the noise of barking dogs, they moved to the agents' vehicle, where Herran sat in the passenger front seat, with the door open, while the

agents stood outside the door to the vehicle. Id. Herran was able to hear the agents better once they moved to the vehicle. Id.

While sitting in the agents' vehicle, with the door open, one of the agents advised Herran that he was not under arrest and he was free to leave, as follows:

> So just to let you know, you're not under arrest, ok. So if you . . . you're free to go if you want. If you want to go get something to eat, you can let us know, get something to drink. Um, you're free to smoke but unfortunately you can't do it inside the car. Um, so we, we just have a couple of questions, trying to figure out what's, what's going on.

Id.

Initially, Herran told the agents that "his mind is really screwed up first thing . . . in the morning" but the agents told him "to take his time," and they "described Herran as cooperative, coherent and appropriately responding to questions. He was able to discuss technical matters with the agents such as the functioning of peer-to-peer and computer file deletion software. He was also able to provide names of people who had visited his house." Id. (internal citations omitted).

"Herran was only inside [the agent's] vehicle for a few minutes before agents asked if he wanted a cigarette or coffee." Id. While Herran was standing outside the vehicle smoking, his dogs attacked and bit some other agents. Id. "Herran responded by yelling at the dogs and running to secure them . . . in a pen behind Herran's trailer. After securing the dogs, the agents and Herran continued their conversation at a third location in front of the trailer under a tree." Id.

"Herran was never restrained by physical force or intimidation during the questioning. He was never handcuffed or threatened. In fact, he testified that the agents treated him respectfully and [an agent] testified that there was no physical contact between the agents and Herran. And, unlike Craighead, Herran was not isolated from others and was not prevented from speaking with his wife." Id. at *3. Additionally, "[a]lthough he was twice moved for questioning, both moves were precipitated by the barking of his dogs and were not attempts to isolate or enclose him from others and he was always in an open area." Id. The "questioning of Herran spanned approximately two hours." Id.

The magistrate court denied Herran's motion to suppress, finding that his questioning was non-custodial. The district court adopted the Report and Recommendation. The Ninth Circuit reversed, finding that Herran's questioning occurred in the police-dominated atmosphere of his home. "Although Herran was told he was free to leave near the beginning of the interview, 'the mere recitation of that statement does not render an interrogation non-custodial *per se*' and must be assessed 'within the context of the scene as a whole.'" United States v. Herran, No. 20-10157, 2021 WL 5027488, slip op. at *2 (9th Cir. 2021) (citing Craighead, 539 F.3d at 1088). "The length of the interrogation [2 hours], the number of armed agents [8-11], and the way in which the agents directed and escorted Herran around his own property turned the otherwise comfortable and familiar

7

surroundings of the home into a police-dominated atmosphere." Id. at *2 (internal punctuation omitted). "Herran was also confronted with evidence of his guilt and pressured to confess." Id.

Mr. Purbeck was subjected to much worse conditions than those experienced by Herran. Accordingly, just as Herran's interrogation was custodial under Ninth Circuit law, so too was Mr. Purbeck's in-home interrogation in this case.

Early in the morning, Mr. Purbeck unexpectedly encountered many armed FBI agents at his home. There were at least 14 FBI employees (9 agents and 5 other FBI personnel) involved in activities at Mr. Purbeck's home on August 21, 2019, (Doc. 76 at 9:24-25), including multiple officers, wearing body armor, with their guns drawn when approaching Mr. Purbeck's house. (Doc. 77 at 40:16-41:9, 129:23-130:25; Doc. 76 at 85:19-25, 205:6-25).

The FBI restrained Mr. Purbeck. The FBI conducted an illegal pat-down search of Mr. Purbeck for weapons, which involved an FBI agent laying hands on Mr. Purbeck. (Doc. 76 at 12:16-24, 44:3-5). The FBI took Mr. Purbeck's car keys, and they told him that his employer (Ada County) knew he would not be coming to work that morning. (Doc. 77 at 41:19-42:6, 45:2-23).[1] While holding his arm, the

---

[1] The government contends that the FBI merely told Mr. Purbeck that his employer knew he would not be "on time" that day, suggesting that any delay would be slight. (Doc. 82 at 19). However, it is undisputed that Ada County also knew to come to Mr. Purbeck's house some 3.5 to 4 hours after he had been detained to speak with him, which is a lot more than just not being "on time."

8

FBI guided Mr. Purbeck through his house and into the backyard, where they had arranged three chairs in the sun. (Id. at 44:14-46:13). When Mr. Purbeck tried to sit in one of the chairs so that he was not facing the sun, (Id. at 54:1-21), the agents directed him to a different chair where the sun would shine into his eyes. (Doc. 77 at 46:5-13, 50:10-23; see also Doc. 76 at 92:14-25, 53:22-54:21).

When Mr. Purbeck stood to grab his cat, which had run outside, Agent Pinette ordered him to sit back down, and the agent scooped up the cat and put him back in the house. (Doc. 77 at 55:14-56:5). Around the same time, a different agent came outside and began angrily screaming questions at Mr. Purbeck regarding the whereabouts of a gun, while having his hand on his holstered gun. (Id. at 69:1-22). The agents also took both Mr. Purbeck's personal and work phones. (Id. at 56:6-57:6), denying his request to keep his work phone. (Id. at 56:9-57:8).

The FBI kept Mr. Purbeck isolated from others. (Doc. 77 at 7:9-13:18, 64:16-66:4, 65:1-66:4).  Throughout the entire time the FBI was present, they kept Mr. Purbeck outside in the backyard, except for a one-time bathroom break, and they kept his girlfriend Sarah Ganger inside the home. (Doc. 76 at 93:21-94:14; Doc. 77 at 7:10-25, 24:12-22, 65:6-12, 111:16-25).

Mr. Purbeck was not told he was free to leave. (Doc. 77 at 57:14-58:6). However, even if the Court credits the agents' testimony that they told Mr. Purbeck he was not under arrest and did not have to stay, but if he did stay then they would

restrict his movements, (Doc. 76 at 13:20-25, 15:21-25, 147:8-9), the "the mere recitation of that statement does not render an interrogation non-custodial *per se*" and it must be assessed "within the context of the scene as a whole.'" Herran, 2021 WL 5027488, at *2 (defendant told he was free to leave); Craighead, 539 F.3d at 1088 (defendant was told he was free to leave). There is considerable doubt whether either agent actually told Mr. Purbeck that he was free to leave or not under arrest, given that such an important fact undisputedly was not memorialized in their extensive case report. (Id. at 148:9-149:18).

The language used to summon Mr. Purbeck also weighs in favor of finding the interrogation custodial. Mr. Purbeck did not volunteer to meet the officers at the police station, his office, or his home, which is the scenario envisioned when considering the summoning language used here. See United States v. Kim, 292 F.3d 969, 974-975 (9th Cir. 2002). Rather, he was confronted unexpectedly with many armed law enforcement agents, early in the morning, at his home, subjected to a pat-down for weapons, and then led, or accompanied, by police officers through his house and into his backyard.

The FBI confronted Mr. Purbeck with evidence of his guilt regarding Alphabay and related online identities he controlled. (Doc. 76 at 32:24-33:2). The FBI also used stern and forceful tones when addressing Mr. Purbeck when they believed that he was not being fully cooperative with them. (Id. at 215:17-216:12).

The physical surroundings of his interrogation were oppressive. He was in his own backyard. However, as detailed in his post-hearing brief, he was told where to sit and to remain seated when he went to retrieve his cat; he was guarded throughout; he was kept outside throughout; he was denied access to his car keys and to both his personal and work phones; he was denied access to the interior of his house (except for a single trip to the bathroom); and he was kept in the sun, and away from the shade, throughout.

Mr. Purbeck's detention was lengthy, as was his interrogation. Although the government contends that a three-to-four-hour interview is fine, citing two cases from the Eleventh Circuit, see Doc. 82 at 16, that is not the law in the Ninth Circuit. Even the magistrate court in Herran noted, when finding that the interrogation was not custodial, that the two-hour interrogation was "the Court's biggest concern" because it was a "full-fledged interrogation, not a brief inquiry. Herran, 2019 WL 3068435, at *4. And of course, the Ninth Circuit reversed that case, citing the "length of the detention" as one of the factors showing it was a custodial interrogation. Herran, 2021 WL 5027488 at *2 (2-hour interview); see also United States v. Blanford, 467 Fed. Appx. 624, 625 (9th Cir. 2012) (45-minute in-home interrogation was custodial). The FBI kept Mr. Purbeck in his backyard for at least 6 hours, at least 3 hours of which were spent interrogating him.

11

The FBI applied a considerable degree of pressure in detaining Mr. Purbeck. The FBI frisked him, took his car keys, escorted him to his backyard, took his phones, and kept him under guard. The FBI allowed Mr. Purbeck to enter his home only long enough to use the bathroom one time and then led him back out to the backyard.

Applying the factors from Craighead, Kim, and Herran, Mr. Purbeck respectfully submits that he was in custody and, therefore, the FBI was required to have read him his Miranda rights. None of the Ninth Circuit cases cited by the government lead to a different conclusion.[2]

---

[2] United States v. Guadagni, 583 Fed. Appx. 778 (9th Cir. 2014) (defendant voluntarily returned to his home, which the Ninth Circuit has held is a critical difference from instances when the police unexpectedly arrive, see Kim, supra, at 974-975, and agent gave defendant "clear and repeated warning" that he was free to leave); United States v. Quackenbush, 728 Fed. Appx 777 (9th Cir. 2018) (fewer officers present than in Craighead, firearms concealed, defendant interviewed in dining room in view of open front door, and clearly told he was free to leave and did not need to answer questions); United States v. Liddy, No. 20-50238, 2022 WL 4533991 (9th Cir. 2022) (defendant was a lawyer, who chose room for interview, which occurred before he knew officers had a search warrant, and exit not blocked); United States v. Young, 622 Fed. Appx. 694 (9th Cir. 2015) (defendant interviewed in garage with door to main house open, he volunteered to be interviewed separately, and was told at least twice that he was free to leave); United States v. Terragna, 390 Fed. Appx. 631 (2010) (one defendant was a police officer and allowed to spend timely freely with an acquaintance; other defendant freely walked in and out of house during search; both defendants told repeatedly that they were not under arrest and would not be placed under arrest at conclusion of search); United States v. Tobie, 411 Fed. Appx. 995 (2011) (2 agents interviewed defendant for 45 minutes, no guns drawn, and defendant told twice he was not under arrest); United States v. Dierking, 359 Fed. Appx. 823 (2009) (defendant told three separate times that he was not under arrest and would not be

## II.     Purbeck's Statements Were Not Voluntary

As previously addressed in his post-hearing brief, Mr. Purbeck contends that the inculpatory statements obtained by law enforcement, including but not limited to the disclosure of his computer and on-line passwords, were not voluntarily obtained. United States v. Patane, 542 U.S. 630 (2004), does not apply when statements used to discover the physical evidence (here the contents of Mr. Purbeck's computers) were involuntarily obtained. Likewise, Mr. Purbeck's consent is invalid because it was not voluntarily obtained.

## III.     Purbeck Invoked His Right to Legal Counsel

The agents took both Mr. Purbeck's personal and work phones, and they denied his request to keep his work phone. When Mr. Purbeck requested access to the phones the FBI had taken so that he could contact an attorney, the FBI refused him access. When Mr. Purbeck requested to use the FBI's phones to call an attorney, his request was also denied. Despite asking clearly and plainly to contact an attorney, the FBI denied him the ability to contact an attorney, and that is an undisputed violation of his constitutional right to counsel.  His willingness to answer questions to Ada County about Ada County matters (and matters that the

---

arrested that day, he was told repeatedly that he was free to get a lawyer, interview at kitchen table was by mutual consent and defendant not prevented from moving around apartment).

13

government concedes they do not intend to use, see Dkt. 82 at 7 n.3) after having already confessed to the FBI does not change that analysis.  See, e.g., Missouri v. Seibert, 542 U.S. 600, 608 (2004).[3] Mr. Purbeck clearly and unequivocally invoked his right to legal counsel, and the Court should grant his motion to suppress.

## IV.   Inevitable Discovery Does Not Save the Searches and Seizures

The government's arguments that they would have inevitably discovered the passwords to Mr. Purbeck's phones are not supported by the record. Expert witness Jim Persinger's analysis is that it would have taken 4 billion years for the government to brute force their way into Mr. Purbeck's secured computers. (See Exh. C to Defendant's 12/13/22 Notice of Filing Exhibits). Agent Coffin opined that the password was not as difficult to break as stated by Mr. Persinger, but Agent

---

[3] Mr. Purbeck also objects to the government's use of documents at the motion to suppress hearing and in its brief that are under seal in the Ninth Circuit Court of Appeals and the District of Idaho.  The government appears to have cross-examined Sarah Ganger using an affidavit that is under seal in the Ninth Circuit (see Doc. 77 at 20-27; see also Dkt. 10 "under seal" in In re Robert Purbeck v. Robert Wilkinson et al., 21-35467 (9th Cir.)), and cross-examined Mr. Purbeck using his civil complaint that is also under seal in the District of Idaho. (See Dkt. 1 in Robert Purbeck v. Robert Wilkinson, et al., No. 1:21-cv-0047-BLW (D. Id.). Mr. Purbeck amended his civil complaint on May 18, 2021 to allege three plastic chairs, instead of the two wooden chairs and one plastic chair originally alleged, and that amended civil complaint is also under seal. (See Dkt. 19 in Purbeck, 1:21-cv-0047-BLW). [**NB**: undersigned counsel has absolutely no involvement whatsoever in any civil actions to which Mr. Purbeck is a party, and therefore counsel's knowledge of any statements in those civil actions is very limited. That said, he has checked ECF and confirmed that Dkt. 10 in the Ninth Circuit and Dkt. 1 and Dkt. 19 in the District of Idaho are under seal and he cannot access them].

Coffin also admitted that he had not independently tested his hypothesis in any fashion, something Mr. Persinger has done, because he (Coffin) already had the password from Mr. Purbeck and any test would not be valid, and (2) he had not considered how he would have determined whether to use upper case or lower case in determining whether the password was more or less breakable than Mr. Persinger's analysis shows. (Doc. 76 at 78:18-81:20, 83:5-17). As between Mr. Persinger's demonstrated and long-held expertise and Agent Coffin self-described competence, Mr. Persinger is by far the more credible witness. Additionally, without having first obtained Mr. Purbeck's passwords with the root word "leviathan," there is nothing that would have caused the FBI to recognize any so-called password list as containing the root words of Mr. Purbeck's current passwords, and the government's argument to the contrary is sheer speculation. At a minimum, the record is insufficiently developed to support a finding that the government would have inevitably discovered the evidence that is the subject of this motion to suppress.

      WHEREFORE, Mr. Purbeck respectfully requests that the Court grant his motion to suppress and the relief sought therein.

Respectfully submitted, this 11th day of April, 2023.

>/s/ *Andrew C. Hall*_____
>Andrew C. Hall
>Georgia Bar No. 318025
>Hall Hirsh Hughes, LLC
>150 E. Ponce de Leon Ave., Suite 450
>Decatur, Georgia  30030
>404/638-5880 (tel.)
>andrew@h3-law.com
>*Counsel for Defendant Robert Purbeck*

## CERTIFICATE OF COMPLIANCE WITH TYPE AND FONT

## AND CERTIFICATE OF SERVICE

I hereby certify that this motion has been prepared in Times New Roman font (14 pt.) and consistent with the Local Rules of this Court.

I further hereby certify that I have this date caused a true and correct copy of the foregoing DEFENDANT'S REPLY BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS, PASSWORD DISCLOSURES, ETC.  to be served by filing it with the Clerk of Court using the ECF System that will send notification of such filing to:

Assistant United States Attorneys Michael Herskowitz and Alex Sistla

This the 11th day of April, 2023.

/s/ Andrew C. Hall<br>Andrew C. Hall